# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

                                   Case No.  17-CR-124

      v.

MARCUS HUTCHINS,

                Defendant.

## LAW CONCERNING THE PRODUCTION OF MUTUAL LEGAL ASSISTANCE TREATY REQUESTS

The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Assistant U.S. Attorneys Michael Chmelar and Benjamin Proctor, files this memorandum of law concerning the disclosure of a Mutual Legal Assistance Treaty ("MLAT") request between the United States and a foreign sovereign.

MLAT requests are sent by governments, through established central authorities[1], seeking assistance in the investigation or prosecution of criminal matters.   Treaties that authorize mutual legal assistance in criminal matters are self-executing[2] and have the force of law, upon receiving the advice and consent of the

---

[1]      The U.S. Central Authority for MLAT requests and other international matters is the Office of International Affairs ("OIA"), Criminal Division, U.S. Department of Justice.

[2]      The treaty at issue in this case (U.S.-Lithuania) is self-executing, as described in the transmittal letter to the Senate on April 20, 1998.

Case 2:17-cr-00124-JPS-NJ   Filed 03/01/18   Page 1 of 5   Document 51

Senate. *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008).

As the government stated during the hearing on the defendant's motion to compel, there is no bright line rule concerning the production of a MLAT request. Rather, generally speaking, the requests themselves are analyzed under the traditional paradigm used to assess the discoverability of all materials collected during an investigation. However, in some cases, MLAT requests are protected from disclosure by the terms of the treaties authorizing the request, as well as by other legal privilege.

Because MLATs are an agreement between two sovereigns to provide mutual assistance, and they do not confer any private right upon third parties to enforce their terms. *See United States v. $734,578.82 In U.S. Currency,* 286 F.3d 641, 659 (3rd Cir. 2002) (noting that the MLAT between the United States and United Kingdom does not give rise to a right of any private person to contest potential violations of the MLAT). Absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels. *United States v. Rommy,* 506 F.3d 108, 129-30 (2d. Cir. 2007) (citing **Head Money Cases**, 112 U.S. 580, 598 (1884) (noting that "treaty is primarily a compact between independent nations" and "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it")). Violations of the terms of a treaty are addressed by the sovereigns through diplomatic channels. *Id.* at 129. And as the court in *Rommy* noted, "[f]or any number of reasons,

Case 2:17-cr-00124-JPS-NJ   Filed 03/01/18   Page 2 of 5   Document 51

sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases." *Id.* at 129. The admissibility of the evidence collected through a MLAT is based on U.S. law, not the laws of the foreign sovereign. *United States v. Umeh*, 646 Fed.Appx. 96, 100 (2d. Cir. 2016) (citing *Rommy*, 506 F.3d at 129)

The district court in *United States v. Saltsman*, No. 07 CR 641. Dkt 170 (EDNY Mar. 22, 2011),[3] considered and denied a defense motion for an order compelling the government to disclose MLAT related materials. Specifically, in that case, the defendants argued that disclosure of the following materials were "critical" to the defense: "(1) materials the government may have submitted to foreign authorities or foreign entities in order to obtain evidence against the defendants, (2) orders or other related documents that may have been issued by foreign or domestic courts, and (3) correspondence between the government and foreign authorities and foreign entities related to the government's requests, including any documents clarifying the government's requests and any responses." *Id.* at 22. The defendants asserted that they needed the underlying materials so that they could identify "possible grounds to suppress" the related evidence. *Id.* at 23. The defendants argued that the government might have violated the terms of the treaty or misstated facts in an affidavit associated with the MLAT request, which would entitle the defense to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

Relying on the decision in *Rommy*, the district court rejected both arguments and concluded that the defendants could not move to suppress materials obtained

---

[3] Copy of the court's order in *Saltsman* is attached to this filing.

through a MLAT request because the "agreements do not create judicially enforceable individual rights" to challenge compliance with the terms of the treaty. *Id.* at 24. Similarly, the court concluded that *Franks* only applies "when the Government makes false statements in order to establish probable cause." *Id.* at 25.

In this case, the underlying records obtained through a MLAT have been disclosed to the defense, but the MLAT request itself has not been disclosed. Here, the MLAT request did not include an affidavit by an agent. To the contrary it was a plain request for the production of business records under a mutual agreement between the United States and a foreign jurisdiction, signed by an attorney for the government. The treaty at issue in this case explicitly states that the treaty does not give rise to a right of any person to contest potential violations of the MLAT. Specifically, the treaty at issue in this case states, "This Treaty is intended solely for mutual legal assistance between the Parties. The provision of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."

Therefore, it appears that FRCrP 16 and section 3500 do not warrant disclosure of the MLAT request in this case. Moreover, because the treaty does not create an individual right to challenge enforcement of the terms of the treaty, the defendant does not need the MLAT request in order to prepare pre-trial motions.

Dated at Milwaukee, Wisconsin, this 1st day of March, 2018.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney


By:  *s/ Michael Chmelar*
MICHAEL J. CHMELAR
BENJAMIN W. PROCTOR
Assistant United States Attorneys
Michael Chmelar Bar No.: IL 6277248
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave. Suite 530
Milwaukee, Wisconsin 53202
Tel: (414) 297-1700
Email: michael.chmelar@usdoj.gov
Email: benjamin.proctor@usdoj.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

ZEV SALTSMAN, MENACHEM EITAN,
MARTIN WEISBERG, STEVEN
NEWMAN, and EDWARD NEWMAN,

                       Defendants.

-------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 22 2011 ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**
**07-CR-0641 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Defendants are charged, in an October 29, 2008 second superseding indictment

("Indictment" (Docket Entry # 61)), with several counts of conspiracy, securities fraud, and

money laundering. Defendants have brought various pretrial motions. As set forth below, their

motions are granted in part and denied in part.

## I.    BACKGROUND

      The Indictment alleges a securities fraud scheme involving two publicly traded

companies, Ramp Corporation ("Ramp") and Xybernaut Corporation ("Xybernaut"), the

companies' officers, and two residents of Israel, Defendants Zev Saltsman ("Saltsman") and

Menachem Eitan ("Eitan"), who were aided by an attorney, Defendant Martin Weisberg

("Weisberg") (id. ¶¶ 1-2, 8-10).[1] Weisberg, who allegedly facilitated the fraud with respect to

both Ramp and Xybernaut, was also a member of Xybernaut's Board of Directors. (Id. ¶ 10.)

The other Defendants, Edward and Steven Newman ("the Newmans"), were associated with

Xybernaut: Edward Newman was Xybernaut's Chief Executive Officer ("CEO") and Chairman

of the Board, while Steven Newman was President, Chief Operating Officer ("COO"), and Vice

---

[1] Saltsman has pleaded guilty to one count of securities fraud. (See Judgment (Docket Entry # 158).)

