UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**UNITED STATES OF AMERICA,**

                                   Case No. 17-CR-124

                     Plaintiff,

                                   Milwaukee, Wisconsin

     vs.

                                   February 22, 2018

**MARCUS HUTCHINS,**

                     Defendant.
----------------------------------------------------------------


**TRANSCRIPT OF MOTION TO COMPEL HEARING**

BEFORE THE **HONORABLE NANCY JOSEPH,**
UNITED STATES MAGISTRATE JUDGE


**A P P E A R A N C E S**


For the Plaintiff:              United States Attorney
                                By: **Mr. Michael Chmelar**
                                    **Mr. Benjamin Proctor**
                                Assistant U.S. Attorneys
                                530, U.S. Courthouse
                                517 E. Wisconsin Avenue
                                Milwaukee, WI   53202


For the Defendant:              Baker Marquart LLP
                                By: **Mr. Brian E. Klein**
                                Attorney at Law
                                2029 Century Park E #1600
                                Los Angeles, CA   90067

                                Zeitgeist Law PC
                                By: **Ms. Marcia C. Hofmann**
                                Attorney at Law
                                25 Taylor St.
                                San Francisco, CA   94102

D. Stiller LLC
By:  **Mr. Daniel W. Stiller**
Attorney at Law
P.O. Box 511130
Milwaukee, WI  53203

REPORTED BY:                    HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202
                                (414) 297-3074

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

1    **TRANSCRIPT OF PROCEEDINGS**

2    THE COURT:  Good afternoon.  Everyone please be

3    seated.  Okay.  We're here for United States of America vs.

4    Marcus Hutchins, Case Number 17-CR-124.  May I have the

5    appearances, please, beginning with the Plaintiff.

6    MR. CHMELAR:  Good afternoon, Your Honor.  Michael

7    Chmelar and Ben Proctor on behalf of the United States.

8    THE COURT:  Good afternoon, Mr. Chmelar.  Good

9    afternoon to you, Mr. Proctor.

10   MR. KLEIN:  Good afternoon, Your Honor.  Brian Klein,

11   Dan Stiller, Marcia Hofmann for Marcus Hutchins, who is here in

12   court, out of custody.

13   THE COURT:  Good afternoon to you Mr. Klein,

14   Mr. Stiller, and Miss Hofmann.  And good afternoon to you,

15   Mr. Hutchins.

16   We are here on Defendant's motion to compel.  I have

17   that before me.  The Government has responded.  Defense has

18   replied.  I thought an efficient way to address the motion would

19   be to bring us together and talk about it.  Then I can give you

20   a ruling, and then we can discuss moving this case forward.  So

21   Mr. Klein, it's your motion.  If you can begin first.  I think I

22   want to just kind of direct some specific questions, but then

23   you're, of course, free to add anything you think would be

24   helpful.  So let's address them one at a time.

25   The first category of materials you're seeking are

1 | materials of communications relating to the surveillance and

2 | arrest of Mr. Hutchins.  The Government has replied that they

3 | have provided several materials in response, including F.B.I.

4 | 302, two reports of surveillance on 7-26 and August 2nd.  Some

5 | other materials.  But also most recently an August 2nd E-mail

6 | regarding the -- discussing the surveillance of Mr. Hutchins.

7 | So that's what it appears to be the status of things.  Any

8 | additional material you received since the motion has been

9 | pending, Mr. Klein?  And that's one question.

10 |        And the second question, if you could address it,

11 | appears -- I guess from the way I read it also from your

12 | response, although you don't intend it to be broad, the request

13 | is phrased in a broad way.  Although I think I understand you,

14 | of course, don't want -- you know, the Agents were talking about

15 | what they had for lunch in Vegas.  What's the best restaurant to

16 | go to.  You don't want that kind of stuff.  But it is broad as

17 | written.  Also contemplates a broad order if I were to provide

18 | one.  So address those two things for me, please.

19 |        MR. KLEIN:  Yes, Your Honor.  I do always appreciate

20 | restaurant tips, though.  But no, we haven't received anything

21 | since that production, which was the day they filed their

22 | response.  So that's the extent of what we received since we

23 | filed our reply, Your Honor.

24 |        THE COURT:  And Mr. Klein also, I don't -- I don't

25 | want to get in the way of your presentation, but it's just my --

1    there's no jury here.  You can sit down.  That way the

2    microphone can pick you up.

3            MR. KLEIN:  Okay.  Yes, Your Honor.  So I'll repeat.

4    No, we haven't received anything since that production that the

5    Government produced the day it filed its response.  And we

6    are -- again, I think it's important to understand that this

7    request is meant to be contained.  You're right.  We're not

8    seeking purely logistical, non-substantive communications.  You

9    know, where they went to lunch.  Or how do I book my plane

10    flight?  But we're focussed actually on the exact type of

11    communications we got only after we filed our motion to compel.

12    And that communication, which was sent on August 2nd, is

13    actually extremely relevant to our anticipated motion to

14    suppress.  Where the Agents discussed what to start -- what to

15    do if Mr. Hutchins starts drinking.

16            And so we believe there would be additional

17    communications.  The Government responds by saying oh, there's

18    no more reports.  Well, there's a broad category of potentially

19    responsive documents that would be material to our suppression

20    motion, and those would include other types of E-mails.  Text

21    messages that deal with those matters.  The Agents were there

22    for quite some time surveilling Mr. Hutchins.  And we believe

23    there are likely to be other substantive communications that

24    would be responsive, that would go to our motion.

25            And again, it's not just limited to the issues of

1    intoxication and lack of sleep or exhaustion.  But also focussed

2    on the fact that Mr. Hutchins is a citizen of the United

3    Kingdom.  How -- the rights people have in the United Kingdom,

4    and how essentially their version of Miranda is very different.

5    And so we were looking for additional communications about those

6    kind of matters.  And I think that is a targeted request

7    focussed on our suppression motion.

8             Also focussed, though, to be clear, on what will

9    happen at trial.  Because we do expect the Government to

10   introduce statements Mr. Hutchins made in his post-arrest

11   interview.  And we expect that to be, frankly, a large portion

12   of their trial.  And we have a right to challenge those

13   witnesses.  To challenge the substance of what they were told.

14   The circumstances of that in front of the jury.  And to probe

15   the facts.  And so having the full record of what happened, what

16   the Agents knew, what they were communicating about, what they

17   were communicating about with the prosecutors, potentially, is

18   very relevant to both pretrial motion but also to the trial.

19             THE COURT:  Thank you, Mr. Klein.  The latter part of

20   your argument regarding Mr. Hutchins' nationality got less

21   attention in the pleadings.  And what are you looking for?

22   Discussion, for example -- well, he doesn't know U.S. Miranda

23   rights?  That part is a little bit fuzzier than what you're

24   looking for in terms of we're observing him at the airport.  His

25   drinking.  He appears to be intoxicated.  Perhaps we're

observing that he's walking in a wobbly way.  I don't know.  I'm just making these up as examples.  But in terms of the nationality question, that's fuzzier in terms of what you are looking for?

MR. KLEIN:  So there may be discussions about should we provide special advisements to him because he's a foreign citizen?  I don't know exactly.  You're right, it is a little fuzzier in that sense.  But any sort of substantive communication the Agents had prior to the arrest, whether among themselves or with the prosecutors, about how to advise Mr. Hutchins of his Miranda rights.  How to deal with the fact that he was a citizen of the United Kingdom.  Those would all be relevant.  Again, I think in our initial motion we did lay out that theory.  The Government sort of glossed over it.  And we noted that in our reply.  But I think that is actually really important.

I would also say it's not just focussed on that one day they chose to arrest him.  I think it's of note that Mr. Hutchins went to this conference.  DEF CON was there for a long time.  It's Las Vegas.  They could have chosen to arrest him as soon as he arrived in the country.  And we have our reasons we believe they chose to arrest him at the very end of the Vegas trip.  And so when you arrest someone at the end of a Vegas trip -- you know, they say what goes on in Vegas stays in Vegas -- but I think there was maybe a pointed reason they chose

1  to wait until the end.  And it was, in this case, where

2  Mr. Hutchins, you know, was exhausted, and there were other

3  circumstances that we would think were relevant to that

4  interview.

5          THE COURT:  Thank you, Mr. Klein.  If I could kind of

6  jump ahead a little bit.  I'm trying to think of how all of this

7  information, for example, would play out in a motion to

8  suppress.  So -- motion to suppress challenging whether or not

9  Mr. Hutchins knowingly waived his Miranda rights.  The spotlight

10  on that kind of analysis for the most part is on -- would be on

11  Mr. Hutchins.  His state of mind.  What he understood.  His

12  physical state.  Anything that could have influenced his ability

13  to understand and knowingly waive.

