UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

UNITED STATES OF AMERICA,                )
                                         )
                    Government,          )  Case No. 17-CR-124
                                         )  Milwaukee, Wisconsin
      vs.                                )
                                         )
MARCUS HUTCHINS,                         )  May 16, 2018
                                         )  1:30 p.m.
                    Defendant.           )

------------------------------------------------------------

**TRANSCRIPT OF EVIDENTIARY HEARING**

BEFORE THE HONORABLE NANCY JOSEPH

UNITED STATES MAGISTRATE

Official Court Reporter:
Richard Derrick Ehrlich, RMR, CRR
richard_ehrlich@wied.uscourts.gov
(414) 290-2642

Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S

 2

 3      For the Government:

 4                         Michael J. Chmelar
                           Benjamin Proctor
 5                         United States Department of
                           Justice (ED-WI)
 6                         Office of the U.S. Attorney
                           517 E. Wisconsin Avenue
 7                         Milwaukee, WI 53202
                           414.297.1582
 8                         michael.chmelar@usdoj.gov
                           benjamin.proctor@usdoj.gov
 9

10
        For the Defendant:
11
                           Marcia C. Hofmann
12                         Zeitgeist Law, PC
                           25 Taylor Street
13                         San Francisco, CA 94102
                           415.830.6664
14                         marcia@zeitgeist.law

15                         Brian E. Klein
                           Baker Marquart, LLP
16                         2029 Century Park E
                           Suite 1600
17                         Los Angeles, CA 90067
                           424.297.1728
18
                           Daniel W. Stiller
19                         D. Stiller, LLC
                           P.O. Box 511130
20                         Milwaukee, WI 53202
                           414.207.3190
21                         dan@dstillerllc.com

22

23      Marcus Hutchins, Defendant, present in person.

24

25
```

1                        I N D E X

2    Witness                                              Page


3    Lee Chartier

4
     Direct Exam by Mr. Chmelar    ....................... 13
5    Cross-Exam by Mr. Stiller     ....................... 44
     Redirect Exam by Mr. Chmelar  ....................... 78
6    Recross-Exam by Mr. Stiller   ....................... 83
     Exam by The Court             ....................... 84
7    Further Exam by Mr. Chmelar   ....................... 86

8
     Jamie Butcher
9
     Direct Exam by Mr. Chmelar    ....................... 87
10   Cross-Exam by Mr. Klein       ....................... 108
     Redirect Exam by Mr. Chmelar  ....................... 149
11   Recross-Exam by Mr. Klein     ....................... 153
     Exam by The Court             ....................... 153
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  Good afternoon.  We are here for
 2   United States vs. Marcus Hutchins.  Case No. 17-CR-124.
 3              May I have the appearances, please, beginning with
 4   the plaintiff?
 5              MR. CHMELAR:  Good afternoon, Your Honor.  Michael
 6   Chmelar and Benjamin Proctor on behalf of the United States.
 7              THE COURT:  Good afternoon, Mr. Chmelar and
 8   Mr. Proctor.
 9              MR. CHMELAR:  Good afternoon.
10              MR. KLEIN:  Good afternoon, Your Honor.  Brian
11   Klein, Marcia Hofmann, Daniel Stiller here for Mr. Hutchins,
12   who is here present in court out of custody.
13              THE COURT:  Good afternoon, Mr. Klein,
14   Ms. Hofmann, and Mr. Stiller.
15              And good afternoon to you, Mr. Hutchins.
16              THE DEFENDANT:  Good afternoon.
17              THE COURT:  We are here for an evidentiary hearing
18   on the defense motion to suppress.  Before I begin, I see we
19   have some people in the audience.  I want to make sure --
20   and I'm now entering an order that all the witnesses are
21   sequestered, so the attorneys can make sure any of their
22   witnesses are not present in the courtroom before we begin.
23              MR. CHMELAR:  Well, our two witnesses -- we only
24   have two -- they're in the hallway.
25              THE COURT:  Any witnesses --
```

1     MR. KLEIN:  And Mr. Hutchins might be our only

2 witness.  So he, of course, is allowed to be here.

3     THE COURT:  I understand.

4     All right.  Is the Government ready to start?

5     I will address the two objections that I received.

6 But other than that, is the Government ready to start?

7     MR. CHMELAR:  We are, Judge.

8     THE COURT:  And, Mr. Klein, are you ready to

9 start?

10     MR. KLEIN:  Yes, other than those two objections I

11 think you're going to get to.

12     THE COURT:  Okay.  As to the two objections, I

13 received objection from the defense objecting to the

14 admission of the Miranda warning statement with time

15 handwritten across it.

16     The Government had had an opportunity to respond.

17 I am overruling the objection and allowing it for the

18 following reasons:  No. 1, as the parties very well know,

19 the Rule of Evidence does not apply at an evidentiary

20 hearing.

21     Secondly, the parties -- the defense who is moving

22 to exclude the statement, will have the opportunity, of

23 course, to cross-examine the witness and make any relevant

24 record and relevant argument regarding the Miranda

25 statement.

 1          And then, lastly, and I think importantly, as I

 2    understand the defense motion here, the key question is

 3    voluntariness.  So this is not a motion, as I understand it,

 4    on paper so far where the defense is alleging that Miranda

 5    warnings were not given at all.  I think that would slightly

 6    change the analysis.  But even then, what weight to give the

 7    statement and the circumstances regarding any handwriting or

 8    changes, it will all be part of the total analysis.

 9          Mr. Klein, you look like you wish to be heard.

10          MR. KLEIN:  When you're done, Your Honor, but I

11    did want to respond to that last point.

12          THE COURT:  Why don't you go ahead now before I

13    move on to the second issue.

14          MR. KLEIN:  So two points, Your Honor.  We ask for

15    exclusion but also an adverse inference just to make that

16    clear.

17          Regarding your latter point, I think what's

18    important to the analysis is that this written document was

19    how Mr. Hutchins was allegedly advised of his rights.  And

20    so based on the disclosure we received from the Government,

21    it was through an agent reading this form to him that he was

22    advised and, through his signature on it, that he was

23    advised of his rights, and, the Government argues

24    effectively waived them knowing and voluntarily.  So,

25    therefore, I think it actually is directly on point in that

1  sense.  And the timing of that, of course, would be

2  incredibly relevant.  I mean, if he had signed this form

3  well after the fact, then it would not be a proper Miranda

4  warning or waiver.

5          So with all due respect, I want to disagree with

6  that part of your analysis, that the consequence we think is

7  an appropriate consequence here where a piece of evidence

8  has been altered after the fact.

9          I know the Government raises issue with, "Well,

10  it's not been destroyed or lost," but our response is that

11  the original document, contemporaneous with when they say he

12  signed it, has been effectively destroyed or lost.  So,

13  therefore, those are appropriate remedies even at this early

14  stage.

15          And I know the Government cited in its brief,

16  "Well, this usually happens at trial," and the cases it

17  relies on are civil cases.  Civil cases, as Your Honor

18  knows, don't have suppression hearings.  They have motions

19  in limine, and this is effectively a motion in limine.  So

20  that's why we're saying this would be the appropriate time

21  to issue those rulings, as well as the reason I just

22  articulated the appropriate thing to do.

23          And I would note that, Your Honor, just as a

24  related point, depending how the testimony comes out today

25  and what the agents say about this process, we may need to

1    call the AUSAs as witnesses.  I just want to flag that issue

2    upfront potentially to impeach the FBI agents.

3            THE COURT:  Mr. Chmelar or Proctor, do you wish to

4    say anything?

5            It was my intention to get quickly through the

6    objections so we can get to the motion, but since Mr. Klein

7    made a record, I'll allow you to speak too.  Is there

8    anything you --

9            MR. CHMELAR:  No.  I think we state our position

10   in our filing.  We agree, obviously, with your decision on

11   the issue.  So, no, we don't have anything additional to say

12   to that.

13           THE COURT:  Thank you.

14           Mr. Klein, I'm going to take up your points in

15   reverse order.

16           As to, I guess, the significance of the Miranda

17   warning.  Of course, that is relevant in the totality of the

18   analysis.  So I don't disagree with you there.  But I was

19   making the point that I would see it differently if the

20   question was whether he was Mirandized at all.

21           But the parties will have -- you will have an

22   opportunity, the Government will have an opportunity to ask

23   questions of witnesses to layout as to the timing, as you

24   point out, which, of course, is important.  So I don't want

25   to belabor that point.

1          The adverse inference, I think the Government is

2     correct under Seventh Circuit law.  Even in civil cases, to

3     get an adverse inference, you have to show bad faith.  So I

4     want to set the adverse inference aside and frame this issue

5     the way I see it.  As to any inferences to be made regarding

6     any of the evidence, including timing of the Miranda,

7     including timing of reporting, whether reports are altered

8     or changed in any way, those are the usual inferences that

9     are part of any analysis in analyzing totality as to what

10    weight to give any testimony, whether it's paper or whether

11    it's oral testimony.

12          So although it's not an adverse inference finding

13    in the sense I usually see in civil cases, but in doing a

14    totality of analysis in deciding what weight to give

15    evidence, I think I inherently get to decide which is more

16    important, which is more valuable, which I can rely, which I

17    can't rely on which move the needle or not move the needle

18    toward the ultimate question being raised.  So that's all I

19    will say on that.

20          And I want to move to the second objection raised

21    by the defense, that is as to the jail call post-interview

22    of Mr. Hutchins.

23          The defense is absolutely correct.  What is, I

24    understand, the motion to be is what's at stake, or what's

25    relevant or why the delving into is what happened in the

1   interview time both in terms of police action or also what

2   Mr. Hutchins' state of mind or ability to knowingly,

3   intelligently, and voluntarily waive his right.  So the

4   statement came after that.

5           And I read the transcript that the Government

6   submitted, Exhibit 7.  I believe it is numbered.  So unless

7   the statement, the audio call is illuminating the state of

8   mind during the interview process, I don't see how it can

9   help me analyze or move the needle on that.

10          Mr. Chmelar or Mr. Klein, did you wish to say

11  anything further on that?

12          MR. CHMELAR:  The Government would, Judge.

13          So are you affirmatively deciding that you will

14  not consider it, and we should not introduce it, or you're

15  not going to consider it as part of our arguments?  Or are

16  you keeping an open mind at this point?

17          THE COURT:  Well, the way I came on the bench and

18  was thinking about it, and I'm still thinking about this, is

19  this:  On paper, from reading it, I don't see it moving the

20  needle; but, again, because the Rules of Evidence do not

21  apply here, I will hear it.  But I'm just telling you, right

22  now you're going to have to persuade me how what happened

23  after illuminates the state of mind of Mr. Hutchins during

24  the relevant time, which is the interview.

25          MR. CHMELAR:  And I think we're prepared to make

1    an argument on that at the conclusion.  I know Your Honor

2    had expressed interest in taking arguments at the conclusion

3    of evidence of the hearing.  So if you're still inclined to

4    do that, we're prepared to argue how, from the Government's

5    perspective, it is relevant in that it does indicate and go

6    to several specific allegations that have been alleged by

7    the defense.

8            I think, as you first indicated, if the defense

9    had structured their argument in one particular way, maybe

10   it wouldn't so irrelevant, but because they had argued

11   coerciveness as part of their reason expressed post-arrest

12   statement, we do think it goes to whether or not he was

13   coerced during that statement and whether or not he was

14   under the influence of whatever the allegation is.

15           So while it may have limitations based on the

16   timing, we do think it still is relevant and does affect --

17   and will and able the Court to make a more informed decision

18   about what had transpired during the interview.

19           THE COURT:  Mr. Klein, did you wish to be heard?

20           MR. KLEIN:  I mean, we just disagree on the points

21   they want to offer it in for.  We think it is irrelevant for

22   those points.  I think we made that clear.

23           Just not to try your patience, but just to go back

24   to the bad faith thing real quick.  We think we can show bad

25   faith through things, but I just want to raise that issue

1    and let you know we understand the Government did raise the

2    bad faith issue, and we've now talked about it.

3              We do think, through various circumstantial

4    evidence, we can show bad faith to meet that standard.

5              THE COURT:  Okay.  So I will allow you to explore

6    that during the hearing.  Again, that will go to any weight

7    to be given to any evidence that you wish me to consider.

8              What I do advise and remind counsel, again, why we

9    are here.  This is not Mr. Hutchins' trial.  We are here for

10   a very focused issue.  So while I will indulge you, to a

11   certain extent, allow each side to make their record, but I

12   really need the parties to focus on what the legal questions

13   are as to this motion.  Make your record, which will help me

14   in making a decision of this case.

15             With that, Mr. Chmelar, are you ready with your

16   first witness?

17             MR. CHMELAR:  We are.  We're going to first call

18   Special Agent Lee Chartier.

19                  LEE CHARTIER, WITNESS, SWORN

20             THE CLERK:  State your name and spell your last

21   name for the record.

22             THE WITNESS:  My first name is Lee, L-E-E,

23   Chartier, C-H-A-R-T-I-E-R.

24

25

DIRECT EXAMINATION

BY MR. CHMELAR:

    Q    Agent Chartier, where do you work?

    A    The FBI.

    Q    And what's your position with the FBI?

    A    Special agent.

    Q    How long have you been employed with the FBI?

    A    Eleven years, approximately.

    Q    Could you describe your background in the sense
of -- to the Court of what responsibilities as far as
assignments have been with the FBI?  Like, what divisions or
sections?

    A    When I first got on with the FBI, I spent three
years working counterterrorism.  And then since, roughly,
2011, it's been cyber investigations.

    Q    And the entire time of your FBI career, have you
been assigned to the Milwaukee field office?

    A    I have.

    Q    In addition to being a special agent, do you have
any other titles or responsibilities with the FBI in the
Milwaukee field office?

    A    Yes, I do.  Primarily supervisor.

    Q    What does that mean?

    A    It means when my boss is gone, I'm the person that
stands in.

1    Q    So when the supervising special agent, that's the

2    title of that individual, would be out of the office, you

3    would take over?

4    A    Correct.

5    Q    And what are your responsibilities as they relate

6    to cyber investigations in the Milwaukee field office?

7    A    Investigate cyber-related crimes, cyber hacking,

8    cyber criminal intrusion typically financially motivated.

9    Q    And are you a member of any kind of group or

10   section within the bureau that focuses in on that?

11   A    Yeah.  We have a cyber crimes task force here in

12   Milwaukee that encompasses TFOs -- task force officers --

13   from the local PDs, County, even other government agencies

14   like DHS, IRS.

15   Q    During your history with the FBI, have you ever

16   received any commendations or awards?

17   A    Yes, I have.  I received a Medal of Excellence

18   from the director in 2016.

19   Q    Would that be Director Comey?

20   A    Yes, it was.

21   Q    What was the Medal of Excellence for?

22   A    Being a top performing cyber agent.

23   Q    During your career as an FBI agent, have you ever

24   participated in any interviews?

25   A    Yes, I have.

1    Q    Interviews of individuals in custody?

2    A    Yes.

3    Q    And witnesses?

4    A    Correct.

5    Q    If you had to approximate, and it may be

6  difficult, but how many interviews of both witnesses and

7  in-custody individuals do you think you've participated in?

8    A    Yeah.  I don't know entirely, but it's got to be

9  somewhere over 50.

10   Q    What about if you had to break that down to just

11  the individuals who have been in custody?

12   A    Probably close to 20.

13   Q    Are you one of the agents who was assigned to, in

14  part, to the investigation of Mr. Marcus Hutchins?

15   A    Yes, I was.

16   Q    Would it be accurate to say it was for a limited

17  capacity?

18   A    Yes, that is correct.

19   Q    Were you involved in his arrest in Las Vegas on

20  August 2nd, 2017?

21   A    I was.

22   Q    I want to discuss some details around the events

23  of the arrest, leading up to the arrest, and then after the

24  arrest.

25        I've already mentioned the arrest took place in

1    Las Vegas, correct?

2         A    That is correct.

3         Q    He was arrested on August 2nd, 2017.  When did

4    you arrive in Las Vegas?

5         A    The day before.

6         Q    August 1st?

7         A    Correct.

8         Q    Were you with anybody else?

9         A    Special Agent Jamie Butcher.

10        Q    And who is she?

11        A    She's the case agent responsible for the

12   investigation.

13        Q    And what office is she associated with?

14        A    The Milwaukee office.

15        Q    The arrest that took place on August 2nd, 2017,

16   what specific location did the arrest -- where did it

17   happen?

18        A    At the Las Vegas airport.

19        Q    Any particular location in the -- well, let me

20   back up and rephrase that.

21             When you first observed Mr. Hutchins, where was

22   he?

23        A    He was in the terminal for the outbound

24   international flights.

25        Q    And did you observe where he went after he entered

1    the terminal?

2         A    Yes.  He went into one of the lounges.

3         Q    In the airport lounge?

4         A    Like, yeah, an airport lounge, first-class lounge.

5    Something to that.

6         Q    Where they serve food and drinks and stuff like

7    that?

8         A    Correct.

9         Q    At some point, did you approach him?

10        A    I did.

11        Q    Were you with anybody?

12        A    Yes.  I was accompanied by two CBP officers,

13   uniformed CBP officers.

14        Q    And when you approached Mr. Hutchins, was he alone

15   or was he with anybody?

16        A    He was alone at a table.

17        Q    Can you describe to the Court the exchange that

18   you had with Mr. Hutchins at the airport lounge?

19        A    I just asked him if he was Marcus Hutchins.  He

20   identified as "yes."  I asked him if he could come with us

21   to answer a few questions.

22        Q    And did he agree?

23        A    Yes, he did.

24        Q    Was he placed in handcuffs at that time?

25        A    No, he was not.

1      Q    The lounge -- I know you described as, like, an

2  airport lounge.  Is this, like, a public setting in the

3  terminal?

4      A    Correct.

5      Q    Were there lots of other people around, or was it

6  pretty remote?

7      A    There was quite a few people around.

8      Q    Okay.  And when you approached him, could you

9  describe to the Court what you were wearing?

10      A    I was wearing business casual clothing.  I didn't

11  have any identifying information out except for a badge that

12  the CBP officers had given me.

13      Q    Okay.  And were you armed?

14      A    I was.

15      Q    Was your firearm visible?

16      A    No, it was not.

17      Q    How was it concealed?

18      A    I just had the shirt over it.

19      Q    You had your shirt untucked?

20      A    It was untucked and over the firearm.

21      Q    Okay.  What was Mr. Hutchins doing in the lounge

22  when you approached him?  And by that I mean was he eating

23  or drinking anything?

24      A    Yeah.  He was drinking a beverage.

25      Q    At some point during your interactions with

1  Mr. Hutchins, were you able to clarify what he was drinking?

2  A    Yes.  It came up that --

3  Q    What did he identify the substance as?

4  A    He said he was drinking a soda.

5  Q    After he agreed to go with you, where did you and

6  Mr. Hutchins and the CBP officers go?

7  A    We walked across the terminal to some locked

8  double doors.  We went inside the double doors which had

9  access to a stairwell that led down to where international

10  flights would come in for intake for, like, immigration

11  control areas.  There were no flights inbound at that time,

12  so it was pretty desolate down there.

13  Q    And what was the purpose of entering the

14  stairwell?

15  A    Just getting out of the sight of the public.

16  Q    What happened once you were behind closed doors to

17  the staircase?

18  A    I identified myself.  I told Mr. Hutchins that he

19  was under arrest pursuant to a federal arrest warrant.

20  Q    And when you identified yourself, how did you do

21  that?  What did you say?

22  A    I said I was a special agent with the FBI here to

23  serve an arrest warrant, and he was under arrest.

24  Q    Did Mr. Hutchins ask you anything at that time?

25  A    He had a lot of questions.  All I said to him at

1    that point was, "We're on our way to an interview room, if

2    you can just be patient."

3              All questions would be answered to him when he got

4    there.

5         Q    And I think you said he was handcuffed?

6         A    He was handcuffed at that time, yes.

7         Q    Was he handcuffed with his hands in front of him

8    or behind him?

9         A    Behind him.

10        Q    After he was handcuffed, where did you go?

11        A    We went to the CBP controlled space in there that

12   had an interview room in it.

13        Q    With respect to -- like, in relation to where you

14   were in the stairwell, was that stairwell on the way to that

15   interview room?

16        A    It was.

17        Q    And approximately how long did it take you to get

18   from the location where you placed the handcuffs on

19   Mr. Hutchins to the interview room?

20        A    A minute, maybe two.

21        Q    Okay.  And once you arrived at the interview room,

22   what did you do?

23        A    Completely -- again, identified myself.  The other

24   agent that was with me, Special Agent Butcher, identified

25   herself.  We, again, stated that we were here -- he was

1    under arrest pursuant to a federal arrest warrant.

2         Q    You entered the room at that point, I assume,

3    correct?

4         A    Correct.

5         Q    Can you describe to the Court what the room, the

6    makeup of the room was, the size, and what it consisted of?

7         A    It was an interview room, 10 x 10, roughly, a

8    table.  It had two chairs in it originally.  We added a

9    third.

10        Q    Okay.  And was Mr. Hutchins escorted to one

11   particular location of the interview room and seated?

12        A    Yes, he was.  He was escorted to the other side of

13   the table with just one chair, and at that time he was

14   unhandcuffed.

15        Q    The handcuffs were removed from him?

16        A    Correct.

17        Q    Did he remain uncuffed while he was in the room

18   during the course of your time in that room?

19        A    Yes, he did.

20        Q    The interview room, did it have a door?

21   Obviously, correct?

22        A    Correct.

23        Q    Did it have, like, not just an opening but an

24   actual physical door that would shut?

25        A    Yes.

1     Q    Was the door locked or unlocked?

2     A    It was unlocked.  We could come and go.

3     Q    What about a bathroom?

4     A    He had access to a bathroom.  We asked him a

5 couple times if he needed to.  I think he only took us up

6 one time.

7     Q    So you've described the initial interactions with

8 Mr. Hutchins.  You identified yourself.  Do you have some

9 sort of credentials that you used to do that?

10    A    Yes, I do.

11    Q    And who are those issued by?

12    A    The FBI.

13    Q    Do you usually use those to conduct interviews in

14 the course of identifying yourself to people who are being

15 interviewed?

16    A    Yes.  I always do that just to make sure they

17 understand who they're talking to.

18    Q    You mentioned when you got to the room that Agent

19 Butcher was there?

20    A    Yes, she was.

21    Q    Was there anybody else in the interview room at

22 that time?

23    A    No.

24    Q    Did anybody else participate in the interview of

25 Mr. Hutchins other than you and Agent Butcher?

1       A    No.

2       Q    You indicated earlier in your testimony that you

3  have experience interviewing approximately 50 individuals,

4  some in custody, out of custody, and approximately 20 --

5  participating in approximately 20 in-custody interviews.

6            Do you have a particular pattern you follow when

7  you conduct in-custody interviews?

8       A    Yes.  Always start out with identifying yourself,

9  explaining the reason why the individual is there, and then

10  explaining the Advice of Rights form.  I typically always

11  read that verbatim.  I hand that form to them, ask them to

12  read it, even read portions of it out loud.  I typically

13  always ask them if they can read English; and if they agree

14  with what's written on that form, please sign below.

15      Q    And, generally, as you describe it, did you do

16  that at this particular case interviewing Mr. Hutchins?

17      A    Absolutely.

18           MR. CHMELAR:  Judge, I should've asked before we

19  started.  I have approximately four exhibits that I intend

20  to show Agent Chartier.  I know that Mr. Proctor has a

21  number of exhibits he intends to show Agent Butcher.

22           Do you want us to ask permission each time we

23  approach, or could we just approach?

24           THE COURT:  You may approach.  And that goes to

25  both of you.  Please, just approach.

1           MR. CHMELAR:  Thank you.

2           And I provided copies of all four exhibits.  I'm

3    going to show Agent Chartier and to the defense.

4           THE COURT:  Thank you.

5    BY MR. CHMELAR:

6       Q    Agent Chartier, I handed you what's marked Exhibit

7    9.  Do you recognize that?

8       A    Yes, I do.

9       Q    How do you recognize it?

10      A    This is the form that Mr. Hutchins was presented

11   with that day of the interview.

12      Q    There's two witness lines at the bottom of the

13   form, near the bottom of the form.  Do you see those?

14      A    Yes, I do.

15      Q    There's two signatures there.  Do you recognize

16   one of those signatures as being yours?

17      A    Yes.  Mine is the messier one.

18      Q    Is it the one in the blue ink?

19      A    Yes, it is.

20      Q    You indicated earlier, at least you described

21   earlier kind of the sequence you go through when you're

22   interviewing in-custody individuals.

23           With respect to Exhibit 9, how did you use Exhibit

24   9 during the interview with Mr. Hutchins?

25      A    I used it like I always do.  I had the form in my

hand.  I read it out loud and then presented it to him
across the table.  I asked him if he could read the form.  I
asked him if he could understand and read English.  And
then, if he even wanted to, to read parts of it out loud and
then sign if he agreed below.

Q    After you did that, did Mr. Hutchins read the
form?

A    He looked at it.  My understanding is he read it.

Q    Did he sign it?

A    Yes, he did.

Q    Do you recognize his signature on this form?

A    Yes.  It's right here (indicating).

Q    Under the section marked "Consent"?

A    Correct.

Q    After Mr. Hutchins signed the form, did you sign
the form?

A    Yes, I did.

Q    And where was Agent Butcher during this process?

A    She was on the same side of the table as I was.  I
signed it and then handed it to her.

Q    And then what happened to the form?

A    She signed it, and then it went in the folder.

Q    Did Mr. Hutchins indicate that he understood what
was stated on the form and what you had read to him?

A    He indicated he did.  He continued to talk to us.

```
 1        Q     Did he ask you any questions about anything that
 2   was contained on the form?
 3        A     No.
 4              MR. CHMELAR:  Judge, we'd ask that Exhibit 9 be
 5   admitted.
 6              MR. STILLER:  No objection, Your Honor.
 7              THE COURT:  Exhibit 9 is received.
 8              MR. CHMELAR:  Thank you, Judge.
 9   BY MR. CHMELAR:
10        Q     Agent, I've handed you what we marked as Exhibit
11   8.  Do you recognize Exhibit 8?
12        A     I do.
13        Q     What is it?
14        A     Just an acknowledgment that any violation or
15   attempt to lie to us is a violation of the 1001.
16        Q     Title 18, Section 1001?
17        A     Correct.
18        Q     And did you use this form during the interview
19   with Mr. Hutchins?
20        A     Yes, we did.
21        Q     How did you use it?
22        A     Again, just reaffirming that, you know, in talking
23   to us, that he needs to be truthful.  Anything that he says
24   isn't truthful is a violation of this.
25        Q     Okay.  With the Advice of Rights form, you
```

1  described the process in which you read from the form to

2  him, Mr. Hutchins, and then you handed him the form and then

3  had him read it.  Did you do that with respect to the

4  acknowledgment of penalties for false statements to the FBI?

5        A    I think I just paraphrased it; just that, "You

6  understand it's illegal to lie to us.  Please read this form

7  as well and sign it if you agree."

8        Q    Okay.  And looking at Exhibit 8, do you recognize

9  your signature on Exhibit 8?

10       A    I do.

11       Q    Where does it appear on Exhibit 8?

12       A    It's, again, in blue ink right below

13 Agent Butcher's.

14       Q    And then do you recognize Mr. Hutchins' signature

15 on the form?

16       A    I do.

17       Q    And where does that appear?

18       A    It's right there under the signed category.

19       Q    With respect to Exhibit 9 and Exhibit 8, did you

20 actually witness Mr. Hutchins sign both of those forms?

21       A    I did.

22            MR. CHMELAR:  Judge, we would ask Exhibit 8 be

23 admitted into evidence.

24            MR. STILLER:  No objection.

25            THE COURT:  Exhibit 8 is received.

BY MR. CHMELAR:

    Q    Agent Chartier, after you identified yourself and
advised Mr. Hutchins of his rights as described on the
Advice of Rights form, Exhibit 9, and advised him of his
acknowledgment of penalties for false statements to the FBI
shown on Exhibit 8, did you conduct an interview with him?

    A    I did.