Chairman of the Board. (Id. ¶¶ 6, 7.) Andrew Brown ("Brown"), who is not charged, was associated only with Ramp: from 2001 to 2003, he was a consultant for Ramp, after which he served in various positions at the company, including CEO, President, and COO, and as a member of the Board. (Id. ¶ 12.)

The alleged scheme involved "private investment in public equity" ("PIPE") transactions. (Id. ¶ 16.) PIPE transactions are privately negotiated sales of publicly traded securities, generally sold at a discount to the market price. (Id.) The announcement of PIPE transactions usually depresses the market value of the company's stock.[2] (Id.) The alleged scheme also involved "short sales," in which the seller borrows securities, sells them at a certain price, and then hopes to "cover" his "short position" by repaying the lender with an equivalent number of shares obtained at a lower price after the market price falls. (Id. ¶ 17).

In a prefatory section entitled "The Fraudulent Scheme," the Indictment describes some—though apparently not all—of the fraudulent conduct the Government intends to prove. The Government alleges that, between 2001 and 2005, Defendants Saltsman, Eitan, Weisberg, and the Newmans, along with Brown, "devised and carried out a scheme to defraud the shareholders of Xybernaut and Ramp by causing Xybernaut and Ramp secretly to issue discounted PIPE shares to SALTSMAN and EITAN," via various "Nominee Entities" controlled by Saltsman and Eitan. (Id. ¶ 19.) To effectuate the scheme, Saltsman and Eitan established short positions in Ramp and Xybernaut securities; received (through the Nominee Entities they controlled) discounted PIPE securities from the two companies; and then used the PIPE securities to cover their short positions. (Id.) In exchange for helping Saltsman and Eitan profit

---

[2] This occurs both because PIPEs "dilute existing shareholders' stakes" and because the PIPE shares are "sold to buyers at a discount to the issuer's prevailing stock price." Gretchen Morgenson & Jenny Anderson, "Secrets in the Pipeline," N.Y. Times, Aug. 13, 2006.

in this manner, Weisberg, the Newmans, and Brown allegedly received kickbacks. (Id.)  The Defendants, in order to conceal the scheme, allegedly failed to make various required disclosures to the Securities and Exchange Commission ("SEC").  (Id. ¶ 21.)  These material omissions prevented the SEC and Ramp and Xybernaut shareholders from learning the full extent of the Defendants' compensation (which included the alleged kickbacks) and the Defendants' beneficial ownership of the companies (which included shares controlled by the Nominee Entities).  (Id.)

The Indictment goes on to describe two separate parts of the alleged overarching scheme: the "Ramp Scheme" and the "Xybernaut Scheme."  In the "Ramp Scheme" (id. ¶¶ 22-43), which lasted from December 2002 to July 2004, Ramp allegedly executed ten PIPE transactions, and "numerous other financial transactions," with various Nominee Entities (id. ¶ 22).  In the SEC filings relating to these ten PIPE transactions, Ramp failed to disclose that the Nominee Entities were related to one another, in that they were all controlled by Saltsman and Eitan.  (Id. at 23.)  The Indictment goes on to offer further detail with respect to only seven of the ten alleged PIPE transactions, designated "PIPE 1" through "PIPE 7."  (Id. ¶¶ 24-40.)  These details include the dates of the PIPE transactions, the specific Nominee Entities involved, related false or misleading SEC filings, and other related misleading statements and conduct, for which Defendants Saltsman, Eitan, and Weisberg, as well as Brown, were allegedly responsible.  (Id.)  Saltsman and Eitan also allegedly failed to disclose, as required, their ownership interests in Ramp via the Nominee Entities.  (Id. ¶¶ 41-43.)  The Indictment also alleges one $50,000 kickback paid to Brown.  (Id. ¶ 32.)  No mention is made of Xybernaut or of the Newmans in the "Ramp Scheme" section of the Indictment.

3

The "Xybernaut Scheme" section alleges similar activity taking place from April 2001 to December 2004 (id. ¶¶ 44-56), mentioning fourteen PIPE transactions, "and several other financial transactions," with various Nominee Entities controlled by Saltsman and Eitan (id. ¶ 44). The PIPE transactions were allegedly negotiated and approved by Defendant Steven Newman, and as in the Ramp Scheme, SEC filings corresponding to the PIPE transactions failed to mention that all of the Nominee Entities were controlled by Saltsman and Eitan. (Id. ¶¶ 44-45.) The Indictment then offers specifics about only two PIPE transactions, designated "PIPE 8" and "PIPE 9." (Id. ¶¶ 46-50.) These specifics include dates, the specific Nominee Entities involved, and related false or misleading statements or conduct for which the Newmans, Saltsman, Eitan, and Weisberg were responsible. (Id.) As part of the Xybernaut Scheme, the Indictment alleges, the Newmans and Weisberg received substantial kickbacks, which they failed to disclose to the SEC. (Id. ¶¶ 46-48, 51-53.) Finally, as in the Ramp Scheme, Saltsman and Eitan allegedly failed to disclose, as required, their ownership interests in Xybernaut via the Nominee Entities. (Id. ¶¶ 54-56.) In the "Xybernaut Scheme" section of the Indictment, no mention is made of Ramp or Brown.

Having set forth those facts, the Indictment charges the Defendants with a total of nineteen counts of conspiracy, securities fraud, and money laundering. Count One charges the existence of a conspiracy to commit securities fraud lasting from April 2001 to December 2004. (Id. ¶¶ 57-59.) Despite having described separate "Ramp" and "Xybernaut" schemes, the Indictment alleges a single conspiracy, under 18 U.S.C. § 371, naming all of the Defendants together as participants. The Defendants are alleged to have

> knowingly and willfully conspire[d] to use and employ manipulative and deceptive devices and contrivances, directly and indirectly, in violation of Rule 10b-5 of the Rules and Regulations of the SEC . . . , in that the defendants did knowingly and willfully conspire, directly and indirectly, to (a) employ devices,

4

schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of Ramp and Xybernaut securities, and by use of the means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Section 78j(b) and 78ff.

(Id. ¶ 58.) The Indictment goes on to enumerate five overt acts, representing only a sample "among other[]" such acts, that were committed in furtherance of the conspiracy. (Id. ¶ 59.) These overt acts repeat only some of the conduct alleged in the prefatory "Fraudulent Scheme" section of the Indictment. None of the alleged overt acts involve both Ramp and Xybernaut or both Brown and the Newmans.