14          Also anything the Officers or Agents may have done

15  that would have overborne his will, if you will.  There was no

16  pun intended there.  It just came out before I could catch it.

17  So to that -- that being the framework, jumping ahead, I'm

18  trying to see, then, the relevance of some of the materials you

19  may be looking for as to discussions Agents may have had with

20  each other after the fact.  Or even before the fact, in terms of

21  the question of overbearing the Defendant's will.

22          MR. KLEIN:  Yes, Your Honor.  I mean, I think we all

23  know that a Miranda waiver has to be knowing, intelligent, and

24  voluntary.  And if you look at the cases we cited -- and it's

25  the Carson case -- it does talk about how if the Agents are

aware or have reason to believe that the person is under the
influence of drugs or alcohol, then there's a lesser standard
when you look at whether they were overwhelmed.  Sort of undue
coercion.  And so I think it is important to know what the
Agents' intent was, because I think it backs into what
Mr. Hutchins was experiencing.

So, for example, if the Agents create a situation that
is more likely to lead to a situation where he's not knowingly,
voluntarily, and intelligently waiving his rights, that creates
a real problem.  And also if they're aware that he may not be
knowingly doing so because he's a foreigner.  Because he's a
British citizen.  Because they have a very different set of
rights they provide.  In fact, it's almost like flipped, in a
way, if you read what they are.  I think that is highly relevant
to the inquiry of whether the statements should be suppressed.
It's also relevant at the trial, when the Agents are on the
stand, so that the jury can judge the credibility of the
situation and what surrounded it and take it in the full
context.

So it is a little nebulous on some level, but I
actually think we really pointed it into a very focussed area.
Which is, you know, going right to the heart of how -- what
happened in this post-arrest interview, and what are the
circumstances that led to that.  And did the Agents create a
situation where it wouldn't be voluntary, knowing, and

1    intelligent?

2          THE COURT:  Thank you, Mr. Klein.  Let me allow

3    Mr. Chmelar to jump in here, because some of the discussion we

4    are having may be academic if there are no other documents

5    responsive to what you are looking for.  So Mr. Chmelar?

6          MR. CHMELAR:  Thank you, Your Honor.  So we did detail

7    in our response to the motion to compel on Page 3 of our filing

8    what we thought kind of related to what the defense was looking

9    for in the motion to compel.  And it details the information

10   disclosed to date.  In addition to the things that Your Honor

11   noted were produced shortly after the motion to compel.  So the

12   audio recording, the post-arrest statement, the 302 detailing

13   that.  But it's recorded.  We produced all of that stuff

14   already.

15         The second report that detailed a conversation that

16   was not recorded, that took place between the Agents and

17   Mr. Hutchins on the way to a holding facility.  And then

18   Mr. Hutchins was shown certain documents during the post-arrest

19   interview.  Those were produced.  We even did produce Agent

20   notes that were taken during the interview.  The consent forms

21   he signed to have certain digital evidence that he possessed to

22   be searched.  His advice of rights form which he signed

23   indicating that, you know, he understood his rights, his Miranda

24   rights, and waiving those.

25         And in addition to that we produced -- certain things

1   I -- I question whether or not they're subject to production,

2   but we did produce them.  The E-mail that Mr. Klein was

3   referencing about --

4            THE COURT:  August 2nd?

5            MR. CHMELAR:  Yeah.  Mr. Klein was referencing about

6   how they plan to address making the arrest.  I don't know that

7   that's subject to production, because it does go to what the

8   Agents' planning in the case was.  And I don't know how -- as

9   Your Honor indicated, it's certainly -- to support a motion to

10  suppress it has to do with what Mr. Hutchins' state of mind was.

11  Whether -- he can certainly take the stand and say he was

12  intoxicated or not.  Whether the Agents believed he was

13  intoxicated or not.  I don't know how that plays a part in it.

14  But we did produce that.

15            And in response to the suggestion by the defense that

16  there was a constant surveillance on Mr. Hutchins while he was

17  in Las Vegas, and that it was a deliberate process to wait until

18  the end to arrest him, to catch him in an exhaustive state?  I

19  think that's just mostly speculation on the defense.  As we

20  wrote in our response, it's seeking information that doesn't

21  exist really for -- in support of a motion that might not be

22  there.

23            Our understanding, the Government's understanding, is

24  that there was surveillance conducted on two days.  I know the

25  reply the defense filed stated that there was active

1    surveillance watching Mr. Hutchins go everywhere over the course

2    of the entire time he was there.  I think they noted something

3    like from January -- July 26th through the 17th -- continuing

4    through August 2nd.  And that's referenced on Page 3 of their

5    filing.  Their reply.

6             That's not our understanding.  Our understanding is

7    that it happened on two days.  When he arrived in Las Vegas and

8    they watched him -- F.B.I. watched him check into his hotel he

9    was staying at.  And then on the day he went back to the

10   airport, and the day he was leaving.  And none of that suggests

11   that there's any kind of, you know, deliberative process by the

12   F.B.I. that was in place to catch him at an inopportune time.

13   When he was staggering, or -- you mentioned, you know, maybe

14   they observed him stumbling around or something like that.  None

15   of that is reflected in any of the things that we produced.

16            I mean, these are things -- the reports -- they're not

17   even reports.  They're just surveillance logs which, again, I

18   question whether or not they're subject to production.  But we

19   did produce them.  They are talking about like Mr. Hutchins

20   getting a sandwich at a food cart.  And then getting possibly

21   Uber or Lyft and getting to the airport.  And then watching him

22   enter the airport.  Things like that.  These aren't indications

23   that he was under intoxication, or exhausted, or anything like

24   that.

25            So we produced what we've been able to identify

1    regarding surveillance.  I don't believe the communications --

2    our position is the communications between the Agents and with

3    the Government attorneys about, you know, our deliberative

4    process about when arrests should be made, things like that are

5    subject to production.

6         And for the sake of this discussion we'll assume that

7    the defense is not looking for, as you mentioned, Judge, like

8    things about like what restaurants to go to.  We wouldn't turn

9    over kind of logistical type things because it's not material to

10   any of the issues, either, that we perceive to be maybe an issue

11   at trial, or maybe even pretrial motion.

12        So we've produced everything that we've been able to

13   identify.  There certainly may be communications where the

14   Agents do discuss -- you know, as indicated in the E-mail that

15   we produced -- you know, this is what we will do when

16   Mr. Hutchins arrives.  And in the event that, you know, a

17   certain event takes place, this is how we should react to it.

18   You know, we've produced that.  But I don't think there's any

19   other substantive reports that the defense has asked for

20   production and assume exists.  We've not been able to locate

21   those.

22        So I think from the Government's perspective we've

23   satisfied our obligations under the Local Rule 16, Rule 16,

24   Brady, Giglio, 3500.  I'm just not -- we're not aware of

25   additional information that at this time is subject to

1  production.

2           THE COURT:  Thank you, Mr. Chmelar.  So just to make

3  sure that I get it -- so the surveillance reports or logs that

4  you mentioned, were that of July 26th and August 2nd.  Is that

5  correct?

6           MR. CHMELAR:  Yes.

7           THE COURT:  And it's your representation other than

8  those reports there are no other surveillance reports or logs,

9  is that correct?

10          MR. CHMELAR:  There's another E-mail we produced.

11          THE COURT:  The August 2nd E-mail?

12          MR. CHMELAR:  Yeah.

13          THE COURT:  I was going to get to that.

14          MR. CHMELAR:  So no other -- so they're actually

15  entitled FD-1055 reports.  They're physical surveillance logs.

16  We've not located any additional logs like that.

17          THE COURT:  And then getting to the E-mail of August

18  2nd, the discussion that you already mentioned.  Any other

19  similar E-mails, discussions, or reports?

20          MR. CHMELAR:  Similar to the discussion of how to

21  arrest Mr. Hutchins?

22          THE COURT:  Yes, how to arrest --

23          MR. CHMELAR:  I'm sure there are operational plans

24  about what to do, because it took place -- the arrest took place

25  in an airport.  So I'm sure there was additional conversations

amongst Agents and law enforcement about how to conduct an
arrest in a public sector area like that. But none of them
involved any information about how -- you know, what they were
observing about Mr. Hutchins. This was purely law enforcement's
plan on how to address the arrest and the circumstances in which
it was taking place.

THE COURT: Any of them discussing how to approach
Mr. Hutchins if he's intoxicated? Incapacitated in any way?
And any of them discussing the status of Mr. Hutchins as a
foreign national?

MR. CHMELAR: So I'll address the first one -- first
question first. Other than the E-mail, I -- we produced
regarding, you know, the possibility if he goes to a -- to a --
doesn't even discuss if he's intoxicated. Said if he goes to
a -- to an area where alcohol is being served, they wanted to
take him into custody at that point. And I should note that
prior to the post-arrest interview taking place, Mr. Hutchins --
we produced this report as well -- made a statement that he was
not under the influence of alcohol.