    Q    I've handed you Government Exhibit 1.  Do you
recognize Government Exhibit 1?

    A    Yes, I do.

    Q    How do you recognize it?

    A    It's a recording of the interview.

    Q    There's a set of initials on Government Exhibit 1.
Do you recognize the initials, or at least one of the
initials on there?

    A    Yes, I do.

    Q    Whose initials do you recognize those to be?

    A    It's mine.

    Q    Prior to appearing in court today, did you listen
to the contents of Government Exhibit 1?

    A    Yes, I did.

    Q    And after listening to it, did you then mark your
initials on it as a form of identifying it?

    A    I mean, at the time this was made?

    Q    Yeah.

1       A    Yes.

2       Q    Okay.  To the best of your knowledge, does it

3 truly and accurately reflect the contents of the interview

4 you conducted, the recorded interview you conducted with

5 Mr. Hutchins on August 2nd?

6       A    Yes, it does.

7       MR. CHMELAR:  Judge, I would ask Exhibit 1 be

8 admitted into evidence.

9       MR. STILLER:  No objection.

10       THE COURT:  Exhibit 1 is received.

11       MR. CHMELAR:  Thank you, Judge.

12 BY MR. CHMELAR:

13       Q    You already indicated that the individuals present

14 for the interview were you, Agent Butcher, and Mr. Hutchins.

15 Are those the speakers that could be heard on the recording

16 on Exhibit 1?

17       A    Yes.  I think at one point, another agent came in

18 regarding the consent for the phone that you can hear on the

19 recording, but the primary two were me and Special Agent

20 Butcher.

21       Q    And when you say "consent for the phone," what are

22 you referring to?

23       A    At one point, it was requested for Mr. Hutchins to

24 provide consent to search a backpack, I think two phones and

25 a laptop.

1       Q    And did he agree to that?

2       A    He did.

3       Q    I've handed you what's been marked as Exhibit 4.

4  Do you recognize that?

5       A    Yes, I do.

6       Q    What do you recognize it to be?

7       A    Consent to search.

8       Q    Is that the consent to search that you were

9  referring to just a moment ago in your testimony?

10      A    Yes, it was.

11      Q    There's a number of things listed on the consent

12  form.  It's two phones, two laptops, a backpack, and then a

13  USB identified by make and color, correct?

14      A    Correct.

15      Q    Do you recognize the signature at the bottom

16  under -- on Exhibit 4, under the No. 4 it says, "I authorize

17  these agents to take the items which they may determine to

18  be related to their investigation."

19          Then there's a date and signature.

20      A    I do.

21      Q    Okay.  The signature above that, do you

22  recognize -- or I'm sorry -- the signature right below that

23  above the signature for Jamie Butcher, do you recognize that

24  signature?

25      A    Which signature are you talking about?

```
 1          Q    The one above Agent Butcher's.

 2          A    Yes, I do.

 3          Q    Whose signature is that?

 4          A    Mr. Hutchins.

 5          Q    And did you witness Mr. Hutchins sign this form?

 6          A    I did.

 7          Q    And that happened during the course of the

 8   interview after he was advised of his rights and the

 9   acknowledgment of penalties for perjury or, excuse me,

10   penalties for false statements to the FBI?

11          A    It was.

12          Q    And since we're on the topic, I'm going to ask you

13   about that -- you know, stay on the phones and the consent

14   to search right now.  Were any of these devices locked?

15          A    Yes.

16          Q    And how were they unlocked?

17          A    Key code, thumbprint.

18          Q    By who?

19          A    Mr. Hutchins.

20          Q    He did that at your request, or he volunteered to

21   do that?

22          A    He volunteered to do that.

23          Q    Do you remember during the course of the

24   interview, specifically related to the phones, anything

25   remarkable or anything specific about how they were unlocked
```

1    or jokes or anything related to him unlocking those two

2    devices?

3         A    Yeah.  One of the devices he commented the

4    password was long enough that we wouldn't be able to guess

5    it, and he couldn't unlock himself when he was intoxicated,

6    which was a good thing.

7         Q    And was he successful in unlocking it at that

8    time?

9         A    Yes, he was.

10        Q    What about the other device?  Did he make a joke

11   about the password for that?

12        A    Yeah.  He said we could probably guess it.  It was

13   something very simple.  I don't remember exactly what it

14   was.

15        Q    Okay.  But that's captured on the audio recording

16   in Exhibit 1, correct?

17        A    It is.

18        Q    Both of those things you just described; is that

19   correct?

20        A    Correct.

21             MR. CHMELAR:  And, Judge, we would ask to admit

22   Exhibit 4.

23             MR. STILLER:  No objection.

24             THE COURT:  Exhibit 4 is received.

25   \\\

BY MR. CHMELAR:

Q    Agent, you just described at least a part of the interview with Mr. Hutchins that occurred after you went over the Advice of Rights and things like that with him. Other than, you know, kind of like the jokes about the password and other casual conversations about the password to the phone, how would you describe the nature of the interview and the exchange with Mr. Hutchins during the interview process?

A    Professional.  Friendly at times.

Q    And what was the format?  What I mean by that was it a Q and A?  Was it more of a dialogue or a mix?

A    It was a little bit of a mix, but a lot of Q and A.

Q    And during the interview, did you ever find Mr. Hutchins to be evasive?

A    At times.

Q    And in response to Mr. Hutchins being evasive, what did you do?

A    You can hear me a couple times just kind of quasi admonish him that we know more details than we're telling him, and it's important that he's truthful with us.

Q    And prior to the beginning of the interview, or during the interview, did he ever express any reservations about talking to you?

1     A    No, he didn't.

2     Q    Prior to the start of the interview or during the

3 interview, did he ever say that he wanted to have an

4 attorney present?

5     A    No, he did not.

6     Q    Other than being somewhat, you know, joking at

7 times and being evasive at other times, how would you

8 describe his overall level of mental awareness during the

9 interview?

10     A    It was good.  I didn't see anything that would

11 indicate otherwise.

12     Q    Did you have any indication during the interview,

13 either during a reading of his rights or any time during the

14 course of the interview, that he was under the influence of

15 either drugs or alcohol or impaired in any way?

16     A    No, I did not.

17     Q    At any point, did you observe any physical

18 manifestations of impairment or intoxication?

19     A    No.

20     Q    Was he sweating at all, complaining of nausea or

21 vomiting?

22     A    No.

23     Q    Was he fidgety?

24     A    A little bit but none that I would constitute as

25 what I would typically see in somebody that's intoxicated.

```
1     Q    Did he seem mentally aware of what was going on
2  and engaged in the interview with you?
3     A    Yes.
4     Q    Did he do anything that led you to believe that?
5  Was he asking any questions or asking clarifying questions
6  about the nature of what you were asking him?
7     A    Several clarifying questions, yes.
8     Q    The entire interview and the exchange you had with
9  him, it was all in English, correct?
10    A    Correct.
11    Q    Was he shown any documents during the interview?
12    A    Yes, he was.
13    Q    What was he shown?
14    A    He was shown a sheet of online identities that we
15 knew he had knowledge of or used himself.
16    Q    And approximately how many?
17    A    I think, roughly, like, 80.
18    Q    And what else?
19    A    Then he was shown another sheet that had some
20 string information related to a program in it.
21    Q    What do you mean a "string information"?
22    A    Just, like, a different way of looking at a file.
23    Q    Computer code or a computer file?
24    A    Yes.
25         MR. STILLER:  Which?
```

1          Compound question.  Singular answer.

2          THE COURT:  Sustained.

3    BY MR. CHMELAR:

4    Q    Was it a computer code?  A way of looking at a

5    computer code?

6    A    Correct.

7    Q    What else?  Anything?

8    A    The last one would be a chat, a page of chat

9    between two people.

10   Q    And what was the nature of the chat?  Like, what

11   was the chat?

12   A    It was a dialogue between an instant messaging ID

13   that Mr. Hutchins said was him and another individual.

14   Q    Okay.  What was the purpose of giving him the

15   approximately 80 nicknames?

16   A    We knew he had information on several of them, and

17   we knew he used some of them.  So it was in an effort to try

18   to help jog his memory to provide us further information.

19         MR. STILLER:  Your Honor, I'm going to object.

20         THE COURT:  There's an objection?

21         MR. STILLER:  I'm not seeing the relevance of this

22   to the voluntariness of the decision whether to talk or not

23   talk.

24         THE COURT:  Mr. Chmelar, relevance?

25         MR. CHMELAR:  The relevance is that they've

 1    claimed that he was intoxicated of some sort, or on drugs,

 2    and, therefore, he was not capable of validly waiving his

 3    Miranda rights.

 4            They've additionally alleged that he was coerced

 5    into making a post-arrest statement.

 6            The fact that he was able to review approximately

 7    80 nicknames from a list with recall suggests that he was

 8    not under the influence, intoxicated.  He was mentally

 9    competent to proceed in the interview.

10            THE COURT:  The objection is overruled.

11            MR. CHMELAR:  Thank you, Judge.

12    BY MR. CHMELAR:

13       Q    What was his response to reviewing the 80

14    nicknames?

15       A    He remembered several; identified roughly a

16    handful of his own.

17       Q    Okay.  Did he provide you context with some of the

18    names?

19       A    Yes, he did.

20       Q    And the only thing listed on the sheet were

21    nicknames?

22       A    Correct.

23       Q    What about the string, this computer code or

24    string that you referred to, what was the point of that?

25       A    It was an effort to try to get him to identify a

1  specific piece of software that we thought he had knowledge

2  of.

3          Q    What software?

4          A    It's a Kronos malware.

5          Q    Okay.  And did he review it?

6          A    He did.

7          Q    And what did he identify it as?

8          A    He said, "I don't know what to tell you.  It's a

9  string."

10         Q    And did you understand what he meant by that?

11         A    I did.  He's looking, I mean --

12         Q    How did you interpret that?  What did you

13  interpret that to mean?

14         A    He didn't recognize the string itself.  He did key

15  in on one word that was in the string, and it said "Kronos."

16         Q    Okay.  Is a string -- in your experience, is it

17  different than source code or other compiled computer code?

18         A    It is.

19         Q    Is it more difficult or easier to read than a

20  search code?

21         A    It's easier to read but less informative.

22         Q    Okay.  But he was able to review it?

23         A    He was able to review it.

24         Q    And he was able to form an opinion about it as the

25  way it was?

          A     Correct.

          Q     And as best you can, for people who are unfamiliar
with a string the way that you're describing, what does it
look like?  Just alpha numeric characters, or what is it?

          A     Yeah.  It looks like a long string of characters.

          Q     And then you also described providing him with a
set of chats, correct?

          A     Correct.

          Q     I've handed you Exhibit 11.  Do you recognize
Exhibit 11?

          A     Yes, I do.

          Q     Is this part of the chats that Mr. Hutchins
reviewed?

          A     Yes, it was.

          Q     Do you see a date on the -- well, let me back up.

                Going from left to right on Exhibit 11.  The first
column all the way to the left, what is represented in that
column?

          A     Those are those online instant messaging IDs we
talked about earlier.

          Q     And did Mr. Hutchins identify one of these as
being him?

          A     Yes, he did.

          Q     Which one?

          A     My understanding was IRP@Jabber.sd.

1       Q    And the next column over, is that a date?

2       A    Yes, it is.

3       Q    And what is the date of this particular chat?

4       A    It's February 1st, 2015.

5       Q    Am I correct in saying that attached to that

6 string is a time?

7       A    Correct.

8       Q    And then to the far right, there's the actual text

9 of the chat?

10      A    Correct.

11      Q    When you presented him with this particular page,

12 did he review it?

13      A    He did review it.

14      Q    Was he able to recall it?

15      A    Yes, he was.

16      Q    And this interview took place in 2017, but he was

17 able to recall chats from 2015, correct?

18      A    Yes, he was.

19      Q    And, specifically, was he able to -- there's some

20 highlighted parts on this, correct?

21      A    Correct.

22      Q    All the way at the top, there's something related

23 to Sunspace?

24      A    Uh-huh.

25      Q    Do you know what Sunspace is?

1          A     Yeah.  It's a file sharing website that, you know,

2     you can post a file out there, make it available to others,

3     and then they can download the file and then delete the

4     link.

5          Q     And was he able to identify what his interactions

6     were with respect to this particular page and in relation to

7     the other individual he's chatting with?

8          A     Yes, he was.

9          Q     What did he tell you?

10         A     He compiled Kronos for this individual and then

11    made it available via Sunspace.

12              MR. CHMELAR:  Okay.  Judge, I would ask Exhibit 11

13    be admitted.

14              MR. STILLER:  No objection.

15              THE COURT:  11 is received.

16    BY MR. CHMELAR:

17         Q     You mentioned that when Mr. Hutchins entered the

18    interview room, there was, like, a bottle of water waiting

19    for him, right?

20         A     Yeah.  There was a bottle of water waiting for him

21    in the interview room.

22         Q     Did you at some point offer him food?

23         A     Yes, we did.

24         Q     Did he, in fact, eat?

25         A     Yes, he did.

```
 1        Q    Do you recall what he had?

 2        A    It was, like, a fast food burger place.  I don't

 3   recall the name.

 4        Q    Did you give him the opportunity to ask you

 5   questions?

 6        A    Yes, a couple.

 7        Q    Did one of the requests relate to the fact that he

 8   wasn't going to be making his flight?

 9        A    It did.

10        Q    And what was the request?

11        A    He asked if he could contact his mother so she

12   didn't have to drive, I think roughly, like, four hours to

13   an airport that he wasn't going to be arriving at.

14        Q    It's somewhere in the UK?

15        A    Somewhere in the UK, correct.

16        Q    Okay.  And did you allow him to do that?

17        A    Yes, we did.

18        Q    How did that happen?

19        A    He was given access to his phone, and my

20   understanding, he was allowed to contact her via Facebook.

21        Q    At any point during the interview, did you notice

22   that he was slurring his speech at all?

23        A    No.

24             MR. CHMELAR:  May I have one moment, Judge?

25             THE COURT:  You may.
```

BY MR. CHMELAR:

Q    Was there anything during the interview concerning his physical appearance that gave you concern?

A    No.

Q    I want to go back to a follow-up question about when you first had contacted with him at the lounge.  You referenced that he was drinking, like, a Coke or something like that.  Some sort of soda.

Did you ask him if he had been consuming any alcohol prior to the interview?

A    Yes, we did.  And he said, "No, I don't typically drink alcohol before flights because it makes me dehydrated."

Q    Did you ask him anything else?

A    Other than if he had drank that day, and he said, "No," he wasn't drinking.

Q    Anything related to his state of mind?

A    Yeah.  I asked him if he was of the right frame of mind to have a conversation with us, and he said he was.

MR. CHMELAR:  Give me one more minute, Your Honor.

THE COURT:  You may.

MR. CHMELAR:  Thank you.

We don't have any other questions on direct, Judge.

THE COURT:  Mr. Stiller, am I looking at you?

```
 1                    MR. STILLER:  You are, Your Honor.
 2                    May I question from the podium?
 3                    THE COURT:  Yes, you may.  Just be careful to
 4      project, if that's your preference, Mr. Stiller, so that not
 5      only the court reporter can hear you but also we're using
 6      the recording as well.
 7                              CROSS-EXAMINATION
 8      BY MR. STILLER:
 9           Q    Agent Chartier, back on August 2nd of last year,
10      am I correct that that's the first exposure you've ever had
11      to Marcus Hutchins?
12           A    One on one?
13           Q    Had you ever met him before?
14           A    No.
15           Q    Had you ever talked to him before?
16           A    No.
17           Q    Had you ever seen him, been around him?
18           A    I had seen him at the airport before but never
19      been around him.
20           Q    You had seen him at what airport when?
21           A    I had seen him at the international airport in
22      Las Vegas.
23           Q    On August 2nd?
24           A    On August 2.
25           Q    All right.  So August 2nd of 2017 represents
```

1     the -- as of that moment, the universe of exposure you had

2     to Marcus Hutchins, right?

3         A    Correct.

4         Q    And so when you've generally testified to your

5     sense of him during the interview with him, you have no

6     basis for comparison, right?

7         A    That would be correct.

8         Q    You saw what you saw, but you're not in a position

9     to say that, "Oh, I know what Hutchins looks like when he

10    has his A game, and this was his A game."

11         Right?

12         A    Okay.

13         Q    Is that correct?

14         A    That was the first time I saw him, yes.

15         Q    All right. And you have no basis for comparing

16    his behavior any other time with the time you were with him

17    on August 2nd?

18         A    Sure.

19         Q    All right. Real quick, I want to draw your

20    attention to Exhibit 1, which is the audio recording of

21    Mr. Hutchins' post-arrest statement.

22         A    Okay.

23         Q    Correct?

24         A    Correct.

25         Q    All right. And Mr. Chmelar asked you whether that

```
 1    constitutes an accurate depiction of the interview, right?

 2         A    He did.

 3         Q    And you said that it is accurate?

 4         A    Yes.

 5         Q    But the reality is it is not complete, right?

 6         A    Listening to the interview, yes, it wasn't started

 7    at the very beginning of the discussion in that room.

 8         Q    And that would mean it is not complete, right?

 9         A    Well, I mean, it depends on what your definition

10    of when the interview actually started.  I mean, if I'm just

11    filling out forms, I don't necessarily constitute that as

12    part of the interview.

13         Q    We'll get there in a second.

14         A    Okay.

15         Q    But just so we're clear, to the extent this judge

16    listens to that recording, isn't it true that it will begin

17    mid-stream?  Not mid-statement but mid-stream?

18         A    I don't think that's an accurate depiction.  He

19    was still filling out forms at the time the audio recording

20    was turned on.

21         Q    The evidence will speak for itself.

22              But the key component here is that you've

23    testified today about this Advisement of Rights, right?

24         A    Uh-huh.

25         Q    You've testified today about reading those rights
```

1   to Mr. Hutchins, right?

2       A    I did.

3       Q    You've testified today about an exchange of forms,

4   right?

5       A    Okay.

6       Q    Not "okay."  Is that "yes" or "no"?

7       A    Yes.

8       Q    All right.  And the bottom line is that that

9   recording that is Exhibit 1, none of what you've testified

10  to in that regard will appear on the audio recording, right?

11      A    Not all of the forms, no.  Some of the forms are

12  on the recording.

13      Q    The Advisement of Rights with regard to the right

14  to remain silent and the right to an attorney?

15      A    I said some of the forms, not all of them.  The

16  consent forms were filled out on the recording.

17      Q    I'll ask the question more precisely.

18          The advisement to Mr. Hutchins of his right to

19  remain silent and of his right to have an attorney and an

20  attorney present, that portion of the conversation is not

21  depicted on the audio, correct?

22      A    No, that's not on the audio recording.

23      Q    All right.  Mr. Chmelar sort of started with the

24  actual arrest, or your initial contact with Mr. Hutchins in

25  the airport lounge, right?

1    A    Right.

2    Q    That's where Mr. Chmelar started his questioning?

3    A    Okay.  Yes.

4    Q    And I think you testified that you were there with

5    two customs and border patrol agents, right?

6    A    I was.

7    Q    And they were in uniform?

8    A    That's correct.

9    Q    For the Court's benefit, could you describe what a

10   CBP uniform that day looked like?

11   A    As I recall, it was navy blue with a badge.  The

12   title of "CBP" spelled out; weapons visible, a duty belt.

13   That's all, roughly, I recall.

14   Q    And, in contrast, you were business casual, right?

15   A    Correct.

16   Q    But you made mention of the fact that you had a

17   law enforcement credential, correct?

18   A    I did.

19   Q    And that was some kind of credential that had been

20   loaned to you by CBP?

21   A    I had a visitor badge that allowed me to enter and

22   exit the terminal while still remaining armed.

23   Q    Okay.  I assume that didn't identify you as an FBI

24   agent?

25   A    It did not.

```
1        Q    Did it in any way include reference to CBP?

2        A    It had reference to law enforcement.  I don't

3   remember if it had reference to CBP.

4        Q    So if Mr. Hutchins or anyone else sitting in that

5   bar would've seen you three individuals, that person

6   would've seen a business casual individual and two fully

7   garmented CBP officers, right?

8        A    Correct.

9        Q    I think you indicated that upon approaching

10  Mr. Hutchins, your first remark was that you asked him to

11  come with you.  You had some questions for him, right?

12       A    Correct.

13       Q    And I'm not questioning the truthfulness of you

14  having questions for him, but what was really going on here

15  is that you had an arrest warrant that you were there to

16  execute, right?

17       A    Correct.

18       Q    But on that initial contact, that detail was

19  omitted in favor of "We would like to ask you some

20  questions," right?

21       A    Yeah, in the effort of trying to present the least

22  intrusive way to interact with Mr. Hutchins.

23       Q    And in going least intrusive, the fact that -- the

24  arrest warrant was withheld at that initial moment, right?

25       A    Just for a couple seconds to walk across the
```

1   terminal, yes, it was.

2        Q    At that moment?

3        A    At that moment, it was.

4        Q    All right.  And so then you and the border

5   patrol -- or the CBP agents escort Mr. Hutchins to some kind

6   of stairwell, right?

7        A    Correct.

8        Q    And backing up a second.  Your activities in

9   connection with this situation were being monitored by other

10  officers, right?  Officers or agents?

11       A    I'm not sure what you're asking.

12       Q    There was surveillance going on, right?

13       A    Yes, there was.

14       Q    And agents other than you, they ultimately

15  maintained what they captioned a "Surveillance Log," right?

16       A    Yes.

17       Q    And that surveillance log noted Mr. Hutchins'

18  arrival to the airport, correct?

19       A    I would have to read it, but I assume so.

20       Q    Would you like to see it to refresh your memory?

21       A    I haven't seen it, so, yeah.  Sure.

22       Q    If you could just browse that to yourself.

23       A    Okay.

24       Q    So having had an opportunity to review that, other

25  agents noted the time of Mr. Hutchins' arrival to the

1    airport itself, right?

2         A    Yeah.

3         Q    Noted the time he approached the ticket counter,

4    right?

5         A    Yeah.

6         Q    The time he passed through security?

7         A    Yeah.

8         Q    And ultimately his presence in the lounge, right?

9         A    Correct.

10        Q    And it indicates that your escort of Mr. Hutchins

11   out of the lounge occurred at 1:17 p.m.?

12        A    I didn't look at the specific time on there.

13        Q    Would it refresh your memory to look at it again?

14        A    Sure.

15             MR. CHMELAR:  We'll stipulate, Judge, that if it

16   says it in the report, that's what time it happened.

17             MR. STILLER:  No rush.

18             THE WITNESS:  Okay.  Yeah, 1:17.

19             MR. STILLER:  Thank you.

20   BY MR. STILLER:

21        Q    So then in the stairwell, you're still there in

22   your business casual, right?

23        A    Correct.

24        Q    Are the CBP uniformed folks there with you?

25        A    Yeah.  Everything was locked.  I couldn't get

1    anywhere without them.

2         Q    So they were there with you?

3         A    Correct.

4         Q    All right.  And it's at that point where handcuffs

5    are placed on Mr. Hutchins, right?

6         A    Correct.

7         Q    And you testified today that Mr. Hutchins had a

8    bunch of questions, right?

9         A    Yeah, of course.  He had several questions.

10         Q    And one of those questions would've been, "What is

11    this about?"

12              Right?

13         A    Well, I don't recall exactly what he was asking,

14    but I assume that was one of them.

15         Q    Well, you've encountered a man in a lounge and

16    told him you have a few questions, right?

17         A    Uh-huh.

18         Q    That happened, correct?

19         A    Correct.

20         Q    And then you escort him to a stairwell, right?

21         A    Uh-huh.

22         Q    And at that point, you placed handcuffs on him,

23    right?

24         A    I did.

25         Q    And so it almost would just make sense that

1    someone might ask, among other questions, "What is this

2    about?"

3         Right?

4    A    It makes sense.

5    Q    All right.  And I think you even testified on

6    direct that you shared with Mr. Hutchins that what this is

7    about is something that would be shared later in the

8    interview room, right?

9    A    I told him he was under arrest pursuant to a

10   federal arrest warrant and that further details would be

11   explained to him shortly if he could just be patient.

12   Q    And I guess the question I have is that today you

13   testified that at that point you told Mr. Hutchins that he's

14   under arrest pursuant to a federal arrest warrant.  That's

15   your testimony today, right?

16   A    Yes, it is.

17   Q    All right.  But mid last April, you met with

18   Mr. Chmelar and/or Mr. Proctor, correct?

19   A    Last April?

20   Q    Middle of this April.  Last month.

21   A    Okay.  This last -- yes.

22   Q    And I'm going to guess that you were in the loop

23   knowing that that was the day before we were scheduled to

24   have this very hearing, right?

25   A    Correct.

1          Q     And whether it was Mr. Chmelar or Mr. Proctor, an

2     assistant U.S. attorney sort of reviewed the events of that

3     day in anticipation of your testimony the following day,

4     right?

5          A     They did.

6          Q     And isn't it true that, at that time, what you

7     shared with the prosecutors is that you, in handcuffing

8     Mr. Hutchins, you told him that he was under arrest, period?

9          A     I didn't testify to that.

10               I don't understand what your question is.

11         Q     I'm not talking about testimony.

12               When you were meeting with Mr. Chmelar and/or

13    Mr. Proctor in anticipation of testifying the following day,

14    isn't it true that you discussed that portion of your

15    dialogue with Mr. Hutchins in terms of telling him simply

16    that he was under arrest?

17         A     No.  We talked about the arrest and how it

18    happened.  I'm not sure what the question is.

19         Q     In talking with Mr. Chmelar and/or Mr. Proctor,

20    did you discuss the dialogue between yourself and

21    Mr. Hutchins in the stairwell last August 2nd?

22         A     Yes, I did.

23         Q     And in discussing that dialogue with Mr. Chmelar

24    or Mr. Proctor on that day, isn't it true that what you

25    shared is that you advised Mr. Hutchins that he was under

```
 1        arrest without reference to an arrest warrant?
 2        A    I advised him that he was under arrest, yes, but I
 3   would tell him why I was there and the law enforcement
 4   purpose that I'm serving.
 5             I'm not sure what your question is.
 6        Q    My question is:  In speaking with the prosecutors
 7   in anticipation of testifying last month --
 8             MR. CHMELAR:  Judge, I would object to the
 9   continued, repeated questioning of the same question
10   answered over again.
11             Agent Chartier has stated what his recollection is
12   about both the arrest and his conversation in preparing for
13   testimony.
14             I don't know if Mr. Stiller is proposing that same
15   questioning, presenting the same question another time is
16   going to provide any more clarity.
17             THE COURT:  Mr. Stiller, I'll ask that you please
18   move on from this question.
19             MR. STILLER:  Thank you.
20   BY MR. STILLER:
21        Q    So at some point, if I heard you right, you
22   escorted now handcuffed Mr. Hutchins down some stairs or
23   something like that to an interview room?
24        A    Yeah.
25        Q    And Agent Butcher was waiting there for you in
```

1    that interview room?

2         A    She was.

3         Q    And we talked in terms of initially there were two

4    chairs but a third one was necessary?

5         A    Correct.

6         Q    Is that third chair something that had to be

7    obtained and moved into the room after you and Mr. Hutchins

8    arrived to the room?

9         A    No.  We thought about it beforehand, and it was

10   brought in before.

11        Q    So the third chair was waiting for you by the time

12   you got there?

13        A    Correct.

14        Q    Now, going back to the stairwell real quick.

15   Backtracking for just a second.  When Mr. Hutchins asked

16   words to the effect of, "What is this about," and your

17   answer was either that he's under arrest or under arrest

18   pursuant to an arrest warrant, there was no mention made

19   that the arrest warrant was out of the Eastern District of

20   Wisconsin, correct?

21        A    At that time, no.

22        Q    There was no mention that the arrest warrant

23   flowed from an indictment, correct?

24        A    I don't believe I mentioned that at that time.

25        Q    And if you didn't mention there was an indictment,

1    I'm guessing that there was no mention that the indictment

2    contained multiple felony charges naming Mr. Hutchins and

3    another with a variety of Kronos-related crimes, correct?