Counts Two and Three allege separate substantive securities fraud counts as to Ramp and Xybernaut, respectively. (Id. ¶¶ 60-63.) Only Saltsman, Eitan, and Weisberg, and not the Newmans, are charged in Count Two, whereas Count Three charges all the Defendants. (Id.)[3] Counts Two and Three describe the alleged conduct using the same generalized language used in Count One—in particular, alleging the use of unspecified "manipulative and deceptive devices and contrivances"—with the exception that the word "conspire" is not used. (Id. ¶¶ 61, 63.) Counts Two and Three "reallege[] and incorporate[]" the prefatory sections of the Indictment relating to the Ramp and Xybernaut Schemes, respectively. (Id. ¶¶ 60, 62.)

Count Four charges all of the Defendants with participating in a single money laundering conspiracy (id. ¶¶ 64-65), and Counts Five to Nineteen charge Saltsman and Eitan with acts of substantive money laundering (id. ¶¶ 66-69.) The rest of the Indictment sets forth forfeiture allegations as to each count. (Id. ¶¶ 70-99.)

---

[3] Again, Brown, who is associated only with Ramp, is not charged in the Indictment.

5

## II.    DISCUSSION

### A.    The Newmans' Motion for an Order Finding Count One Duplicitous

The Newmans move the court for an order finding Count One to be duplicitous, therefore requiring reformulation. ("Newman Duplicity Br." (Docket Entry # 102-1) at 5-13.) This motion is based on the division in the Indictment between the Xybernaut Scheme and the Ramp Scheme. While the Indictment charges that a central group—Saltsburg, Eitan, and Weisberg—were involved in both, there is no indication that the Newmans were involved in the Ramp Scheme, or that non-defendant Brown was involved in the Xybernaut Scheme. The Government, in its brief opposing the Newmans' motions ("Gov't Newman Br." (Docket Entry # 130)), argues that Count One charges a single conspiracy characterized by the Defendants' agreement "to conceal and lie about material aspects of PIPE transactions and engage in a corrupt relationship in connection with the publicly traded stock of Xybernaut and Ramp." (Id. at 9.) The Government further characterizes the conspiracy's common goal as one "to conceal Saltsman's and Eitan's investment interests from the public." (Id. at 11.) For the reasons stated below, the Newmans' motion to reformulate Count One is denied.

### 1.    Applicable Law

#### a.    Rule 7(c)(1) Pleading Standard in Conspiracy Cases

Under Federal Rule of Criminal Procedure 7(c)(1), an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." The offense need not be pleaded in detail. The requirement, under the Sixth Amendment of the United States Constitution, that a defendant be "informed of the nature and cause of the accusation," is met so long as the indictment "contains the elements of the offense charged[,] . . . fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United

6

States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (internal quotation marks and alterations omitted).  In general, an indictment is sufficient where it "tracks the language of the statute and states the time and place" of the alleged offense.  United States v. Frias, 521 F.3d 229, 235-36 (2d Cir. 2008); see also United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973) ("[W]e have consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms.").

In charging a conspiracy, an indictment need only charge "a common intent, sufficient to identify the offense which the defendants conspired to commit." Wong Tai v. United States, 273 U.S. 77, 81 (1927) (internal quotation marks omitted).  Thus, a conspiracy charge "need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense [or] apprise the grand jury in essential terms of the object of the conspiracy." United States v. Wydermyer, 51 F.3d 319, 325-26 (2d Cir. 1995); see also United States v. Kahan, 572 F.2d 923, 935 (2d Cir. 1978) ("[A]n indictment need not allege every circumstance of a conspiracy so long as it unmistakably identifies the conspiracy charged.") (citing Wong Tai, 273 U.S. at 80-81).

The federal conspiracy statute, 18 U.S.C. § 371, states in relevant part that "[i]f two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy," then each is guilty of the crime of conspiracy.  Accordingly, the elements of the crime are: (1) an agreement among two or more persons, the object of which is to commit any federal offense; (2) the defendant's "knowing and willful joinder" in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy by one of the conspirators.  United States v. Svoboda, 347 F.3d 471, 476 (2d Cir. 2003).  In principle then, an indictment charging a conspiracy would be sufficient if it merely

7

alleged that, at a specified time and place, two or more persons agreed to commit one or more specified federal crimes,[4] and that one of the conspirators committed an overt act in furtherance of that agreement.  See United States v. Lam Lek Chong, 544 F.2d 58, 63 (2d Cir. 1976) ("[A] conspiracy indictment need not allege every overt act committed in furtherance of the conspiracy."); see also Wong Tai, 273 U.S. at 81 ("[I]t is not necessary [for a conspiracy count] to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense.") (internal citation omitted).

b.      The Rule Against Duplicity in Conspiracy Cases

A count is duplicitous if it alleges two distinct offenses.  See United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992).  The rule against duplicity is motivated by several considerations: avoiding a "general" guilty verdict concealing the jury's finding of guilty as to one crime but not guilty as to the other; avoiding non-unanimity among jurors regarding which crime the defendant actually committed; assuring the defendant adequate notice of the charges; providing the basis for appropriate sentencing; and protecting against double jeopardy.  Id.  Even if an indictment is found to be technically duplicitous, the reviewing court need not take any action unless these concerns are implicated.  See United States v. Olmeda, 461 F.3d 271, 281 (2d Cir 2006).  In reviewing a pretrial duplicity motion, a reviewing court may find the danger of a non-unanimous jury verdict to be minimal, since the court will be able to ensure unanimity through its charge.  See United States v. Ohle, 678 F. Supp. 2d 215, 223 n.7 (S.D.N.Y. 2010).

"A conspiracy indictment presents 'unique issues' in the duplicity analysis because 'a single agreement may encompass multiple illegal objects.'  In this Circuit, 'it is well established

---

[4] See Braverman v. United States, 317 U.S. 49, 53 (1942) (a single conspiracy may encompass an agreement "to commit one or many crimes").

8

that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects.' " Aracri, 968 F.2d at 1518 (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)). Even if the acts charged in a single count could have been brought as separate charges, the count will not be found duplicitous so long as the conduct alleged "could be characterized as part of a single continuing scheme." Id. (citing United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989)).