There certainly are discussions amongst law
enforcement, both here and overseas, that Mr. Hutchins was a
U.K. citizen. So yes, there are discussions about his country
of origin, because he was traveling here from a foreign country
to the United States. So there was certain preparation put in
place in the event that Mr. Hutchins did, in fact, travel to the

1 U.S.

2         THE COURT: Thank you. Anything else, Mr. Klein?

3         MR. KLEIN: Yes, Your Honor. I would just like to

4 respond briefly. I mean, I think the Government's response

5 basically assumes that we're going to lose our motion. But I

6 don't think we should assume that. I mean, we're trying to --

7         THE COURT: I'm not assuming that, Mr. Klein. The

8 motion's not even before me yet. I can't read into the future.

9         MR. KLEIN: I know. So I can't read into the future,

10 but the things Mr. -- the things the Government just described

11 are exactly the kind of things we're asking for. We think are

12 relevant for that motion. Discussions among law enforcement

13 about the plans to arrest him related to his foreign status.

14 They have those things.

15         They also -- Mr. -- I was a former Federal prosecutor.

16 I know when Agents go to arrest people they often communicate by

17 text. It's not just by E-mail, because it's cumbersome.

18 There's been no discussion or -- as far as I know -- review to

19 see if there's been any text messages exchanged among the Agents

20 that would also address these issues. And I think that's highly

21 relevant.

22         And the reason why I say it's relevant, a motion to

23 suppress isn't just about what's in Mr. Hutchins' mind. It's

24 also about whether the Government was creating the situation

25 that would be coercive. And that's directly in the Carson case,

1  Your Honor, and I don't need to read it unless you want me to.

2  But the determination is whether the Police coerced a suspect.

3  Or whether the Government coerced a suspect.  And so their plan,

4  how they set this up, whether they -- their concerns about him

5  being a foreign national, their concerns about him at the end of

6  the Vegas trip, whether he'd be able to knowingly,

7  intelligently, voluntarily waive his rights, are all incredibly

8  relevant to what we want to do here.

9          THE COURT:  Well, Mr. Klein, on the foreign national

10  part -- again, getting back to the fuzziness.  I mean, relevant

11  to your motion it's not just the fact of being a foreign

12  national.  They knew that.  Or -- relevant to your motion is how

13  does the fact of his foreign national-ness play into his ability

14  to understand his rights?  So it's not just if there's a report

15  out there, a discussion about well, he's a foreign national,

16  then you get it.  It's are there reports discussing

17  Mr. Hutchins' foreign national-ness, nationality, as it relates

18  to Miranda rights or understanding that procedure?  It's very

19  specific.  It's not broad.

20          MR. KLEIN:  That's right, Your Honor.  We are focussed

21  and targeted on that.  And again, it's -- again, not just

22  reports, but types of communications.  But yes, Your Honor.

23          MR. CHMELAR:  I can tell you, Judge, there are no

24  communications regarding the accomodation of his -- fact that

25  he's a United -- a citizen of the United Kingdom, and his

1   ability to understand perspectively Miranda rights.  I mean,

2   that's taken at the time the person is being interviewed.

3          The other issue that always comes up when a foreign

4   national is arrested in the U.S. is compliance with the Vienna

5   convention.  So a lot of the discussions go about communicating

6   -- you know, making sure that we follow what we need to do to

7   comply with the Vienna convention, which is one of the documents

8   we also produced, just notifying the Embassy.  As Your Honor

9   knows, certain countries require mandatory notification.  Some

10  are discretionary.  I think the United Kingdom is a mandatory

11  situation.

12         So it's -- you know, it's conveying information to the

13  Agents about that fact, since he's a foreign national.  We have

14  to make sure that we're complying with our conventions.  But to

15  my knowledge I've never seen any documents, nor am I aware of

16  any documents that exist that discuss the fact that Mr. Hutchins

17  is a citizen of the United Kingdom in the context of whether or

18  not he would understand Miranda.  I can speculate as to why, but

19  to my knowledge I don't -- I'm not aware of any.

20         THE COURT:  Thank you.  Mr. Klein, you're raising your

21  hand.

22         MR. KLEIN:  I feel like I'm in class.  So I don't know

23  what the best way to get your attention is, Your Honor, but just

24  real quick.  I appreciate that statement, but I don't know that

25  the Government has conducted or reviewed text messages among the

1  Agents for those kind of things.  It seems like they just

2  don't -- that it's even something they're going to look at.  And

3  so counsel for the Government may be right but, you know, we

4  would ask Your Honor to have them double-check that at a

5  minimum.  And do a thorough check of E-mail, text, and

6  correspondence.  Because it's very possible the prosecutors

7  weren't copied on things and they aren't aware of them.  That

8  happens all the time.

9         MR. CHMELAR:  I have gone to the F.B.I. and reviewed

10  all electronic communications, including text messages, and they

11  don't -- if you're asking if a communication exists that puts

12  some sort of weight on the fact that he's a citizen of the

13  United Kingdom, and his ability to understand or not understand

14  Miranda, it just does not exist in text or E-mail.  I'll be

15  happy to review again.

16         THE COURT:  Thank you.  Okay.  So as to the first

17  category, request materials of communications relating to

18  surveillance and the arrest of Mr. Hutchins, I will deny that

19  motion without prejudice.  I'm denying it based on the

20  representation of the Government today that that there are no

21  additional documents responsive to this request with the

22  understanding clearly of what Mr. Hutchins (sic) is looking for.

23  Not just all and everything, but specifically relating to

24  Miranda issues, both as to his physical and mental state, and

25  also his foreign nationality.  I will, however, order that the

1    Government just double-check, because I have been framing my

2    questions in terms of reports and E-mails.  That the Government

3    also double-check also that there are no text messages that are

4    responsive, again, to what we're talking about here.  Again,

5    it's not just Mr. Hutchins is a foreign national, but again, it

6    has to be relevant to his ability to understand Miranda and

7    knowingly waive them.

8            So that motion is denied.  I say without prejudice,

9    because I know things are dynamic and sometimes even if there's

10   an evidentiary hearing, sometimes there's testimony that opens

11   the door to more information that perhaps the parties are not

12   aware of pre-motion.  Someone was about to speak.  I don't know

13   if it was you, Mr. Chmelar?

14           MR. CHMELAR:  I was just going to say we will

15   certainly check, Your Honor.  We'll continue, obviously, to

16   follow our discovery obligations.  And in the event anything

17   is -- becomes newly discovered we will, of course, produce that

18   as soon as possible.

19           THE COURT:  Thank you.  Number two.  Defense seeks

20   materials and communications relating to co-Defendant -- a

21   charged co-Defendant in the Indictment here.  Mr. Klein, any --

22   I'll start where I started the last one.  Any additional

23   information since this motion has been pending?

24           MR. KLEIN:  No additional discovery has been produced

25   to us, Your Honor.

1          THE COURT:  Okay.  Anything you want to add in regards
2     to this motion?

3          MR. KLEIN:  No.  I would just emphasize really quickly
4     we think we're very much entitled to this discovery.  From the
5     Government's response it seems very clear that they are holding
6     back documents that they would produce if they had -- if they
7     did arrest the co-Defendant, and we feel like we're entitled to
8     those now.  And that's what we're asking for.

9          THE COURT:  Thank you.  Mr. Chmelar?

10         MR. CHMELAR:  Nothing additional, Judge.  I really
11    don't -- as Mr. Klein was saying that, I was trying to think
12    about what -- what that could potentially be.  That -- you know,
13    the suggestion that we were holding information back that we
14    currently possess.  I really can't think of what that might be.
15    We -- we turned over, as noted on Page 5 of our response,
16    material that was responsive to an MLAT.  And I know that we
17    were going to cover that later.  And then the undercover chats
18    that took place between the F.B.I. -- the F.B.I. and the
19    co-Defendant.  And then, you know, a copy of the malware that
20    was purchased from the co-Defendant.  And then some chats that
21    the individual had on a forum.

22         So I would say that, you know, as material becomes --
23    if new material is obtained, you know, we would certainly
24    produce that.  I can't remember if this came up -- the defense
25    argument came up with respect to this topic or not, but there

1   was a question in their filing about a forum AlphaBay.

2              THE COURT:  Yes.

3              MR. CHMELAR:  That the Government had seized it.  The

4   Government had shut it down.  And I can't remember -- recall if

5   we -- in our motion or response we noted that recently there was

6   a specific period of time an unencrypted copy of that forum for

7   just a specific period of time -- that just became available.