4            MR. CHMELAR:  Judge, I guess I would object to the

5    line of questioning at this point because I'm not sure how

6    it relates to -- or the multiple arguments presented in the

7    motion to suppress related to the waiver of Miranda in the

8    coerciveness of the interviewing tactics by the agents.

9            THE COURT:  Mr. Stiller?

10           MR. STILLER:  Your Honor, what Mr. Hutchins did

11   and didn't know at the time that he was Advised of Rights,

12   may have waived rights, and then proceeded to talk and

13   continue to talk I think is relevant to the knowing and

14   informed and voluntary nature of his decision to talk in

15   terms of what he shared.

16           THE COURT:  I'll allow it.  You may proceed.

17           MR. CHMELAR:  Can I just make one other point,

18   Judge?

19           THE COURT:  You may.

20           MR. CHMELAR:  It wasn't the basis of their motion.

21   Their motion was that it was a citizen of the United

22   Kingdom, that he was sleep deprived, that he was intoxicated

23   as far as the waiver of Miranda.

24           Those factors, in their motion they argued,

25   related to the fact that the agents' tactics were then

1    coercive.

2            They've never alleged, as far as I know, until

3    this most recent filing in the memoranda in support of their

4    position, that there's somehow some sort of deceptive

5    practices.

6            So I don't think it's on point, but I respect

7    Your Honor's decision.  I just wanted to clarify for the

8    record why we're making that objection.

9            THE COURT:  Thank you.

10           Because I'm looking at voluntariness, and a lot of

11   factors can go into it, I'll allow it.

12           Mr. Stiller, you may continue, please.

13           MR. CHMELAR:  Thank you, Judge.

14           MR. STILLER:  Thank you, Your Honor.

15   BY MR. STILLER:

16       Q    So in the interview room with you and

17   Agent Butcher, fairly quickly Mr. Hutchins again asked what

18   this is about, correct?

19       A    I don't recall exactly when he asked, but it was

20   explained to him as much as we could at that time.

21       Q    Well, let's back up.

22           When we're in the stairwell, he had questions, and

23   you said, basically in so many words, "We'll get to that

24   later in the interview room," right?

25       A    Yeah.  I asked him to be patient, and further

1    information would be explained to him.

2        Q    And then now we're in the interview room.  You're

3    joined by Agent Butcher.  And at some point fairly early in

4    things, Mr. Hutchins again asked what this is about, right?

5        A    I'm sure he did.

6        Q    And when you say you're sure you did, do you

7    remember that at that point, Agent Butcher said, "We're

8    going to get to that."  Right?

9        A    You would have to ask Agent Butcher.

10       Q    Or listen to the recording?

11       A    Or listen to the recording.

12       Q    Very well.

13            Then an interview followed, and it lasted, in

14   total, about 90 minutes, right?

15       A    Yeah.  An hour 45, roughly.

16       Q    Okay.  And it covered many topics like

17   Mr. Hutchins' personal background, right?

18       A    Correct.

19       Q    To some extent, his education and his job history,

20   right?

21       A    Correct.

22       Q    Discussed his online activities including gaming?

23       A    Yeah, I do remember that.

24       Q    His coding activities?

25       A    Yes.

```
 1        Q     Kronos was discussed?
 2        A     Yes, it was.
 3        Q     There was the issue of access to Mr. Hutchins'
 4   backpack, his laptop, and his phone, right?
 5        A     Yeah, regarding consent.
 6        Q     Yes.  Some conversation about his recent
 7   activities in Las Vegas, right?
 8        A     Yes.
 9        Q     He was there for a conference?
10        A     Yes.
11        Q     Talk of black hats?
12        A     Yeah.  I remember Jamie had some line of
13   questioning regarding that.
14        Q     There was a conversation about somebody named
15   Vinnie and Mr. Hutchins' relationship with that person?
16        A     Yes.
17        Q     A conversation about Beta Monkey?
18        A     Yes.
19        Q     Is that a person or a thing?
20        A     It's an online nick.  So, yeah, it's a person.
21        Q     "Nick" is a nickname?
22        A     Yeah.
23        Q     All right.  And then conversation ultimately about
24   WannaCry?
25        A     Yeah.  There was a portion of questions related to
```

WannaCry.

Q    Then as things are sort of starting to wind down, at some point you do ask Mr. Hutchins whether he has any questions for you, right?

A    I asked it a couple times, yeah.

Q    You recall a couple times?

A    Well, they're not all in the recording; but, yeah. I mean, at the end, I was asking him if he had any questions.

Q    And at the end when you asked him that on the recorded portion of the interview, his question is why the hell he's here, right?

A    Yeah, if you say so.  I'd have to go look at the exact transcript.

Q    Or listen to the recording?

A    I've listened to the recording.

Q    But I think this is important.  At no point during this 90 minute or hour and 45 minute interview was it shared with Mr. Hutchins the reality that any arrest warrant rested on a Wisconsin indictment charging a variety of Kronos-related offenses, right?

A    Can you ask your question again?

Q    Sure.  At no time during this 90 minute or hour and 45 minute interview did you or Agent Butcher share with Mr. Hutchins the reality that the arrest warrant flowed from

1    an indictment here in Wisconsin accusing him of

2    Kronos-related offenses?

3         A    No, that's not correct.  He was presented with the

4    cover sheet for the arrest warrant.  We talked about where

5    we were from, what we did, the investigations that we

6    investigate.  We didn't go into any specific detail related

7    to the case information because I wanted to know if he was

8    lying about information.  I wanted to be aware of it.  But

9    the criteria under why we were there, why he was under

10   handcuffs -- now, he continued throughout that interview to

11   question why he was there because he thought he was there

12   related to WannaCry, which had nothing to do with the reason

13   we were there.

14        Q    So to the extent that these details you just spoke

15   about, to the extent you shared those with Mr. Hutchins,

16   those were on the prerecorded portion of your encounter?

17        A    It was.

18        Q    You testified about a bathroom break, burger, and

19   opportunity to connect with his mother in England, right?

20        A    In the UK, correct.

21        Q    Yeah.  Those were all things that happened after

22   the interview was completed, right?

23        A    No.  There was water waiting for him when he

24   showed up.  I remember getting change to put in the vending

25   machine before he --

1      Q     Burger, bathroom, opportunity to connect with his

2   mother.  Those were things that happened at the conclusion

3   of the interview, right?

4      A     Correct.

5      Q     Now, I want to visit with you a little bit about

6   your understanding of Mr. Hutchins' activities while he was

7   in Las Vegas.  Are you with me?

8      A     I wasn't aware of all of his activities, but I'll

9   answer what I can.

10      Q     All right.  Well, just so we're clear, when you

11   ran into Mr. Hutchins in the Las Vegas airport on

12   August 2nd, this wasn't coincidental, right?

13      A     No, it wasn't.

14      Q     You and fellow agents had been aware of his

15   presence in Las Vegas for the previous week to 10 days,

16   right?

17      A     Correct.

18      Q     And a decision was made to attempt his arrest, to

19   execute the arrest warrant in connection with his outbound

20   flight, right?

21      A     Correct.

22      Q     That wasn't something the warrant demanded of you.

23   That was a law enforcement, strategic decision, right?

24      A     Correct.

25      Q     And in realtime, though you hadn't met

1    Mr. Hutchins, you knew him to be young, right?

2        A    Correct.

3        Q    You knew him to be a male?

4        A    Correct.

5        Q    You knew him to be in Las Vegas for a conference,

6    right?

7        A    Correct.

8        Q    And so whatever the reasons were for planning the

9    arrest for being in connection with his outbound flight, the

10   reality of things is that Hutchins' presence was known to

11   law enforcement over the previous week, and he was allowed

12   to participate in the Vegas experience over that period of

13   time, right?

14       A    I can't answer that.  I'm not sure what you're

15   asking.

16       Q    He was free to do in Las Vegas whatever anybody

17   chooses to do in Las Vegas for a week, right?

18       A    He wasn't under arrest at that time.

19       Q    Right.  And he was free to experience Las Vegas in

20   whatever way he chose?

21       A    Sure.

22       Q    Also, in connection with the arrest, the presence

23   of CBP officers, that was also not coincidental, right?

24       A    No.  I had to be escorted through the terminal.

25       Q    All right.  And you had been in contact with CBP

1   in advance of arriving to the airport on August 2nd,

2   right?

3        A    Correct.

4        Q    And, initially, sort of the working plan was that

5   you were going to perfect or execute Mr. Hutchins' arrest

6   consistent with the way CBP does things, right?

7        A    Those tactics were discussed.

8        Q    And those tactics involved making the arrest as

9   the wanted person attempts to board the plane, right?

10       A    That's the way CBP typically does it.

11       Q    And that was the plan, but you wanted to allow for

12  one contingency, correct?

13       A    Correct.

14       Q    And the contingency you were concerned about was

15  if Mr. Hutchins were to start drinking?

16       A    Yes.

17       Q    And by "drinking," I assume we don't mean Coke or

18  water.  We mean alcohol, right?

19       A    Yeah.  The consumption of alcohol.

20       Q    And so going in to attempt and execute this

21  arrest, you were concerned about the possibility of

22  Mr. Hutchins having basically even one sip of alcohol,

23  right?  That was a concern to you?

24       A    Yeah.  Any consumption of alcohol would be a

25  concern, right.

1      Q    And based on that concern, what your sort of

2   amendment to the CBP arrest protocol was is to suggest that

3   if he's seen ordering a drink, we should pull him out of the

4   terminal, right?

5      A    It was a little more detailed than that; but,

6   yeah, generally.

7      Q    Yeah.  And so the fact of the matter is that as

8   things eventually played out, Mr. Hutchins' order of what

9   turned out to be a Coca-Cola triggered that contingency,

10  right?

11     A    It's true.

12     Q    You and other officers were concerned that, "Oh,

13  he may have ordered an alcoholic beverage.  Let's get him

14  out of there before he has a chance to drink anything"?

15     A    Correct.

16     Q    All right.  Now, today it's your testimony that

17  early on in the interview -- and I take it this is the part

18  that's not recorded, right?  You asked Mr. Hutchins whether

19  he had anything to drink that day?

20     A    Well, it came up in discussion, "Why did you

21  interact with me in the lounge?"

22          And we spelled it out for him.  I said, "I was

23  worried about you drinking any alcohol."

24          And that's when the, "No, I don't drink alcohol

25  before international flights because it makes me

1   dehydrated."

2       Q    Well, isn't it true that you plainly asked him if

3   he had anything alcoholic to drink that day?

4       A    I think that's true also.

5       Q    All right.  And he said, "No," right?

6       A    My understanding, yeah.

7       Q    Your understanding.  You were the one asking the

8   questions and hearing the answer, right?

9       A    I don't remember who asked the question, but I do

10  remember the answer was "No."

11      Q    All right.

12      A    I do remember the other part with not drinking

13  before international flights.  That's what sticks with me.

14      Q    Got you.

15           And you were asking about alcohol consumed or not

16  consumed that day, correct?

17      A    I don't remember specifying a timeline.

18      Q    Agent Chartier, you wrote a report exclusively

19  detailing this particular portion of your dialogue with

20  Mr. Hutchins, right?

21      A    It was probably Agent Butcher that wrote the

22  report.

23      Q    I'm handing you what's been marked for

24  identification as Defendant's Exhibit No. 1.

25           Do you mind taking a look at that just to

1    yourself?

2         A    Yeah, I see it.

3         Q    So on December 9th of last year, Agent Butcher

4    authored a report, correct?

5         A    She did.

6         Q    And that report is a one paragraph report, right?

7         A    It is.

8         Q    And that report is devoted exclusively to noting

9    that, prior to initiating the interview of Marcus Hutchins,

10   that you, Agent Chartier, inquired if Hutchins had been

11   drinking the day of the arrest, right?

12        A    That's what it says.

13        Q    And is that accurate?

14        A    If it says that, I'm sure I did it.

15        Q    All right.  And then the report goes on to say

16   that Hutchins stated that he had not been drinking that day,

17   correct?

18        A    It does.

19        Q    And then it goes on to talk in terms of his

20   distaste for drinking before a long international flight,

21   right?

22        A    Correct.

23        Q    So the focus was on alcohol consumption that

24   particular day, right?

25        A    I don't know that that was the focus, but

1    certainly any alcohol consumption was the focus.

2         Q    Whatever reference to alcohol consumption is to

3    that day, correct?

4         A    That's the way it's worded here, yes.

5         Q    And that day would've really amounted to that

6    morning, right?

7         A    Correct.

8         Q    Where he's in your custody, essentially, as of

9    1:17 p.m., right?

10        A    Correct.

11        Q    He had been at the airport for a couple hours

12   before then, right?

13        A    Correct.

14        Q    All right.  What you didn't ask about was anything

15   having to do with the ingestion of other mind-altering

16   substances, right?

17        A    No, I didn't.

18        Q    Marijuana, synthetic marijuana, right?

19        A    No.

20        Q    Club drugs like Molly, ecstasy, things like that?

21        A    No, I didn't ask him.

22        Q    Misused prescription drugs like Adderall or

23   something of that nature?

24        A    No.

25        Q    No questions about that, right?

```
1           A    No.

2           Q    There was also -- at this particular point, before

3    the interview kind of gets rolling, there wasn't discussion

4    of what Mr. Hutchins' consumption of alcohol and/or drugs

5    may have been over the preceding 7 to 10 days that he had

6    been in Las Vegas, right?

7           A    No.  I didn't see how that was relevant.  I was

8    interacting with him.  He was answering questions.  I didn't

9    see any reason to go into that little of detail.

10          Q    But the fact of the matter is your questions were

11   limited to alcohol, right?

12          A    Correct.

13          Q    And as we've already established, alcohol

14   consumption, or the lack of it, that day, right?

15          A    Correct.

16          Q    All right.  As the 90-or-so-minute interview

17   proceeded, you did start learning a little bit more about

18   Mr. Hutchins' activities while he had been in Las Vegas,

19   right?

20          A    Yes.

21          Q    He talked of his wallet having been stolen at a

22   pool party, right?

23          A    He did.

24          Q    We're grown-ups here.  Las Vegas pool parties are

25   more about bikinis and beer than, like, kids in the water
```

```
 1    playing Marco Polo, right?

 2              MR. CHMELAR:  Object.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  What was the question again?

 5    BY MR. STILLER:

 6         Q    The Las Vegas pool party scene is kind of more

 7    about bikinis and beer than little kids playing Marco Polo,

 8    right?

 9         A    It's been a long time since I've been to Vegas,

10    but I assume so.

11         Q    And at some point, Agent Butcher kind of asked

12    innocent questions to Mr. Hutchins about the conference he

13    had been there to attend, right?

14         A    Correct.

15         Q    And in response to those questions, Mr. Hutchins

16    said he hadn't attended any of the conference, right?

17         A    I believe that's correct.

18         Q    He said he just came for the parties?

19         A    I do remember that statement.

20         Q    He described himself as an introvert and said that

21    to participate in the networking surrounding the conference,

22    he needed to be drunk, right?

23         A    I do remember a comment about liquid courage.

24         Q    In fact, "liquid courage" was your label, right?

25         A    (Affirmative nod.)
```

1    Q    Later on in the interview, I think Mr. Hutchins

2 may have yawned, and it caused you to ask how much sleep he

3 got the night before.  Do you remember that?

4    A    I don't recall.

5    Q    You don't recall him telling you that he had

6 gotten no sleep at all before adding that he went to bed for

7 about two hours?

8    A    I do remember the two-hour comment.

9    Q    All right.  So to the extent Mr. Hutchins told you

10 that the night before he hadn't gotten to bed except for two

11 hours, that would've been the night leading into his arrest,

12 right?

13    A    Correct.

14    Q    And you asked no questions whatsoever about

15 "Mr. Hutchins, what kept you up so late last night"?

16         No follow-up, right?

17    A    No, I did not.

18    Q    I think where I want to finish up is generally

19 with respect to documenting and memorializing investigative

20 efforts.  Are you with me?

21    A    Sure.

22    Q    So certainly the audio recording in this case is a

23 way of memorializing what was said between Mr. Hutchins and

24 you and Agent Butcher on August 2nd, right?

25    A    Okay.

```
 1        Q    Is that correct?

 2        A    I don't understand the question.  Sorry.

 3        Q    The audio recording memorializes the conversation?

 4        A    Yes, it does.

 5        Q    All right.  Reports written at or near the time of

 6   the conversation memorialized what happened in the

 7   conversation, right?

 8        A    They do.

 9        Q    I showed you Agent Butcher's report from

10   December 9th, right?

11        A    December 8th?

12        Q    December 8th.  I'm sorry.

13        A    Yes, you did.

14        Q    The one about you advising -- or asking

15   Mr. Hutchins about whether he had anything to drink that

16   day, right?

17        A    Correct.

18        Q    Agent Butcher had written a report memorializing

19   the August 2nd interview closer in time to the interview,

20   right?

21        A    Wrote a report?  The interview report?

22        Q    The 302.

23        A    Yes, the 302.

24        Q    A different one than the one that's in front of

25   you?
```

1          A     Correct.

2          Q     And that report that Agent Butcher wrote closer in

3     time to the interview, it made no mention of questions about

4     alcohol consumption, right?

5          A     It's a long report.  I think that was more

6     reflective of the recording, my understanding.

7          Q     You've seen the report, right?

8          A     I have seen the report.  I don't remember specific

9     questions about alcohol on it, and I think that's why this

10    was done after the fact.

11         Q     Four or five months after the fact?

12         A     Apparently.

13         Q     August 2nd?  December 8th?

14         A     Yeah.

15         Q     All right.  But that sort of proves -- I think

16    suggests an important point.  When something in the

17    investigation happens after the fact, you create a report

18    reflecting what that sort of different vision might be,

19    right?

20         A     Yes.

21         Q     I want to pass up to you -- I think it's Exhibit

22    9.  That's the Government exhibit.  That's the Advisement of

23    Rights form, right?

24         A     That it is.

25         Q     And at the top of the form, it sets forth a time,

1    right, or a series of times?

2         A    Yes, it does.

3         Q    And down at the bottom of the form in connection

4    with your signature and Agent Butcher's signature, it again

5    reflects a series of times, right?

6         A    It does.

7         Q    And the series of the times at the bottom of the

8    form is the same as the series of times at the top of the

9    form, right?

10        A    Yes.

11        Q    And in each place, three times are listed,

12   correct?

13        A    Correct.

14        Q    And in each place, two of the three times are

15   crossed out?

16        A    They are.

17        Q    As you sit here today, are you aware that

18   Agent Butcher, sometime after August 2nd, wrote those

19   times on the form?

20        A    I am aware of that.  It was a mistake at the time,

21   and it wasn't noted.

22        Q    The question is when did you first become aware of

23   that?

24        A    I don't specifically recall.  It was a busy time.

25   Probably a month after.

```
 1        Q    All right.  At any point, did you write a 302
 2   memorializing that after the fact, the Advisement of Rights
 3   form had been modified to reflect a variety of times?
 4        A    I'm not the case agent assigned to this.  I was
 5   helping out that day.  That's something you would have to
 6   ask Special Agent Butcher.
 7        Q    Well, the question was whether you wrote any
 8   report?
 9        A    I did not write a report, but I also did not
10   modify this form.
11        Q    That was Agent Butcher?
12        A    That was Agent Butcher.
13        Q    And when you say you learned about it a -- you
14   estimate that you learned of that circumstance about a month
15   after it occurred.  Roughly, when would that have been?
16        A    I don't recall the specific date.  Like I said,
17   this is something I was helping out on.  I wasn't the
18   primary case agent.  So it's not necessarily my -- it
19   wouldn't be my role to deal with any mistakes or problems
20   with it.  So I don't specifically recall the exact day.
21        Q    Let me try and help you out.
22        A    Okay.
23        Q    Today is May 16th.
24        A    Okay.
25        Q    We talked already about the time last month in
```

```
1    April when you met with Mr. Chmelar and Mr. Proctor for the

2    sake of preparing for testimony at the next day's hearing.

3    Do you remember that?

4         A    Yeah.  Correct.

5         Q    You recall that mid-April?

6         A    Uh-huh.

7         Q    How much in advance of mid-April might it have

8    been that you learned about the change to the Advisement of

9    Rights form?

10        A    Well, like I said, approximately a month after

11   this happened.  So it would've been, what?  September?  The

12   beginning of September, I found out that the time wasn't

13   recorded on here.

14        Q    We talked about the fact that as of August $2^{nd}$,

15   you knew that Mr. Hutchins was a male and young, and so on

16   and so forth, right?

17        A    Uh-huh.

18        Q    You also knew that he was a resident and citizen

19   of the UK?

20        A    I did.

21             MR. STILLER:  I've got nothing further.  Thank

22   you.

23             THE COURT:  Thank you.

24             Anything further, Mr. Chmelar.

25             MR. CHMELAR:  I do, Judge.  Just a few questions.
```

REDIRECT EXAMINATION

BY MR. CHMELAR:

Q    Agent Chartier, you were asked some questions by
Mr. Stiller about advising Mr. Hutchins of the nature of the
arrest and the reason he was under arrest.

Do you recall a specific time during the interview
on the recording where it could be heard that you actually
show him and hand him the arrest warrant issued out of the
Eastern District of Wisconsin?

A    A specific time on the recording?

Q    Right.  Do you recall the recording reflecting a
time when you handed him the arrest warrant?  He can be
heard in a way -- handing him the warrant and redoing the
warrant?

A    I don't specifically.

Q    If it's on the recording, it's on the recording?

A    If it's on the recording, it's on the recording.

Q    Do you recall specifically handing him the arrest
warrant from the Eastern District of Wisconsin?

A    Yeah, I do.

Q    Okay.  Mr. Stiller asked you a number of questions
about whether or not, you know, the nature of the
investigation and what you had told him or what you hadn't
told him.

Do you recall a certain point where Mr. Hutchins

1    asked specifically if the case was about Kronos, the

2    interview related to Kronos, and if you were looking for the

3    developer?

4        A    I do.

5        Q    And what did you respond?

6        A    I said I don't think we're looking anymore.

7        Q    And why did you say that?

8        A    Because it was our belief that Mr. Hutchins was

9    the developer of Kronos.

10       Q    And Mr. Stiller asked you about other parts of the

11   interview that related to, you know, other segments of the

12   interview.  He talked about unlocking the phones, needing

13   consent, and, you know, identifying yourself and things like

14   that.  He asked you about a portion of the interview that

15   dealt with WannaCry.  Do you remember that?

16       A    I do.

17       Q    What portion of the interview related to WannaCry

18   in relation to the Kronos investigation?

19       A    It was the end of the interview.  Just some

20   questions that we had.

21       Q    Was there a portion of the interview that dealt

22   with an individual that's been indicted with Mr. Hutchins?

23            You know there's a co-defendant on this case,

24   correct?

25       A    Yes.

1    Q    Did you discuss that individual with Mr. Hutchins?

2    A    Yes, we did.

3    Q    Did you question him about the identity and the

4    location -- the true identity of that individual and the

5    location of that individual?

6    A    We did.

7    Q    Was there a discussion about his ability to

8    identify the individual?

9    A    Yes, there was.

10   Q    And that was all in the context of Kronos?

11   A    Yes, it was.

12   Q    Mr. Stiller asked you a number of questions

13   regarding the time listed on the Advice of Rights form,

14   Exhibit 9.  Do you remember that?

15   A    Yes.

16   Q    Regardless of the times that are written on there,

17   do you have any doubt that you orally advised Mr. Hutchins

18   of his rights by reading that form and then handing him that

19   form before the interview started?

20   A    No doubt.

21   Q    Do you have any doubt that that was done before

22   the recording was started?

23   A    No doubt.

24   Q    I want to ask you just briefly about the recording

25   device and the circumstances in which the device was used.

1    The interview room that you used, was it a CBP interview

2    room?

3        A    It was.

4        Q    That's customs and border patrol.  That's what the

5    acronym stands for, right, "CBP"?

6        A    Correct.

7        Q    Do you know what I mean by -- when I ask you if it

8    was prewired?

9        A    Yes, I do.

10       Q    What does that mean?

11       A    It means that the room is hard wired for video and

12   audio.

13       Q    And was this particular room, the interview room

14   you were using, prewired?

15       A    Yes, it was.

16       Q    And did you use the prewired system?

17       A    No, we weren't able to.  It wasn't functional that

18   day.

19       Q    And as a result, what did you do?

20       A    We went to our backup, which was the handheld

21   digital recorder.

22       Q    In the normal course of interviews -- and you

23   already indicated you conducted approximately 20 in-custody

24   interviews.  At a time when interviews are recorded, and

25   you're the interviewing agent, meaning you're in the room

1    with the in-custody individual, is that -- in your

2    experience, is that normally the interviewing agent's

3    responsibility to activate or deactivate the recording

4    equipment?

5         A    No.  If it's prewired, it's done outside the room.

6         Q    I just want to go back to one other thing.  You

7    recall that I asked you about a portion of the interview

8    that dealt with WannaCry and how it related to the overall

9    length of the interview.  Would it be accurate to say that

10   from your review and your recall of the interview, that the

11   portion that dealt with WannaCry was minimal?

12        A    Yes, it was.

13        Q    During the interview, we talked about showing what

14   you described as a string to Mr. Hutchins?

15        A    Yes.

16        Q    What did that string relate to, as far as you

17   know?

18        A    Kronos.

19        Q    Was there any verbiage in there in this string

20   that identified it as Kronos?

21        A    Yes, there was.

22        Q    What was it?

23        A    It just spelled out "Kronos."

24        Q    With respect to the co-defendant that Mr. Hutchins

25   was currently indicted with and that the questions related

1    to that individual, were there additional questions on the

2    recording and during the interview that related to that

3    individual's role with respect to Mr. Hutchins and his

4    experience and history with that individual?

5         A    Yes, there was.

6         Q    That all related to Kronos, correct?

7         A    Correct.

8              MR. CHMELAR:  Can I have one moment, Judge?

9              THE COURT:  Yes.

10             MR. CHMELAR:  That's it, Judge.  Thank you.

11             THE COURT:  Anything further, Mr. Stiller?

12             MR. STILLER:  One narrow area, Your Honor.

13                        RECROSS-EXAMINATION

14   BY MR. STILLER:

15        Q    Agent Chartier, this idea of the malfunctioning

16   hard wiring for audio and video recording in the CBP

17   interview room, when did that become known to you and/or

18   Agent Butcher?

19        A    The day of.

20        Q    Before Mr. Hutchins arrived to the room, correct?

21        A    Correct.

22             MR. STILLER:  Nothing further, Your Honor.

23             THE WITNESS:  Can I clarify one response on the

24   Vegas question that he had earlier?

25             THE COURT:  No.  You have to answer the questions

1    that are before you, Agent.

2                THE WITNESS:  All right.

3                THE COURT:  And I do have a couple of

4    clarification questions for you.

5                THE WITNESS:  Okay.

6                          EXAMINATION

7    BY THE COURT:

8        Q    So when I go to listen to this audiotape, from --

9    the testimony is that it starts -- the conversation has

10   already started; is that correct?

11       A    It has.

12       Q    Okay.  So what went on before what I'm going to

13   hear on the audio?

14       A    It's pretty much the context of informing him why

15   we're there, showing the warrant, identifying ourselves,

16   where we came from, what we're here to talk -- generally

17   talk about that day.  And then beginning the discussion of

18   the Advice of Rights, showing it to him after we've read it,

19   asking him if he can read it.  If he agrees to what's

20   written there, please sign below.

21               And I think at the end, when the recording starts,

22   you can still hear us talking through some of the forms is

23   when the recording was started, and that was all at the

24   beginning of that interview.

25               So to give you an idea, the range of time, 5, 10

1    minutes maybe.  Yeah, I think it was just an oversight.

2         Q    I think you just answered.  Why wasn't the

3    interview recorded from the very beginning, this 5 to 10

4    minutes section that you just summarized for me, why was

5    that not also recorded?

6         A    As you could well imagine, it was a little chaotic

7    at the time.  We had to deal with CBP.  We were having to

8    deal with counselor notifications.  You know, we were

9    talking about looking at the phones and laptops.  So there

10   was a lot of moving parts.  And I think it was just -- it

11   was an oversight.