The court is aware of no case decided in the Second Circuit in which a court has held a conspiracy count to be duplicitous.[5] Indeed, several courts have rejected such claims. For example, in United States v. Israilov, No. 08-CR-1327 (HB), 2009 WL 3642867 (S.D.N.Y. Nov. 4, 2009), defendant Israilov was charged with participating in a 2002-2008 conspiracy that included various acts of robbery and extortion; Israilov was only alleged to have participated in one of these acts, a 2002 robbery. Id. at *1. Israilov argued that the indictment alleged multiple conspiracies to commit the separate acts, and was therefore duplicitous. Id. The court rejected this argument, finding it sufficient that the indictment "expressly allege[d]" that Israilov and the other defendants "knowingly did combine, conspire, confederate and agree together and with each other" to violate the Hobbs Act, and also alleged that the 2002 robbery Israilov participated in was committed "in furtherance of" the conspiracy. Id. at *2. In other words, it was enough for the indictment, tracking the elements of the crime of conspiracy, to allege that the defendants had conspired together, at a certain time and place, to violate a federal statute, and that an overt act was committed. See also United States v. Rigas, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003) ("Although not all Defendants are individually implicated in every fraudulent act, the

---

[5] The only such cases cited by the Newmans are district court cases from outside the Circuit: United States v. Marlinga, No. 04-CR-80372, 2005 WL 513494 (E.D. Mich. Feb. 28, 2005); and United States v. Muñoz-Franco, 986 F. Supp. 70 (D. Puerto Rico 1997). (Newman Duplicity Br. at 10-11.) Judge Sand, in United States v. Ohle, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010), declined to rely on Muñoz-Franco.

9

identification of various overt acts and different substantive crimes involving only some Defendants does not automatically transform a single overarching scheme into a series of separate conspiracies."); United States v. Principato, No. 01-CR-588 (LMM), 2002 WL 31319931, at *2 (S.D.N.Y. Oct. 16, 2002) (indictment was sufficient where it alleged "a conspiracy to commit various crimes, some with regard to Ecotyre securities, some with regard to Bigmar securities, but the conspiracy being one conspiracy").

In United States v. Gabriel, 920 F. Supp. 498 (S.D.N.Y. 1996), the court reached the same conclusion as the court in Israilov, despite finding the count in question to be "more consistent with an allegation of two conspiracies" —one to commit fraud and a subsequent one to cover up the fraud. Id. at 503. Given the conspiracy count's "boilerplate allegations" of a single conspiracy, the Gabriel court could not "conclude on the basis of the pleadings alone that there [was] *no* set of facts falling within the scope of [the conspiracy count] that could warrant a reasonable jury in finding a single conspiracy." Id. at 505 (emphasis in original). This conclusion is consistent with the minimal pleading requirements of Rule 7(c)(1), discussed above.

### 2.   Count One Is Not Duplicitous

In arguing that Count One is duplicitous, the Newmans rely on Kotteakos v. United States, 328 U.S. 750 (1946). (Newman Duplicity Br. at 6-7.) Kotteakos articulated the concept of a "wheel" conspiracy, consisting of a "hub" and "spokes"—such that, for the conspiracy to be a single conspiracy, there must be a "rim" connecting the spokes. The Newmans argue that Count One charges a "wheel" conspiracy, with Saltsburg, Eitan, and Weisberg forming the "hub," and Brown and the Newmans separate "spokes" that are unconnected by the requisite "rim." (Newman Duplicity Br. at 6-7.) Notably, Kotteakos did not find the conspiracy *charge* to

10

be duplicitous, but instead found a "variance" between the single-conspiracy charge and the

proof at trial, which showed that several defendants had separately and independently negotiated

fraudulent loans through Brown, the central figure. 328 U.S. at 755. In other words, the

Government in Kotteakos *proved* spokes and a hub, but no rim.

While it is true that "a single conspiracy is not transformed into multiple conspiracies

merely by virtue of the fact that it may involve two or more phases or spheres of operation,"

United States v. Payne, 591 F.3d 46, 61 (2d Cir. 2010), and while all the members of a

conspiracy need not "know one another's identities nor specifically know of one another's

involvement," United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008), the Government must

nevertheless *prove* some connection between the multiple "spokes" or "spheres" of a conspiracy.

Cases that, like Kotteakos, have addressed the question of whether the Government has proven a

single conspiracy—that is, variance cases, not duplicity cases—have established three

requirements. The Government must prove: (1) that the defendant was aware of the overall

conspiracy's general nature and scope; (2) that the defendant was aware of the conspiracy's

overarching common purpose, and that this was a purpose the defendant had decided to pursue;

and (3) that the multiple spheres of the conspiracy were mutually interdependent. See Payne,

591 F.3d at 61; Eppolito, 543 F.3d at 47-48; United States v. Berger, 224 F.3d 107, 115 (2d Cir.

2000). Where the proof at trial does not meet these requirements, the defendant will prevail on a

post-trial variance motion. See, e.g., United States v. Johansen, 56 F.3d 347, 351 (2d Cir. 1995).

However, it does not follow from the variance cases that the Government must, in an

indictment, explicitly *allege* that the defendants were aware of the overall scope of the

conspiracy, or that each "sphere" of the conspiracy relied on the other "spheres." These

requirements define what it means to "conspire," and therefore, facts sufficient to meet them are

implicitly alleged in a conspiracy charge.  In light of the minimal pleading requirements of Rule 7(c)(1), the Newmans' motion for the reformulation of Count One is denied.[6]

## B.   The Newmans' Severance Motions

The Newmans move to sever from their trial any charges related to Ramp, under Federal Rule of Criminal Procedure 8(b), and for discretionary relief under Rule 14(a).  (Newman Duplicity Br. at 13-23.)  The Rule 8(b) motion is easily disposed of since the "established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."  United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988).  Since Count One is not "frivolous," the Rule 8(b) motion is denied.

The Newmans' Rule 14 motion is denied as well.  Under Rule 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  The Newmans argue that they are likely to be prejudiced by a single trial since, given the complexity of the charges, "the distinctions between Xybernaut and Ramp will blur" and the jurors will likely "conclude that if crimes occurred at Ramp, then they probably occurred at Xybernaut too."  (Newman Duplicity Br. at 21-22.)  The Newmans also argue that, because Brown, who was a Ramp executive, will be testifying for the Government, the Government's

---

[6] Some courts have suggested, though not held, that the Government must *allege* facts satisfying the "rim" requirement.  See United States v. Ohle, 678 F. Supp. 2d 215, 223 (S.D.N.Y. 2010) (finding indictment valid in part because it "*alleges* a mutual dependence and assistance across the schemes") (emphasis added and internal quotation marks omitted); United States v. Cuti, No. 08-CR-972 (DAB), 2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009) ("The Indictment has sufficiently *charged* the mutual dependence and assistance between the Defendants required to prove one conspiracy[.]") (emphasis added); United States v. Marcus Schloss & Co., 710 F. Supp. 944, 953 (S.D.N.Y. 1989) (in "wheel" conspiracy cases, the Government "must *allege* and prove that each of the charged conspirators on the rim had sufficient awareness of the existence of the other members of the alleged conspiracy"; under peculiar circumstances of case, court did not decide duplicity issue) (emphasis added and internal quotation marks omitted).  However, such statements are contrary to the minimal pleading requirements of Rule 7(c)(1).

case as to Ramp will be stronger than its case as to Xybernaut and the Newmans, such that the stronger Ramp evidence will unfairly prejudice the Newmans. (Id. at 22.)