8   That we put in a request for information related to the

9   co-Defendant.  And I believe Mr. Hutchins.  If anything is

10  produced in response to that request, we would certainly produce

11  it.  But until just recently that was not available to the

12  Government.

13             And I say that meaning like when we just started this

14  discovery process, that was not available to the Government.  So

15  that's something that came -- that the Government became aware

16  of.  And when we did, we put in a request for -- I think we

17  noted that in our response.  So we have not yet received that

18  information, but that would potentially relate to their request

19  for additional information about the co-Defendant.

20             THE COURT:  As I read the defense pleadings, it seems

21  that a category or primary area they're looking for on this is

22  evidence perhaps that this co-Defendant was acting independently

23  of Mr. Hutchins.  Which, of course, would be a defense at trial.

24  Is there any additional information other than what you have

25  already provided that is responsive to that?

1      MR. CHMELAR:  Not that I'm aware of.  And I say that

2  with a caveat that I think we put in our response, it is

3  certainly possible that the co-Defendant acted independent on

4  certain -- he had other enterprises going on outside the alleged

5  conspiracy with Mr. Hutchins.  What that might be, I'm not sure.

6  The information from AlphaBay might show that.  But, you know,

7  not that we -- not that we currently possess.

8      So I'm not -- I'm not aware specifically of something

9  that shows that he was selling the Kronos malware independent of

10  Mr. Hutchins, but rather my earlier statement was meant to

11  indicate that he may have been involved in other criminal

12  activity in addition to selling the malware.  But at this point

13  I'm not aware of it.

14      THE COURT:  So I think the concern -- the

15  Constitutional concern here, as I see it, is -- and it should be

16  a concern for the Government as well, that we have a

17  situation -- for example, Mr. Hutchins proceeds to trial before

18  a co-Defendant is arrested.  And after co-Defendant is arrested,

19  then additional discovery is disclosed to co-Defendant, which

20  Mr. Hutchins did not have, and perhaps that could have been

21  evidence that he would have used in his own defense at trial.

22  So that's the scenario that we're -- I see as a potential

23  Constitutional problem that we ought to avoid, and the

24  Government should equally want to avoid that.

25      MR. CHMELAR:  We certainly appreciate that.  And I

1   started out in our initial response, I'm not aware of

2   information that we're holding back just waiting to give to the

3   co-Defendant alone.  I'm just not aware of that.  We gave things

4   actually to the Defendant, Mr. Hutchins.  Conversations that

5   were exclusively between the co-Defendant and the F.B.I.  We

6   would certainly turn that over to the co-Defendant if he was

7   ever detained and brought here.  But I'm not aware -- the

8   Government's not aware of additional information that we would

9   produce as to that individual but not to Mr. Hutchins.

10          THE COURT:  Do you both have copies of the Indictment

11  before you?

12          MR. KLEIN:  Yes, Your Honor.

13          THE COURT:  Do you --

14          MR. CHMELAR:  I don't, but I'm familiar with it.

15          THE COURT:  I hope so, Mr. Chmelar.  So I'm looking at

16  Page 3 of 8, which is overt acts in furtherance of the

17  conspiracy.  I believe that's the area that summarizes

18  activities between -- you know, without getting into the

19  specific counts as to Mr. Hutchins and the co-Defendant --

20  paragraph -- I mean paragraph 4(b), on or about July 13, 2014,

21  video showing the functionality of the Kronos Banking trojan was

22  posted to a publicly available website.  Co-Defendant used the

23  video to demonstrate how Kronos worked.  So is this evidence

24  that Mr. Hutchins has in preparation of his defense?

25          MR. CHMELAR:  So the -- in the -- one of the chats

1    that we produced -- so everything alleged in the overt acts that

2    we possessed we produced to defense.  So that's a reference to

3    an undercover chat that took place between the F.B.I. and the

4    co-Defendant, and when a demo of Kronos was requested, the

5    co-actor directed the individual, the F.B.I., to YouTube and to

6    the URL.  And so there's a URL that was provided.  And the video

7    may have since been taken down by YouTube.  But I'm fairly

8    certain everything alleged in the overt acts section has been

9    produced to the defense.

10             THE COURT:  Okay.  So that you anticipated my

11    question, so you spare me from reading another paragraph.

12             MR. CHMELAR:  Yes.

13             THE COURT:  Representing it's all been provided.  All

14    right.  Mr. Klein, anything additional?

15             MR. KLEIN:  Well, Your Honor, it just obviously is a

16    little confusing to us in the sense that they spent 3 pages

17    arguing why we shouldn't get things, but now we're hearing that

18    we received everything.  So I just -- again -- I mean, we have

19    your concern also, Your Honor.  That we want to make sure that

20    if the co-Defendant is arrested, there's nothing else they're

21    going to give him, the co-Defendant, that Mr. Hutchins isn't

22    receiving.

23             And I guess to just put a fine point on that, for

24    example, Mr. Chmelar brought up the idea oh, the co-Defendant

25    might have been involved in other criminal activity involving

malware. And that would actually be very relevant to us to show

they operated independently. And that, therefore, there's a

defense here. And so we're just -- you know, we're a little

confused by that. I mean, they could have just come out and

written hey, we produced everything. They could have told us

that in the discovery conferences, but they didn't. So we --

we I think in good faith believed, at least until today, that

they had not given us things that they would give to the

Defendant. The co-Defendant.

THE COURT: Thank you, Mr. Klein. Mr. Chmelar,

anything else?

MR. CHMELAR: Part of -- I'm sorry -- part of our

response related to the co-Defendant had to do with this request

for information leading, you know, to his location so they can

go and interview him. So that related a lot to -- that involved

a lot of -- involved -- a lot of our response involved that --

that particular topic. So --

THE COURT: Thank you. All right. So as to this

motion, and given the Government's representation today, this

motion is also being denied without prejudice for the same

reason. Cases are dynamic. If it becomes necessary to review

this, we can cross that bridge when we get there. And then that

takes us to item number 3 regarding Randy. Mr. Klein?

MR. KLEIN: Yes, Your Honor. Sorry. I'm just

flipping the page here. One second.

1          THE COURT:  Take your time.

2          MR. KLEIN:  So again, I think we're requesting basic

3    information about who we'll call Randy, including quite simply

4    just the name of Randy's attorney.  Legally the Government is

5    relying on a mis-categorization of Randy as a tipster.  They've

6    made -- in their response basically created the situation where

7    they've agreed that Randy is at least allegedly a percipient

8    witness of certain things.  And so, therefore, we believe we're

9    entitled to a lot of information about Randy.

10         It's pretty clear they're going to call Randy at

11   trial, or at least he's very much on their list.  And to not

12   even give us the name of his Attorney to go to try to even talk

13   to this person?  I mean, that just seems -- you know, a position

14   they should not be taking, frankly.  And we're surprised by it.

15   But also we think we're entitled to more than that, of course.

16         And we stand by our position that we're entitled to a

17   full disclosure about this person, and who they are, and what

18   discovery, other statements they might have made.  We have a

19   very redacted 302, Your Honor.  It's incredibly redacted.  Like

20   it's basically black ink.  We would like an un-redacted 302 of

21   this person's proffer.  We would like other discovery about this

22   person, including whether this person's been provided

23   compensation by the Government in connection with their

24   cooperation.  So --

25         THE COURT:  Thank you.  Mr. Chmelar?

1    MR. CHMELAR:  This becomes -- the issue of -- we've

2  all adopted calling him Randy.  Comes up later regarding search

3  warrants.  So I'll come back to that.  But we've produced much

4  more than the 302.  And it is, in fact, redacted.  So --

5  so they -- the individual we've been discussing as Randy was the

6  subject of a separate -- totally separate Government

7  investigation.  He -- Randy came in and proffered with the

8  Government.  We produced the proffer letter.  Redacted.  And

9  then he came in and divulged a great amount of information about

10  certain cyber actors, including Mr. Hutchins.

11    The redactions that Mr. Klein is referencing relate to

12  the other cyber actors other than Mr. Hutchins.  So the

13  redactions in the 302 we produced regarding that proffer

14  session?  The information about Mr. Hutchins was not redacted.

15  The information about all the other individuals -- and there's

16  pages of them -- were redacted.  Because it's not relevant to

17  this particular matter.  And the redactions still allow the

18  defense to have an idea of the scope of the criminal conduct

19  that this individual was involved in.  And it does disclose a

20  lot of other criminal conduct.  The proffer report does disclose

21  a lot of the other additional criminal conduct that this

22  individual was involved in outside of his interactions with

23  Mr. Hutchins.

24    We also produced all the -- some evidence that was

25  seized from that individual's residence during the execution of

1    an unrelated search warrant.  And we produced chats between the

2    individual that's been identified as Randy, or discussed as

3    Randy, and Mr. Hutchins over a long period of time.  And we

4    produced those to the defense.