12        Q    And where the interview ends in the recording, is

13   there additional interview or interaction that is not

14   recorded after that?

15        A    There was a period of time where he's eating food

16   and just kind of casually asking questions.  But there was

17   no questions from, really, us that were case specific.  It

18   was just banter back and forth, waiting until we can get

19   transportation for him to the Henderson County correctional

20   facility.

21        Q    During the course of the interview, either the

22   recorded portion or the unrecorded 5 to 10 minutes before,

23   did you obtain pedigree information from Mr. Hutchins?  By

24   "pedigree," I mean background information?

25        A    No.

1    Q    So no question about how old you are?  The usual

2    questions.

3    A    Yeah.  I think we asked him for an identifying

4    document.  I don't remember if that happened before.  I

5    thought some of that was on the recorded portion of it.

6    Q    No questions about education?

7    A    It's all on the recorded.

8    THE COURT:  Those are my questions.  Any questions

9    specific to the questions that I asked?  Mr. Chmelar?

10   MR. CHMELAR:  Yes, just one.

11                    FURTHER EXAMINATION

12   BY MR. CHMELAR:

13   Q    As far as the background questions the judge was

14   just asking you about, I know you mentioned some of the

15   recording -- some of those questions, background information

16   are captured in the recording.  Did you also know about

17   Mr. Hutchins prior to the interview?

18   A    Yes, I did.

19   Q    You had some background information about him?

20   A    Correct.

21   Q    Did you know him to be operating a blog, a

22   computer security blog?

23   A    Yes, I did.

24   Q    That was in English and dealt with pretty

25   technical aspects of computer science, correct?

```
 1        A    Correct.
 2             MR. CHMELAR:  I don't have any other questions,
 3   Judge.
 4             THE COURT:  Okay.  Mr. Stiller, any questions from
 5   my questions or Mr. Chmelar's questions specifically?
 6             MR. STILLER:  No, thank you.
 7             THE COURT:  Okay.  Thank you, sir.  You may step
 8   down.  Please do not discuss your testimony with any other
 9   witnesses.
10             MR. PROCTOR:  Your Honor, at this time, the United
11   States calls Agent Butcher.
12             THE COURT:  Mr. Klein, you're raising your hand.
13             MR. KLEIN:  Your Honor, Mr. Hutchins would like to
14   use the restroom, if we can take a quick break.
15             THE COURT:  Let's take a quick break before we
16   swear in our next witness.  Five minutes.
17        (Break.)
18                  JAMIE BUTCHER, WITNESS, SWORN
19             THE CLERK:  Would you please state your name and
20   spell your last name for the record?
21             THE WITNESS:  Sure.  Jamie Butcher, B-U-T-C-H-E-R.
22                       DIRECT EXAMINATION
23   BY MR. PROCTOR:
24        Q    Good afternoon.  How are you employed?
25        A    I'm a special agent with the FBI.
```

1      Q    And how long have you been a special agent with

2  the FBI?

3      A    Approximately three years.

4      Q    And where are you currently assigned?

5      A    In Milwaukee.

6      Q    And what are your current duties?

7      A    I am on the cyber intrusion squad.  So cyber

8  intrusion matters.

9      Q    How long have you been with the cyber intrusion

10  squad?

11      A    For approximately six years.  I did cyber

12  intrusion work in my previous capacity with the FBI as well.

13      Q    So your entire career in Milwaukee as a special

14  agent has been working on cyber-related issues?

15      A    Yeah.

16      Q    And then before serving as a special agent in

17  Milwaukee, you said you were working on cyber-related

18  issues.  What capacity was that?

19      A    I was a staff operations specialist, which is

20  basically a tactical analyst supporting case work.

21      Q    And that's with the FBI?

22      A    Yes.

23      Q    And where was that?

24      A    In New York.

25      Q    And how long did you do that?

1      A      Approximately three years.

2      Q      And what did you do immediately before that?

3      A      I was in an administrative capacity with the FBI

4   as well.

5      Q      And that was in New York?

6      A      Yes.

7      Q      And what did you do before that?

8      A      I was in the advertising and marketing industry.

9      Q      And where was that?

10     A      That was two years after college.

11     Q      And where?

12     A      In New York.

13     Q      Okay.  And before that was college?

14     A      Yes.

15     Q      Now, did you become involved in an investigation

16  that ultimately led to the arrest of Marcus Hutchins?

17     A      Yes.

18     Q      Do you recall when he was arrested?

19     A      August 2nd, 2017.

20     Q      Where did that occur?

21     A      In Las Vegas.

22     Q      And did you participate in an interview of Marcus

23  Hutchins on that day?

24     A      Yes.

25     Q      Can you describe the circumstances of when you

first interacted and observed Mr. Hutchins on that day?

A    Yes.  I was waiting in the secured area in the

airport downstairs to interview rooms, a lobby area and a

restroom that's controlled by CBP and other security

personnel at the airport.  And Special Agent Chartier and a

CBP officer had gone to take Mr. Hutchins into custody from

the lounge in the airport.

Q    And then they brought him down to where you were?

A    Yes.

Q    And then what happened?

A    And then we went into the interview room, myself,

Mr. Hutchins, Mr. Chartier.  Mr. Hutchins was uncuffed and

shown a seat in the interview room facing the door with the

table in between myself and him, and Agent Chartier was at

the end of the table.

Q    So it was the three of you in the interview room?

A    Yes.

Q    What were you wearing?

A    Plain clothes with kind of a drapey cardigan for

concealment purposes.

Q    Were you wearing anything identifying yourself on

the exterior as an FBI agent?

A    No.

Q    Did you have credentials that identified you as an

FBI agent?

1      A    Yes.  We identified ourselves to Mr. Hutchins

2   after entering the interview room with credentials.

3      Q    Were you armed?

4      A    Yes.

5      Q    And where was your firearm?

6      A    On my hip.

7      Q    Was it in plain sight or was it concealed?

8      A    It should've been concealed by my cardigan, yes.

9      Q    Now, are you familiar with Miranda warnings?

10     A    Yes.

11     Q    And when, typically in your experience and

12  training, when are those given in an interview?

13     A    Before beginning any questioning of the person in

14  custody.

15     Q    Now, when you and Mr. Hutchins and Mr.

16  Chartier were -- or Special Agent Chartier were in the

17  interview room, was Mr. Hutchins advised of his Miranda

18  warnings?

19     A    Yes.

20     Q    When did that happen?

21     A    Before any questioning began.  Shortly after we

22  got into the interview room.

23     Q    Can you just describe how that process went

24  forward?

25     A    Special Agent Chartier read the rights from the

1    form directly to Mr. Hutchins.  He passed him the form and

2    asked if he could read out loud the portion that says that

3    "I understand and certify these rights," and asked, if he

4    agreed to speak to us, if he would sign the form, which he

5    did.

6         Q    In front of you, I've placed several exhibits.

7    One of them is marked Exhibit 9.  Can you locate that?

8         A    Yes.

9         Q    Is that the form that you're referring to?

10        A    Yes.

11        Q    And do you recognize signatures on that form?

12        A    Yes.

13        Q    And what signatures do you recognize?

14        A    Mr. Hutchins, myself, and Agent Chartier.

15        Q    And you recognize the other ones besides yourself

16   because you were present at the moment they were signed?

17        A    Yes.

18        Q    Can you take a look at Exhibit 8 in front of you?

19   Do you recognize Exhibit 8?

20        A    Yes.

21        Q    How do you recognize Exhibit 8?

22        A    It's a form that is an acknowledgment that it's

23   illegal to lie to an FBI agent.

24        Q    Was that form presented to Mr. Hutchins?

25        A    Yes.

1      Q     When was that presented to Mr. Hutchins?

2      A     Shortly after the Miranda rights form.

3      Q     And what happened regarding that form with

4      Mr. Hutchins?

5      A     He signed that one as well.

6      Q     Can you take a look at what's marked as Exhibit 4

7      in front of you?

8      A     Uh-huh.

9      Q     Do you recognize Exhibit 4?

10     A     Yes.

11     Q     What is Exhibit 4?

12     A     It's a Consent to Search form that includes

13     phones, laptops, a backpack, and a USB drive.

14     Q     And do you recognize signatures on that form?

15     A     Yes.

16     Q     And what signatures do you recognize?

17     A     Mr. Hutchins and myself.

18     Q     Did you witness Mr. Hutchins sign that form?

19     A     Yes.

20     Q     And when was that form presented to Mr. Hutchins?

21     A     It was a few minutes into the interview.  We had

22     gotten verbal consent prior to the form.  And then before

23     any searches began, the form was signed.  It's on the

24     recording.

25     Q     So after Mr. Hutchins signed these forms, at some

1    point did you begin substantive questioning?

2        A    Yes.

3        Q    I mean, you and Special Agent Chartier?

4        A    Yes.

5        Q    And you participated in asking those questions?

6        A    Yes.

7        Q    In your personal, professional experience, have

8    you encountered people who are intoxicated?

9        A    Yes.

10       Q    And did Marcus Hutchins appear intoxicated at that

11   time?

12       A    No.

13       Q    Did he seem lucid?

14       A    Yes.

15       Q    And in your professional and personal experience,

16   can someone be somewhat intoxicated and still understand

17   what's going on?

18       A    Yes.

19       Q    Based on your interaction with Mr. Hutchins that

20   day, did it appear to you that he understood what was going

21   on?

22       A    Yes.  He asked several follow-up questions when he

23   didn't understand a question we had asked.

24       Q    Did you present documents to Mr. Hutchins during

25   the course of the interview?

1      A    Yes.

2      Q    And did he review and comment on those documents?

3      A    Yes.

4      Q    Would you say he demonstrated a knowledge of

5  computers and cyber issues based on your interaction?

6      A    Yes.

7      Q    Was he able to recall items from his memory?

8      A    Yes.

9      Q    Is there any reason that he gave you to question

10  whether or not he understood what was going on at that time?

11     A    No.

12     Q    Can you describe the tone of the conversation of

13  the interview?

14     A    For the most part, it was pretty light.  There

15  were several jokes made by Mr. Hutchins and ourselves during

16  the interview.  There's several instances of laughter during

17  the interview.  It was pretty casual, I would say.

18     Q    How would you describe Mr. Hutchins' answering of

19  questions during the course of the interview?

20     A    He asked several follow-up questions but kind of

21  held back a bit in several of the questions, I think.

22     Q    In his answers to you?

23     A    Yes.

24     Q    Would you call it minimizing?

25     A    Yes.

 1      Q      How long did the interview take?

 2      A      A little under two hours.

 3      Q      During the course of this interview, did you or

 4   Special Agent Chartier threaten to punish Mr. Hutchins or

 5   his family if he didn't talk to you?

 6      A      No.

 7      Q      Did you make promises that he would get rewards if

 8   he talked to you?

 9      A      No.

10      Q      Was Mr. Hutchins offered water?

11      A      Yes.  There was one on the table there for him

12   when he came into the room.

13      Q      And was he offered food at any point?

14      A      Yes, later on in the interview.

15      Q      And was he allowed to use the bathroom?

16      A      Yes.

17      Q      How was the temperature in the room?  Was it

18   excessively hot or cold?

19      A      No.  And that's on the recording too.

20   Agent Chartier felt a little warm, but myself and

21   Mr. Hutchins stated that we feel quite fine.

22      Q      Was this interview recorded?

23      A      Yes.

24      Q      And how was it recorded?

25      A      With a handheld recorder.

1    Q    And whose handheld recorder was it?

2    A    It's the possession of the FBI.

3    Q    And who had custody of it that day?

4    A    I did.

5    Q    And do you know if the room you were in was wired

6    for recording?

7    A    It was, but it was broken.  We had talked to the

8    CBP agents that morning, and they told us it was inoperable.

9    Q    Now, are you familiar with rooms that are --

10   interview rooms that are wired for recording?

11   A    Yes.  That's typically how we conduct any

12   custodial interview.

13   Q    And if a room is wired for recording, who's

14   responsible for turning that system on, the agents in the

15   room conducting the interview or somebody else?

16   A    Someone else so the agents can focus on conducting

17   the interview.

18   Q    Whose job was it to record the interview with the

19   room wiring being down?

20   A    Mine.

21   Q    I represent to you that Exhibit 1 has been

22   admitted into evidence.  It's a recording of the interview.

23   Are you familiar with the recording of the interview?

24   A    Yes.

25   Q    Now, does that recording of the interview include

1    the reading of Miranda and the filling out of the form that

2    you testified to earlier?

3         A    No.

4         Q    Why not?

5         A    The interview was moving at kind of a quick pace,

6    and because I was focused on getting the Miranda warnings

7    and everything signed off, I forgot to push the button.  And

8    I realized that, as we began questioning, that I hadn't

9    started the recording yet.

10        Q    So would you call that a mistake?

11        A    Yes.

12        Q    What prompted you starting the recording?

13        A    Agent Chartier had started to ask some questions,

14   and I realized I just hadn't started it yet.

15        Q    And by "questions," you mean substantive

16   questions?

17        A    Yes.

18        Q    The kinds of questions that would elicit possibly

19   an incriminating statement?

20        A    Yes.

21        Q    I'm going to go back to Exhibit 9, which is in

22   front of you.  You mentioned earlier that Mr. Hutchins'

23   signature is on there as well as yours and Special Agent

24   Chartier's.  Did you sign that document around the time that

25   Mr. Hutchins signed the document?

1      A      Yes.

2      Q      Now, towards the top of the document, there's a

3  portion that says "Time."  And then after the signatures,

4  towards the bottom of the document, there's a portion that

5  says "Time."  Do you see that?

6      A      Yes.

7      Q      What's going on there?

8      A      I did not fill out the time at the time of the

9  signing of the warnings, and I tried to recreate it shortly

10  thereafter, and I realized when I was doing my paperwork

11  that it was incorrect.  So I attempted to recreate it and

12  put the approximate times there.

13      Q      So you wrote down "11:08" at one point?

14      A      I did.

15      Q      Okay.  And then you crossed that out?

16      A      Yes.

17      Q      And then you wrote "2:08", or squiggly line 2:08?

18      A      Yes.

19      Q      And what does the squiggly line mean?

20      A      Approximate.

21      Q      And you crossed that out?

22      A      Yes.

23      Q      And then later you wrote the approximate symbol,

24  and then 1:18?

25      A      Yes.

1      Q     And this was part of your attempt to recreate the

2   time?

3      A     Yes.

4      Q     In recreating the times, were you recognizing that

5   the times that you previously listed were wrong?

6      A     Yes.

7      Q     What did you do to go about to try to recreate

8   these times?

9      A     When I had the final time, the 1:18 which I

10  believe to be approximately correct, within 10 minutes of

11  the time that it was actually signed, I had the faxed

12  information that was sent to the consulate by my coworker.

13  I had surveillance logs from the individuals in Las Vegas

14  and other documentation that had time indications on it that

15  I didn't have when I had the previous times.

16     Q     Why didn't you write down the time when the

17  signatures were put on that form?

18     A     I just got caught up in the interview process.

19     Q     So you were just trying to move forward with the

20  interview?

21     A     Yeah.

22     Q     Any question that that document was reviewed and

23  signed by Marcus Hutchins before you started recording the

24  interview?

25     A     No.

1        Q    You wrote a report about that interview?

2        A    Yes.

3        Q    And in that report, did you note when Mr. Hutchins

4 was advised of his rights?

5        A    No, but that he was advised of his rights.

6        Q    My apologies.  I think I phrased that question

7 wrong.

8        In that report, do you indicate that Mr. Hutchins

9 was advised of his rights at one point?

10       A    Yes.

11       Q    And you indicate that he was advised of those

12 rights before the substantive questioning started?

13       A    Yes.

14       Q    After the interview concluded, where did

15 Marcus Hutchins go?

16       A    To Henderson Detention Center, which is the local

17 county facility.

18       Q    And are you aware whether or not he made any calls

19 while at that facility?

20       A    Yes, two calls.

21       Q    Two calls.

22       And how did you find that out?

23       A    We requested the calls from the local department,

24 and they gave me a list of calls in the range that

25 Mr. Hutchins was allowed to make phone calls.  And I knew

the phone number of his local contact, the only contact in

the U.S., his boss, which I had provided him the number for,

and I was able to recognize that number in the metadata of

those calls.  And then his voice was on the call as well as

his name for both of them.

Q    I'm showing you what's been marked as Exhibit 2.

Are you familiar with Exhibit 2?

A    Yes.

Q    What is Exhibit 2?

A    The first phone call that Mr. Hutchins made from

the county jail.

Q    And how do you recognize that?

A    I reviewed it prior to this hearing.

MR. PROCTOR:  Your Honor, at this time, I move

admission of Exhibit 2.

THE COURT:  Any objection?

MR. KLEIN:  Just our previously entered one,

Your Honor.

THE COURT:  Thank you, Mr. Klein.

It is received.

BY MR. PROCTOR:

Q    I've just handed you what's been marked as Exhibit

7.  Are you familiar with Exhibit 7?

A    Yes.

Q    What is Exhibit 7?

1      A      A transcript of the first phone call made from the

2    jail.

3      Q      Did you prepare this document?

4      A      Yes.

5      Q      And how did you prepare this document?

6      A      I listened to the call and transcribed to the best

7    of my ability.

8      Q      And there's a date and a time on the front page of

9    Exhibit 7.  How did you obtain those dates and times?

10     A      It was included in the metadata that we received

11   for the calls.

12     Q      Did anybody else review this transcript before

13   today before you submitted it?

14     A      Yes.

15     Q      A colleague?

16     A      Yes.

17            MR. PROCTOR:  Your Honor, at this time, I'd move

18   Exhibit 7.

19            THE COURT:  Mr. Klein.

20            MR. KLEIN:  Your Honor, we object, and I'll

21   explain.  There are some slight, in our view -- I listened

22   to the jail calls.  We believe there are some slight

23   inaccuracies in this.  So we would ask Your Honor, if you're

24   going to review this evidence, that you should listen to the

25   actual calls themselves, if you want to rely on an aid.  But

1   you shouldn't rely on this as actual evidence because there

2   are some slight inconsistencies based on our review of it.

3                   THE COURT:  Mr. Proctor, do you wish to respond?

4                   MR. PROCTOR:  Your Honor, in the interest of time,

5   my hope is to move through the transcript rather than play

6   the audio today and highlight a few things.  If the defense

7   believes there are inconsistencies, I'm open to hearing what

8   they are.  But for purposes of today, I think the most

9   efficient way is to admit it and then allow us to move

10  forward.

11                  The Court can review the audio and determine for

12  itself what is actually said.

13                  THE COURT:  Mr. Klein, anything further on that?

14                  MR. KLEIN:  Just that objection, Your Honor.

15                  THE COURT:  Okay.  So, of course, the audio itself

16  is the primary source, and that's what I'll listen to.

17                  For now, I'll consider the reference of the

18  transcript as an aid.  And to the extent there are

19  discrepancies, the audio, of course, will control.

20  BY MR. PROCTOR:

21      Q    I'm going to move through the transcript with you

22  and highlight a few things.  I'm going to ask you to read or

23  summarize various passages in here.

24                  So if you can turn to page 2.  Under the first

25  entry listed as "System," is there an indication made that

```
1    this call is recorded?

2         A    Yes.

3         Q    And moving on a few lines down, the second entry

4    listed as "Hutchins," does Mr. Hutchins indicate why he

5    believes he was arrested?

6         A    Yes.

7         Q    What does he say?

8         A    That he used to write malware, and "they picked me

9    up on some old shit."

10        MR. KLEIN:  Your Honor, you know, our objection is

11   not based on these tapes are inaccurate tapes of jail calls,

12   it's more on the relevance of this.

13        In the interest of time, I don't know that it

14   makes sense to walk through what they view as having the

15   agent repeat what is actually on the tape to Your Honor.

16        It seems like she's just testifying -- actually,

17   the best evidence is the tape itself.  So I think, in that

18   sense, we will object if they're just going to walk through

19   portions of the transcript and have her recite her

20   transcript.  I mean, she wasn't there.

21        THE COURT:  I'm sorry, Mr. Klein.  I didn't mean

22   to talk over you.  I did talk over you, so please finish

23   your thought.

24        MR. KLEIN:  That was the end of my thought,

25   Your Honor.
```

```
 1            THE COURT:  Thank you.
 2            Mr. Proctor, do you wish to add anything?
 3            MR. PROCTOR:  Yeah.  I'm happy to further explain
 4   the point of what I'm trying to make if Your Honor wants to
 5   hear it now; otherwise, I can ask very just summarized
 6   leading questions and walk through it quicker, if that's in
 7   the interest of everybody.
 8            THE COURT:  Well, Mr. Proctor, I already received
 9   the audio.  And to the extent that you wish to use the
10   transcript during argument, you certainly could reference
11   it.  You all will have it before us, and I'll have the audio
12   check the primary source on this.  I don't think it's
13   necessary, and in the interest of time, to have the agent
14   just read what I can read myself.
15            MR. PROCTOR:  All right, Your Honor.  I'll just
16   ask, then, my follow-up question.  My summarizing final
17   questions on this.
18   BY MR. PROCTOR:
19       Q    You've listened to it, and you prepared the
20   transcript.  Does Mr. Hutchins, in this transcript, discuss
21   why he believes he was arrested?
22            I'll leave it there.
23            Does he identify why he believes he was arrested?
24       A    Yes.
25       Q    Does he summarize aspects of his interview with
```

1    the FBI?

2        A    Yes.

3        Q    Does he speculate why the FBI decided to arrest

4    him at this point?

5        A    Yes.

6        Q    At any point, does Mr. Hutchins complain about not

7    understanding what the FBI talked about during their

8    interview?

9        A    No.

10       Q    At any time, does Mr. Hutchins complain about

11   being intoxicated?

12       A    No.

13       Q    At any time, does Mr. Hutchins complain about

14   being impaired in any way?

15       A    No.

16       Q    At any time, does Mr. Hutchins complain about the

17   FBI using threats or promises to get him to talk?

18       A    No.

19       Q    During the call, does Mr. Hutchins come across as

20   lucid and coherent or something less?

21       A    Lucid and coherent.

22       Q    Does he recall many details regarding his use of

23   computers and the origins of the case that ultimately led to

24   his arrest based on his memory?

25       A    Yes.

```
1              MR. PROCTOR:  No further questions, Your Honor.
2              THE COURT:  Thank you.
3              Mr. Klein.
4              MR. KLEIN:  Yes, Your Honor.
5              Your Honor, may I approach the lectern?
6              THE COURT:  You may.
7              MR. KLEIN:  Do you mind if I move this so I can
8    get some of the exhibits because there's not a lot of space
9    here to work with the exhibits.
10             THE COURT:  Help yourself, Mr. Klein.
11                          CROSS-EXAMINATION
12   BY MR. KLEIN:
13        Q    Good afternoon, Special Agent.  You've been with
14   the FBI three years?
15        A    Almost nine.
16        Q    Three years as a special agent?
17        A    Yes.
18        Q    And as part of your training, you're trained on
19   how to surveil people?
20        A    Yes.
21        Q    You're trained how to arrest people?
22        A    Yes.
23        Q    You're trained how to provide Miranda warnings?
24        A    Yes.
25        Q    You're trained how to write reports?
```

```
 1          A     Yes.
 2          Q     And as part of your training on writing reports,
 3    you're trained to write an accurate report, correct?
 4          A     Yeah.
 5          Q     A full report?
 6          A     Yes.
 7          Q     And if later you learn you need to fix in that
 8    report, you actually are trained to write an additional
 9    report, correct?
10                You wouldn't go in and amend your report?  You
11    would actually write a supplemental report?
12          A     Right.
13          Q     You're also, part of your training, is how to
14    record interviews?
15          A     Yes.
16          Q     And you are the case agent in this case, correct?
17          A     Correct.
18          Q     What does that mean?
19          A     That means I am the primary investigator in the
20    case.
21          Q     So you're the lead agent?
22          A     Yes.
23          Q     So Special Agent Chartier, was he working with you
24    or for you, or what was your relationship with --
25          A     He was working with me, yeah.
```

1       Q    Although he's technically your supervisor,

2  correct?

3       A    No.

4       Q    Is he the head of the cyber unit?

5       A    No, he's a colleague.

6       Q    Did you meet with the prosecutors in advance of

7  today's testimony about your testimony?

8       A    Yes.

9       Q    How many times?

10      A    Once for this and once in the case prior that was

11  postponed.

12      Q    So that's back in mid-April?

13      A    Yes.

14      Q    And who did you meet with when you met with them?

15      A    Both of them.

16      Q    And was Special Agent Chartier with you?

17      A    No.  We were separate for most of the time.

18      Q    And have you talked to him about your testimony

19  today?

20            After you met with him the first time, did you

21  talk to Special Agent Chartier about your meeting with them?

22      A    Not about the specifics of our individual

23  testimony, no.

24      Q    Did you talk to him about anything with your

25  meeting with the AUSAs?

```
 1        A     We've been working on the case together.  The case
 2   in general, yes.
 3        Q     What about your prep meeting?  The meeting where
 4   you met with them to talk about your testimony, did you talk
 5   to Special Agent Chartier about that?
 6        A     Generally.
 7        Q     What did you tell him?
 8             MR. CHMELAR:  Objection.
 9             MR. PROCTOR:  I'm going to object, Your Honor, to
10   the relevance of this.  There's nothing wrong with agents
11   meeting with prosecutors in advance.  I'm not sure where
12   he's going with this.
13             THE COURT:  Mr. Klein.
14             MR. KLEIN:  I'm just trying to find out if they
15   talked about details of their meetings that maybe shared
16   things they wanted to talk about.
17             THE COURT:  I'll allow it.  I believe Mr. Klein is
18   probing to what extent the witness's testimonies are
19   independent of each other.  So I'll allow it.
20             THE WITNESS:  Can you repeat the question?
21             MR. KLEIN:  Yes.
22   BY MR. KLEIN:
23        Q     What did you talk about with Special Agent
24   Chartier about your prep meeting with the prosecutors?
25        A     Various things.  I can't remember specifics.
```

```
 1        Q      Give me some big picture things you discussed with
 2    them.
 3        A      Just generally the interview and Miranda and just
 4    making sure that we were on -- you know, that our facts were
 5    the same.
 6        Q      So you were making sure your facts were the same?
 7    You just said that, correct?
 8        A      I did.
 9        Q      Okay.  Did you review any documents in advance of
10    this meeting?
11        A      Of course.
12        Q      What did you review?
13        A      The transcripts.  The report from the interview
14    and all of the recordings.
15        Q      When you say "all of the recordings," which
16    recordings are you referring to?
17        A      The post-arrest statement and both jail calls.
18        Q      How many times did you listen to those?
19        A      Once this morning and once before when we were
20    originally scheduled.  I listened to it several times while
21    I was writing the report, but that's been quite sometime.
22        Q      And, again, with the jail calls, you weren't
23    listening in when those calls were being made, right?
24        A      No.
25        Q      You got those later?
```

1        A    Yes.

2        Q    Nobody from the FBI was listening in those calls

3  when they were made, right?

4        A    No.

5        Q    Now, Mr. Hutchins was indicted in July 2017?

6        A    Yes.

7        Q    And you were the case agent at that time?

8        A    Yes.

9        Q    And you were the case agent leading up to his

10  indictment?

11        A    Yes.

12        Q    There was an arrest warrant that was issued as

13  part of his indictment; is that right?

14        A    Yes.

15        Q    And that arrest warrant was issued also in July?

16        A    Yes.

17        MR. KLEIN:  One second, Your Honor.

18  BY MR. KLEIN:

19        Q    The indictment charges Mr. Hutchins and a

20  co-defendant with a number of charges, correct?

21        A    Yes.

22        Q    And there's how many counts?  Six counts?

23        A    I believe so.

24        Q    One second.  I'm looking for the arrest warrant.

25        And you knew before he was indicted that he was a

1   citizen of the United Kingdom, correct?

2        A    Yes.

3             MR. KLEIN:  May I approach?

4             THE COURT:  You may.

5             And you don't have to ask, Mr. Klein.

6             MR. KLEIN:  I forgot about that, Your Honor.

7   BY MR. KLEIN:

8        Q    So what I placed in front of you is the copy of

9   the -- one second.  Sorry about this.