The Newmans' arguments are unavailing. "[T]here is a preference, in the federal system, for the joint trial of defendants indicted together[.]" United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). Indeed, "the district court should grant a severance motion only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." Id. The preference for joint trials of co-defendants is "particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998). Furthermore, "differing levels of culpability and proof are inevitable," and constitute "insufficient grounds for separate trials." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988).

The Newmans have not demonstrated that a joint trial, involving both the Ramp and Xybernaut Schemes, charged as two parts of a single conspiracy, will impermissibly prejudice them. There is no reason to believe that a properly instructed jury will be unable to distinguish between the alleged illegal acts attributable to each defendant, notwithstanding inevitable differences in culpability and evidentiary strength. The Newmans' severance motion is therefore denied. The court also denies, for the same reasons, the Newmans' motion to impanel separate juries to consider the Ramp and Xybernaut Schemes.

### C.    Motions for a Bill of Particulars

Weisberg and the Newmans separately move for bills of particulars, and each join in the others' motion. ("Newman Bill of Particulars Br." (Docket Entry # 101-1); "Weisberg Br."

13

(Docket Entry # 105) at 10-15, 24; "Newmans' Motion to Adopt Weisberg's Motions" (Docket Entry # 103).)

### 1.    Applicable Law

"An indictment that fulfills the requirements of Federal Rule of Criminal Procedure 7(c)(1) but is nonetheless insufficient to permit the preparation of an adequate defense may be supplemented with a bill of particulars." United States v. Rigas, 490 F.3d 208, 237 (2d Cir. 2007) (internal quotation marks and citation omitted). The decision whether to order the filing of a bill of particulars is within the sound discretion of the district court. See United States v. Walsh, 194 F.3d 37, 47 (2d Cir.1999).

Federal Rule of Criminal Procedure 7(f) permits a defendant to seek a bill of particulars in order to enable him "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is warranted "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Walsh, 194 F.3d at 47 (quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (internal quotation marks omitted)). A bill of particulars is not a discovery device and is not meant to force the Government to disclose its evidence or its legal theory. See United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974); United States v. Hotte, No. 97-CR-0669 (SJ), 1997 WL 694718, at *3 (E.D.N.Y. Nov. 6, 1997). Nevertheless, if a bill of particulars is "necessary to give the defendant enough information about the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories." United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks omitted).

14

2.      Particulars Regarding the Newmans' Connection to the Ramp Scheme

The Newmans, again noting that the Indictment alleges no facts connecting them to the Ramp Scheme, request that the court order the Government to provide a bill of particulars disclosing: (1) the identity of the individual(s) with whom the Newmans agreed to join the Ramp Scheme; (2) whether the Newmans had knowledge of, or participated in, any of the specific conduct the Government alleges as part of the Ramp Scheme; (3) whether the Newmans had knowledge of, or participated in, any of the overt acts the Government alleges were committed in furtherance of the Ramp Scheme; and (4) the specific documents, "in the millions of pages produced in discovery," that support the Government's allegation that the Newmans were party to the Ramp Scheme. (Newman Bill of Particulars Br. at 2-3.)

As to the Newmans' first request, the Government, in a May 7, 2010 letter, provided to Defendants and filed under seal with the court, disclosed the identifies of the co-conspirators not named in the Indictment. The Newmans also appear to want the Government to specify the particular co-conspirators with whom the Newmans conspired regarding Ramp. However, this request, and the Newmans' other requests for particulars, all ask for evidentiary detail the Government is not required to disclose.

As discussed above, by charging the Newmans with participating in a single conspiracy involving both Ramp and Xybernaut, the Government takes on the burden of proving at trial that the Newmans were aware of the overarching conspiracy's general scope, that the Newmans shared in the overarching conspiracy's purpose, and that the Ramp and Xybernaut spheres of the conspiracy were mutually interdependent. In effect, Count One alleges such awareness and intent on the part of the Newmans, and such interdependence between the conspiracy's spheres. Such allegations are sufficient to permit the Newmans to prepare a defense.

The Government need not specify *how* it will prove such allegations.  Indeed, the Government may not have direct evidence of any explicit conversations or conduct linking the Newmans to the Ramp Scheme, but may instead choose to prove the Newmans' participation in the overarching conspiracy circumstantially.  See United States v. Torres, 604 F.3d 58, 67 (2d Cir. 2010) ("[C]onspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence."); United States v. Wilson, 565 F. Supp. 1416, 1439 (S.D.N.Y. 1983) ("The existence of a conspiracy and a defendant's participation therein is usually established by circumstantial evidence based upon independent proof of each alleged co-conspirator's acts, conduct and statements and the totality of conduct of all the participants and the reasonable inferences to be drawn therefrom."), aff'd, 808 F.2d 184 (2d Cir. 1986).

The Newmans are not entitled to a preview of the Government's evidence.  Forcing the Government to disclose whether or not the Newmans knew of or were involved in the alleged conduct associated with Ramp, or to specify the documents the Government believes tie the Newmans to the Ramp Scheme, would require the Government to tip its hand as to its theory of the case.  This is not the proper function of a bill of particulars.  See United States v. Urso, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); United States v. Kenny, 883 F. Supp. 869, 880 (E.D.N.Y. 1995) ("[T]he Government is under no obligation to disclose the specific role played by a defendant in a conspiracy . . . ."); United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (requests for "particulars regarding [defendants'] involvement with the conspiracy . . . are routinely denied in the Second Circuit"); United States v. Benevento, 649 F. Supp. 1379, 1388 (S.D.N.Y. 1986) (denying particulars "as to the degree of

16

cooperation alleged between" co-conspirators) (overruled in part on other grounds, 836 F.2d 60 (2d Cir. 1987)).

Nothing in United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988), upon which the Newmans rely, compels a different result. In Davidoff, the indictment charged the defendant with a racketeering conspiracy involving the extortion of three companies. 820 F.2d at 1153. However, the proof at trial showed that the defendant, as part of the same conspiracy, had been involved in extorting three additional companies. Id. at 1153-54. Noting the Government's heightened obligation to particularize its charges when defendants are charged under "statutes as broad as" the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the Second Circuit held that the district court's denial of the defendant's bill of particulars motion was an abuse of discretion. Id. at 1154-55. In particular, the court found that it was error for the court not to direct the Government to identify "at least the victims of discrete extortionate schemes" within the larger RICO conspiracy, since it was "simply unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies, allegations not made prior to trial." Id. at 1154. The concerns expressed in Davidoff are simply not present in the instant case. There is no reason to believe that the Government has not identified in the Indictment all of the fraudulent schemes it intends to prove. Davidoff does not require the Government to provide additional details connecting the Newmans to one of the already identified alleged schemes.