5           So the idea that his identity and who he is might be

6    relevant I think is -- we obviously believe is meritless at this

7    point.  We -- we proffered to the Court in our response that he

8    might not need to be a witness.  These chats were shown to

9    Mr. Hutchins at his post-arrest.  Assuming, you know, that

10   nothing is suppressed.  The -- we showed the chats that were

11   obtained from Randy to Mr. Hutchins during the post-arrest.  He

12   identified them.  Made certain statements related to those

13   chats.  So the underlying information about Randy -- and I

14   should note we also produced undercover chats that were made by

15   the F.B.I. involving the F.B.I. and Randy before Randy was taken

16   into custody that show his criminal conduct.  So we've produced

17   a significant amount of the underlying material that discloses

18   Randy's -- go to Randy's credibility and his veracity.

19          But the one thing we have not disclosed at this point

20   is Randy's identity.  Because, one, we believe that in this

21   context -- because Randy came forward after his interactions

22   with Mr. Hutchins had ceased, he wasn't acting as a Government

23   actor at that point.  So he was coming in as a tipster to the

24   Government about someone else's criminal conduct.

25          We do note that he did have -- on an occasion he

1    received the Kronos malware from Mr. Hutchins, but that was

2    before he was acting as a Government source.  And we've produced

3    the malware that was received to the defense as well.  And as

4    Mr. Proctor and I noted in our response, that if we determined

5    that this individual would be called as a witness, we would

6    disclose him -- his identity, as the District Court requires, by

7    the pretrial conference -- final pretrial conference hearing in

8    the packaged material.  But I think based on what we've produced

9    to date, and that individual's status with the Government, his

10   identity?  The need to know his true identity?  I don't think

11   the defense has met their burden under the -- under current case

12   law.

13          THE COURT:  Thank you.  Mr. Klein, is there anything

14   else you wish to add?

15          MR. KLEIN:  Yes.  I would just note that -- you know,

16   the prosecutor mentioned that they may not need to call Randy

17   because they may be able to get Mr. Hutchins' alleged statements

18   into the evidence and him acknowledging these reported chats.

19   But even then we still may want to call Randy to talk about

20   those chats and what was happening in the context.  So the idea

21   that we can't get the name of the attorney for this person to

22   even see if he'll speak to us?  To give us context or

23   information?  It just seems, you know, completely not in line

24   with how discovery is supposed to work.  And it doesn't seem

25   inconsistent with how the Seventh Circuit has viewed the

1    difference between tipsters and transactional witnesses, which

2    Mr. Randy clearly is.  So we think we're entitled to at least

3    some information.  Additional information.

4            THE COURT:  Thank you.  Well, Randy is not exactly a

5    tipster.  Not exactly a transactional witness.  But perhaps

6    closer to a transactional witness, given his -- what the

7    Government anticipates that he will -- he would testify to.  At

8    any rate, the Government has provided a lot of substantive

9    information regarding Randy, but not his identity and that of

10   his attorney.  Even with that information, Mr. Hutchins has also

11   a right to prepare for trial.  Perhaps do his own investigation

12   on Randy.  Perhaps seek the testimony of Randy, or not.

13           I know that the trial Judge Stadtmueller has a

14   pretrial order ordering a list of witnesses to be disclosed.  In

15   my view, the time between the final pretrial and the trial date

16   would be insufficient to allow -- if Mr. Hutchins chose to -- to

17   investigate Randy or perhaps assume him as a witness.

18           So I'm not ordering immediate disclosure of Randy's

19   identity, but I am ordering disclosure sooner than the time of

20   the pretrial report.  I'm going to use what we usually do in

21   this District, which I believe is usually 30 days prior to the

22   trial date to have this information disclosed, as to allow them

23   to do their leg work as to Randy.

24           MR. CHMELAR:  Thank you, Judge.

25           THE COURT:  Moving on.  Number 4 is regarding --

1          MR. PROCTOR:  Your Honor, I apologize.  But I have a

2    hearing before Judge Jones.  I have to leave.

3          THE COURT:  Thank you.  Judge Jones is more important

4    than me.  Go ahead.

5          MR. PROCTOR:  Mr. Chmelar is more important than me.

6    Thank you.

7          THE COURT:  Number 4, Mr. Klein, is regarding the

8    Grand Jury instructions.

9          MR. KLEIN:  Yes, Your Honor.  We think we provided a

10   definitely non-speculative basis to get access to the Grand Jury

11   legal instructions.  Just to be clear, it's the legal

12   instructions.  Not asking for -- I mean, we'd like witness

13   statements, of course.  And we expect them at a certain point

14   under the discovery obligations.  But this is focussed on the

15   Grand Jury legal instructions.

16          Our view is it's very clear that -- or at least

17   arguably very clear that the Indictment misstates the law.  That

18   would indicate to us -- and I think it should indicate to

19   anyone -- that they -- the Grand Jury would have been likely

20   mis-instructed on the law.  So that goes directly to a motion to

21   dismiss we contemplate filing.  We can contemplate a motion not

22   just to dismiss those two counts because they're erroneous on

23   their face, but also we can move to dismiss based on

24   mis-instruction of the Grand Jury.

25          And one of the Government's responses to this is well,

1    we're not required to instruct them.  Well, they did.  And even

2    if they're not required, if they mis-instructed them, it's very

3    clear from case law that is a real problem, potentially, for the

4    Government.  And so again, we think this is a fair, targeted

5    request, focussed on a very substantive defense motion that we

6    intend to file.  And we'd like access to these legal

7    instructions.

8              THE COURT:  Mr. Klein, you may have hit on it.  My

9    question to you is, for the purpose of a motion to dismiss are

10   we not talking about two separate grounds?

11             MR. KLEIN:  Yes, Your Honor, we are.

12             THE COURT:  So I guess my question is, are you able to

13   attack the defect on the Indictment without the instructions to

14   the Grand Jury on the law?

15             MR. KLEIN:  I think we could file a motion that would

16   facially move to dismiss the Indictment as being erroneous

17   facially, right?  But, of course, we see this as -- you

18   mentioned two parts.  One is the facial problems with the

19   Indictment in Counts 2 and 6.  And they're actually -- just like

20   little nits or typos?  We're not talking about that, of course.

21   We're talking about, frankly, the most material part in any type

22   of white collar case, which goes to the mens rea or the mental

23   state -- alleged mental state of a Defendant.

24             And so we think both because of the nature of the

25   error, as well as the error themselves, that we are entitled to

1    the legal instructions.

2              THE COURT:  Thank you.  Mr. Chmelar.

3              MR. CHMELAR:  You know, obviously we disagree with the

4    defense.  I think they're under -- under Rule 12 there's a

5    couple different ways that -- couple different challenges that

6    could be brought.  One is impropriety in the Grand Jury

7    proceeding, and one is a facial challenge for failure to state

8    the offense.  I think this is the latter.  This is -- based on

9    their filing, they're alleging that because the word intentional

10   is missing from two of the counts, that it fails to state an

11   offense.

12             And so whether or not the Grand Jury was told what

13   the -- you know, advised -- or instructed on the law is -- as we

14   put in our response, we don't see how it is relevant or

15   material.  We don't have to instruct the Grand Jury.  My

16   practice is not to instruct the Grand Jury.  Now, it doesn't

17   mean that they weren't instructed in this case.  I'm not going

18   to make that representation.  But based on what they're filing

19   and what they're alleging the problems are?  They don't need the

20   Grand Jury instructions, because they haven't shown a compelling

21   necessity and a particularized need in this particular case.

22             THE COURT:  Mr. Chmelar, allow me to interrupt you.

23   What would a compelling need look like in this context?  I mean,

24   as you know the Grand Jury is secret.  They don't have access to

25   it.  How does one show that compelling need in the context of

1   what we're talking about?

2          MR. CHMELAR:  In the -- you know, I'd have to think of

3   a hypothetical and maybe a certain situation where information

4   unrelated to the case was presented to a Grand Jury, or

5   information was misrepresented to the Grand Jury.

6          THE COURT:  But the defense would never have that

7   information, right?  Because they don't have the Grand Jury

8   transcript at that stage.  Trying to figure out, how does this

9   look like in real life?

10         MR. CHMELAR:  I'm not sure, because the case law on it

11  doesn't -- it's not really -- it's hard to satisfy.  And it

12  doesn't happen that often.  And if you're asking me for a

13  particular hypothetical in the situation where it could -- would

14  qualify?  I couldn't present Your Honor with that circumstance.

15  I just know that in this particular situation that is before the

16  Court right now, an allegation as to Count 6, that the count

17  should say intentionally attempted to cause damage?  When

18  attempted, as we put in our response, includes -- it means an

19  intentional act?  It's not clear to me that that's -- actually

20  fails to state the offense correctly.