10            This arrest warrant, I ask you to turn your

11  attention to it.  Do you see it there?

12       A    Yes.

13       Q    So it's an arrest warrant from the Eastern

14  District of Wisconsin, correct?

15       A    Yes.

16       Q    And it has Mr. Hutchins' name on it?

17       A    Yes.

18       Q    As well as an alias?

19       A    Yeah.

20       Q    At the bottom of it, it has your signature?

21       A    No.  That's Special Agent Chartier's.

22       Q    Okay.  So he signed it, not you, even though

23  you're the case agent?

24       A    Yes, because he actually took Mr. Hutchins into

25  custody.

```
 1        Q    Okay.  And it has the date Mr. Hutchins was taken
 2   into custody?
 3        A    Yes.
 4        Q    And that is August 2$^{nd}$, 2017?
 5        A    Yes.
 6        Q    Does it list all the charges Mr. Hutchins is
 7   charged with?
 8        A    No.
 9        Q    What does it say in terms of charges?
10        A    Conspiracy to defraud the United States.
11        Q    So it doesn't mention any of the other charges,
12   right?
13        A    No.
14        Q    And it mentions there's an indictment?
15        A    Yes.
16        Q    Now, turning your attention back to the events of
17   late July and August 2017.  You knew Mr. Hutchins was coming
18   to Defcon before he arrived, correct?
19        A    Correct.
20        Q    And you knew that he was flying from the United
21   Kingdom?
22        A    Yes.
23        Q    And at that time, you had an arrest warrant for
24   him, right?
25        A    Yes.
```

Q    And you had an indictment?

A    Yes.

Q    And when he landed, was he arrested?

A    No.

Q    He wasn't arrested?  I'm talking about in
Las Vegas.

A    Yeah.

Q    How long was he in Las Vegas for before you
arrested him?  Do you recall?

A    Approximately a week.

Q    Did you seek to arrest him any point prior to the
day he was arrested?

A    No.

Q    So the first time you tried to arrest him was that
time at the airport when he was arrested?

MR. PROCTOR:  Object to the relevance of this
questioning, Your Honor.

THE COURT:  Mr. Klein.

MR. KLEIN:  Yes.

THE COURT:  Do you want to answer the objection?

MR. KLEIN:  Yes, Your Honor.  I think we're just
trying to show that they had the opportunity to arrest him,
and they waited until a precise moment.  And we'll get to
that in our argument of why that moment is important.

THE COURT:  I'll allow it.

BY MR. KLEIN:

Q    In advance of his coming to the U.S., you were aware that he had been to the U.S. once before, correct?

A    Correct.

Q    And that was a few years before?

A    I believe it was the year prior.

Q    It was also for Defcon?

A    Yes.

Q    And you know what Defcon is, right?

A    Yes.

Q    What is it?

A    A conference for hackers and security professionals.

Q    And it's known for its parties, right?

A    I suppose.  I've never been.

Q    You've been to Vegas, though, right?

A    Once before the arrest, yes.

Q    Vegas is known for its parties, correct?

A    Yes.

Q    You didn't seek to arrest him before he got to the U.S., did you?

A    We intended to.

Q    Before he got to the U.S.?

A    No, when he first arrived in the U.S.  There were concerns that were expressed by the organization because of

1    the sinkhole for WannaCry; therefore, the arrest was delayed

2    until his departure.

3         Q    But you could've arrested him before?

4         A    We could have.

5         Q    Now, I want to turn your attention to the events

6    of the day of his arrest.  You arrived the day before his

7    arrest in Las Vegas, correct?

8         A    Yes.

9         Q    And when you arrived, you came with Special Agent

10   Chartier.  I might be mispronouncing his name.

11        A    Yes.

12        Q    It was just you two from the Milwaukee field

13   office?

14        A    No.  Our colleague, Elliot Mustell, was also with

15   us.

16        Q    You all flew out together?

17        A    No.  Mr. Mustell flew out at a later time in the

18   day, and we picked him up at the airport.

19        Q    Is he in the cyber unit too?

20        A    He is.

21        Q    And did you meet with other FBI agents here once

22   you landed?

23        A    Yes.

24        Q    And you planned for his arrest the following day?

25        A    Yes.

1    Q    So you stayed here in Las Vegas that night.  The

2    next morning you got ready to arrest him, correct?

3    A    Yes.

4    Q    Were you part of the surveillance team that

5    started surveilling him starting at 6 in the morning?

6    A    No.

7    Q    Did you just go directly to the airport that

8    morning?

9    A    Yes.

10    Q    What time did you arrive at the airport?

11    A    I want to say around 10.  I don't know the

12    specifics, but it was early.

13    Q    Before Mr. Hutchins got there?

14    A    Significantly, yeah.

15    Q    And you were with Special Agent Chartier?

16    A    Yes.

17    Q    Were you with the other special agent you just

18    mentioned?

19    A    Yes.

20    Q    Now, I want to have you direct your attention to

21    this surveillance log.  Do you have it in front of you now?

22    A    Yes.

23    Q    It's five pages, correct?

24    A    Yes.

25    Q    Did you prepare this log?

```
 1        A    No.

 2        Q    Who did?

 3        A    The agents that conducted the surveillance.  The

 4   Las Vegas agents.

 5        Q    Okay.  So you worked with a team of Las Vegas

 6   agents that morning?

 7        A    Yes.  I did not meet the surveillance team at any

 8   point.

 9        Q    Okay.  But you knew he was being surveiled?

10        A    For the morning, yes.

11        Q    Okay.  So I'm going to direct your attention to

12   page 3.

13             Your Honor, I'm not sure you have a copy.

14             THE COURT:  I do not.

15             MR. KLEIN:  Let me bring a copy up.

16             THE COURT:  Thank you.

17   BY MR. KLEIN:

18        Q    So I direct your attention back to page 3.  Are

19   you there?

20        A    Yes.

21        Q    So this describes when the surveillance first

22   started to surveil Mr. Hutchins that morning, correct?

23        A    Yes.

24        Q    And so these times here would be accurate?  You

25   would rely on these as an FBI agent, right?
```

1         A      Yes.

2         Q      And so I guess surveillance picked up at

3    6:44 a.m.?

4         A      Yes.

5         Q      And then the agents followed him and observed food

6    being delivered?

7         A      Uh-huh.

8         Q      And they observed him leaving for the airport?

9         A      Yeah.

10        Q      If you turn over to page 4, do you see that he

11   arrived at the Las Vegas airport at 12:18 p.m.?

12        A      Yes.

13        Q      And next he went through the ticket counter.  Do

14   you see that?

15        A      Yes.

16        Q      And security?

17        A      Yes.

18        Q      Now, Mr. Hutchins wasn't arrested when he arrived

19   at the airport, right?

20        A      No.

21        Q      And he did go through security, correct?

22        A      Yes.

23        Q      And he wasn't arrested right after he went through

24   security, was he?

25        A      No.

1    Q    So he cleared TSA at 12:41 p.m.  Do you see that

2  on page 4?

3    A    Yes.

4    Q    And then he went into the club?

5    A    Yes.

6    Q    That's not like a music club.  It's an airport

7  club, right?

8    A    Yes.

9    Q    And where were you at this point?

10   A    I was in the secure area of the airport.

11   Q    And were you in contact with the agent surveilling

12  him?

13   A    They made contact with us once he had arrived at

14  the airport, yes, and then once he was in the lounge.

15   Q    And how did they make contact with you?

16   A    I believe they contacted the airport agent, the

17  Las Vegas agent that was there.

18   Q    So you were in a room with Special Agent Chartier

19  and you and some sort of agent from the airport?

20   A    A special agent from the FBI, the Las Vegas

21  office.  He was assigned to the airport, yes.

22   Q    Okay.  Was someone from Customs and Border Patrol

23  in the room with you?

24   A    I'm not sure if they were at that time or not.

25   Q    When did Mr. Chartier head upstairs to effectuate

```
1   the arrest of Mr. Hutchins?

2        A    He went when Mr. Hutchins was in the lounge

3   because there was concern that Mr. Hutchins might start

4   drinking, and that would be of concern to us.

5        Q    So he went at 12:49 p.m., because that's when it's

6   noted?

7        A    Uh-huh.

8        Q    And then you'll see at the bottom, at 1:17,

9   Mr. Hutchins was escorted out by Customs and Border Patrol?

10       A    Yes.

11       Q    And that would've been when he was with

12  Mr. Chartier?

13       A    Correct.

14            MR. KLEIN:  Your Honor, I would actually offer

15  this exhibit into evidence.  I would mark it as Exhibit --

16  I'm not sure what number.  I can start with A if you want to

17  do defense exhibits differently or if you want to

18  sequentially go up.

19            THE COURT:  It's always easier to sequentially go

20  up.  What was the last one?

21            THE CLERK:  They're out of order anyway.

22            THE COURT:  Yeah.  The last one I have is Exhibit

23  11.

24            MR. KLEIN:  That's what I have too.  So maybe

25  we'll make this Exhibit 12.
```

1          THE COURT:  Let's do that.

2          Mr. Proctor, do you have any objection?  You're

3    raising your hand.  Do you have an Exhibit 12?

4          MR. PROCTOR:  No.  We don't have --

5          MR. CHMELAR:  We went out of order as well, Judge.

6    We labeled our exhibits and then decided against some and

7    introduced others.

8          THE COURT:  Okay.  We'll call this Exhibit 12.

9          Any objection to the receipt of Exhibit 12, the

10   surveillance log?

11         MR. CHMELAR:  No, Judge.

12         THE COURT:  It's received.

13         MR. KLEIN:  Thank you.

14         Your Honor, may I approach with the arrest

15   warrant?  I want to offer that into evidence as well.

16         THE COURT:  You may.

17         MR. KLEIN:  And I meant to approach you, not the

18   witness.

19         THE COURT:  We're going to call that Exhibit 13.

20         MR. KLEIN:  Your Honor, we offer Exhibit 13 into

21   evidence too.

22         THE COURT:  Any objection to the receipt of the

23   warrant, Exhibit 13?

24         MR. PROCTOR:  No objection.

25   \\\

BY MR. KLEIN:

    Q    When you were there that day down in the room with Special Agent Chartier and the FBI airport liaison or agent, you were in, you said, casual clothes, or business casual?

    A    Yes.

    Q    Special Agent Chartier was too?

    A    Yes.

    Q    You didn't have the FBI jackets on you?

    A    No.

    Q    The kind you use to effectuate an arrest usually?

    A    No.

    Q    Neither did Special Agent Chartier?

    A    No.

    Q    You did have your badge on you, though?

    A    Yes.

    Q    And a weapon?

    A    Yes.

    Q    And Special Agent Chartier had his FBI badge?

    A    Yes.

    Q    And his weapon?

    A    Yes.

    Q    So at 1:17, Mr. Hutchins was arrested by CBP and Special Agent Chartier?

    A    Correct.

    Q    And at some point, they appear down in your room,

1    or did you go up and meet them?

2         A    No, they came down.

3         Q    Okay.  Between the time they came down and came to

4    you, you don't know what happened?

5         A    No.  As far as I know, they walked down to the

6    area.

7         Q    So when they arrive, it's -- who's coming to the

8    room first when you were there?

9              When Mr. Hutchins appears in the room, who is with

10   him?

11        A    Agent Chartier and the CBP officer.

12        Q    Okay.  And where is the FBI liaison officer?

13        A    I don't know if he was in the room or not at that

14   time.

15        Q    What is his or her name?

16        A    Nick.

17        Q    Nick.  Do you remember the last name?

18        A    No, but I could find it.

19        Q    Okay.  We may ask you to do that.

20             So I want to direct your attention -- Special

21   Agent Chartier had some concern about -- let me go back.

22             The original plan was to arrest Mr. Hutchins as he

23   was about to board the plane, correct?

24        A    Yes.

25        Q    You weren't originally intending to arrest him in

```
 1        the lounge?

 2              A    No.

 3              Q    And the only reason the FBI chose to arrest him

 4        was because they thought he ordered an alcoholic beverage?

 5              A    Correct.

 6              Q    So that was a concern to you if he had had a

 7        drink?

 8              A    Yes.

 9              Q    And the concern was if he had been drinking, you

10        may not be able to interview him right away, correct?

11              A    Yes.  It's less reliable.

12              Q    So if someone is drinking even one drink, it's

13        less reliable?

14              A    Probably.

15              Q    Now, I'm going to direct your attention --

16                   Your Honor, may I approach and provide this to you

17        also?

18                   THE COURT:  Yes.  And you don't have to ask,

19        Mr. Klein.

20        BY MR. KLEIN:

21              Q    Now, as the case agent, part of your duty would be

22        to draft memos capturing what's happening during the case,

23        right?

24              A    Yes.

25              Q    And I think those are commonly referred to --
```

1  often referred to as 302s?

2      A    Yes.

3      Q    Do you understand that terminology?

4      A    Yes.

5      Q    And so in this case, I direct your attention to

6  the 302 I placed in front of you.  This is the 302 you

7  drafted following Mr. Hutchins' arrest, right?

8      A    Correct.

9      Q    And it's dated.  Do you see the top, date of entry

10  is August 11, 2017?

11      A    That's when it was signed off, correct.

12      Q    Okay.  And the date drafted is August 7.  Is that

13  on the bottom?  Do you see on the right?

14      A    Yes.

15      Q    Okay.  So that's the date you drafted it?

16      A    I began drafting it, yes.

17      Q    And when you say "signed off," what do you mean

18  "signed off"?

19      A    That it was approved by the supervisor and

20  serialized to the case file.

21      Q    And who is that supervisor?

22      A    SA John May.

23      Q    And I would ask you to look through it.  This is

24  quite a lengthy 302.  It's eight pages, right?

25      A    Yes.

Q    And you prepared this 302 five days after the arrest?

A    I began it as soon as we returned to Milwaukee.

Q    When did you return to Milwaukee?

A    For business, on the 7th.  It was the weekend when we returned.

Q    So you returned to Milwaukee on the 7th?

A    I returned to Milwaukee at 1:00 a.m. on the 5th, on Saturday.

Q    So is that the night of the 4th or the morning of the 5th?  Or is that the next --

A    We departed from Las Vegas the evening of the 4th and arrived back in Milwaukee at 1:00 a.m. on the 5th, on a Saturday.

Q    And so you went into the office that Saturday and started to prepare notes?

A    No.  I went into the office on Monday, the first business day after we returned.

Q    So you didn't prepare this in Las Vegas?

A    No.

Q    And this report appears to be -- it's a largely -- let me step back.

You had partially recorded the interview with Mr. Hutchins, correct?

A    Yes.

```
1          Q     And this report is -- you listened to the
2    recording when you prepared this report?
3          A     Yes.
4          Q     And you meant to capture what he said on the
5    recording?
6          A     It's meant to be a summary, correct.
7          Q     So turning to the top of this -- I want to look at
8    page 1.  Turning to the very top.
9          A     Okay.
10         Q     It's blacked out for some reason, but it
11   mentions -- there's an opening paragraph, right?  Marcus
12   Hutchins, date of --
13         A     Date of birth, yeah.
14         Q     Date of birth.  Was interviewed at McCarran
15   International Airport, Las Vegas, Nevada?
16         A     Correct.
17         Q     And then it states, "After being advised of the
18   identity of the interviewing agents" --
19         A     Yes.
20         Q     And that would be you and Special Agent Chartier?
21         A     Correct.
22         Q     The nature of the interview and being advised of
23   his rights?
24         A     Yes.
25         Q     And by that you meant the Miranda waiver?
```

```
 1          A     Yes.

 2          Q     And the 1001 waiver?

 3          A     Yes, but that doesn't count as an Advice of

 4     Rights.  That's just legal -- yeah, false statements.

 5          Q     Okay.  So by that you're referring to --

 6          A     The Miranda warning specifically.

 7          Q     Which is marked as Exhibit 9?

 8          A     Yes.

 9          Q     Do you have a copy of that in front of you?

10          A     Not anymore, no.

11          Q     Okay.  Let me bring you a copy.  I'll make sure I

12     also have a copy.

13                So you have Exhibit 9 in front of you?

14          A     Yes.

15                MR. KLEIN:  And, Your Honor, you have a copy of

16     that, correct?

17                THE COURT:  I do.

18     BY MR. KLEIN:

19          Q     So when you refer he was advised of his rights,

20     you're referring to this?

21          A     Correct.

22          Q     Your opening paragraph doesn't mention whether he

23     waived those rights, does it?

24          A     No.

25          Q     Okay.  And this form that I'm asking you to look
```

1    at --

2         A    It's implied.  If he provided the information --

3         Q    I'm just asking you to answer my questions now.

4         A    Okay.

5         Q    It doesn't mention that he waived his rights, does

6    it?

7         A    No.

8         Q    Okay.  So turning to the form, do you see it?

9         A    Yes.

10        Q    Do you see your signature at the bottom of it?

11        A    I do.

12        Q    When did you sign this?

13        A    After Mr. Hutchins signed it.

14        Q    Okay.  And do you see another signature there?

15        A    Yes.

16        Q    Whose signature is that?

17        A    Special Agent Chartier's.

18        Q    Okay.  So is it meant to be signed by whoever is

19   there present for this part of the interview?

20        A    Correct.

21        Q    The form, as it was signed that day -- this is not

22   the exact form that was signed that day, is it?

23        A    This is a copy, not the original.

24        Q    When Mr. Hutchins signed this form, right?

25        A    Yes.

1       Q    Right after he signed it, you signed it?

2       A    Yes.

3       Q    Special Agent Chartier?

4       A    Yes.

5       Q    Was the place filled in?

6       A    No.

7       Q    Was the date filled in?

8       A    No.

9       Q    Was the time filled in?

10      A    No.

11      Q    And I'm talking about the time both at the top and

12 the bottom.

13      A    Correct.

14      Q    And so you mentioned earlier that you felt like

15 you didn't have time at that point to fill it in, correct?

16      A    Yes.  I felt like the interview was progressing,

17 and I needed to focus on that.

18      Q    And you actually filled this in later, sent five

19 days later on August 7th?

20      A    I'm uncertain of which time I filled out the form.

21 I think it was while I was still in Vegas.

22      Q    You're not certain?

23      A    The original information.

24      Q    Do you recall meeting with the prosecutors on

25 April 18th to prepare for the original set hearing here?

1       A    Yes.

2       Q    And do you recall telling them that you realized

3   you had incorrectly filled out this form, and that when you

4   were drafting your 302, you attempted to reconstruct the

5   time?

6       A    Correct.

7       Q    Okay.  So you didn't start drafting your 302 until

8   August 7th?

9       A    Correct.

10      Q    That's not in Vegas, is it?

11      A    No.

12      Q    Okay.  So you didn't start to fill out the time,

13  or fill in these other portions until you got home to

14  Milwaukee, correct?

15      A    No.  I filled out the location and the original

16  time while I was still in Vegas.

17      Q    When you say the original time, what are you

18  referring to?

19      A    The 11:08 time, that was incorrect.

20      Q    So you filled out -- in Vegas, you filled --

21  you're saying you filled out at McCarran International

22  Airport?

23      A    Yes.

24      Q    And you filled out 11:08 a.m.?

25      A    Yes.

1      Q    And 11:08 at the bottom?

2      A    Yes.

3      Q    And then when you got home to Milwaukee is when

4 you altered the form?

5      A    Yes.

6      Q    So the form that Mr. Hutchins saw didn't include

7 that information, did it?

8      A    Not the time or the location, no.

9      Q    And you don't recall when in Las Vegas you

10 bothered to fill it in at the airport and the original time?

11      A    I don't.  There was a lot happening.

12      Q    Well, after Mr. Hutchins left the interview room,

13 you were done speaking to him, correct?

14      A    Incorrect.  We transported him to Henderson

15 Detention Center, and there was a lot of --

16      Q    But you had time.  You could've filled out this

17 form during that day?

18      A    It was a long day.

19      Q    How long do you think it takes to fill out a time?

20      A    Not very long.

21      Q    Okay.  But you didn't do it that day, did you?

22      A    I may have done it that evening or the next day.

23      Q    And then when you get back to Milwaukee five days

24 later, you altered this form?

25      A    Correct.

```
 1          Q    And you alter it twice, actually, right?

 2          A    I realized it was incorrect, yes.

 3          Q    So you first put down "2:08 p.m."?

 4          A    Yes.

 5          Q    Then you crossed that off?

 6          A    Yes.

 7          Q    Did you immediately -- actually, you first crossed

 8     off the "11:08 a.m.," right?

 9          A    Yes.

10          Q    Then you fill in "2:08," and you put a squiggly

11     line, which you mean by approximation?

12          A    Yes.

13          Q    By that you mean within 10 minutes?

14          A    Within the general time frame, yes.

15          Q    What do you mean by the general time frame?

16          A    That it's not a specific time.  It's approximate.

17          Q    Okay.  Times are important, correct?

18          A    Yes.

19          Q    And when you look at the log, they don't put in a

20     squiggly line and approximation, do they?

21          A    When I look at what?

22          Q    When you look at the surveillance log -- turn your

23     attention back to that.

24          A    Yes.

25          Q    Are there approximations of time?
```

1        A    No, there are not.

2        Q    Okay.  And you're actually trained not to put --

3    the time this happened is important, correct?

4        A    Yes.

5        Q    And the time you originally put in didn't have a

6    squiggly line?

7        A    Correct.

8        Q    And so you then cross out the 2:08 at the top of

9    the form, and then you fill in 1:18?

10       A    Correct.

11       Q    And you don't change that time?

12       A    No.  It's approximate, and I believe it to be

13   within 10 or 15 minutes of when the Miranda rights were

14   given.

15       Q    You recognize that when Miranda rights are given

16   is important, don't you?

17       A    Yes.

18       Q    And they need to be given before someone is

19   interviewed, correct?

20       A    Of course.

21       Q    So this time when this happens is very important,

22   isn't it?

23       A    Yes.

24       Q    Now, you didn't note anywhere in -- I direct your

25   attention back to your 302.  There's no notation in here

```
1    that you altered this form, is there?

2         A    No.

3         Q    Okay.  There's no notation, in fact, about when

4    the interview started, is there?

5         A    No.  I have not done that in the past.

6         Q    Are you aware that FBI guidance on recording

7    interviews is to include the time of interviews?

8         A    I was not until I was informed today.

9         Q    Who informed you of that today?

10        A    Mr. Proctor.

11        Q    What did he tell you?

12        A    He showed me the guidance that you had provided in

13   your submission to the Court.

14        Q    And what did he tell you?

15        A    He just showed me the guidance.

16        Q    He just showed it you and didn't say anything?

17        A    I don't recall.  He just mentioned that that would

18   be something that you may ask about.

19        Q    And did you read the guidance?

20        A    I did.

21        Q    And did he ask you if you had known about the

22   guidance beforehand?

23        A    No.

24        Q    He didn't ask you any questions about the

25   guidance?
```

1      A    It's an internal policy.  That's not something

2   that I have --

3      Q    My question is:  Did he ask you anything about the

4   guidance, not whether it's a policy?

5      A    No.

6      Q    Did he talk to you about other questions you might

7   be asked today?

8           MR. PROCTOR:  Your Honor, I'm going to object to

9   this.  Preparation between counsel and agents, those

10  specific things, that's not relevant whether or not

11  Mr. Hutchins voluntarily waived his Miranda rights.

12          THE COURT:  Mr. Klein.

13          MR. KLEIN:  Your Honor, I'm just focusing in on

14  the fact about how she got to this point where she now

15  understands this policy, which she apparently didn't

16  understand before and actually is an important policy

17  because she's noted that when you record an in-custody

18  suspect or defendant, the FBI guidance says you're supposed

19  to put the time in the 302, and she didn't do that.

20          THE COURT:  You made your point, Mr. Klein.  So

21  I'll allow you to -- you could ask a question to wrap it up,

22  and let's move on.

23          MR. KLEIN:  Yes, Your Honor.  I'll just move on

24  now.

25          THE COURT:  Thank you.

BY MR. KLEIN:

    Q    So, Special Agent, you also wrote another 302 about that day of the arrest, correct?

    A    Yes.

    Q    And that was about when you were transporting Mr. Hutchins to the Henderson facility?

    A    Do you mean from the facility to processing the next day?

    Q    Yes.  I think it was --

    A    There are several.

    Q    Yes, that sounds right to me.

    And so you did another 302, right?

    A    Correct.

    Q    And was that written around the same time as this one?

    A    Yes.

    Q    In that report, you didn't note that you had altered the time on this form, did you?

    A    No.  The form had nothing to do with that instance.

    Q    At some point, about a month after this happened, you spoke with Special Agent Chartier about this form, didn't you?

    A    About?

    Q    About this form, the Advice of Rights form.

1      A      I'm uncertain.  I'm not sure what you're asking.

2      Q      Well, did you ever tell anybody in the FBI last

3   year that you had changed the times in this form?

4      A      Yes, because they were incorrect.

5      Q      Who did you tell?

6      A      I probably told several people.

7      Q      Do you remember if you told Special Agent

8   Chartier?

9      A      I most likely did, yes.

10      Q      You wrote a 302 in December of last year, about,

11   and questioned that -- you claim Mr. Chartier asked Marcus

12   Hutchins, correct?

13      A      Correct.

14      Q      And that was a supplemental 302?

15      A      It was.

16      Q      And you were directed to write that by the

17   prosecutors?

18      A       It was unclear from the original reports that

19   those issues had been addressed; so, yes.

20      Q      And so you wrote that supplemental report?

21      A      I did.

22      Q      And you didn't include in that report that you had

23   changed the times, did you?

24      A      No.

25      Q      Okay.  And you have not written a supplemental

1   report so far to note that you changed the times?

2       A    The times being changed --

3       Q    I'm just asking a question.  Have you written

4   a supplement?

5       A    No, but they should be apparent.

6            MR. PROCTOR:  Your Honor, I ask that she be

7   allowed to answer the question.

8            THE COURT:  If we can speak one at a time both for

9   the benefit of the recording and also our court reporter.

10           Yes, one person at a time, please.

11           Mr. Klein, you can continue, please.

12           MR. KLEIN:  Yes, Your Honor.

13  BY MR. KLEIN:

14      Q    The first time that you mentioned this altering of

15  the times to the prosecutors was when you met with them back

16  in April?

17      A    I don't believe so.  They had the form in advance

18  of that.

19      Q    You told them before April 18th that you had

20  altered this form?

21      A    Yeah, they were aware of it.  They had the form in

22  their possession.

23      Q    So you said "I've altered this form" to them?

24      A    Yes.

25      Q    And they knew before April 18th?

1       A     Yes.

2       Q     And did you tell them anything else about that?

3       A     That I had put a time originally. And then when I

4 went to write my report, I realized it was incorrect and

5 sought to correct it.

6       Q     When you were down in the interview with

7 Mr. Hutchins, you didn't ask him if he had been drinking,

8 did you?

9       A     I did not. Agent Chartier did.

10      Q     You didn't ask your own independent question,

11 correct?

12      A     No.

13      Q     You didn't ask him if he had done any drugs that

14 day?

15      A     I did not.

16      Q     You didn't ask him if he was exhausted?

17      A     No. Agent Chartier had asked if he was --

18      Q     I just asked if you had asked if he was exhausted.

19      A     Okay.

20      Q     As part of the arrest of Mr. Hutchins, because

21 he's a United Kingdom citizen, you had to notify his

22 embassy?

23      A     Correct.

24      Q     And that's standard FBI practice?

25      A     Yeah.

```
 1          Q     When anyone from a foreign country is arrested,

 2    you notify their embassy?

 3          A     Yes.

 4          Q     And agent -- is it Mustell?

 5          A     Mustell.

 6          Q     He prepared that form?

 7          A     Yes.

 8          Q     And he called at 1:26 to notify them?

 9          A     Correct.

10          Q     And that was after he was arrested?

11          A     Yes.

12          Q     How did Mustell know to call at 1:26?  Where was

13    Mustell?

14          A     He was just outside the interview room in the

15    lobby area of the secure space.

16          Q     Okay.  And after the arrest, you and Special Agent

17    Chartier interrogated Marcus in that room, correct?

18          A     Interviewed, yes.

19          Q     And that lasted about an hour and 40 minutes?

20          A     Approximately.

21          Q     And you took notes, too, during your interview?

22          A     I did.

23          Q     And you take notes because you may rely on them to

24    write your 302?

25          A     And it's a good way to review what was discussed
```

1    before you have the ability to review the recording.