3.      Particulars Regarding Criminal Conduct not Specified in the Indictment

Defendants move for a bill of particulars identifying unindicted co-conspirators and specifying criminal acts the Government intends to prove at trial that are not alleged in the Indictment. (Weisberg Br. at 10-15; Newmans' Motion to Adopt Weisberg's Motions.) As

17

noted above, the Government has disclosed the identities of the unindicted co-conspirators, and therefore the Defendants' first request is moot.

The Defendants' second request stems from the Indictment's allegations that the overt acts committed in furtherance of the conspiracy charged in Count One were committed "among other[]" such acts and that the conspiracy and acts of substantive securities fraud, charged in Counts One through Three, involved the use of unspecified "manipulative and deceptive devices and contrivances." (Indictment ¶¶ 58, 59, 61, 63.)  Count Two, the securities fraud count corresponding to the Ramp Scheme, incorporates by reference the "Ramp Scheme" portion of the introductory section of the Indictment (id. ¶ 60); Count Three, corresponding to the Xybernaut Scheme, incorporates by reference the "Xybernaut Scheme" portion (id. ¶ 62). Defendants complain that "[t]hese allegations leave open the possibility that, at trial, the government will attempt to prove [the Defendants'] guilt through conduct beyond that set forth in the Indictment." (Weisberg Br. at 14.)

Defendants' motion to particularize all of the overt acts the Government will seek to prove with respect to the conspiracy charged in Count One is denied.  An overt act is simply an act committed "to effect the object of the conspiracy," 18 U.S.C. § 371, and "need not be itself a crime," United States v. LaSpina, 299 F.3d 165, 176 (2d Cir. 2002) (quoting Braverman v. United States, 317 U.S. 49, 53 (1942)).  To require the Government to disclose every act, criminal or not, that it intends to prove was committed in furtherance of the conspiracy would amount to forcing the Government to disclose its entire case as to Count One.  This is not the purpose of a bill of particulars.  See United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge.").

However, Defendants' demand that the Government particularize the unlawful "manipulative and deceptive devices and contrivances" that it intends to prove presents a closer question. As stated in the prefatory sections of the Indictment describing the Ramp and Xybernaut Schemes, which are incorporated by reference into Counts Two and Three, the ten alleged Ramp PIPEs and fourteen alleged Xybernaut PIPEs simply represented examples among "numerous" other financial transactions constituting the overall scheme. (Indictment ¶¶ 22, 44.) Furthermore, the Indictment provides details—including dates, corresponding Nominee Entities, and corresponding false or misleading statements by Defendants—with respect to only seven of the ten Ramp PIPEs, and two of the fourteen Xybernaut PIPEs.

Indeed, the Government has made it clear that it will introduce evidence of financial transactions beyond those described in the Indictment. Defendant Saltsman pleaded guilty (Docket Entry # 158) to a superseding information (Docket Entry # 116) that charged fraud, relating to the sale of Xybernaut securities, that took place from November 2004 to April 2005— *i.e.*, beyond the alleged December 2004 end of the Xybernaut Scheme described in the Indictment. Furthermore, the Government, in its brief responding to the Newmans' motions, disclosed that it intends to introduce evidence that "Steven Newman invested alongside Saltsman and Eitan in a Ramp PIPE transaction in or around November 2003." (Gov't Newman Br. at 13.) This date does not correspond to any of the Ramp PIPE transactions detailed in the Indictment.

The problem is exacerbated by the amount of discovery the Government has provided to the Defendants. The Defendants state that they have received the digital equivalent of approximately seven million pages of documents (Newman Bill of Particulars Br. at 2, Weisberg Br. at 3), and the Government does not dispute this figure. As this court recognized in <u>United States v. Urso</u>, 369 F. Supp. 2d 254 (E.D.N.Y. 2005), "a bill of particulars is appropriately

granted where the government's pre-trial discovery disclosures are so voluminous that the defendant remains in the dark about the specific acts of which he is accused." Id. at 271 (citing United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987)); see also United States v. Nachamie, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering bill of particulars where Government had produced over 200,000 documents relating to 2,000 Medicare claims but had "not yet informed the defendants which of these claims were false and in what way they were false"). The fact that the Government has detailed certain specific acts in the Indictment does not change the fact that the Defendants remain "in the dark" with respect to additional conduct the Government may seek to prove at trial.

Based on the open-endedness of the Indictment and the possibility that the Government will seek to prove criminal conduct of which the Defendants are not on notice, the court is convinced that a bill of particulars is necessary. See Davidoff, 845 F.2d at 1154-55; Bortnovsky, 820 F.2d at 574-75 (where defendants were accused of submitting false insurance claims, and had received several thousand pages of discovery, district court abused its discretion in denying bill of particulars where defendants were not informed, before trial, of which specific insurance claims were allegedly fraudulent); United States v. Bin Laden, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (ordering bill of particulars where allegations were too broad to "permit [the defendants] reasonably to focus their trial preparations, especially in light of the voluminous amount of material that has been produced in discovery"); United States v. Upton, 856 F. Supp. 727, 753 (E.D.N.Y. 1994) ("[A]lthough the Superseding Indictment does detail 33 specific instances of falsification of records, it would be unfair under the circumstances of this case to allow the government to introduce allegedly falsified maintenance records buried in thousands of documents already produced without prior notice to defendants of those documents upon which

20

the government intends to rely."); United States v. Santoro, 647 F. Supp. 153, 188 (E.D.N.Y.

1986) (in securities fraud case, even though Government had provided broad categories of inside

information it would seek to prove, ordering bill of particulars with respect to "the precise nature

of the inside information on which [defendants were] alleged to have traded"), rev'd on other

grounds, Davidoff, 845 F.2d 1151.

Although a bill of particulars is required, the court declines to order, as Defendants

request, the particularization of "the specific acts referred to as 'manipulative and deceptive

devices and contrivances' " (Weisberg Br. at 15). The phrase "manipulative and deceptive

devices and contrivances" is taken from the statute under which Defendants are charged, 15

U.S.C. § 78j(b), and its implementing rule, 17 CFR § 240.10b-5. "This broad language, on its

face, extends to manipulation of all kinds, whether by making false statements or otherwise."