21         And on the other count, it's clearly our position it's

22  a scrivener's error.  The other two counts which charge the same

23  conduct do correctly indicate -- use the term intentionally.

24  The one count that the defense is complaining about says

25  knowingly.  So there's three counts that all charge the same

offense. I don't know, Judge, what the hypothetical would be

that qualify, but I know that this particular one is not it.

THE COURT: Thank you. Mr. Klein, anything further?

MR. KLEIN: Your Honor, I just think we've shown a

particularized need for these legal instructions, and I think

we're entitled to them. Whether it's -- and it would be the

whole -- all of them. And we rest on our papers.

THE COURT: Thank you. I think this is one that I

need to take under advisement. And here's why. Based on the

questions I've already asked, I think it's -- I haven't figured

out yet on the standard for this compelling need. What it looks

like. Because it's a very difficult standard. So I'd like to

take a look at that. That's one.

And two, as this is presented, the preliminary request

to look at the Grand Jury instructions on the law is very much

intertwined with the substantive motion that you would bring.

So if you are going to file such a motion, I will entertain both

at the same time. So I would like to have that -- take that

motion under advisement.

MR. KLEIN: That makes sense, Your Honor. We would

like to file one at the same time, too.

THE COURT: And then lastly, then as to number 5, is

the request for the MLAT, M-L-A-T documents. My understanding

is from the pleadings that the Government has produced documents

received from this MLAT, M-L-A-T, document. But the defense is

1    requesting the underlying application, for lack of a better

2    word.  Mr. Klein?

3                MR. KLEIN:  Yes, Your Honor.  And it's not just the

4    MLATs.  The search warrant.  The Government made reference today

5    to a search warrant we haven't received related to Randy.

6    Obtained the evidence they provided to us in discovery in this

7    case.  So we're seeking both more information related to MLAT

8    requests for underlying documents, as well as the search

9    warrant.  I think we laid out our position pretty clear.  This

10   isn't about the Government's trial plans or something like

11   their -- trying to get inside their legal strategies.  These are

12   documents they used to obtain evidence that they intend to use

13   in this case.  And we are seeking those documents.  And we

14   believe we are entitled to those.

15               And whether or not we have a motion to suppress of the

16   search warrant, we may or may not.  We don't know.  We haven't

17   seen it.  So it's very hard for us to say we don't.  And on the

18   MLATs, we haven't seen them.  We don't know what motions we may

19   have there, or how those may play out in trial.  We're seeking

20   that information.

21               THE COURT:  On the MLATs, Mr. Klein, the Government

22   responded by saying you have the documents.  What was produced

23   as a result of them.  But the applications themselves are not

24   subject to production under Rule 16, because they're internal

25   Government documents, because they were not sworn or signed by a

1  law enforcement Agent, but actually by D.O.J. attorneys.  Can

2  you address that?

3          MR. KLEIN:  Yes.  That's just not accurate in our

4  view, Your Honor.  These are not internal documents.  So what

5  that rule is meant to cover is some sort of internal memo the

6  Government might issue like an internal policy.  Right?  Here's

7  the new policy on this.  Or here's how you should handle this

8  case.  And it's like, you know, an Attorney General sending some

9  memo down the line to people.  That's not what we're seeking

10 here.  We're seeking a document that the Government produced and

11 created and sent to a foreign Government.  It is by no means an

12 internal document.  It was sent to a foreign Government.  It is

13 the most external you could get, even.  Arguably.  So I think

14 that argument doesn't hold any water.

15         THE COURT:  Thank you.  Mr. Chmelar, if you could

16 address both -- I was focussing on the MLAT, but there's a

17 search warrant issue, too, as well.  Address both, please.

18         MR. CHMELAR:  So the defense hasn't identified

19 anything to support their request.  They fail to identify

20 anything that supports the production of the MLAT request.  And

21 despite what Mr. Klein is saying here today, in the motion to

22 compel they said that it contains information regarding the

23 Government's theory of the case, which is why they want it.

24 That's not covered by Rule 16 or any of the discovery process.

25         The underlying records that were obtained through the

MLAT were produced. The MLAT request itself was not -- as we indicated, it's not subject, we don't believe, to production under 3500, Giglio, Brady, or anything like that, because it's not signed by -- it's certainly not 3500. It's not signed by an Agent that would, you know, potentially be testifying in this case.

The document is conveyed to a foreign Government. I think it is -- the Government obviously believes it is not subject to disclosure under 16. It's specifically excluded under 16(a)(2). It's -- it's not -- if it's not an other internal Government document, it's certainly a memoranda issued by the Government to another foreign Government for information. So to the Government it's not clear that it is subject to production. But the defense has not identified any authority that would lead to its production. So from that perspective, we think that the request for the production of the underlying documents sent to the foreign Government should be denied.

THE COURT: Mr. Chmelar, you just quoted from 16(a)(2). As you mention, and I already indicated, it speaks of internal Government document. And Mr. Klein is arguing this is not internal. It didn't stay within the D.O.J. It went abroad. So why is this an internal document?

MR. CHMELAR: Well, I guess if the view is that the qualifier other internal Government documents relates to all three of those category of information? Then Mr. Klein is

1    correct.  It was a document that was produced and sent to a

2    foreign Government.  So I guess arguably would not be an

3    internal Government document to the U.S.  I'm not sure that

4    16(a)(2) is read in that fashion, but I -- we still don't

5    believe it's subject to production.

6          And I don't see -- outside of whether or not it's

7    specifically excluded under 6(a)(2), it's certainly not subject

8    to production under 16(a)(1).  So I think our question would be,

9    Your Honor -- and the question for the defense is what authority

10   supports the production of the documents?  If it's not Giglio,

11   Brady, 3500, or Rule 16, why is it subject to production?  And

12   our point of view -- from -- our point of view is that it's not.

13         THE COURT:  Are you aware of any -- I have not come

14   across this document before.  Are you aware of any cases

15   discussing this, Mr. Chmelar?

16         MR. CHMELAR:  Yeah.  So there's -- it's not exactly a

17   bright line on whether or not they're subject to production.

18   Sometimes it involves whether or not the document -- the

19   information was sent to the foreign Government as sort of a

20   joint operation with that foreign Government.  In which case

21   it's -- sometimes things happening in a foreign location during

22   a joint operation then cause them to more likely be subject to

23   production or scrutiny.

24         But to answer your question more specifically, no, I

25   don't think there's a real bright line rule on MLAT requests.

1          THE COURT:  Thank you.  The search warrant now?

2          MR. CHMELAR:  The search warrant goes back to Randy.

3    The search warrant took place during a separate investigation.

4    It took place at a residence in the United States.  Mr. Hutchins

5    had no privacy interest in any -- he didn't own the property,

6    didn't live at the property, had no association with that

7    property, or that individual, as far as we know, other than

8    online communications.  And as I said earlier, it was a wholly

9    separate investigation that did not involve Mr. Hutchins at all.

10   It just happened to turn out that the individual who was the

11   subject of that investigation knew Mr. Hutchins and his

12   connection to the Kronos malware.  But other than that, the

13   affidavit doesn't refer to Kronos.  Doesn't have any -- refer to

14   Mr. Hutchins or anything involving Mr. Hutchins or this case.

15         So Agents who work for the F.B.I. work on lots of

16   different matters, and they write lots of reports and affidavits

17   related to other cases.  Simply because that Agent may testify,

18   have other, you know, investigations and information and made

19   statements in other cases doesn't mean that they're material to

20   this particular case.  And they don't all become 3500.  Has to

21   be related to the current case at hand.  And that was not the

22   situation here.  That affidavit goes to a separate

23   investigation.  Does not involve Kronos malware.

24         THE COURT:  Thank you.  Mr. Klein, anything further?

25         MR. KLEIN:  Yes, Your Honor.  I think it's -- you

1  know, the Government's made it clear they want to introduce

2  evidence they seized as a result of that search warrant in this

3  case at trial.  We have a right, I believe, to evaluate that

4  search warrant and potentially move to suppress it.

5          THE COURT:  On what grounds would you seek to suppress

6  it if Mr. Hutchins does not have standing as to that search?

7          MR. KLEIN:  Well, Your Honor, off the top of my head,

8  I don't know.  But I'd like to look at it and -- you know, there

9  are other grounds to move to suppress a search warrant.  Not

10  just -- you can -- at least maybe there is standing.  I don't

11  know.  I don't know where this residence was.  I mean, we've

12  heard, you know, representations.  But we haven't seen it.  And

13  I would like to look at it.

14          Maybe there are no grounds.  But, you know, it is

15  evidence they intend to introduce at trial, and we would like to

16  look at the search warrant.  We don't see any prejudice to the

17  Government at us looking at this search warrant.  I mean, they

18  articulated nothing, other than they just don't want to give it

19  to us.  And so I think we're entitled to it.