2         Q    And those notes don't reflect the time you

3    provided the Miranda warnings, do they?

4         A    No.

5         Q    They don't mention Miranda warnings, do they?

6         A    No, because it's standard for custodial --

7         Q    I'm just asking you if they mention it.

8         A    No.

9         Q    You had originally planned to tape the interview

10   using sort of the room's audio recording system?

11        A    Yes.  That's our standard procedure.

12        Q    And that didn't work that day?

13        A    No.

14        Q    Had you brought a recording with you?

15        A    Yes, for backup.

16        Q    So you knew before the interview started that you

17   would need to turn on your audio recorder?

18        A    Yes.

19        Q    You didn't start it when Mr. Hutchins first

20   arrived in the room, did you?

21        A    No.

22        Q    In fact, you started it mid-stream of what was

23   going on?

24        A    When substantive questioning began, yes.

25        Q    But you started after you claim he was shown the

1   Miranda warnings?

2         A    Yes.

3         Q    And signed them?

4         A    Yes.

5         Q    Okay.  I want to back up to what happens.  He

6   walks into the room, right?  And that's when Chartier asked

7   him if he had been drinking?

8         A    Yes.  I'm not certain whether it was before or

9   after Miranda, but it was before questioning began.

10        Q    And then when you show him when he walks in the

11  room, it is the Miranda warnings?

12        A    Agent Chartier did, yes.

13        Q    And the 1001 waiver?

14        A    Yes.

15        Q    And then you start the interview?

16        A    Yes.

17        Q    Okay.  Soon after the interview starts, you

18  realize you haven't pressed record on your button?

19        A    Correct.

20        Q    And you press it?

21        A    Yes.

22        Q    And when you press record, you don't know anywhere

23  on that auto recording that Mr. Hutchins has been advised of

24  his rights, do you?

25        A    No.

```
 1          Q     You don't know that you had -- the system had
 2    failed, the internal taping system, do you?
 3          A     No.
 4          Q     You don't note that you started this audio
 5    recording mid-stream, do you?
 6          A     No.
 7          Q     You just press play, and it goes to the end?
 8          A     Correct.
 9          Q     I want to turn your attention to that moment when
10    you first pressed play.
11                You recall that almost within 30 seconds after you
12    pressed play, Mr. Hutchins asked you, "What is this about"?
13                MR. PROCTOR:  I'm going to object and clarify.
14                You mean press record?
15                MR. KLEIN:  Press record.  Sorry.
16    BY MR. KLEIN:
17          Q     You recall that within 30 seconds after you press
18    record, Mr. Hutchins asked, "What is this about"?
19          A     I believe so.
20          Q     And your response is, "We're going to get to it.
21    Did you have a good week"?
22          A     Yeah.  But Agent --
23          Q     I'm just asking you if that's your response?
24          A     Yes.
25          Q     And you recall that it was about -- and I'll use
```

1    an approximation because I know you might not remember this.

2    It was about over an hour into this where Special Agent

3    Chartier showed Mr. Hutchins the arrest warrant?

4         A    I believe so.

5              MR. KLEIN:  One moment, Your Honor.

6    BY MR. KLEIN:

7         Q    You didn't show Mr. Hutchins his indictment during

8    this interview, did you?

9         A    No.

10        Q    And you first showed him the arrest warrant at

11   that point of over an hour into the interview, correct?

12        A    Correct.

13             MR. KLEIN:  One moment, Your Honor.

14             THE COURT:  Take your time.

15   BY MR. KLEIN:

16        Q    That day was the first day you had ever met

17   Mr. Hutchins, correct?

18        A    Correct.

19        Q    So you've never met him in person before?

20        A    No.

21        Q    You had never even seen him before in person,

22   correct?

23        A    No.

24        Q    So any sort of judgment you make about how he

25   behaved would be based on that sole experience, correct?

1      A      Correct.

2      Q      So you don't know how he is regularly.  You're

3   just basing it on that one moment?

4      A      Yes.

5             MR. KLEIN:  One quick second, Your Honor.

6             Your Honor, nothing further.

7             THE COURT:  Thank you, Mr. Klein.

8             Mr. Proctor, anything further?

9             MR. PROCTOR:  One second, Your Honor.

10                      REDIRECT EXAMINATION

11   BY MR. PROCTOR:

12     Q      Mr. Klein asked you about the surveillance logs

13   and the times on those logs regarding when Mr. Hutchins was

14   observed in the airport going to the lounge.  Do you recall

15   that?

16     A      Yes.

17     Q      Was the FBI in a position to arrest him

18   immediately when he walked into that lounge, or did they

19   have to go from somewhere else?

20     A      We had to -- well, Agent Chartier and the CBP

21   officer had to come up from the secure area, which the

22   airport is rather large.  So it would've taken some time to

23   get up there.

24     Q      It would've taken awhile?

25     A      Yeah.

```
 1          Q     Mr. Klein asked you several times writing or not
 2    writing 302s regarding the changes to the form, Exhibit 9.
 3    Do you recall that?
 4          A     Yes.
 5          Q     Do you think it's self-evident from that form that
 6    it's been changed?
 7          A     Yes.
 8          Q     Would that kind of negate the need to write a 302
 9    saying you changed the form?
10          A     In my opinion, yes.
11                MR. KLEIN:  Your Honor, I object to this.
12                THE COURT:  Excuse me.  One person at a time.
13                Mr. Proctor, you were talking while the witness
14    was also talking.  Or the witness was talking while you were
15    still asking your question.  I think that's what happened.
16    And then objection jumped in.
17                Mr. Klein, your objection.
18                MR. KLEIN:  I think these are leading questions
19    and calling for speculation.
20                THE COURT:  Okay.  Mr. Proctor, you may rephrase
21    your question.
22                Witness, if you'll please wait for the question
23    before you jump in.
24                THE WITNESS:  Yes, Your Honor.
25    \\\
```

BY MR. PROCTOR:

    Q    Did you erase times on Exhibit 9?

    A    No.

    Q    How did you indicate that the time has been
altered?

    A    I crossed it out with one line, so it was clear
that it was altered.

    Q    Would you see a point in writing a 302 to
dedicate, to memorialize that change?

    A    No.

    Q    Towards the end of his questioning, Mr. Klein
asked you if you had ever seen Mr. Hutchins outside of that
interview.  Do you recall that?

    A    Yes.

    Q    Have you seen Mr. Hutchins in other contexts after
that interview?

    A    Yes.

    Q    So you've had time to observe him; is that
correct?

    A    Yes.

    Q    Is he in court today?

    A    Yes.

    Q    Were you able to observe him right now?

    A    Yes.

    Q    Were you able to hear him speak on other occasions

1    than that interview?

2         A    Since the interview, yes.

3         Q    Does that change any of your testimony regarding

4    your observations that he was clear and lucid during the

5    interview?

6         A    No.

7              MR. PROCTOR:  One second, Your Honor.

8    BY MR. PROCTOR:

9         Q    The next day, after Mr. Hutchins had been placed

10   at Henderson Correctional Facility, did you have any

11   interactions with him at that point as well?

12        A    Yes.

13        Q    And can you describe that interaction?

14        A    We picked Mr. Hutchins up for a transport for

15   processing through FBI systems and to drop him off at the

16   U.S. marshals that day.  Some suspicious activity had

17   happened overnight, so we did ask him about that at the time

18   of transport.

19        Q    So you had a conversation with him?

20        A    Yes.

21             MR. PROCTOR:  Nothing further, Your Honor.

22             THE COURT:  Mr. Klein, anything further from you?

23             MR. KLEIN:  Very brief, Your Honor.

24

25

                      RECROSS-EXAMINATION

BY MR. KLEIN:

    Q    When Mr. Hutchins waived -- to sign that form is

important, correct?

    A    Yes.

    Q    And the FBI could have arrested Mr. Hutchins the

moment he walked into the airport, correct?

    A    Yes.

    Q    You could've arrested him at the lounge, correct?

    A    Yes.

    Q    You did arrest him at the lounge?

    A    Yes.

         MR. KLEIN:  Nothing further.

         THE COURT:  Thank you, Mr. Klein.

                        EXAMINATION

BY THE COURT:

    Q    Agent Butcher, Exhibit 9 is still in front of you?

    A    Yes.

    Q    Okay.  That's the Miranda form.  So the

original -- I guess the first number, the first time, the

11:08, what's the source of that time?

    A    I can't recall, Judge.  I'm very sorry.

    Q    And then the approximately 2:08, what's the source

of that time?

    A    I believe it was based on time changes, but I also

1   can't recall.  The one that I find to be most accurate is

2   the 1:18 because I had all the source documents of the other

3   times available.

4        Q    And what's the source of the -- I think you

5   testified to that, but if you can kind of wrap it up for me.

6   What's the source of the approximate 1:18?

7        A    So the notification to the consulate, the times on

8   that, the surveillance logs, the time of the recording

9   beginning, all of those things combined.

10            THE COURT:  Thank you.

11            Anything specifically from the questions that I

12  asked Agent Butcher.

13            Mr. Proctor?

14            MR. PROCTOR:  No, Judge.

15            THE COURT:  Mr. Klein?

16            MR. KLEIN:  No, Your Honor.

17            THE COURT:  Okay.  Thank you.  You may step down.

18            Any further witnesses from the Government?

19            MR. PROCTOR:  No, Your Honor.

20            THE COURT:  At this time, is the Government

21  resting then?

22            MR. PROCTOR:  Yes, Your Honor.

23            THE COURT:  Mr. Klein?

24            MR. KLEIN:  Your Honor, can we have a moment to

25  decide?  We have a couple of decisions to make.

```
 1              THE COURT:  Yes.
 2              MR. KLEIN:  We'll probably need a break.
 3              THE COURT:  Let's take a break.  Let our court
 4     reporter stretch his back, too.
 5          (Break.)
 6              THE COURT:  Mr. Klein.
 7              MR. KLEIN:  Yes, Your Honor.
 8              THE COURT:  How do you wish to proceed?
 9              MR. KLEIN:  We wish to call assistant United
10     States attorney Michael Chmelar or Benjamin Proctor.
11              THE COURT:  And may I have a proffer?
12              MR. KLEIN:  Yes, Your Honor.  There's two points
13     we want to have them testify about.  The first relates to
14     Special Agent Chartier's testimony.
15              On April 18th of this year, we received a
16     disclosure from them about what Special Agent Chartier told
17     them.  And in that disclosure, he doesn't mention two facts
18     that have become very important to this hearing.  One, that
19     he -- and what he testified here today is that he
20     communicated the fact of an arrest warrant in the stairwell
21     to Mr. Hutchins.
22              MR. CHMELAR:  Judge, I would only ask one thing as
23     Mr. Klein is making his proffer, that he avoid using
24     pronouns like "he" because there's multiple people he's
25     referring to.
```

1          You've asked him to be specific.

2          THE COURT:  Yes.  Mr. Klein, be specific, please.

3          MR. KLEIN:  Sure.  So Special Agent Chartier --

4     let me step back.

5          So there's two parts to what he testified to today

6     that are inconsistent with what he told the prosecutors in a

7     meeting before today.  The first part is -- and he only met

8     with those prosecutors.  There are no other witnesses in the

9     room.  We established that through Special Agent Butcher,

10    which is that each met with the prosecutors separately.  So

11    the only two we could call would be these two prosecutors.

12         So the first part is that today, Special Agent

13    Chartier -- and this is, in substance, testified that when

14    he and the two CBP officers arrested Mr. Hutchins, they

15    brought him into a stairwell, and that Special Agent

16    Chartier informed him that he was under arrest but also of

17    the fact that there was an arrest warrant.

18         And then later he testified today that when they

19    were downstairs in the interrogation room and before the

20    interview was being recorded, but during the process of

21    showing him the Miranda, Mr. Hutchins, the Advice of Rights

22    form, they showed -- Special Agent Chartier says he showed

23    him the arrest warrant.  The arrest warrant we had put into

24    evidence, Your Honor.  So you're aware that --

25         THE COURT:  I have that.

1          MR. KLEIN:  When Special Agent Chartier met with

2    the prosecutors on April 18th, 2018, he disclosed neither

3    of those facts to the prosecutors.  He only disclosed, and I

4    can quote from it, Your Honor, if you want me to quote from

5    it, or I can bring up the email so you can see the

6    disclosure.

7          THE COURT:  No, you may proceed.

8          MR. KLEIN:  This is the disclosure we got.  "Once

9    Mr. Hutchins and Agent Chartier were behind closed doors

10    leading to a stairwell, Mr. Hutchins was placed in handcuffs

11    and told that he was under arrest.  Mr. Hutchins asked why

12    he was arrested, and he was told that, once in an interview

13    room, they could talk further."

14          There's no discussion of being shown an arrest

15    warrant -- or being told of an arrest warrant in a

16    stairwell.  Then once they get down in the interview room,

17    the disclosure is, "When they arrived at the interview room,

18    Agent Chartier removed the handcuffs from Mr. Hutchins.

19    Agent Chartier identified himself and showed his FBI

20    credentials to Mr. Hutchins.  Agent Chartier then read

21    Mr. Hutchins his rights from an Advice of Rights form.

22    Mr. Hutchins indicated he understood his rights.

23          "Agent Chartier then gave the Advice of Rights

24    form to Mr. Hutchins, and Mr. Hutchins was asked to read the

25    form.  Mr. Hutchins read the form.  And after reading it, he

1    signed it.  Agents Butcher and Chartier then signed the

2    form.

3          "Mr. Hutchins then received, read, and signed the

4    acknowledgment of penalties for false statements to the FBI.

5          "Mr. Hutchins then made a statement to Agent

6    Chartier and Butcher."

7          And then from there the interview went on.

8    There's no mention of being shown an arrest warrant before

9    the taping of the interview began, and that's a critical

10   point in our briefing here, Your Honor, because we raised

11   this in our briefing, and it's an important point, which is

12   that Mr. Hutchins, to knowingly and intelligently and

13   voluntarily waive your rights, you need to have some sense

14   of what's at issue here.  And the fact is -- and I think it

15   will come together when we put it all together later in

16   argument -- is that they deceived Mr. Hutchins the entire

17   time about the purpose of this interview.

18         He, in fact, wasn't shown the arrest warrant --

19   and we've heard that from Special Agent Butcher -- until

20   over an hour into the interview or the interrogation.  He

21   was never shown the indictment.  Within 30 seconds of it

22   starting with the tape, he asked what was this about, and

23   they said, "We'll get to that later."

24         And so I think this is a very critical point for

25   us.  And the two people that can establish it, the only two,

1    or one of the two, is either of the prosecutors.

2            And then the second reason we want to call them is

3    because Special Agent Butcher claims that she told them

4    about changing this time, and we don't believe that's

5    accurate.  We don't believe she told them before

6    April 18th.

7            The first time we learned of the changing of the

8    time was on April 18th.  That's when we received an email

9    from the prosecutors describing that.

10           And so what she testified today was, "No, I told

11   them a long time ago, not on April 18th but even before

12   that."

13           And so we would want to ask them about when she

14   first told them about that fact.  And, again, the timing of

15   when he signed this form could not be more critical.  And so

16   I think that's another important fact.

17           Again, she made them witnesses to this fact.  So

18   that's why we want to call them.

19           One second.

20           And to be clear, the issue isn't the fact that the

21   time was changed, because we all know it was changed now,

22   but when it was changed.

23           THE COURT:  Well, when it was changed in terms of

24   whether it was changed in Las Vegas or whether it was

25   changed five days later here in Milwaukee?

1          MR. KLEIN:  When it was changed whether in Las

2  Vegas, whether in Milwaukee, and who that was disclosed to

3  after the fact.

4          THE COURT:  Before I ask some questions,

5  Mr. Chmelar or Mr. Proctor, do you wish to respond?

6          MR. CHMELAR:  To all aspects of what Mr. Klein has

7  indicated?

8          THE COURT:  Yes.

9          MR. CHMELAR:  So, yes.

10          THE COURT:  I guess first to his request to call

11  you as a witness and then the topics you wish to cover.

12          MR. CHMELAR:  Sure.  I think the request itself is

13  ridiculous, and I was trying to think of an adjective to

14  describe the request when he told us about it.

15          It's hard for me to put into words.  I've been

16  doing this for a long time.  I've never had anybody suggest

17  that we would be witnesses except in state court practice

18  when I actually took statements from victims.

19          We provided, as we noted in our briefings, the

20  information that they're now contending is impeaching at

21  their request.  I don't believe we were obligated to provide

22  it; nonetheless, we provided it.  And we specifically noted

23  in the correspondence to the defendant's attorneys that the

24  information we provided were our summaries, not the agents,

25  meaning these were not agent statements.  These were our

summaries off our recollections of what took place.  None of
it is inconsistent with what -- so two points:  None of it
is inconsistent with what the agents testified about.  There
may be things that are not included, but that's because
they're summaries.  And I can tell you that if I were
called -- and I'll let Mr. Proctor speak for himself -- I'm
not going to say anything that is inconsistent with what the
agents said because the agents are the ones that, despite
what Mr. Klein is saying in claiming that we are the only
ones, Mr. Proctor and myself are the only ones who could
establish this information.  Well, that's clearly false.  We
just had two witnesses who established it.  We rely on the
agents, and we are not in a position to contradict what they
said.

There are lots of things in the summary.  I don't
know how long the agents testified for, but they testified
for a long time.  There's one page of bullet points on the
topics that we felt was maybe new information that we felt
as a courtesy of the request we sent over to them.

But, you know, I can tell you that if I was asked
anything -- I'm not in a position to contradict what they
said.  I wasn't there.  I rely on them and what they say.

Simply because I didn't put it in a summary, or,
you know, Mr. Proctor and myself talked and put it --
summarized some of the information, it wasn't included

doesn't mean it didn't happen, or that's not the way that it
unfolded from the agent's perspective.

So on the substance of the request, there's no
grounds to call us as witnesses. We're not witnesses. The
agents are the witnesses. Information we obtain during
preparatory sessions was exactly that. It's just
information during preparatory sessions. Information we
passed over, as I indicated, were summaries. We never asked
the agents to review them. They're certainly not statements
of the agents. So it's not impeaching of the agents.

As for the substance of the actual impeachments,
whether or not the times were actually changed on the Advice
of Rights form here on the 7th when the agent returned from
Las Vegas or in Las Vegas is, from the Government's
perspective, meaningless. The times were altered or amended
on the face of the documents -- on the face of that
document, Exhibit 9.

The defense has been in possession of Exhibit 9
since very early on in the case. It was one of the first
documents that was tendered in discovery, and Your Honor has
Exhibit 9. It's clear that it was amended on the face.
Whether or not it was amended after the interview in
Las Vegas or here, from, as I said, the Government's
perspective, we don't see how it plays any important part in
determining whether or not the Miranda warnings were given

prior to the interview starting, which Agent Chartier and

Butcher both testified to happened.  The defense, in their

own motion, states that it happened prior to the interview

starting because in their motion, they say the colloquy

concerning the Advice of Rights happened before the

recording started, and the recording is the interview.

So whether or not the times were amended or not

here or there, and whether or not, you know, Agent Butcher

told us she amended it, we knew it was amended because we

can look at it.  Anybody looking at it can see it was

amended.

So I think, in essence, twofold:  One, I'm not in

a position, and I feel I can speak for Mr. Proctor -- he's

nodding "yes" -- he's not a position to contradict what the

witnesses testified about because we only provided

summaries.

Two, the relevance and the value of that

impeaching information, to the extent it is impeaching or

would be impeaching if any of it can be established, is

minimal and certainly is no grounds for either Mr. Proctor

or myself to testify about anything.

THE COURT:  Thank you.

Mr. Proctor, did you wish to add anything, or,

Mr. Klein, did you wish to add anything?

MR. PROCTOR:  I don't wish to add anything.

1    Mr. Chmelar said enough.

2              THE COURT:  Thank you.

3         Mr. Klein.

4         MR. KLEIN:  Yes, Your Honor.  I agree with this

5    fact, which is the agent's testimony is their testimony, and

6    Your Honor is being asked to rely on that, and Your Honor,

7    as part of that, has to evaluate their credibility, and it

8    goes directly to their credibility when we have two agents

9    who have said completely contradictory things here today.

10             One agent testified that he showed the arrest

11   warrant to Mr. Hutchins before the recording of the

12   interview began when he was giving the Advice of Rights.

13   That's Special Agent Chartier.

14             The other agent this afternoon later said the

15   first time it was shown was over an hour into the interview.

16   That's directly contradictory testimony, and it goes right

17   to our argument about deception.  And when those agents met

18   with the prosecutors in preparation for this, Special Agent

19   Chartier did not share that information.  We contend that he

20   made that up.  And so it is an important fact that the first

21   time he disclosed that he showed the arrest warrant, or

22   claims he showed the warrant was today on the stand,

23   and it's directly contradicted by the other special agent,

24   and the two witnesses to that prep session are these

25   prosecutors.  There was no other agent in the room, and it's

1    simply to establish from them that when they met with him,

2    he did not tell them that he showed the arrest warrant.  It

3    helps buttress our argument the first time he did it was

4    today, and that's in direct contradiction to another agent.

5            And as for the timing of the form and when it was

6    signed, the agent claims she told the prosecutors well in

7    advance that she had changed the time.  We don't believe

8    that's true.  Her credibility is at issue here.  They are

9    depending on both of their credibility to claim that

10   Mr. Hutchins knowingly and intelligently waived his rights.

11   And if they're both found not to be credible, then this

12   evidence should definitely be suppressed, and we think it

13   should be.  So it goes right to the heart of this case.

14           THE COURT:  Thank you, Mr. Klein.

15           I'm denying the request.  I think, as you know in

16   making the request, from being a very experienced attorney

17   yourself, that you're asking for something that's very

18   extraordinary.  And to allow it, I think, would allow to --

19   in every single case, the prosecutor can be called to talk

20   about what witnesses told them during their preparation

21   session.  That's in contradiction to what they testified in

22   court, or that's different, or that shows discrepancy.

23   That's almost in every case they meet with their witnesses.

24   That does not change them from counsel of record to ordinary

25   witnesses in the case.

```
1              I don't think it's appropriate.  I would not allow
2    it.  Of course, the record is the record, and you can
3    certainly make all the arguments that you have made on the
4    record that we have.
5              And, additionally, to the extent that you think my
6    ruling is incorrect, you made a proffer as to what you
7    wanted to elicit from the Government, and that could be
8    further reviewed as appropriate.
9              With that, Mr. Klein, any other witnesses?
10             MR. KLEIN:  Yes, Your Honor.  We want to call
11   Mr. Hutchins, but we wanted to ask Your Honor in advance
12   about the scope of where you would allow the prosecutor to
13   go because we have some very, very -- I'll add very discrete
14   questions.  So it will be important to us to know the scope
15   of what you would go to because we're not trying to open the
16   door to other areas, to be clear.  I'm happy to walk
17   Your Honor through our questions.
18             THE COURT:  So just to answer your question.
19   Generally, the scope of this hearing is on the voluntariness
20   question.  This is not a hearing on whether Mr. Hutchins is
21   guilty or not guilty.  So I'm not interested in anything
22   that goes beyond the factors of voluntariness.
23             Does that answer your question?
24             MR. KLEIN:  No, but it's helpful to know that to
25   the extent that I did understand that, and I appreciate you
```

1    saying that.

2         I guess our question is -- there's two areas we

3    would think about asking him about, and I'll explain what

4    they are.  The first one was what he was aware of about

5    United Kingdom advisements when people get arrested on the

6    date of his arrest.  So, again, the questions would be very

7    simple.  "On August 2nd, were you aware of any UK

8    advisements people get when arrested?"

9         He'll answer that question, which ones, or which

10   ones --

11        THE COURT:  Is your question to me are you allowed

12   to ask those questions?  Is that your question?

13        MR. KLEIN:  I know we're allowed to ask them.  I

14   guess we don't perceive these questions as opening the door

15   to other questions, like, beyond the scope of them crossing

16   him on what his understanding of UK law was.  So that's what

17   I'm going to.

18        So if we ask him about UK law, we believe the

19   scope of the cross should be limited to his understanding of

20   UK law.  By "UK," I mean United Kingdom.

21        THE COURT:  I understood that, Mr. Klein.

22        Yes, that's fair.  It's so obvious to me I don't

23   know if I'm missing something.

24        MR. CHMELAR:  I think you are, Judge.  I think

25   Mr. Klein is saying if Mr. Hutchins decides to take the

1    stand and proffers to the Court that he understood the

2    United Kingdom version of Miranda to be whatever it is, then

3    we're not allowed to ask him any questions about his

4    understanding of the Miranda rights as he was read and

5    waived them with the agents.

6              THE COURT:  Is that your question, Mr. Klein?

7              MR. KLEIN:  Yes.

8              THE COURT:  Okay.  I think that's too limited,

9    right?  If he's asked about UK law, and the topic is,

10   you know, how does he understand UK Miranda rights versus

11   U.S. Miranda rights?  I mean, UK Miranda rights, I actually

12   don't have them, Miranda, but UK rights as far as a suspect

13   is.  Yes, the Government can ask him questions about his

14   understanding of Miranda rights, his understanding of

15   Exhibit 9.

16             MR. KLEIN:  Your Honor, just to put a point on it.

17   We weren't going to ask him his understanding of UK rights

18   versus Miranda.  It would simply be his understanding of UK

19   rights.  So we would not be asking him to draw a comparison

20   to the rights, which is what the prosecutors, I suspected

21   and now understand, would like to cross him on.  So it's

22   simply, "Were you aware of UK advisements?  Which ones?"

23   And then, "What was your basis for your understanding," not

24   asking anything about U.S. Miranda rights.  There's no

25   direct question about U.S. Miranda rights.

1          THE COURT:  Anything further?

2          MR. CHMELAR:  I mean, it can't be limited like --

3     I respect whatever your decision is, but it can't be

4     reserved or restricted in that way.

5          They've proffered certain allegations.  And,

6     in fact, Mr. Klein just claimed one of the agents lied on

7     the stand before the Court.

8          If Mr. Hutchins takes the stand, and they

9     proffered in their motion for this hearing and in the motion

10    to suppress that he was under the influence of drugs, he was

11    coerced, he didn't understand his rights, I don't see how he

12    could take the stand and state what essentially is UK law

13    without answering any questions concerning the nature of the

14    interview.  What would be the point of having him describe

15    his understanding of whatever the UK version of Miranda is?

16    It would serve no purpose.  It shouldn't be limited.

17         If he is asked a question that he doesn't want to

18    answer or he feels may be incriminating, he has the right,

19    under the Fifth Amendment, to claim his privilege not to

20    answer that question.  But the Government shouldn't be

21    limited in their cross-examination of Mr. Hutchins in these

22    areas just as the defense wasn't limited to much extent

23    about their cross-examination with the agents concerning

24    what would be the totality of the circumstances of the

25    events that unfolded on the 2nd.

1          So we would object to the idea that it can somehow

2     be limited before he testifies.  And we certainly intend to

3     ask a whole variety of questions regarding his claim of

4     impairment, his drug use, his ability to understand, write

5     and read English.  These are all relevant factors that

6     Your Honor is to consider.  And I would say that without

7     those things coming in, they've proffered nothing and

8     established nothing regarding the suggestion that he was

9     under the influence and failed to comprehend the events of

10    August 2nd.

11         So it's up to them, and they can choose to go any

12    way they want, but we're prepared to fully cross-exam

13    Mr. Hutchins.  And I guess it's up to him and the Court if

14    he doesn't want to answer certain questions, but I don't see

15    why he should be limited in any way.  If the questions are

16    within the scope of the hearing, why should they be limited

17    in some fashion?

18         THE COURT:  So where I began, because I initially

19    misunderstood the scope of your question, Mr. Klein, I

20    thought you were asking me is this a free fall to ask

21    Mr. Hutchins substantive questions regarding the merits of

22    the case or questions that may elicit culpable questions.  I

23    made the general statement, No, we're here for the voluntary

24    to -- on the motion to suppress, whether or not his

25    statement was voluntarily made.