United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008). Indeed, "conduct itself can be

deceptive, and so liability under [the statute and rule] does not require a specific oral or written

statement." Id. (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158

(2008)) (internal alterations and quotation marks omitted). Thus, to comply with the

Defendants' request, the Government would have to detail, before trial, every misleading public

or private statement and act it intends to introduce. This would amount to a preview of the

Government's entire case and would improperly constrain the Government. See United States v.

Mahaffy, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006) (bill of particulars "confine[s] the

Government's proof to particulars furnished and [thus may] restrict unduly the Government's

ability to present its case") (internal quotation marks omitted).

Instead of directing the Government to detail every "device" or "contrivance" it intends

to prove, the court adopts a middle course that it believes will permit the Defendants adequately

to prepare for trial. The Government is directed to provide to the Defendants, within thirty days of the issuance of this memorandum and order, a list of every filing, communication, or submission to the SEC or any other United States agency (collectively, "agency filing"), which the Government intends to introduce into evidence at trial and which the Government believes includes a false or misleading statement or material omission. The Government shall further specify the date of each agency filing, which defendant or unindicted co-conspirator it believes is responsible for such filing, and what false or misleading statement(s) or material omission(s) it believes to be contained therein.

The court recognizes that the Government may introduce evidence of false or misleading conduct, statements, or omissions in contexts other than communications with the Government—for example, in the form of press releases, emails, etc. However, the court's intent is not to force the Government to detail every unlawful act it will seek to prove. See Davidoff, 845 F.2d at 1154 (Government need not "always disclose in advance of trial every act it will prove that may violate some criminal statute"). Nevertheless, the Defendants must be given fair notice of the scope of criminal conduct with which they are charged. The Government has alleged that the criminal conduct it seeks to prove was carried out in large part through the submission of materially false or misleading agency filings. The disclosure of *all* such filings the Government intends to introduce is sufficient to provide Defendants with the notice to which they are entitled. Furthermore, the Government presumably is already aware of all such agency filings, and thus the instant order will not unduly constrain the Government's ability to present proof at trial.

**D.    Rule 16 Discovery**

Weisberg, joined by the Newmans, moves for discovery under Federal Rule of Criminal Procedure 16(a)(1)(E). (Weisberg Br. at 5-10; Newmans' Motion to Adopt Weisberg's

22

Motions.)  Rule 16(a)(1)(E) requires the Government, upon defendant's request, to disclose items "within the government's possession, custody, or control," to the extent such items are "material to preparing the defense."  Evidence is material "if it could be used to counter the government's case or to bolster a defense."  United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993).  Defendants bear the burden of making a *prima facie* showing that the evidence they seek is material.  United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991).  Thus, to be entitled to disclosure under Rule 16(a)(1)(E), Defendants must demonstrate a "strong indication" that the items in question "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  United States v. Basciano, Nos. 03-CR-929 (NGG), 05-CR-060 (NGG), 2008 WL 375537, at *3 (E.D.N.Y. Feb. 8, 2008).

The documents Defendants demand relate to requests the Government has made to foreign governments or other foreign entities in order to obtain records, some of which the Government may introduce into evidence at trial.  (Weisberg Br. at 5.)  In particular, Defendants state that the following are "critical" to the defense: "(1) materials the government may have submitted to foreign authorities or foreign entities in order to obtain evidence against the defendants, (2) orders or other related documents that may have been issued by foreign or domestic courts, and (3) correspondence between the government and foreign authorities and foreign entities related to the government's requests, including any documents clarifying the government's requests and any responses."  (Id. at 6.)

Defendants explain that they require the requested items so that they can identify "possible grounds to move to suppress" the related evidence.  (Weisberg Br. at 6.)  However, the two grounds for suppression the Defendants propose are meritless.

First, Defendants argue that a suppression motion could be based on the Government's violations, in obtaining the records in question, of the foreign entities' own laws or rules, or violations of treaties or agreements with the foreign entities, including Mutual Legal Assistance Treaties ("MLATs"). (Id.) However, Defendants could not prevail on a suppression motion on such grounds. Foreign rules or laws do not apply in United States courts and thus cannot serve as the basis for suppression motions. See United States v. Rommy, 506 F.3d 108, 129 (2d Cir. 2007) ("We need not here decide whether any DEA actions violated Dutch domestic law. The admissibility of evidence in a United States court depends solely on compliance with United States law."). And agreements between the United States and foreign entities create no judicially enforceable individual rights. See id. at 129-30 ("For any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases. Thus, a proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply strong presumption against inferring individual rights from international treaties.") (internal quotation marks omitted). See also United States v. Umeh, No. 09-CR-524 (JSR), 2011 WL 9397, at *4 (S.D.N.Y. Jan. 3, 2011); United States v. Al Kassar, 582 F. Supp. 2d 488, 493 n.3 (S.D.N.Y. 2008). Defendants have pointed to nothing in the applicable treaties or agreements that would confer individual rights of enforcement. Therefore, the court will not compel disclosure on this ground.

Second, Defendants claim there are some indications that the Government made misleading statements, or was at least "undisciplined" in its presentation of facts, in its submissions to the foreign entities. (Weisberg Br. at 8-9.) Therefore, Defendants argue, they are entitled to disclosure of these submissions so that they can "determine whether there has been a violation of the rule of Franks v. Delaware, 438 U.S. 154 (1978), and its progeny." (Weisberg

24

Br. at 7.)  However, <u>Franks</u> only applies where the Government makes false statements in order to establish *probable cause*.  <u>See</u> <u>United States v. Falso</u>, 544 F.3d 110, 115 n.4 (2d Cir. 2008) (to prevail in a <u>Franks</u> hearing, defendant must make "a substantial preliminary showing that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause").  The probable cause requirement only applies to searches or seizures where the defendant enjoys a reasonable expectation of privacy.  <u>See</u> <u>Garcia v. Artus</u>, No. 08-CV-1423 (JFB), 2010 WL 1816333, at *7 (E.D.N.Y. May 5, 2010) ("[T]the Court need not address whether the police had probable cause to search the trunk [because] petitioner did not have a reasonable expectation of privacy in the area searched.").  Therefore, <u>Franks</u> simply does not apply to submissions, even false ones, made by the Government to foreign entities in order to obtain materials in which Defendants enjoy no expectation of privacy.