20          And the other issue, just going back to the MLAT real

21  quick, the qualifier internal clearly covers all three.  I mean,

22  it just wouldn't make any sense.  Otherwise the Government would

23  have to produce their reports and memoranda.  And that's not the

24  case.  So if you read that rule as it's written, it's very

25  clear.  It's only covering internal documents.  MLATs are

produced.  Applications are produced.  In fact, when the
Government seeks abroad to extradite people -- and I have an
extradition case now -- they actually produce the whole MLAT to
the foreign country and the whole underlying affidavit.  And so
I think, again, we're entitled to both.

THE COURT:  Thank you.  Mr. Chmelar, as to both --
actually both the search warrant and the MLAT.  What's the
prejudice to the Government?

MR. CHMELAR:  Well, we don't -- we're certainly not
interested in getting into a practice of producing material in
unrelated cases because the defense is interested in seeing it.
That's not what discovery is for.  It's a slippery slope.
That -- there's no basis under the law to support the request.
Simply because Mr. Klein wants to see an affidavit in an
unrelated case doesn't mean that he is entitled to view it.  And
so for that reason I think it should be denied.

I am not familiar with any way or -- to suppress any
of the evidence -- for Mr. Hutchins to suppress any of the
evidence that was obtained through the search warrant at a
location he has no connection to.  Likewise, you asked me
earlier about the MLAT process and the discovery of that.
Mr. Klein mentioned maybe, you know, having that would lead him
to the ability to suppress it.  I am not familiar with any
vehicle in which Mr. Klein would have the ability to suppress
anything produced by a foreign Government through a treaty.

1    Because that's what it is.  It's production through a legal

2    assistance treaty.  I'm not familiar with any mechanisms --

3    maybe Mr. Klein or one of the other defense attorneys are,

4    because it's more in their line of challenging that stuff.  But

5    I'm not familiar with it.  So the idea that production of either

6    one of them would be supportive of any sort of pretrial motion?

7    I don't think is accurate.

8              THE COURT:  Thank you.  Okay.  So as to the search

9    warrant I have not heard and cannot at this time imagine grounds

10   that Mr. Hutchins would have for challenging the search warrant.

11   I'm denying it on that basis.  As to the MLAT, because I have

12   not come across this before, I want to do my due diligence on it

13   and give a written order on that.  I think that's all the stuff

14   we had for this afternoon.  Mr. Klein, is there anything I am

15   forgetting here on your motion to compel?

16             MR. KLEIN:  No, Your Honor.  That covers our five.

17             THE COURT:  Mr. Chmelar, anything I am forgetting

18   here?

19             MR. CHMELAR:  No.  I simply have two questions.  On

20   the Grand Jury -- instructions to the Grand Jury.

21             THE COURT:  Yes.

22             MR. CHMELAR:  And the MLAT.  Is your -- as to the

23   Grand Jury, does Your Honor want the Government or the defense

24   to look into any case law and provide it to the Court and/or

25   order the transcript related to the potential instructions for

1  the Court to review?  Or the same with the MLAT request.  I

2  certainly am aware of information that's available to the

3  Government.  Case law which I noted earlier may not be --

4  provide a clear, bright line as to either way.  But we would

5  certainly be willing to do additional research, if the Court

6  wanted.  Because I -- as I sit here thinking about 16(a)(2), I'm

7  pretty sure that it's consistently viewed that -- outside of the

8  open file policy that we have -- that F.B.I. 302's are excluded

9  under that.  So I question whether or not that would qualify as

10 an internal document or not.  But regardless, if Your Honor

11 would like additional research by the Government, at least, we

12 would be more than willing to provide any.

13        THE COURT:  Thank you.  As to the MLAT, yes, some

14 research.  And I don't want a big brief on it.  But additional

15 research that -- because it's not something that comes up a lot.

16 It would be educational for me and help me get it right.  Any

17 authority that you have that's relevant both sides can submit to

18 me.

19        And as to the Grand Jury, the way I was going to

20 handle that is to keep the request for the Grand Jury

21 instruction under advisement and to address it along when I'm

22 addressing the anticipated motion from Mr. Klein.  That's the

23 way I was thinking about addressing that motion.  Mr. Klein, is

24 that the way you understood things on the Grand Jury?

25        MR. KLEIN:  It was, Your Honor, but obviously you can

1  choose how to handle it.  You're the Judge.  So as I understand

2  it, we can file something short.  Just sort of a short one or

3  few page thing about MLATs and why we are entitled to it.  And

4  then for the Grand Jury --

5          THE COURT:  You've already made your argument as to

6  why you are entitled to it.  What I'm looking for, if you've

7  seen other -- if you come across other cases on how this is

8  handled, that would be helpful to me.

9          MR. KLEIN:  I didn't mean to make an argument.  It

10 would just be informative.  Here's the cases we can direct you

11 to.  And for the Grand Jury, just so I understand, to be clear,

12 when we file our motion to dismiss Counts 2 and 6, our

13 anticipated motion, you will then in viewing that make a

14 decision about whether you think you will want to either look at

15 the legal instructions or provide them to us.  Is that what

16 you're saying?

17         THE COURT:  That is what I'm saying, because I

18 understand your motion to be on two grounds.  Both facial defect

19 and possible mis-instruction of the Grand Jury.  And I

20 anticipate -- the Grand Jury part maybe is hard to do without

21 seeing it, but I anticipate in discussing those two grounds to

22 be fleshed out more.  And because there's some intertwining

23 between them, it would help me understand whether it's necessary

24 to go there in addressing the motion.

25         MR. KLEIN:  So I guess, Your Honor, the crux of our --

1    what I'm trying to understand is if we're filing a motion to

2    dismiss facially, we should file a motion to dismiss based on

3    mis-instruction even though we don't know what they were

4    instructed?  Or even if they were instructed?  Because the

5    Government wasn't even clear, again, to us, that they even

6    instructed the Grand Jury on the law here.

7            MR. CHMELAR:  Yeah, and that's the thing, Judge, for

8    this speculative aspect of this.  I mean, every defense Attorney

9    can just file a motion saying they were mis-instructed, with no

10   basis, which is the case here.  If the defense hadn't been

11   filing this -- which we put in our motion -- I would just ask

12   to -- I would -- I would make a motion and ask them if I could

13   just amend the count they're complaining about.  But if they're

14   going to file a motion to dismiss it, I'll certainly just go

15   back to the Grand Jury and present the case again and cure the

16   defect.  Or I can have them file a motion with the Court.

17   Because to me it's just a -- it was clearly a scrivener's error,

18   considering all the way the other counts are charged.

19           So I think that, you know, it's really just -- as it

20   was with the -- you know, the surveillance and the motion to

21   suppress, a search warrant in somebody else's house -- this is

22   just more speculative kind of approach to the case to see what

23   they could do, rather than basing it on what has been produced.

24           So I don't know if that changes Your Honor's position,

25   but that's the way that we see this.

1          THE COURT:  My question to you, if you believe that

2     correcting the Indictment would address what the defense is

3     complaining about, why do you need the defense I guess

4     agreement?

5          MR. CHMELAR:  Well, because I don't -- I don't see it

6     as a substantive defect.  I see it as a scrivener's error.  And

7     I can correct a scrivener's error by making a motion to correct

8     it.  But if it's deemed to be more substantial error like no,

9     you've got to go back to -- you know, you can't correct it just

10    by motion, then I do have to return to Grand Jury and correct

11    that count with the Grand Jury.  That's why I'm saying like

12    if -- but for the fact the defense making a bigger deal out of

13    this than I think it is, I would have just asked them -- I would

14    have brought it to their attention and said, hey, there's this

15    potential error in Count 2.  I'm going to make a motion to

16    correct that error.  Are you going to object?  And work it out

17    that way.  But they seem to believe that it serves as grounds to

18    dismiss more than that particular count.

19         THE COURT:  Thank you.  Mr. Klein, do you wish to jump

20    in here?