1          Now, as I understand it, you were just going to

2     ask a very narrow question, a couple of questions, What is

3     your understanding of your rights as a UK citizen when you

4     were arrested?  And whether, then, the Government is just

5     limited to that.

6          I think the Government is right, Mr. Klein, that

7     the question is whether Mr. Hutchins' waiver, if any, was

8     voluntarily, intelligent, and knowingly made.  So they can

9     cross-examine him on that.

10         MR. KLEIN:  Your Honor, in this sense I disagree,

11    Your Honor.  I would say that -- you know, if we got up and

12    asked him, "What was your date of birth," just to establish

13    the fact that he's under 18, right?  I don't believe that

14    would open the door to a million other questions.

15         I think there is naturally a scope and a general

16    objection which is beyond the scope.  I understand

17    necessarily the rules always don't -- necessarily always

18    apply in these hearings, but I think the general notion that

19    you can't go beyond the scope of the direct.  And to be

20    clear, our examination of the agents was directly in the

21    scope of everything they testified about.  They testified

22    about the Miranda waiver and what they did.  So we would be

23    limiting our direct very pinpoint, very targeted.  Just like

24    if someone submits an affidavit, which in some other

25    jurisdictions they do, and maybe it's just to establish,

like, I own this house, right?  And that's what's in the

search warrant context.  And so the only thing you would be

allowed to cross-examine the person about, it would be

about:  "Do you own this house or not," right?

You're not putting everything else into play,

like, "What did the agents do?  Did you sign a consent?"

So I think that's the point I'm focused on, is

that we don't believe we would be opening the door to a

broad array of questions just because we specifically asked

about his understanding of UK law.

Again, no questions about United States law, no

questions about what happened that day, only his

understanding of UK law on that day.  I think it's very

pinpoint, and I think it would be beyond the scope to say

that now they can ask him -- show him Exhibit 9, show him

any exhibit they want, ask him if he was drunk.  That's just

well beyond the scope of where we even went on direct

because then we would have to get up, Your Honor, on

redirect and have to go through an entire colloquy on those

same points, and that's what we are not intending to do.

Our point is just to ask a very few targeted questions.

And I'll disagree with Mr. Chmelar on this point,

which is, you know, we raised arguments, and we're here at

this hearing because now we can argue from the facts that

are in this hearing.  We're not stuck with one thing.  We're

allowed to argue what the facts show. We didn't know what
this hearing would show, and that's why we're here.

So the fact that we might -- our argument might be
shaped differently after this hearing is totally appropriate
just like their response is going to be shaped very
differently. So I think we should be permitted to ask these
very specific questions, and they should only be permitted
to cross on the topic area of the questions.

THE COURT: So two follow-up questions, Mr. Klein:
One is even within the narrow topic of understanding UK
rights, it's part of the context of your larger motion that
because the UK rights are different is one piece of the
equation and Mr. Hutchins not making a voluntary and knowing
waiver. So in that context, that is why I believe it's
relevant, that they can cross-examine him on factors that
make or not make the waiver knowingly made. So, I guess,
that's not a question. That's more of a statement.

And the second thing I want to say is more of a
question. I do understand that when facts are developed at
an evidentiary hearing, then the arguments are going to be
shaped based on the facts elicited. So is it your position
at this point, then, your focus of your arguments will only
be on the fact of UK citizenship and UK law being different,
and you are now abandoning the other factors you had put in
your motion regarding impairment based on drug use and lack

1    of sleep?

2              MR. KLEIN:  No, that's not what we're doing,

3    Your Honor.  We're not abandoning those arguments.  I think

4    the record is clear when you listen to the tape that we can

5    establish that he was exhausted; that he had been out

6    partying.  We're not abandoning those other arguments.  I

7    didn't mean to imply that.  I'm just saying that how we

8    argue this is going to be based on how the evidence develops

9    here today.  And so we may raise points and emphasize

10   different points when we talk about what the significance of

11   what we learned today is.

12             I think, though, again, our point is that he talks

13   about the UK advisements and what the understanding was.

14   That's just what he understood.  So we're not going to make

15   an argument that, you know, about what he understood about

16   the Miranda rights, and we're not going to put words in his

17   mouth about what he understood about Miranda.  We would just

18   argue here's what he understood about UK law.  So that's

19   what we would put in.  Here's what his understanding of UK

20   law was.

21             THE COURT:  You certainly can.  You can certainly

22   ask him questions about that.  That's not what we're

23   discussing right now.

24             The question is, then, if you limit your direct to

25   that, whether or not the Government can then ask him about

1    other factors because they have the burden of establishing

2    that the waiver was knowing and voluntarily made.

3                    MR. KLEIN:  Yes, Your Honor.

4                    THE COURT:  And my answer to that is, yes, they

5    can ask Mr. Hutchins questions on the other factors relevant

6    to knowing and voluntariness of the waiver if he testifies.

7    But they cannot, as I said from the outset, question him

8    regarding the merits, the culpability, or anything like

9    that.

10                    MR. KLEIN:  Is that your ruling, Your Honor?

11                    THE COURT:  It is.

12                    MR. KLEIN:  Your Honor, can we have a second to

13   confer about that?

14                    THE COURT:  You may.  You may take a couple

15   minutes.

16       (Break.)

17                    THE COURT:  Mr. Klein, how do you wish to proceed?

18                    MR. KLEIN:  Your Honor, we've talked to our

19   client.  We've talked among ourselves.  We're not going to

20   call Mr. Hutchins.  So we have no other witnesses to call.

21                    I have a few procedural questions, but I also know

22   Mr. Stiller has an issue he wants to attend to, and I'm not

23   sure how much longer we plan to stay here today.  He can

24   speak for himself about it.

25                    THE COURT:  Before I hear from Mr. Stiller,

1    Mr. Hutchins, you understand that you do have a right to

2    testify at this hearing if you choose to.  Do you understand

3    that?

4            THE DEFENDANT:  I understand.

5            THE COURT:  And is it your choice not to testify

6    today after consultation with your attorneys?

7            THE DEFENDANT:  That's correct.

8            THE COURT:  Thank you.

9            Mr. Stiller, sir.

10           MR. STILLER:  Judge, sorry to burden you with

11    this.  I'm the only one available to pick my children up.

12    And so if I'm not out of here about now, they're going to be

13    on the curb.  So I'm not necessarily saying the world needs

14    to bend to my schedule.  My formal role is over, and so I

15    guess I'm seeking to be excused.

16           THE COURT:  You may be excused if it's fine with

17    your co-counsel.

18           It was my intent to hear oral arguments on this

19    motion this evening.  So if you're not the person doing the

20    oral argument, and I know how those childcare fees add up

21    having been victim to them many a time, you certainly are

22    excused.

23           Mr. Klein, do you wish to relieve Mr. Stiller?

24           MR. KLEIN:  Well, obviously, I would like him to

25    stay, Your Honor.  And I actually would hope that we could

order a copy -- there were some developments here that we
would like to review the transcript on to fully advise you
of our arguments.  So I would hope that we could order the
transcript on a very expedited basis and submit you a brief.

What's today?

THE COURT:  Today is the 16th.  May 16th.

MR. KLEIN:  Submit you a brief next week.  Next
week is Memorial Day weekend.  It's also my wedding
anniversary.  I'll be in big trouble, speaking of personal
issues.  That we be permitted to order the transcript to
properly brief Your Honor on some of the points we would
want to raise.  And I think, with that, we would ask for
just a quick turnaround on the briefing schedule.  We can
talk to the court reporter afterwards and order the
transcript on an expedited basis.

THE COURT:  Does the Government wish to be heard
on proceeding on briefs as opposed to oral arguments?

MR. CHMELAR:  We're prepared to argue right now.
The case has been going on for some time, and I know the
last time we were here, Your Honor expressed some interest
in moving the case forward.  So we would like to proceed to
arguments and move forward with a decision on the case.  And
if Your Honor, after arguments, feels additional briefing is
necessary, then, you know, that's the Court's decision, but
we're prepared to argue the case.  And if the Court is

1    prepared to make a decision based on the arguments and the

2    testimony today, we're happy to move forward with the

3    decision on the issues.

4           THE COURT:  Okay.  Mr. Klein, here's what I will

5    do.  I will hear oral arguments tonight, but I will leave

6    the matter open for a week, and I'll give you the

7    opportunity if you want to get expedited briefing --

8           MR. KLEIN:  I'm sorry, Your Honor.  My client was

9    talking to me.

10          THE COURT:  That's okay.

11         And supplement what you have argued today with

12    specifics to the record or specific anything that you wish

13    me to consider, but the reason I want to move forward, as

14    you know, is that the pleadings on the other motions are

15    completed.  So I'm going to turn my attention to -- I want

16    to have all the decisions all out at once instead of

17    bifurcating them in any way and moving this matter forward

18    to the trial court.

19         You can check with the court reporter.

20         We'll proceed to oral argument today.  And,

21    Mr. Klein, I will leave the record open until next Friday

22    the 25th.  Does that work?

23          MR. KLEIN:  Your Honor, that's my wedding

24    anniversary.  Can we make it the --

25          THE COURT:  Okay.  How many years, Mr. Klein?

1    That will decide whether you get an extension or not.

2            MR. KLEIN:  This might be the last year of my

3    anniversary.  I think that's relevant.

4            It's five years, Your Honor.

5            THE COURT:  All right.  That's an important

6    milestone, so I will allow it.  So you're asking until when,

7    Mr. Klein?

8            MR. KLEIN:  The Wednesday after.  So it will be

9    two weeks from now.

10           THE COURT:  So Wednesday after is the 30th.  And

11   then we'll make it simultaneous.  If the Government also,

12   after pondering and looking at additional -- you have

13   something else you want to add to what you have submitted to

14   your oral presentation this evening, you'll have until then

15   to also submit it.

16           MR. CHMELAR:  Very well.

17           THE COURT:  All right.  It is Mr. Hutchins'

18   motion; however, the Government has the burden here in

19   showing that any statement was legally obtained.

20           So, Mr. Chmelar, maybe I'll start with you, or

21   Mr. Proctor.

22           MR. CHMELAR:  If it's okay, Judge, I'll start the

23   argument.  Of course, I invited Mr. Proctor to tell me

24   anything.  I know certain Courts are reluctant to let two

25   attorneys on the topic speak, but if allowed, if Mr. Proctor

has additional arguments, I'd ask that he just be allowed to make them after I conclude instead of conveying them to me, then from me to you.

THE COURT: Well, then, Mr. Klein is at a disadvantage because his --

MR. CHMELAR: Ms. Hofmann is --

THE COURT: He does have Ms. Hofmann here.

MR. CHMELAR: Yes.

THE COURT: So two against two is fair game. If it's against one, not so much.

MR. CHMELAR: Okay.

MR. KLEIN: Ms. Hofmann is like three, Your Honor.

MR. CHMELAR: So, Judge, I guess we'll break down our argument on the two factors that they argued to the Court to secure this evidentiary hearing and the positions they took on the motion to suppress, one being that the waiver was not knowingly and voluntarily made; and, two, that somehow the statement was coerced. I don't think that the second one takes much consideration. So I'll probably spend most of my argument -- or our argument to the waiver part, which I really don't think, based on, now that I think about it, is much in contention either.

There's been nothing really to contradict the agent's testimony that the Miranda rights, the Advice of Rights form was both read to Mr. Hutchins, given to him

1       after it was read to him, and he was allowed to read it,

2       review it, ask questions about it, and that he signed it.

3               So I think the law and the facts are against

4       Mr. Hutchins on this issue.  And Your Honor knows we filed

5       extensive briefing on this prehearing, so all the cases --

6       or any of the cases that we reference are found in the

7       Government filings.  And I'm happy to provide further

8       identification if anything I cite to is confusing or you

9       need further clarification.

10              But under Collins -- it's the 612 F.3d 574,

11      Seventh Circuit case, it collects cases regarding the Waiver

12      of Rights and what's necessary.  And that's a case that

13      describes that -- it refers to a waiver -- it refers to an

14      example of an individual unable to waive Miranda in certain

15      situations including a case, you know, where the agents

16      might have well been speaking gibberish to the interviewee.

17      That's certainly not the case.  I mean, Mr. Hutchins is

18      competent in English.  He's appeared here every time without

19      an interpreter.  The agents interviewed him.  The Miranda

20      waiver form is in English.  You have the audio recording

21      which is in English.  The jail calls are all in English.

22      Mr. Hutchins is certainly competent in reading and writing

23      the English language.  So the fact that he was advised of

24      his Miranda warnings in English and had a chance to read

25      them and stated that he understood his rights, then that's

1    sufficient to satisfy Miranda under the case law in the

2    Seventh Circuit.  There's nothing to support the position

3    that he didn't understand his Miranda rights.

4         And the Springer case cited in our brief states

5    that an individual who understands and comprehends English,

6    once rights are read to them, and they're given the Miranda

7    warnings, or the Advice of Rights form, and they read it and

8    they read it, they have a chance to read it, and they

9    indicate they understand those rights, that's sufficient to

10   satisfy Miranda, and that's exactly what happened in this

11   case.

12        There was this proffer to secure the evidentiary

13   hearing that Mr. Hutchins was somehow confused between the

14   UK, you know, the law or U.S. Miranda rights, but there's

15   been nothing to establish that.  Nothing.  It was just a

16   proffer in basically like a footnote in their motion to

17   suppress.

18        So the law as it stands in the Seventh Circuit and

19   by the U.S. Supreme Court, what happened and what transpired

20   between the agents and Mr. Hutchins regarding the Advice of

21   Rights is review that form and his signing of his

22   understanding and waiving those rights is sufficient.  And

23   as this Court knows, in most cases you don't even need a

24   signed Miranda waiver form.  It can be oral.  And in some

25   cases, you don't even need that.  It can be an indirect

indication that they've waived when an individual just starts talking to the agents after they've been advised of their rights.

So the situation we have here where a form is presented, and it is signed, and two agents testified and witnessed the signature, is sufficient.

And as we noted in our filings, it's clear that -- and Your Honor asked some questions about his education and his age and his background. There is discussion on the recording once you review it to that effect, but we would say that -- and as we stated in our motion, he, through his attorneys, he's a self-proclaimed computer expert. He works in the cyber security for a U.S. company. There's no indication that he should be confused by the Advice of Rights. They're very clear and simplistic, and they're laid out in a point-by-point-by-point basis. It's not even a paragraph which may -- some people may find confusing. It is laid out almost bullet by bullet, and it's very simple to comprehend, and there's nothing to suggest that he had the inability to comprehend that.

And I want to go to the other proffered reason, which was that he was exhausted and partying all week and staying up in the wee hours. As the Court noted in the order granting the evidentiary hearing, which is document 61, and that was taken from the defendant's position in

their motion to suppress.  This Court decided a case, which
we cite in our response, which is Tellefsen,
T-E-L-L-E-F-S-E-N.  It was a 2011 case where it was
undisputed by the parties that the defendant in that case
was intoxicated.  According to the order issued by this
Court, they had a .27 to .33 breath alcohol content level at
the time of the confrontation with police officers, and that
dealt with both the consent to search and the waiver of
Miranda.  And this Court noted that there's a difference
between intoxication and impairment; and, in fact, there was
an expert that testified in that particular case which the
Court, based on the order and opinion as written, adopted.
And I think that's the important distinction here.

       What they've argued is that he was under a
nonspecific, unidentified drug of some sort, and that he
hadn't slept, but at no point did they argue that he was
impaired in any way.  And just arguing that he was impaired
isn't enough.  They haven't put forward anything to suggest
that he was impaired.  And, in fact, the evidence would
completely contradict any such claim because if you listen
to the jail call, and you listen to the post-arrest
interview, Mr. Hutchins is, as the agents noted, totally
lucid during the interview, at times he is evasive.  At
times he is minimizing his involvement.  It's clear that
he's testing from -- you know, it's reasonable to infer from

1  the recording that he's testing the agents on what they

2  actually know before giving up information.

3          So there's no indication in that that he's

4  impaired; in fact, other information about his arrival there

5  is inconsistent with the fact that he was impaired rather

6  than, you know, under the influence of some sort of a

7  narcotic which, by the way, they haven't established.

8          He arrived to the airport in plenty of time for

9  his flight.  There's no indication that he left behind any

10 beverage.  He was in the frame of mind to know that he

11 should contact his mother to advise her that he was not

12 going to be making his return flight so she didn't waste her

13 time coming from their residence to pick him up at the

14 airport.

15          And, you know, the impairment intoxication is an

16 important distinction between -- the impairment goes to the

17 ability of somebody's -- goes towards somebody's ability to

18 function.  And here, as I said, there's no evidence that he

19 was impaired because he was totally functional during the

20 interview.

21          And the agents, as you recall, talked about -- or

22 at least Agent Chartier talked about the fact that they

23 showed him a list of 80 names.  It was just names,

24 nicknames, that he was able to recall.

25          There was a situation where he was shown what was

1  referred to as string code, S-T-R-I-N-G. He was able to

2  identify that as at least being a string. And then he was

3  shown chats that related to conversations he had back in

4  2015, yet he was able to put those chats in context and

5  describe what actually happened during those chats that he

6  was shown.

7          So in the broadest of terms, he was functioning at

8  a very high level, and I think that will be clear once the

9  Court reviews the recording of the post-arrest interview.

10         The idea that somehow the amendments to the time

11 somehow negate the idea that he was given Miranda at a time

12 I think is unfounded and should be rejected. Both agents

13 testified that he was advised of his rights beforehand.

14 And, again, in fact, we noted in our most recent filing that

15 we filed yesterday, that part of their filing, Judge, to get

16 the hearing was to explore what happened prior to the

17 recording device being turned on, but in that they say

18 that -- you know, I'm referring to document 55 on page 10 at

19 the very top. It's signed by all three attorneys. It says,

20 again, the colloquy -- this is, quote, "again, the colloquy

21 involving the advisements and Waiver of Rights happened

22 before any recording started."

23         What we're fighting about here with the defense

24 are the statements on that recording. Nobody has identified

25 any inculpatory statements made prior to the beginning of

1    the recording.  It was the Advice of Rights and the

2    preliminary matters to start off the interview.  And based

3    on their filing, they acknowledge that it happened before

4    the recording started.

5              So, again, based on the law and the facts, the

6    defense loses this motion.

7              The times, again, are just a straw man argument to

8    avoid addressing the fact that Mr. Hutchins understands

9    English, can read English, and signed the Miranda waiver

10   form, and waived his rights.

11             I'm going to circle back to that theory when we

12   talk about the jail call because Your Honor asked us what

13   the relevance of the jail calls were, at least the ones we

14   submitted, and I think it goes to an important part related

15   to that.

16             On the voluntariness of this statement, as we laid

17   out in our prehearing memo of law, intoxication, or in this

18   case, impairment, if they even established it, is only half

19   of what they need to prove because an essential predicate to

20   finding a statement is involuntary is some sort of course of

21   tactics by the agents, and that's based on the Carson case

22   that we cite on page 2 of our prehearing filing.

23             And based on the recording, which speaks for

24   itself, but also the agents' testimony, none of that --

25   there was no course of tactics.  They were joking.

Mr. Hutchins, as I said, was evasive.  He wasn't being
coerced.  I don't think -- it's our position, and I think
it's reasonably inferred from the tone, tenor, and the
interactions with the agents was not being coerced into
saying anything.  He was trying to avoid saying things, and
only when he felt it necessary to admit something did he do
that.  That's the opposite of coercion.  That's Mr. Hutchins
taking control of the interview and dictating what has
happened.

And, again, when we get to the jail calls, I think
there's a reason and an explanation -- two reasons and
explanations that provide a reason why Mr. Hutchins was so
willing to talk to the agents, and it had nothing to do with
the deceit or course of tactics.  There were no threats, no
promises, nothing like that.  And this idea that appeared in
the most recent filing from the defense on the 4th, I think,
where they start talking about deceit, these cases all
involve civil IRS agents approaching people and talking to
them and not telling them that it relates to a criminal
investigation.

Mr. Hutchins knew this was a criminal
investigation.  He knew because he was placed in handcuffs
before anything else happened, and he was told he was under
arrest.  He then was taken to the interview room.  And you
can listen to the recording, Judge, because there is a very

specific moment where Mr. Hutchins utters the words

"Kronos," and then indicates, "Is this what it's about?

You're looking for the developer of Kronos?"

And as Agent Chartier said, "No, not anymore."

And Mr. Hutchins attempted to deny that it was

him.  And then goes through the whole process of describing

how and what his role in the development of that malware was

and his partnership with the other individual who has been

indicted in the case, or at least the person he knew by a

specific alias, and he goes through this whole history about

his relationship with that individual.

So, again, this idea that there is some sort of

deceit or hiding of the ball about what the case was about

is another straw man argument.  It doesn't exist.  It's a

fallacy.  And it's clear in the recording that he knows

exactly what it's about because they discuss it.  They show

him the chats which involve Kronos.  They show him the 80

names.  And there's an individual in there who he identifies

as the individual he provided Kronos, the other aliases used

by that individual and the string.  You know, he doesn't

identify it as his own, but he certainly makes admissions,

Judge, as clearly expressed on the recording of his

involvement and the manufacturing, the development of the

malware.

I also want to note that other things that

1   happened during that interview also suggest that he was a

2   willing participant and he wasn't coerced.  He unlocked his

3   cell phones.  He consented to having his cell phones, his

4   backpack, computer searched.

5           And I want to come back to something that I missed

6   in my other argument about his level of intoxication

7   compared to impairment.  There were two sequences on the

8   recording which are important, I think, to this.  One is

9   when he's unlocking one of his phones, and he complains

10  about the password being so long that he has trouble

11  unlocking it when he's intoxicated or drunk, and he unlocks

12  the phone.  So I think that contradicts, or at least tends

13  to cut across or against the argument that he was somehow

14  under the influence of something, again, which hasn't been

15  established by anything other than a statement by the

16  attorneys.

17          And the other one was the joking with the agents

18  about their ability to probably guess his password because

19  he's recalling, again, like he did with other instances of

20  information that he's confronted with multiple passwords,

21  the ability to recall multiple passwords in a what may be

22  perceived as a somewhat stressful situation.  He's being

23  interviewed by two FBI agents.  But it's calm, cool,

24  collected, answering the questions and is fully engaged.

25          Again, on that same topic, the agents both

testified that there was no observable manifestations of any
impairment or ailments.  No sweating.  I think
Agent Chartier or somebody testified about something related
to that, was that Agent Chartier mentioned that he was
somewhat jittery.  But other than that, you know, there was
no other indications and no concern, in addition to the fact
that he told them he was not intoxicated or under the
influence of alcohol or hadn't been drinking.  Whatever.
The record speaks for itself.

I know that in their motion they claim that that
somehow, you know, without establishing it, that Mr.
Hutchins believed that to mean something else.  I guess
that's not worth much but I guess could be considered to
some degree.

I want to now talk briefly about the calls because
I think the jail call we introduced, at least from our
perspective, and we would argue is relevant to both of those
two issues.  The jail call is relevant because it indicates
that Mr. Hutchins was not impaired during the post-arrest
interview, and it indicates -- at least it suggests that he
was not coerced into making these statements, which, again,
I think is evident based on the interactions with the
agents, but this corroborates that.

He says lots of things during that call.  He
basically recalls what he told the agents, and the phone

1    call is hours after the fact.  And I would say that if he

2    was impaired, and so impaired he didn't even have the

3    ability to comprehend Miranda, I would say that his ability

4    to recall the events as they transpired hours earlier would

5    be equally confusing and unknown to him, but he recalls them

6    with clarity.

7            We quoted from the particular jail call, Exhibit 7

8    to the Court, and we include it as an exhibit.  And I think

9    the jail calls are as valuable for what he says as what he

10   doesn't say.  He doesn't complain that he was, you know,

11   impaired.  He doesn't complain that he was on drugs.  He

12   doesn't complain that he was exhausted.  He complains -- but

13   he does complain about certain things, but he doesn't

14   complain about those things.  He doesn't complain about any

15   trickery, deception, threats, promises made by the agents to

16   him.  He doesn't also complain upon hearing the other

17   speaker tell him, you know, "You don't have to say anything.

18   Don't say anything.  This is recorded.  Don't say anything."

19           In fact, I think it says, "Don't say anything.

20   It's recorded.  Whatever you told them, you told them.

21   Don't provide any more," yet he does.

22           He basically, at that point going forward,

23   reiterates everything he told the FBI.  And the speaker

24   says, "Well, we're going to try and work on getting you an

25   attorney," yet he still talks.

1       And the introduction to the call has the
2   traditional notice and advisement from the jail that is
3   common on all these jail calls, "This call is subject to
4   monitoring and recording," and yet he talks.
5       And I think it suggests what is evident from the
6   interview recording.  He's a talkative person, at least in
7   this context.  There's nothing that the other caller did to
8   coerce him to make these statements.  It was the exact
9   opposite.  The speaker was telling him, "Don't say
10  anything," and Mr. Hutchins, for whatever reason, couldn't
11  resist, and he just said it.
12      So we think it's important in that context.  It's
13  also important for their claim that he was unaware of what
14  his Miranda rights were, although they presented nothing to
15  support that position; that when he's being told this by the
16  other caller, there's no indication, "What?  I have the
17  right to remain silent?  Nobody told me that.  I didn't
18  understand that.  If I knew that, I wouldn't have said
19  anything."
20      He just breezes right through that.  He just keeps
21  going.
22      And I said there were two things that were
23  important about the jail call, why we think they're
24  relevant.  And we fully understand that.  In the context of
25  knowing, you know, the waiver, whether there was a knowing

1      and voluntary waiver and whether the statement was,

2      you know, voluntary, meaning it was not coerced.  You know,

3      the context of what's happened during the interview is

4      important, but, you know, certainly, if an individual called

5      somebody after an interview and said, "I don't know what

6      happened.  I was totally under the influence of marijuana.

7      I had smoked marijuana before I arrived, and I have no

8      recollection of what took place," that would be relevant.

9      This is just the same.  It's absence of any of those types

10     of things and concerns.

11             And the other thing that he does say, which I

12     think also tends to go to why he decided to talk to the FBI

13     and say these things, is when he's presented with those

14     chats, the chat logs, which is one of our Government

15     exhibits, 11, he describes them to the other person on the

16     call as undeniable.  It was as if they put something in

17     front of him that he was just -- put up his hands and is,

18     like, "What else can I do?  They have chat logs of me

19     sending this malware to somebody else.  I couldn't even deny

20     those things."  And it was almost a situation where the

21     evidence was irrefutable.

22             So we would argue to the Court that it has nothing

23     to do with any type of coercive tactics or trickery or

24     deceit, again, which they've established none of.  It was

25     the fact that the agents had put a strong case together

against Mr. Hutchins, and they knew what questions to ask

Mr. Hutchins and knew just as much about the case as

Mr. Hutchins did, and that allowed them to secure the

statement that they secured.  It had nothing to do with any

of the things that would normally be considered coercive

tactics.

And I would additionally argue that how he sounds

on the jail call, how he sounds in the post-arrest

interview, and how he has sounded and the statements he's

made during his multiple court appearances here are all the

same.  They're indistinguishable.  So there's no indication

based on the sound that, you know, there was anything

suggesting that his temperament and his ability to function

was different in any of those settings other than here.

As far as the starting of the recording, it

would've been ideal, obviously, to have the recording

started or play when the agents walked in the room.  But

that's not what happened.  But, again, nobody has identified

any inculpatory statements or admissions that Mr. Hutchins

has made that they're now claiming, "Well, that didn't

happen.  That didn't happen."

And, again, as Your Honor pointed out, it's not

that he's saying he didn't get his Miranda warnings.  He had

alleged that he didn't understand them, but there's been

nothing to support that.  All the evidence is actually to

the -- counters that. So there's been nothing alleged that
was obtained from him that we would be seeking to admit that
was not on that recording other than, you know, the other
evidence we've collected throughout the time. But if we're
talking about that post-arrest interview, everything has
been documented. They're challenging the recording based on
a very finite set of reasons, and we have established that
he was read Miranda. He waived his Miranda. He did it
knowingly and intelligently.