According to the Government, the documents obtained from the foreign entities "relate to bank and brokerage records."  ("Gov't Weisberg Br." (Docket Entry # 131) at 11.)  Defendants do not contest this, and do not claim to have had a reasonable expectation of privacy in these materials.  Presumably, they did not.  <u>See</u> <u>Young v. U.S. Dept. of Justice</u>, 882 F.2d 633, 636 (2d Cir. 1989) ("[B]ank customers have no reasonable expectation of privacy, under the fourth amendment, in bank records of their accounts.") (citing <u>United States v. Miller</u>, 425 U.S. 435, 440 (1976); <u>see also</u> <u>United States v. Payner</u>, 447 U.S. 727, 732 n.4 (1980) (no expectation of privacy in Bahamian bank account, notwithstanding Bahamian law, since "American depositors know that their own country requires them to report relationships with foreign financial

25

institutions."). Since the Defendants have not demonstrated any possibility of a successful

Franks motion, the court will not compel disclosure on this ground.[7]

Defendants, in Weisberg's reply brief, suggest a broader reason for ordering the

Government to produce the requested items: the items, Defendants argue, "will likely, among

other things, identify individuals or entities [and] contain statements by the government

regarding its investigation." ("Weisberg Reply Br." (Docket Entry # 135) at 2-3.)  This might be

a sufficient basis for discovery in a civil action, where the parties must disclose items "relevant"

to the case.  See Crosby v. City of New York, 269 F.R.D. 267, 282 (S.D.N.Y. 2010) ("relevance"

under Federal Rule of Civil Procedure 26 " 'has been construed broadly to encompass any matter

that bears on, or that reasonably could lead to other matter that could bear on any issue that is or

may be in the case' ") (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

---

[7] Defendants rely on United States v. Castrillon, No. 05-CR-156 (CM), 2007 WL 2398810 (S.D.N.Y. Aug. 15, 2007). (Weisberg Br. at 6.)  At issue there was evidence obtained through wiretaps conducted by Colombian authorities, after an MLAT request by the United States. Id. at *1.  The defendants, intending to challenge the "legality" of the Colombian wiretaps, had requested the MLAT applications in discovery, and the Government had voluntarily disclosed them. Id.  Defendants, however, asserted that the Government's disclosure of the MLAT requests was incomplete and thus moved under Rule 16 for their full disclosure. Id. at *1, *5.  The court found that, under the circumstances, the Fourth Amendment did not apply to the Colombian wiretaps, such that the defendants could not mount a valid suppression motion. Id. at *2-3.  The court therefore refused to compel disclosure on such grounds. Id. at *5. Nevertheless, the court ordered the Government to re-assert, in "final and binding" fashion, that it had already turned over all the MLAT requests, or to complete such disclosure. Id. at *5.  The court explained that such documents, touching on how the wiretaps "came to be installed, how they were conducted and how the recorded conversations were preserved," were "relevant and vital to the defense, if they are to mount an attack on the wiretap evidence at trial." Id.  The court did not explain what sort of attack on the wiretap evidence it envisioned, given that no Fourth Amendment suppression motion was possible.  In this case, the court will not compel disclosure without some indication of how the items in question are "material" to the defense; generalized plans to "attack" the evidence will not suffice.  As discussed above, the only attacks on the foreign evidence the Defendants apparently foresee have no possibility of succeeding, and thus cannot serve as the basis for an order to compel.

Defendants' reliance on United States v. Castroneves, No. 08-CR-20916, 2009 WL 528251 (S.D. Fla. Mar. 2, 2009) (Weisberg Br. at 6) is also unavailing.  In Castroneves, the district court ordered the Government to disclose MLAT requests submitted to Brazilian authorities. Id. at *1-2.  The court ordered such disclosure since it was necessary for the defendants to be able to determine whether they had a valid statute of limitations defense. Id.  Here, in contrast, Defendants have not indicated that any motion's validity depends on the contents of the requested items.

However, to be entitled to criminal discovery under Rule 16, Defendants must make a more particularized *prima facie* showing of materiality. That is, Defendants must articulate some specific way in which the items they request could be used to counter the Government's case or bolster a defense. Since Defendants have failed to do so, their Rule 16 motion is denied.

### E.    Motions for Early Disclosure

Defendants move the court for an order directing the Government to immediately turn over exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963). (Weisberg Br. at 15-17.) In particular, Defendants move the court to compel the disclosure of summaries of unrecorded and unwritten exculpatory oral statements of which the Government is aware. (Id.) The Government should turn over exculpatory material promptly upon discovering it, see United States v. Crozzoli, 698 F. Supp. 430, 436-37 (E.D.N.Y. 1988), and must, in any event, disclose Brady material "in time for its effective use at trial," United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001). Furthermore, the Brady obligation "exists without regard to whether that information has been recorded in tangible form." United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007). The court accepts the Government's statement that it is aware of its Brady obligations (Gov't Weisberg Br. at 23), and therefore determines that no order is necessary.

Defendants also request that the Government disclose Jencks Act material no later than ninety days before trial. (Weisberg Br. at 17-18.) The Jencks Act, 18 U.S.C. § 3500, requires the Government, on motion of the defendant, to produce any statement, in its possession, by a witness, relating to the witness's testimony. Under § 3500(b), such disclosure need only be made "[a]fter a witness called by the United States has testified on direct examination." As Defendants should well know, the Jencks Act itself precludes the court from ordering early disclosure of such material. See Coppa, 267 F.3d at 145-46. Therefore, Defendants' motion for

27

an order compelling such early disclosure is denied. In any event, the Government has indicated

that it will provide Jencks Act material four weeks prior to trial. (Gov't Weisberg Br. at 24-25.)[8]

Defendants also request early disclosure of impeachment material under Giglio v. United

States, 405 U.S. 150 (1972); evidence the Government will offer under Federal Rule of Evidence

404(b); and witness and exhibit lists. (Weisberg Br. at 17-25.) The Governments offers to

provide such material four weeks before trial. (Gov't Weisberg Br. at 23-27.) The court finds

that this is more than sufficient.

## III.    CONCLUSION

As set forth above, the court GRANTS Defendants' motion for a bill of particulars in

part. Within thirty (30) days of the issuance of this memorandum and order, the Government is

directed to provide to the Defendants a list of every filing, communication, or submission to the

SEC or any other United States agency (collectively, "agency filing"), which the Government

intends to introduce into evidence at trial and which the Government believes includes a false or

misleading statement or material omission. The Government shall further specify the date of

each agency filing, which defendant or unindicted co-conspirator it believes is responsible for

such filing, and what false or misleading statement(s) or material omission(s) it believes to be

contained therein. All of the Defendants' remaining motions are DENIED.

SO ORDERED.

Dated: Brooklyn, New York
      March 14, 2011

s/Nicholas Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

---

[8] Of course, to the extent Jencks Act material is also Brady material, Brady's requirements trump the statute, and such evidence must still be disclosed in time for the defense to make effective use of it at trial. See United States v. Rittweger, 524 F.3d 171, 181 n. 4 (2d Cir. 2008); United States v. Falkowitz, 214 F. Supp. 2d 365, 394 (S.D.N.Y. 2002).

28