21         MR. KLEIN:  Just real quick.  Obviously we don't view

22    it as a scrivener's error.  It's mens rea.  Also we don't view

23    our motion as being speculative.  In response to at least one of

24    the actually produced materials that are relevant, and we intend

25    to use, so -- before they filed their response.  So, you know,

| | |
|---|---|
| 1 | we'll handle this how Your Honor -- I think I understand Your |
| 2 | Honor's plan.  And we'll prepare our motion and we'll raise |
| 3 | these issues in our motion, and then I guess Your Honor will |
| 4 | decide whether at that time we're entitled to the legal |
| 5 | instructions. |
| 6 | THE COURT:  Thank you, Mr. Klein.  That's how we will |
| 7 | proceed.  I'll see what we have, and we'll sort it out.  If it |
| 8 | creates doing things in two steps on that particular motion, so |
| 9 | be it.  We'll cross that bridge when we get there.  But for now |
| 10 | let's open our calendars, because we do need a schedule in this |
| 11 | case.  Mr. Klein, allow me to begin with you.  Let's get this |
| 12 | show on the road here.  What do you propose as a deadline for |
| 13 | filing motions? |
| 14 | MR. KLEIN:  Your Honor, I think we were thinking -- so |
| 15 | today is -- |
| 16 | THE COURT:  22nd. |
| 17 | MR. KLEIN:  I was thinking 45 days.  I'm trying to do |
| 18 | the math, Your Honor.  I'm a lawyer, not a mathematician, and so |
| 19 | I can't square where that puts us. |
| 20 | THE COURT:  Mr. Klein, why don't we keep the math even |
| 21 | simpler, to 30.  Because I can count to 30.  30 is really clean |
| 22 | here and it will allow us to get things going.  What do you |
| 23 | think about that?  So looking at Friday, March 23rd, would that |
| 24 | work for you? |
| 25 | MR. KLEIN:  Can I talk to my co-counsel, Your Honor? |

1          THE COURT:  Of course.

2          MR. KLEIN:  Your Honor, we would ask for just one more

3   week, to the 30th.  And part of the reason is Mr. Stiller is out

4   of the country for some of those days right at the filing time.

5          THE COURT:  That's fine.  March 30th, then, it is.  So

6   motions to be filed by defense Friday, March 30th.  And then

7   Mr. Chmelar, how much time are you requesting to respond?

8          MR. CHMELAR:  Sometime during -- sometime the week of

9   the 16th, potentially, maybe to the 18th, Your Honor.

10          THE COURT:  So I'll give you to respond until the

11   18th.  And Mr. Klein, what if I give you until the 27th for any

12   replies?

13          MR. KLEIN:  Your Honor, I have a conference I'm

14   running on the 27th.  Can we ask for just the 30th?

15          THE COURT:  Until the 30th?  Replies due on the 30th.

16          MR. KLEIN:  I hate doing things on Mondays because

17   it's always a possibility of the weekend being ruined.  But in

18   this case --

19          THE COURT:  So that's the schedule we will follow.

20   And then I want to rewind back to the short submissions that you

21   will provide me to assist me in the MLAT, which is still

22   outstanding.  I'd like to do a shorter deadline for that.  That

23   way we can address that as well.  What's your -- today's --

24   going back again is the 22nd.  Again I'm anticipating the

25   letters from you, some citations.  What do you -- Mr. Chmelar?

1         MR. CHMELAR: Either the 27th or 29th. I believe I'm

2 out of the office on the 28th and I'm not sure of Mr. Proctor's

3 schedule.

4         THE COURT: So I'll give you until the 29th,

5 Mr. Chmelar.

6         MR. KLEIN: There is no 29th, Your Honor.

7         MR. CHMELAR: Oh, I'm sorry. The 1st.

8         THE COURT: There is no 29th of February.

9         MR. CHMELAR: Sorry, sorry. I'm looking at the wrong

10 month. I'm sorry, Judge. March 1st.

11         THE COURT: March 1st.

12         MR. STILLER: For what it's worth, I'm pretty sure Mr.

13 Proctor is available on February 29th.

14         THE COURT: He probably is. Mr. Klein?

15         MR. KLEIN: That works for us, Your Honor.

16         THE COURT: Okay. So anything you want to submit to

17 me -- again, nothing lengthy. Just what's out there I'd like to

18 know on MLAT due on March 1st. And then I remind the parties if

19 there are any requests for an evidentiary hearing, that you

20 comply with the Local Rule. You just make things smoother.

21 Then I know there's -- if there's agreement with regard to an

22 evidentiary hearing. If there's not, that will allow me to

23 address it right away. We keep that moving. And while I have

24 you all together, I would also like to go ahead and reserve a

25 date for any evidentiary hearing, should one be warranted. That

1  way we know what we are dealing with.

2          MR. KLEIN:  How long after the motion -- the reply

3  date do you usually do that, Your Honor?  I'm just not sure of

4  your preference.

5          THE COURT:  So your motions are due on --

6          MR. KLEIN:  The 30th is the last day that -- we intend

7  to reply, so should assume we reply.

8          THE COURT:  Any request for evidentiary hearing goes

9  on a different calendar than regular motions.  So you would file

10  your motion for -- let's say you file a motion for an

11  evidentiary hearing on March 30th.  The Government by practice

12  has 3 days instead of -- to respond to let me know whether

13  there's an agreement to the request for evidentiary hearing.  So

14  we could schedule one rather quickly here.  Give me a second.

15  Mr. Klein, since you are traveling from out of state I will

16  allow you to propose a date that you can be here in person for

17  any evidentiary hearing, should one be warranted.

18          MR. KLEIN:  And, Your Honor, just so you know, Miss

19  Hofmann also is coming from California.  And, of course, our

20  client.

21          THE COURT:  I mean you collectively.

22          MR. KLEIN:  Your Honor, how about the 19th?  So it

23  would be the day after the Government files its oppositions.

24          THE COURT:  So April 19th.

25          MR. KLEIN:  Yes, Your Honor.

```
 1            THE COURT:  And do you have a time that works for you?
 2            MR. KLEIN:  You know, late morning is usually nice,
 3    Your Honor.  Obviously I don't know what your schedule looks
 4    like that day.
 5            THE COURT:  Mr. Chmelar, April 19th.  How does it look
 6    for you?
 7            MR. CHMELAR:  We're talking about an evidentiary
 8    hearing?
 9            THE COURT:  Yeah.  We want to reserve a time on the
10    calendar so that you can plan, I also can plan, if we're going
11    to have an evidentiary hearing in this case.
12            MR. CHMELAR:  That date is fine with the Government,
13    Your Honor.
14            THE COURT:  Okay.  So let's schedule it then,
15    Mr. Klein.  Let's say early in the afternoon.  That would --
16            MR. KLEIN:  1:30, Your Honor.
17            THE COURT:  Early in the afternoon.  1:30?
18            MR. CHMELAR:  That was April 19th?
19            THE COURT:  Yeah, April 19th.
20            MR. CHMELAR:  And I may have been confused, but wasn't
21    the defense filing their reply to anything we filed on the 30th?
22            THE COURT:  Yes, but that's for evidentiary hearing.
23            MR. CHMELAR:  I understand.  Okay.
24            MR. KLEIN:  So we have it after we file our reply,
25    Your Honor?  I mean, that was -- I wasn't sure how this local
```

1  rule works, and I apologize for my ignorance on this rule.  It's

2  a little different than what I've dealt with.

3          THE COURT:  It's okay to have it before your reply,

4  because you will have opportunity to do post-evidentiary hearing

5  brief on the motion that necessitates an evidentiary hearing.

6          MR. KLEIN:  Okay.  I understand, Your Honor.

7          THE COURT:  So your reply will be everything that

8  doesn't require an evidentiary hearing.

9          MR. KLEIN:  That makes sense to me, Your Honor.

10         THE COURT:  Mr. Catlett, can you read back all our

11  dates for us?

12         THE CLERK:  For pretrial motions I have the -- the

13  pretrial motions due March 30th.  The responses -- the

14  Government response is due April 18th.  And the Defendant's

15  reply due April 30th.

16         THE COURT:  And then we have our evidentiary hearing

17  on April 19th.  And then for the MLAT submission, we have it for

18  --

19         THE CLERK:  I have March 1st.

20         THE COURT:  March 1st.  And we'll also do -- we'll do

21  a written order so that we all are on the same page.  Okay.

22  Mr. Klein, anything further from you, sir?

23         MR. KLEIN:  No, Your Honor.

24         THE COURT:  Okay.  Mr. Chmelar?

25         MR. CHMELAR:  No.  Thank you, Judge.

1          THE COURT:  Okay.  Thank you all.  Safe travels for

2   you who are traveling out of state.

3          MR. KLEIN:  Thank you, Your Honor.

4                          *      *      *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF WISCONSIN

3

4          I, HEIDI J. TRAPP, Official Court Reporter for the

5  United States District Court, Eastern District of Wisconsin, do

6  hereby certify that I reported the foregoing Transcript of

7  Proceedings; that the same is true and correct as reflected by

8  my original machine shorthand notes taken at said time and place

9  before the Hon. Nancy Joseph.

10

11                         /s/ Heidi J. Trapp
                           Official Court Reporter
12                         United States District Court

13

14  Dated at Milwaukee, Wisconsin,

15  this 28th day of February, 2018.

16

17

18

19

20

21

22

23

24

25