The other arguments by the defendants are
unsupported, and I've used this a couple times, but they are
straw man arguments. These are just fallacies to focus the
Court's attention to or arguments they want to set up as
problems.

Were there mistakes in the case? Yes. Are they
of the such that they go to constitutional violation of his
rights under Miranda or the Sixth Amendment not to have his
involuntary statement taken? No. They are simply clerical
errors and errors in the timing of when the recording
devices -- the recording device was started based on what
the agents described as an unusual situation, at least we'll
argue it is, that the recording equipment in the interview
room was not functional at the time and is usually not done
by the interviewing agents. It's done by somebody else.

So unless the Court has any questions on anything

that we've argued here or any of the positions or testimony,
we would ask the Court to deny the motion to suppress.

THE COURT: All right. Thank you, Mr. Chmelar.

Before I give Mr. Klein the mic, just a quick
question. I understand your position that you, the
Government, is not seeking to admit any statements made
prior to the recording; is that correct?

MR. CHMELAR: So, you know, I want to say yes, but
I don't want to give the false impression -- like, the chats
that he was presented with, those are chats that happened
long before the interview took place. You know, obviously,
we seek to admit those, but those didn't result from the
agent's interview. So there were no statements that were
the product of the agent's interview on that day.

THE COURT: So I was focusing on August 2nd. So
I'm focusing on the 5 to 10 minutes that the agent testified
was not recorded.

Your position is there were no inculpatory
statements made during that period?

MR. CHMELAR: Right. The only thing we would rely
on and seek to introduce would be the waiver, his
acknowledgment of his rights and his acknowledgment that he
was advised of the circumstances and the penalties for lying
to the FBI.

A lot of the, you know, quote, unquote,

statements, are not inculpatory statements.  They're just

situational statements.  You know, "Why am I under arrest,"

or, "What is going on?"

So that happened at the time of the -- he was

handcuffed.  But, no, no inculpatory admissions that we

could point to.  And I think that's why we put a footnote in

our most recent filing because no one has identified any of

these things as occurring.  It's just, I think, the

complaints from --

THE COURT:  Mr. Chmelar, if I can interrupt you?

MR. CHMELAR:  Sure.

THE COURT:  Whether or not statements were made

during that time period that the Government didn't use,

isn't the importance --

MR. CHMELAR:  I'm listening, Judge.

THE COURT:  Isn't the importance of that 5 to

10-minute period whether or not Mr. Hutchins voluntarily

waived his rights?  So if I had the recording, while I can

listen to it and evaluate how it was presented to him and

evaluate his response to it?

MR. CHMELAR:  Sure.  And I think that's totally

true, but people waive their rights all the time, and

they're not in writing and they're not recorded, but they

verbally waived their rights.  They consent to searches all

the time that aren't recorded.  People make admissions and

1    statements all the time that aren't recorded, and they waive

2    their rights for various constitutional protections

3    frequently, and those are not recorded.

4            So the fact that there was an opportunity to

5    record it, and it wasn't recorded certainly, as Your Honor

6    pointed out, it would make life much easier for all the

7    parties, and we probably wouldn't be litigating all of this

8    as much.  But it doesn't mean that it didn't happen.  It's

9    just not recorded.  And they don't even contest that he

10   wasn't advised of his rights.  They agree he was.  I mean,

11   you asked Mr. Klein -- I think there was a colloquy between

12   the Court and the defense about this -- but I don't think

13   anybody has ever said he wasn't advised of his rights.

14           There's a blanket claim that somehow he didn't

15   understand it, but it's unsupported.  And the only evidence

16   you have -- and we would proffer it's credible evidence --

17   is that he did.  And under the law, in the Seventh

18   Circuit -- and I keep qualifying because I didn't really

19   look at the other circuits, but in the Seventh Circuit, and

20   I'm just presuming the Supreme Court, if he's an English

21   speaker, and he's able to comprehend and understand English,

22   and he's advised of his rights in English orally, he's

23   handed the sheet of paper, and he reads it, and he signs it,

24   and he indicates he understands it, which all happened here,

25   that's it.  He has then waived -- knowingly waived his

rights unless he can establish somehow some other factors
that would prevent the Court from accepting that, and that
is what we've done.  We presented evidence to that effect.
And there's nothing to contradict that other than these
attacks on Agent Butcher regarding when the actual time was
entered on the report.  Nobody testified that he was not
advised of his rights prior to the interview regardless of
whatever time it occurred.  Everyone agrees he was advised
during -- prior to the recording starting.  Even the defense
agrees to that in their filing.  So that would be our
position on it.

So I understand, yes, it would be easier to
understand the dynamics of the interview, but if it's
anything -- and I think it's reasonable to infer that it was
consistent with the nature of the interview after that, then
by all indications it would indicate that it was a very -- I
don't want to say pleasant experience, but a non- -- there's
no issue with the exchange that took place because the rest
of the interview at times we say is friendly back and forth
and other times it's, you know, very serious.

So there's nothing in the record to suggest in the
jail call, post-arrest interview, or the testimony you took
that somehow he was not advised of his right and didn't
understand those rights.

THE COURT:  Thank you, Mr. Chmelar.

1                Mr. Klein, the mic is yours.

2                MR. KLEIN:  Yes, Your Honor.  Before I start, I

3    want to say I think there was some just real quick confusion

4    on an exhibit that was entered in.  We had understood there

5    were actually two jail calls, and they reference jail calls,

6    and we have a transcript for just one jail call.  And I

7    think they should both be entered as exhibits, and I'm not

8    clear if they both have been or just one.

9                THE COURT:  I only have Exhibit 7, an August 2nd

10   jail recording.

11               MR. KLEIN:  That's the transcript, but I don't

12   know the disk.

13               THE COURT:  The disk?

14               MR. KLEIN:  That's what I'm asking.  I think there

15   might've been a mistake, and we think both calls should be

16   in evidence.

17               MR. PROCTOR:  We introduced just the first call,

18   Your Honor, in the interest of time, but we have no problem

19   introducing the second disk -- or the second jail call and

20   transcript.  We just held it off out of the interest of

21   time.

22               THE COURT:  Mr. Klein, is that what you are

23   requesting?

24               MR. KLEIN:  Yes, Your Honor.

25               THE COURT:  Okay.  So please submit that as well.

1              And, Mr. Proctor, you can take care of that after

2     Mr. Klein is done with his argument in the interest of time.

3              So, Mr. Klein, the floor is yours.

4              MR. KLEIN:  Yes, Your Honor.

5              On some level, Your Honor, I think we're a little

6     bit two ships passing in the night with the Government,

7     which is they are focused on things factually and legally

8     that we don't think are actually dispositive for what we're

9     talking about here, and that's what I want to focus

10    Your Honor on.  Okay.  It's what happened here, what

11    evidence do you have, and what conclusions can we draw from

12    that evidence under the law?

13             And so I think what I would do is you got to start

14    from the beginning, which is what -- this is the

15    Government's burden, and because it is their burden, the

16    Seventh Circuit has said this is such an important right,

17    right?  The Sixth Amendment right, whether you properly

18    waive it, that -- and I'm citing from our brief on page 6

19    that we filed on May 9th, so it's docket No. 75 -- "The

20    importance of the Sixth Amendment in protecting the accused

21    requires that Courts indulge in every reasonable presumption

22    against waiver."

23             And that's what we're asking Your Honor to do

24    because we don't think they can show that there was a

25    knowing intelligent waiver; that Mr. Hutchins properly

1    waived his rights.

2           And what I really want to focus on today is -- and

3    the Government -- you know, we're not saying that

4    Mr. Hutchins was beaten over with fire hoses or physically

5    abused, and that's why he may or may not have signed this

6    form, when or when he may not have signed it.  But I would

7    like to focus on what happened that day and why it wouldn't

8    have been a knowing and intelligent waiver.  And this is

9    what the evidence shows, Your Honor.  He was deceived.

10   That's clear.  He did not understand what was going on.  You

11   cannot waive your right if you don't understand why they're

12   questioning you, and that has been held in this circuit.

13          And so, yes, coercion, intimidation are part of

14   it.  But if you look at -- and, sorry, it's also been held

15   by the Supreme Court.  If you look at the Moran case cited

16   on page 7 of our brief, deception is an independent ground

17   for suppression.  And that's what I want to focus on right

18   now.

19          So what happened here, Your Honor, what we've

20   heard.  And what the evidence will show when you review it

21   all is Mr. Hutchins was deceived.  They intentionally set

22   this up to deceive him.  They didn't arrest him when he

23   arrived in Las Vegas.  They didn't arrest him during that

24   whole week.  They didn't arrest him that morning when they

25   knew he was leaving.  They didn't arrest him when he got to

the airport.  They didn't arrest him when he walked through
security and they would've been certain he was not armed and
could've been no danger.

　　　　And the agent testified something about, like,
"Oh, well, there's a sinkhole issue, and he could've done
something."

　　　　When he goes through security, Your Honor --
you've been through security at the airport.  You're not
holding your computer.  You can't have a gun on you.  You're
not a threat to anybody.  They could've grabbed him right
then.

　　　　Then he went to the lounge, and they didn't grab
him at the lounge.  They did, though, right?  That's what we
learned.  They didn't want to grab him at the lounge.  They
wanted to grab him just as he was boarding that plane.  And
why is that significant?  Who was going to grab him?  Not
the FBI alone, not an FBI agent wearing an FBI uniform
wearing a big jacket.  You heard that.  They weren't doing
that.  The agent was actually carrying a visitor pass.  He
mentioned CBP.  It was two CBP agents went up with this
agent.

　　　　I've flown before, and I'm not, you know, putting
this into evidence, but people do get stopped getting on the
airplane.  And when they get stopped on the airplane,
getting on, the inference you can draw is because it's

something to do with why they're leaving, not that they've been accused of committing a crime 3 or 4 or 5, 10 years ago. It's totally unrelated to their visit in Las Vegas; totally unrelated to anything that's happened in the last year or two, and that's what this indictment is about. I don't think we should lose focus of the indictment which deals with crimes that date years back. Okay? Years back. And the biggest thing in Marcus Hutchins' life at that point was he had stopped the WannaCry virus. That made him an international celebrity. And guess what they focus on when they questioned him? They talk about WannaCry. They're questioning him about that. That has nothing to do with this indictment. It has nothing to do with the arrest warrant. He's been lauded by the White House for his role in that, in stopping that.

And so when you actually listen to this tape -- we want you to listen to the audio recording, this partial audio recording, the part of the audio recording that starts within 30 seconds, Your Honor -- and you should listen to this very closely -- he whispers, "What's this about?"

And what does the agent say? She doesn't say, "Oh, actually, you know what? This is about this arrest warrant, and here's this indictment, and here's what you've been charged, and now we want to talk about all these things."

1          No.  She says, "Oh, in fact, we'll get to that

2    later."

3          "We'll get to that later."  That's hiding the

4    ball.  You can't waive rights if you hide the ball.  And

5    that's what we talk about in our briefing.  If you look at

6    that Fourth Circuit case, the Giddens case, it doesn't just

7    involve IRS agents fooling people about their tax returns.

8    That's not what that case is about at all.  I'm going to ask

9    Your Honor to read that case very closely because what

10   happened there is what happened here, to a large extent.

11         Mr. Hutchins was fooled.  And so when you listen

12   to the tape, what you'll hear -- what Mr. Stiller did

13   stay -- you're right -- he is talking pretty loosely.  He

14   does sound kind of natural.  He does joke around a little

15   bit.  Why would he be like that?  Because he doesn't know

16   what's going on.  He doesn't know why they're questioning

17   him.  He's been totally deceived.  In fact, you hear that

18   throughout the tape.  He asked more than once:  "What's this

19   about," in effect.

20         And it's not until well over an hour into the

21   interview, an hour after everything they really want out of

22   him, that they show him the arrest warrant.

23         And I would draw your attention, Your Honor, to

24   that point in time.  We'll put it in our briefing.  But

25   here's what happens.  And it's Special Agent Chartier, the

agent who said he showed him the arrest warrant. He didn't

show him the arrest warrant before that moment. Because

what you'll hear him say on the tape is, "Okay. Well,

here's the arrest warrant. And just to be honest -- just to

be honest, hey, now I'm going to tell you the truth."

"If I'm being honest with you, Marcus, this has

absolutely nothing to do with WannaCry."

He had already spilled his guts to them is what

the Government is going to argue. And now at this moment,

over an hour into it, this agent saying, "Hey, guess what?

I'll be honest with you now because it has nothing to do

with WannaCry." You cannot effectively waive your rights if

that's the case. If agents are deceiving you about that,

you can't.

And do you know how he also didn't know that he

was waiving his rights and what the real significance was,

and its significance, when they fooled him, and they set out

to fool him, was when you listen to those jail calls,

Your Honor. Again, you should listen to them, and listen to

both of them because in those jail calls, it's very clear he

doesn't know why he's here, why he's being held in jail. He

doesn't understand the American system. He doesn't know why

he's there. He's been exhausted.

And on the last call he makes on that last

transcript, you'll see, Your Honor, this is after midnight.

He's talking to his boss. And what he says in there -- and
I'm just going to read from the transcript that they
provided, and it's now evidence. But I ask you to listen to
the tape because that's the accurate version -- but what he
says is, "So I'm not really sure what is going on, but I
don't think it is just some shit I did in, like, 2005."

Excuse me my French.

He doesn't know what's going on. Even after he's
been in jail he still doesn't know.

Now, if they want you to draw connections by what
he knew, then you should equally be willing to focus on that
statement.

And so when you talk about deception, Your Honor,
you can't fool somebody into waiving their rights. And when
you look at the sequence of events, at what happened here,
that's exactly what happened because what did we learn? At
1:17, he was arrested. The agents both testified to that.
That's in their surveillance log you have.

Guess when they say they had him sign the rights?
1:18.

Agent Butcher puts a little bit of an
approximation on it. That's a minute later. Even if you
give her her 10 minutes, at 1:17 they were up in the club
lounge. They supposedly walked him into the stairwell.
This is what Agent Chartier said. He told him he was under

arrest.  They put him in handcuffs.  This is Agent Chartier.
Then they take him downstairs, right?  A few minutes are
passing.  Then supposedly they have him sign these forms,
and Agent Chartier and Agent Butcher disagree on this point,
and it's critical.

Agent Chartier lied, Your Honor.  I don't say that
light, but he lied.  Okay?  They did not show him this
arrest warrant at that time.  It's clear from his own
statement later in the tape he didn't.

And Agent Butcher said, "No," the two things he
was shown, the Advice of Rights and the 1001 warning, and
then we proceeded.  And that's critical.

Even if you believe the arrest warrant thing, the
arrest warrant doesn't even talk about really what's
happening here.  He wasn't shown it then.  At most, as soon
as he was possibly shown it, was an hour into it.  And so in
that, from 1:17 to 1:18, they apparently did all these
things.  And what do they say they did?  They orally gave
him, they claim, his Miranda rights and why that form is so
critical.  No, both of them testified it was read to him.

His whole basis for the rights was them allegedly
reading the rights, him reading it and then him signing it.
That is not a quick process, Your Honor.  Look at that form.
You cannot walk from whatever level you were at that
airport, arrest him in the hallway, drag him all the way

1    down the stairs and do all those things and ask him about

2    whether he's been drinking and his state of mind in a few

3    minutes.  It didn't happen that way.

4         They rushed him through.  I think you can draw

5    this inference from the evidence.  And whenever he signed

6    that form -- if he signed it at that point, it was quick.

7    I'm not saying that you should draw that inference from the

8    evidence.

9         So I think what -- you step back, and you look at

10   his record, and we'll submit a briefing, we'll be able to

11   lay this out for you, the sequence but also what happened

12   here.  And I would direct your attention when the agents

13   testified.  Obviously, you're allowed to evaluate their

14   credibility on the stand, and I think you should.

15   Agent Chartier was defensive.  That was clear to everyone in

16   this courtroom.  He got defensive.  He got uptight.  He got

17   concerned, and he was giving long, rambling answers at

18   various points, and that should be part of what you evaluate

19   in this process.

20        Agent Butcher, God bless her, is just saying

21   stuff.  And what did we learn from her?  What we learned,

22   after they first prepped with these AUSAs, they got together

23   and said, "Hey, let's get our stories in sync."

24        That's what she said.  "We want to make sure we

25   have the same facts."

That's not what they're supposed to do.  The chips are supposed to be what they are.  They're not supposed to sync up their stories.  And even though they got together and tried to sync them up, we learned here today they didn't sync up because Agent Butcher said, "No, there was no arrest warrant, in effect, given to him when he was down there in that first few minutes.  It was only provided an hour and 10 minutes into things."

And I think, again, that is critical.

So I would ask Your Honor to look at the Giddens case, and we'll provide additional briefing on that, to focus on how that applies here, and that there was deception.

And we haven't walked away from any of our arguments.  There's evidence in the record that he was exhausted.  It's mentioned on the tape.  He doesn't need to testify to that.  You hear his own voice on the tape. There's evidence in the record that he would've been partying and could've been on drugs, and he could've not just been drinking.  So the fact that they just asked him about drinking doesn't preclude anything else.  And you heard Agent Butcher said, "Hey, you know what?  Drinking one drink, one single drink, that's important to whether he's waiving his rights."

Well, anything else would be equally as important

1    if not more important.  And so they chose when they thought

2    he might've ordered one drink, and it was just a Coca-Cola,

3    they yanked him out and arrested him.

4           When your Honor steps back and looks at all this

5    and looks at how it played out and the sequence of events,

6    it's very clear that Mr. Hutchins was not properly

7    Mirandized, did not properly waive those rights, and that

8    any statements he gave subsequent to that should be

9    excluded, should be suppressed.

10          That's it, Your Honor.

11          THE COURT:  Thank you.  Mr. Klein, you can sit

12   down for my question or stand up.  It's up to you.  Just a

13   quick question.

14          So in deciding whether Mr. Hutchins voluntarily

15   waived Miranda rights, focusing on Exhibit 9, the Miranda

16   Rights form, is my task -- I believe it is, and I want you

17   to correct me if I'm wrong -- is my task, as I understand,

18   to make a determination whether the rights were given and

19   Mr. Hutchins had an opportunity to waive them or decline to

20   waive them prior to questioning, or is my task to make a

21   finding as to a specific time?

22          So said differently, is my task the sequence of

23   events; that is, Miranda warnings first and then

24   questioning, or do you believe my task is a specific time

25   that -- to make a finding regarding specific time that the

1  warnings were given and waived?

2        MR. KLEIN:  Well, I think regardless of the time,

3  Your Honor, what you find there, you could find the other

4  way and it's suppressed.

5        So I think, Your Honor, in looking at the record,

6  we'll ask you to look at both things and to draw inferences

7  on both based on the evidence you heard today, or based on

8  the direct evidence.  So I wouldn't say it's just to find

9  out the time.  Because if you look at the Giddens case,

10 Your Honor, and I've asked -- again, I know you will look at

11 it -- in that case, someone did, quote, waive their rights,

12 right, end quotes, but it wasn't a valid waiver because they

13 were fooled.

14        And so you could find, for example, in this case,

15 yes, this was Mr. Hutchins' signature, and he did sign it

16 before it started, but it could still be an invalid waiver.

17        Does that answer your question?

18        THE COURT:  It does.

19        MR. KLEIN:  So I think -- And, Your Honor, we will

20 brief your question.  Now that you've asked it, we'll make

21 sure it's included in our briefing.

22        THE COURT:  You've answered my question.  So you

23 can submit -- I will read everything you submit, but it was

24 not an invitation for more briefing.  There's plenty of

25 briefing on this specific motion, so don't feel obligated to

1    delve into it because you answered the question.

2              MR. KLEIN:  Yes, ma'am.

3              THE COURT:  And I think it was a very focused

4    question.

5              MR. KLEIN:  Yes, Your Honor.

6              THE COURT:  Rebuttal from the Government since the

7    Government has the burden?

8              MR. CHMELAR:  Sure.  I want to start with where

9    you ended with Mr. Klein.  They've never argued to the

10   contrary that he was given Miranda.  So your question posed

11   to Mr. Klein, "Is the timing important?"  They've never

12   argued the timing is important.  None of their filings to

13   get to this point suggested there was some sort of

14   after-the-fact Miranda advisement post-interview.  They've

15   never alleged that, and so for them to now allege it is

16   simply unfounded.  Nothing supported it.

17             So I would say the focus -- I know you didn't ask

18   the Government.  The focus is whether or not he was given

19   Miranda and he understood it under the case law in the

20   Seventh Circuit in the context of the Advice of Rights form.

21             And I want to go and shift a little bit to the

22   responsibility --

23             THE COURT:  Of course, whether it was given prior

24   to the questioning.

25             MR. CHMELAR:  Well, of course.  I don't think

that's -- my point, our point is I don't think -- and I
stressed this during our initial argument -- no one has ever
refuted that point.  No one ever argued it was not given
prior.

They're not arguing -- and I think if you look at
their motion to get to this stage, they acknowledged it was
given before the interview started, before the recording
started.  That's in their motion.  So they've already taken
a position.

And this is very much a case of moving the goal
posts from the defense.  They argued specific points.  And,
yes, the Government has a burden to show something finite
that he was advised of his Miranda rights, and he waived
those rights, and it was a voluntary and knowing waiver in
that he -- the statement was voluntarily given.

They have a burden, too.  And this argument about
deceit -- the case law is clear, and as Mr. Klein implored
you, read the cases.  There's plenty of Seventh Circuit
cases on this topic of deceit.  There's nothing deceitful
here.  He was handcuffed and told he was under arrest on a
federal warrant out of this district and then shown the
arrest warrant.

They, the defense, has the burden on an argument
of deceit under the law to show by clear and convincing
evidence that he was deceived.  That's the case law.  And

that's true in the Seventh Circuit, and the defendant must

prove the information -- the misinformation was material in

his decision to speak to the agents.  They haven't done

that.  They haven't come close to doing that.  They've done

nothing but allude to some idea that he was confused about

what it was that he was being interviewed about.  But both

in the post-arrest interview and in the jail call, which

Mr. Hutchins, the defense initially argued you shouldn't

consider but appears now that they want you to consider it.

On page 11 of the transcript, Mr. Hutchins states, quote,

"Yeah, I knew it was always going to come back.  I just

didn't think it would be so soon."

          And he says something to the same effect during

the post-arrest interview.  He knows deep down what is going

on and why he's there, and he's introduced to the idea and

the topic of Kronos quite early into the interview.

          So I want to make sure there's not a burden

shifting situation going on here.  We have a specific thing

we need to show.  We've established it.  These arguments

that they want to make about his confusion about UK,

Miranda, or rights, there's been nothing established about

that.  His impairment, his inability to understand the

Miranda, there's been nothing established about that.

They've grasped on at the very last moment this idea of some

sort of deceit which clearly does not apply to this

1    particular situation, and they failed to establish by clear

2    and convincing evidence that that situation is applicable

3    and should be -- has been established by them as it is their

4    burden.

5           The other argument that they made, I think,

6    deserves to be addressed is the -- this idea that he somehow

7    was confused about the American legal system. His question

8    in the jail calls goes about is it even legal for them to

9    keep a foreign national in custody?

10          It has nothing to do with his rights under

11   Miranda. It has to do about procedural aspects of what is

12   going to happen next. You know, in the court sequence, will

13   he continue to be detained?

14          There's a case we cite in our pre-evidentiary

15   hearing memorandum. It's the Frank case out of the Ninth

16   Circuit. It involves a Navajo Indian man who argued

17   unsuccessfully that his lack of experience with the American

18   U.S. legal system negated his Waiver of Rights because he

19   didn't understand the U.S. legal system. And that was

20   wholly rejected by the Ninth Circuit. So the idea that he

21   has to be fully familiar with the legal system does not

22   exist. That's not a burden, and it never has been. We'd

23   have trouble arresting foreign nationals in every single

24   case. In every single investigation, we'd have to show they

25   were aware of the U.S. legal system.

1        The case law on waiver of Miranda is quite clear

2    and is established in our brief.  So we would argue that

3    we've established what we need to establish to have the

4    statement admitted and not suppressed.  And the defendant,

5    despite these lobbing allegations related to agents lying

6    and intoxication, impairment, confusion, have established

7    nothing except some inconsistencies and unfortunate

8    circumstances and situations that developed during the

9    interview, like a failure to start the recording at the very

10   outset and the altering of the times.

11       So with that, Judge, we would rest and ask you to

12   deny their motion.

13       THE COURT:  Thank you.

14       Okay.  So this ends this hearing.  The motion is

15   under advisement subject to any supplementals to be

16   submitted by Wednesday, May 30th.

17       I implore counsel not to open the door to new

18   arguments.  The idea of keeping the record open for these

19   two weeks is to give you an opportunity to supplement some

20   thoughts or some authority that you think is so clearly on

21   point that I may have, not missed, but it's not too -- we're

22   not starting new rounds of motion at all in this matter.  So

23   I want to make that very, very clear to counsel here.

24       With that, then, Mr. Klein, is there anything

25   further for this evening?

```
 1              MR. KLEIN:  No, Your Honor.  Just -- no.

 2              THE COURT:  Mr. Chmelar?

 3              MR. CHMELAR:  No.  I spoke with Mr. Proctor.

 4    Mr. Proctor has nothing either.

 5              THE COURT:  Okay.  And I assure the parties, I do

 6    read everything.  I do listen to everything that you -- I

 7    will, and I do.  It's my way of working, but I assure you

 8    that I will listen to everything submitted and read

 9    everything that you submit and issue a decision in this

10    matter.

11              Thank you.

12              Because it's after hours, you will need assistance

13    in leaving the building; otherwise, you won't be able to

14    leave.  So you can take your time to pack your things.  My

15    staff can assist you in getting out the side door, or

16    perhaps the Government attorneys can let you out the door.

17    So I'll let you decide.  And also the members of the

18    audience as well, we will need to let you out as well.  So

19    if you want to sit tight, give us a couple minutes, we can

20    escort you out.

21              MR. CHMELAR:  Judge, I did have one thing that

22    your comment about listening to the recordings reminded me

23    about.  And I think we conveyed it to Your Honor's clerk

24    that the jail recording, the audio comes out high on one

25    speaker, low on another speaker, and there's the ability to
```

1    adjust that and move the needles the opposite direction.  It

2    could be somewhat difficult to find.  Our lit support

3    offered their assistance to the extent you request any;

4    otherwise, we just assume that you have the ability to find

5    someone to assist you, but our litigation support person

6    indicated he would be more than willing to adjust the audio,

7    if necessary.

8              THE COURT:  Okay.  I will see if I need any help.

9    We'll figure it out.

10             And, Mr. Proctor, you also have the other jail

11   call and transcript that you're going to admit.  Let's give

12   those a number so that we're keeping track of everything.

13             MR. CHMELAR:  Yeah, Judge.  The transcript is

14   Exhibit 10, and the recording, underlying recording, is

15   Exhibit 3.

16             THE COURT:  Okay.

17             MR. KLEIN:  Your Honor, the new jail call, will

18   that be a different exhibit number?

19             MR. CHMELAR:  It's 3.

20             MR. KLEIN:  3?

21             THE COURT:  Yeah.  The transcript is --

22             MR. CHMELAR:  Is 10.

23             THE COURT:  Is 10 and the audio is 3?

24             MR. CHMELAR:  Correct.

25             THE COURT:  Okay.  So the record is clear.  Thank

1    you everyone.  Have a good evening.

2            MR. CHMELAR:  Thank you, Judge.

3            MR. KLEIN:  Thank you.

4        (Hearing concluded.)

                    C E R T I F I C A T E


          I, Richard D. Ehrlich, a Registered Merit Reporter

and Certified Realtime Reporter, certify that the foregoing

is a true, complete, and accurate transcript of the

proceedings ordered to be transcribed in the above-entitled

case before the Honorable Nancy Joseph, in Milwaukee,

Wisconsin, on May 16, 2018.


s/Richard D. Ehrlich  May 21, 2018
_____
Richard D. Ehrlich, Official Court Reporter