UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

                              Case No. 17-CR-124

   v.

MARCUS HUTCHINS,

        Defendant.

---

## DEFENDANT'S POST-HEARING MEMORANDUM
## (MOTION TO SUPPRESS)

---

Supplementing the defense argument made at the conclusion of May 18, 2018 evidentiary hearing and in prior filings, defendant Marcus Hutchins submits this memorandum to highlight evidence supporting the suppression of his post-arrest statements.

## <u>DISCUSSION</u>

The evidence elicited at the hearing – both the testimony and exhibits – only strengthened the defense's position that under the totality of the circumstances Mr. Hutchins' purported Miranda waiver and post-arrest statements were involuntary.

These are the circumstances the day of Mr. Hutchins' arrest, August 2, 2017, that, cumulatively and in light of the case law, lead to the conclusion that his post-arrest statements must be suppressed: Mr. Hutchins did not understand the nature and posture of the investigation because the FBI agents who arrested and interrogated him, Agents Butcher and Chartier, intentionally misled him, even after he made a number of specific inquiries seeking to understand why he had been arrested; Mr. Hutchins was exhausted at the tail-end of a week-long partying binge, about which the agents were on notice; and the FBI knew that he was a citizen of the United Kingdom—one having minimal prior contact with this country—where a defendant's post-arrest rights are very different than in the United States.[1]  These circumstances, of course, need to be considered all together, not separately as the government will likely seek to have the Court weigh them.

The admissibility of statements derived from custodial interrogation depends on the validity of the suspect's Miranda waiver, which requires a

---

[1] The defense asks the Court to take judicial notice of what United Kingdom law requires, which was first discussed in the underlying motion to suppress.  (*See* Dkt. No. 55 at 8 fn. 1.) Specifically, the following caution is given upon arrest (though minor wording deviations are allowed): "You do not have to say anything. But it may harm your defence if you do not mention when questioned something which you later rely on in Court. Anything you do say may be given in evidence." Police and Criminal Evidence Act 1984 Code G ¶ 3.5, Revised Code of Practice for the Statutory Power of Arrest by Police Officers (revised July 2012), https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/117583/pace-code-g-2012.pdf.

Case 2:17-cr-00124-JPS-NJ   Filed 05/30/18   Page 2 of 22   Document 85

totality of the circumstances revealing that: (1) the waiver was "'voluntary' in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) the defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Deception as a basis for suppression under *Moran* requires a clear and convincing showing that the agents affirmatively mislead the defendant as to the true nature of their investigation, and that the deception was material to the decision to talk. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983). As the Seventh Circuit explained, the:

> [s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit <u>unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead</u>.

*Id.* (emphasis added).

The hearing in this case revealed more fully how the agents ran afoul of *Serlin*. As explained in the defense's pre-hearing memorandum at pages 9-10, a defendant's Miranda waiver and statements are involuntary when law enforcement deceives the defendant in connection with the purpose of a custodial interrogation. *See United States v. Giddins,* 858 F.3d 870, 885 (4th Cir. 2017).

3

The following discussion highlights key pieces of testimony and exhibits that demonstrate the lack of voluntariness: Mr. Hutchins (repeatedly) inquired about the nature of his arrest and interrogation, and the agents' (tactical) failure to respond, among other things, was intended to mislead him, causing him to talk.

**1. Testimony and Document Exhibit Highlights**

Agents Butcher's and Chartier's testimony, as well as the exhibits offered into evidence, undercuts the government's position that the waiver and statements were voluntary. This is particularly true because Mr. Hutchins had been indicted prior to his interrogation, such that the Court must "indulge in every reasonable presumption against waiver" (and the burden is on the government to overcome that presumption). *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Colorado v. Connelly*, 479 U.S. 157, 169 (1986).

a. <u>Testimony of Agents Chartier and Butcher</u>

The testimony of the two agents who interrogated Mr. Hutchins supports suppression. Their testimony revealed that they knew Mr. Hutchins was from the United Kingdom and that he had been to the United States only once before.[2] Their testimony shows they intentionally kept Mr. Hutchins in the dark about

_____

[2] Hearing Tr. 77:18-20 (Chartier); 113:25-114:2 and 117:2-8 (Butcher).

4

what was happening. (Hearing Tr. at 56:14-24 and 58:16-59:8 (Chartier); 147:17-148:12 (Butcher).)

While the agents were hyper-sensitive to the risk that Mr. Hutchins might take even a single sip of alcohol (*Id.* 65:20-25 (Chartier)), their concern for his mental state was (conveniently) myopic. They turned a blind eye to the possibility that Hutchins had ingested other (non-alcoholic) mind-altering substances and ignored the effects of a week spent partying all hours of the night.

At the outset, it is very important for the Court to remember the agents' pre-hearing collusion. As Agent Butcher revealed, she and Agent Chartier got together to "mak[e] sure that we were on – you know, that our facts were the same." (*Id.* 112:4-5.) Their synchronization of their testimony calls into question their entire characterization of events, and any benefit of any doubt the Court has regarding what happened should accrue to Mr. Hutchins' favor.

Turning to their coordinated testimony, Agent Chartier confirmed that when Mr. Hutchins was arrested at the airport lounge, the agent was accompanied by two uniformed customs agents. (*Id.* 17:12-13.) He was dressed casually and did not wear anything identifying him as an FBI agent. (*Id.* 18:10-12.) This is important because at that moment Mr. Hutchins would have understandably believed the agents wanted to speak to him about an issue

5

related to his travels, his conduct while in Las Vegas, or even the WannaCry ransomware attack in May 2017 for which he had gained worldwide fame for his assistance in stopping it and which law enforcement was investigating. There was unfortunate speculation floating around, which has since been totally refuted, that Mr. Hutchins had stopped the attack after he had accidentally released the ransomware.[3]

Indeed, the Court knows the agents' plan was designed to confuse Mr. Hutchins because Agent Chartier testified that the original plan was to arrest Mr. Hutchins as he boarded his flight home. (*Id.* 65:8-13.) This plan – maximizing Mr. Hutchins' time experiencing normal travel – would have led Mr. Hutchins to further miscomprehend the nature of and likely reason for his arrest.

As Agent Butcher confirmed, they knew of Mr. Hutchins arrival to and weeklong presence in Las Vegas, and even though an indictment had been returned and arrest warrant issued, they chose not to arrest him then or any time before he was leaving. (*Id.* 115:20-116:4.) They knew that arresting him at the airport at the last moment they deemed possible before he departed would lead him to believe that his detention was somehow related to his travels to Las

_____

[3] In late 2017, White House Homeland Security Advisor Tom Bossert lauded Mr. Hutchins for his role in stopping the attack, which the United States has attributed to North Korea. Kevin Collier, *Words of Praise But No Forgiveness for Hacker Who Stopped North Korean Cyberattack*, BUZZFEED NEWS, Dec. 19, 2017, https://www.buzzfeed.com/kevincollier/words-of-praise-but-no-forgiveness-for-hacker-who-stopped?utm_term=.lykQGxXww#.bx7mkyRgg.

6

Vegas, his conduct while there, or even WannaCry.  Although this plan was abandoned because Mr. Hutchins ordered a soda in the lounge, it speaks loudly to the agents' true intent of suggesting to him that his arrest related to his travels, not some alleged events in his distant past.

Back to events in the airport lounge.  Agent Chartier conceded he only asked Mr. Hutchins if he was drunk, a circumstance of real concern to the agent. (*Id.* 65:11-25; 69:14-70:1.)  But while Mr. Hutchins' non-alcoholic intoxication (like from drugs) would have been equally concerning, Agent Chartier chose not to inquire.  (*Id.* 69:14-70:15.)  Neither did Agent Butcher.  (*Id.* 143:13-15.)

Despite their incomplete inquiry regarding Mr. Hutchins' possible impairment, Agent Chartier testified overall that from his perspective he thought Mr. Hutchins was in a good state of mind for the interrogation.  But on cross-examination, Agent Chartier acknowledged that he had no basis for reaching this conclusion, since he had met Mr. Hutchins for the first time that day.  (*Id.* 45:15-18.)

As part of his basis for believing Mt. Hutchins to be unimpaired, Agent Chartier testified that Mr. Hutchins explained that a password to unlock one of his devices was long enough that he could not type it when he was "intoxicated." (*Id.* 32:5.)  But Agent Chartier's testimonial verbiage was imprecise.  The audio recording reveals that Mr. Hutchins actually said he struggled to type the

7

password when "drunk." (Interrogation Tr. 18:55.) But plenty of people can do things when they are high they cannot do when they are drunk, and vice-versa.

Agent Chartier testified that he revealed he was with the FBI and told Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant just after Mr. Hutchins had been detained, when he and the customs officers took Mr. Hutchins from the lounge to a stairwell. (Hearing Tr. 19:8-23.) By his own admission, however, Agent Chartier did not explain the charges or what was going on, despite Mr. Hutchins' numerous questions in the hallway. (*Id.* at 19:25-20:4; 58:25-59:1.)[4]

In addition, Agent Chartier claimed that after he escorted Mr. Hutchins to the (pre-arranged) interrogation room, he and Agent Butcher again advised Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant. (*Id.* 20:25-21:1.) Notably, they did not explain anything else. Agent Chartier acknowledged that Mr. Hutchins was not told that the arrest warrant flowed from an indictment, much less that the indictment charged six felony offenses stemming from the development and sale of Kronos. (*Id.* 56:22-24.)

Further, although the agents tried to coordinate their testimony, Agent Butcher's testimony about these meaningful events was quite different from

---

[4] The defense maintains that this testimony—namely, that Agent Chartier mentioned an arrest warrant to Mr. Hutchins–is inconsistent with his prior statements.

8

Agent Chartier's. She did not testify that he (Agent Chartier) advised Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant. Only Agent Chartier makes this claim, one that is undermined by Agent Butcher and otherwise lacks any support in the record.

Timing, as in what the clock teaches, also matters. Despite the fact that Mr. Hutchins was escorted out of the lounge at 1:17 p.m. and the audio recording started at approximately 1:18 p.m. (*see* Exhibits 14 and 9), Agent Chartier claimed that he read Mr. Hutchins the Advice of Rights form (Exhibit 9) and Mr. Hutchins read and signed it. (Hearing Tr. 24:25-25:6.)

The events Agent Chartier shared simply could not have happened against the clock, as it is depicted in the FBI's surveillance log. After all, Agent Chartier's own version of events involved walking Mr. Hutchins from the lounge to a stairwell; cuffing and engaging in stairwell conversation with Mr. Hutchins; and then walking Mr. Hutchins down to the interrogation room, getting settled there, and making introductions all before any administration of Miranda warnings would have occurred.

Overall, the agents' testimony confirms what the other evidence firmly establishes: they arrested a person who promptly and affirmatively asked to know why he was in custody, and the agents intentionally avoided providing

him with any meaningful response to his understandable and repeated direct questions.

b. <u>The Document Exhibits</u>

The exhibits provide additional support for the defense's argument. The arrest warrant (Exhibit 12) is particularly compelling evidence for two reasons. First, according to Agent Butcher, it was only shown to Mr. Hutchins over an hour into his interrogation. (Hearing Tr. 148:2-12.) Until then, as the audio recording reveals (see discussion below), Mr. Hutchins had no idea that he had been charged in the Eastern District of Wisconsin, the nature of the charges, or even why he was being interrogated. Second, the only offense the warrant specifically references is a violation of 18 U.S.C. § 371, which the face of the warrant depicts in the vaguest of terms, suggestive of cheating on one's taxes: conspiracy to defraud the United States. So even after seeing the warrant, Mr. Hutchins was not on notice that there were six felony charges, or that any of them related to his alleged involvement with Kronos several years prior.

The FBI surveillance log (Exhibit 14) also supports suppression. It shows the agents could have arrested Mr. Hutchins much earlier in the day. After all, as the log notes, they started surveilling him at 6:44 a.m. on the day of his arrest, when he was still at his Airbnb. They could have arrested him at any time during his trip to Las Vegas. But as discussed above, the timing and manner of

10

the arrest – after more than a week of partying, and at the airport with the involvement of uniformed custom officers – was meant to create confusion and mislead Mr. Hutchins about what was really happening.

The log also reveals that Mr. Hutchins was escorted out of the airport lounge at 1:17 p.m., which the agents both confirmed. (Hearing Tr. 51:18 (Chartier); 123:8-10 (Butcher).) This is important because, based on the time Agent Butcher later added to the Advice of Rights form, approximately 1:18 p.m., the agents had very little time to place Mr. Hutchins in handcuffs, walk him to the interrogation room, and as they claim, read to him and have him read and sign the Advice of Rights form.

In light of the testimony and evidence discussed above, the defense renews its request that the Court should exclude the Advice of Rights form (Exhibit 9) that Agent Butcher altered from its consideration here. The defense also renews its request that the Court should draw from the circumstances an inference adverse to the government's position that Mr. Hutchins was warned of and waived his constitutional rights before making a post-arrest statement.

Even if the Court still considers the Advice of Rights form over the defense's objection, the Court should only consider that on its face it was executed at some point in time, not at any particular time. Agent Butcher's belated inclusion of the times, which neither she nor anyone else at the FBI ever

11

documented, calls into question when during the extended time the agents and Mr. Hutchins shared together the advisement of rights and waiver occurred (a question the recorded statement cannot answer).

## 2. Highlights of the Recorded Portion of Mr. Hutchins' Post-Arrest Interrogation (Exhibit 1)

Agent Butcher's failure to start the audiotape at the very beginning of Mr. Hutchins' post-arrest interrogation leaves a gap in the record that severely prejudices him. A complete recording—something that is unavailable to this Court—would provide irrefutable evidence of what did and did not happen during custodial interrogation. The lack of a complete recording is truly unfortunate, and the responsibility for this important evidentiary deficit rests solely at the feet of the FBI.

That said, even the incomplete recording supports suppression. The defense would direct the Court's attention to following portions, which are divided up by topic and demonstrate the FBI agents knew Mr. Hutchins was exhausted from partying and they intentionally misled him so that he did not understand the nature and purpose of the interrogation:[5]

---

[5] These are defense-prepared draft transcriptions of what was recorded. The times provided are approximations. The defense provides these as an aid to Court when it listens to the audio recording.

- **Partying and Exhaustion**

17:26-18:13        Butcher:      So what was the best presentation you saw?

Hutchins:    I didn't see any. I just come for the parties.

Butcher:      Oh, really (laughs) . . .

[Brief discussion of Mr. Hutchins' phone passcode follows.]

Butcher:      So, really, you didn't go see anything?

Hutchins:    No.

Butcher:      You just went to the parties.

Hutchins:    Yeah.

Butcher:      All right.

Hutchins:    I mean, like, I'm a bit of an introvert, so like, too many people in a big crowded room . . .

Butcher:      Yeah, not your thing. Not my thing, either, for sure.

Hutchins:    No, I'm more of a like… Once I'm drunk I'm fine, so I go to the parties, and it's just networking, really.

Butcher:      Right. Yeah.

Chartier:    A little liquid courage.

Hutchins:    Yep.

[From an early point in the interrogation, the agents knew Mr. Hutchins had been partying the entire time of his stay in Las Vegas, and thus, they must have understood he would be utterly worn out by then.]

58:53-59:09        (Hutchins yawns.)

Chartier:    How much sleep did you get last night?

Hutchins:    Not a lot.

Chartier:    None at all?

Hutchins:    Well, no, I got to bed for like two hours and then I had to get up and pack.

[The agents never asked Mr. Hutchins if he was exhausted, but here he tells them that he had only two hours of sleep the night before (after a long week of partying).]

13

- **Agents Intentionally Misleading Mr. Hutchins and His Confusion**

| | | |
|---|---|---|
| 00:30-00:32 | Hutchins: | Can you please tell me what this is about? |
| | Butcher: | We're going to get to it. |

[The agents then proceed to discuss his background and current job for the next ten minutes. They do not answer that question directly, and show him the arrest warrant, which does not mention Kronos, for well over an hour into the interrogation, as discussed below. They never show him the indictment. Nowhere do the agents mention on the recording that they started recording mid-interrogation, what happened before the tape started recording, or when the recording began.]

| | | |
|---|---|---|
| 1:40-1:55 | Chartier: | All right so like I said, we have a bunch of questions for you. We hope you can fill in the gaps. What's your education? |

[Agent Chartier makes this sound like an open-ended investigation and does not specify the focus of his question. As the Court will hear when listening to the rest of the recording, the agents' questioning is very broad-based and bounces among multiple topics, not just Kronos. This would leave any reasonable person not understanding what is really at issue: that he is under indictment, charged with specific crimes based on finite alleged conduct.]

| | | |
|---|---|---|
| 5:05-5:22 | Chartier: | Okay. And I don't know if we did this in the beginning. Sorry, my brain is like— |
| | Butcher: | You're like a mile a minute. Go ahead. |
| | Chartier: | Did you—did we have a passport for you? I didn't have—we didn't take one off of you. Did you have a passport. |
| | Hutchins: | It's in the bag. |
| | Chartier: | It's in your bag? Okay. All right. Well just for the record, could you go ahead and state your full name and then give your date of birth? |

14

[This exchange shows that at the start of the interrogation Agent Chartier was rushing through things to the extent that even Agent Butcher noticed. It is consistent with the defense position that the agents did not take the time they claim to have taken in terms of communicating with Mr. Hutchins, including about such facts as the nature of his situation and his Miranda rights.]

| 11:31-12:15 | Hutchins: | Kronos. I know that name. That was a guy I did work for awhile back  I sold him some injection code or something? Is that what this is about? You're looking for the Kronos developer? |
| | Chartier: | Well, I don't think we're looking. We know who the Kronos developer is. |
| | Hutchins: | You don't—because it ain't me . . . |

[Although the agents claim he created Kronos, they fail to explain to Mr. Hutchins they have arrested him on charges related to Kronos.]

| 15:16-15:53 | Hutchins: | Yeah, well I have an account for research purposes at Malware Tech at xmpp.jp, I think it is. |
| | Butcher: | Are you worried about that one now? Now that you're kind of out in the public eye, research-wise? |
| | Hutchins: | I don't use it for research anymore, but I am a little worried that now, because everybody knows I'm a researcher, they're all going to come back and bite me. |
| | Butcher: | Right. |
| | Hutchins: | Which is probably why I'm here. |
| | Chartier: | No, that's not the reason you're here, buddy. |
| | Butcher: | So you said you got rid of the laptops. . . |

[Mr. Hutchins again expresses uncertainty about why he is being interrogated. And the agents again fail to explain the true purpose, despite being given another opportunity to do so.]

15

| 27:56-29:20 | Chartier: | So you haven't had any other involvement in any other pieces of malware that are out or have been out? |
| | Hutchins: | Only the form-grabber and the bot. |
| | Chartier: | Okay. So you did say the form-grabber for Kronos, then? |
| | Hutchins: | Not the form-grabber for Kronos. It was an earlier one released in about I'm gonna say 2014? |
| | Chartier: | And what was the name of that? |
| | Hutchins: | Oh, fuck. I really can't remember. No, I'm drawing a blank. I mean, like, I actually sell the code. I sell it to people and then they do what the fuck they want with it. |
| | Chartier: | I understand, I understand, I understand. But you see why we're here? |
| | Hutchins: | Yep. I can definitely see. |
| | Chartier: | I mean, you know, Marcus, I'll be honest with you. You're in a fair bit of trouble. |
| | Hutchins: | Mmm-hmm. |
| | Chartier: | So I think it's important that you try to give us the best picture, and if you tell me you haven't talked to these guys for months, you know, you can't really help yourself out of this hole. Does that make sense? |
| | Hutchins: | Yeah. |
| | Chartier: | Now, I'm not trying to tell you to do something you're not doing, but I know you're more active than you're letting on, too. Okay? |
| | Hutchins: | I'm really not. I have ceased all criminal activity involving- |
| | Chartier: | Yeah, but you still have access and information about these guys. |
| | Hutchins: | What do you mean? Like, give me a name and I'll tell you what I know about that. |
| | Chartier: | All right, why don't you start out with this list of nics. |

[Although the agents almost tell him why he is being interrogated, they still leave it up to Mr. Hutchins to guess. And by the end of this conversation, they are focused on what

he might be currently doing, not anything historical like his
alleged involvement with Kronos.]

| | | |
|---|---|---|
| 35:52-36:03 | Butcher: | He paid your VPS— |
| | Hutchins: | If I'm going to go jail because he paid my $7 VPS, I'm going to pissed. |
| | Butcher: | Why did he pay for your VPS? |

[Mr. Hutchins again makes it known he is not really sure why
he is being interrogated.]

| | | |
|---|---|---|
| 57:58-58:23 | Chartier: | Well, you brought up WannaCry, so. |
| | Butcher: | Yeah, well, we were gonna ask you about that anyway. |
| | Hutchins: | That's gonna suck. [laughter] |
| | Butcher: | Wow. It was quite the… Pretty overwhelming for you, I guess, with all the attention it got. |
| | Hutchins: | Yeah, I'm still not over it, oh man, that was something. And now I guess I get to go through it again, will I get indicted for whatever bullshit this is. |

[Mr. Hutchins understandably thinks the agents are
interrogating him to gather information about WannaCry,
which had garnered international headlines. He also again
makes it clear that he does not know what the nature of the
case is.]

| | | |
|---|---|---|
| 1:03:45-1:03:58 | Hutchins: | So can I just ask, is this just some shit to get me to give you the [WannaCry sinkhole] domain, because I know you wanted that, right? |
| | Butcher: | No. |
| | Hutchins: | Yeah |
| | Chartier: | No. |
| | Hutchins: | No, okay. |
| | Chartier: | No, this is not some shit to get us the domain. |

[Mr. Hutchins again, over an hour into the interrogation,
reveals confusion about what is really going on and the agents
again fail to clear it up.]

| 1:11:06-1:11:14 | Hutchins: | So do you think I'm behind it or something? |
| | Chartier: | WannaCry? |
| | Butcher: | No. |
| | Hutchins: | Okay. |

[Mr. Hutchins again believes the interrogation is really about WannaCry, and the agents do not explain the true purpose.]

| 1:17:45-1:18:02 | Chartier: | Okay. Well here's the arrest warrant. And just to be honest -if I'm being honest with you, Marcus. This has absolutely nothing to do with WannaCry. |

[Over 75 minutes into the interrogation, the agents finally show Mr. Hutchins the arrest warrant. Agent Chartier admits the interrogation had nothing to do with WannaCry, implicitly acknowledging their understanding that Mr. Hutchins believed the interrogation to be about WannaCry.]

| 1:19:10-1:19:18 | Chartier: | What questions do you have for us? |
| | Hutchins: | I don't really have any. Like, my only one was why the hell am I here and you've answered that pretty well. |
| | Chartier: | Okay. Well, we'll step out for a second. Give us a minute to talk . . . |

[Now that he has seen the arrest warrant, Mr. Hutchins for the first time understands why he might have been arrested, although even the arrest warrant lacks any mention of Kronos, instead advising only that he is charged with conspiring to defraud the United States.]

### 3. Highlight of the Jail Calls (Exhibits 2 and 3)

As part of the hearing, the audio recordings of two jails between Mr.

Hutchins and his boss were offered and accepted into evidence as Exhibits 2 and

18

3.[6] Statements Mr. Hutchins made on those calls tend to support the conclusion that his Miranda waiver and post-arrest statements were involuntary. They establish that Mr. Hutchins: (1) as a citizen of the United Kingdom, did not have an understanding of this country's criminal justice system; and (2) did not understand the reason for and basis of his custodial status. The pertinent statements of Mr. Hutchins are:

- First Call – "I think they are going to put me in before a judge and that'll decide what happens next or something along those lines, I don't really know how it works."

- Second Call – "So, I am not really sure what is going on, but I don't think it is shit I did in like 2005."

The government contends that the jail calls are relevant because they purportedly demonstrate Mr. Hutchins was not impaired when the agents interrogated him or coerced by the agents to talk, despite the fact that neither topic is discussed on the calls.[7]

With regard to impairment, although the calls took place the day of the arrest, the first one was not placed until many hours after Mr. Hutchins' arrest and interrogation. The calls, therefore, do not speak to his condition during the interrogation.

---

[6] The defense objected to their consideration in its pre-hearing memorandum and maintains that objection.

[7] The Court should not rely on the FBI-prepared transcript of the first jail call, which is in evidence as Exhibit 7 and which, based on a defense review, contains discrepancies with what is actually said on the call.

Regarding coercion, the fact that Mr. Hutchins does not tell his boss that he was coerced or deceived into talking is meaningless in light of the circumstances. At the time of the jail calls, Mr. Hutchins had not yet been to court. He had not met with a lawyer, received a copy of the indictment, heard a recitation of the charges, or had the benefit of any of the other advisements incidental to an initial appearance in court. And so there is no basis for believing that Mr. Hutchins, at the time of the jails calls, would have yet had reason to realize the way the agents intentionally hid the ball from him during the course of the interrogation.

Moreover, Mr. Hutchins' comfort in discussing sensitive matters with his boss, which the Court will hear when it listens to the audiotapes, does not speak to the voluntariness of an earlier decision to speak with law enforcement. It simply means he was comfortable talking with a confidante.

To the extent the Court considers the jail calls at all, they only lend support to Mr. Hutchins' broader argument.

## CONCLUSION

When Mr. Hutchins was taken into custody in Las Vegas on August 2, 2017, he was not a mere subject or even a target of a criminal investigation—somebody who law enforcement might want to only question. Instead, he was under indictment in this District. What that meant, of course, is that there was

20

nothing Mr. Hutchins could have said when he was arrested on August 2 that would have changed the inevitable course of his having to appear initially before a judge in the District of Nevada and to answer to multiple felony charges in this District.

But despite Mr. Hutchins' multiple direct questions to the FBI agents who arrested him about the nature of his circumstance (*e.g.*, "Can you please tell me what this is about?," asked at the outset of the interrogation) and notwithstanding his frequent expressions of uncertainty about the agents' focus of inquiry, the agents intentionally concealed from him the true and pertinent nature of his then-existing reality (*e.g.*, "We're going to get to it," then somewhat revealing things 75 minutes later). Under these circumstances, bolstered by his known-to-the-agents exhaustion and status as a foreigner (among other things), Mr. Hutchins "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" was fatally compromised. *See Moran*, 475 U.S. at 421 (1986).

The Court should suppress Mr. Hutchins' post-arrest statements, and any evidence the government may have obtained as a result of those statements.

DATED: May 30, 2018                    Respectfully submitted,

                                         */s/ Brian E. Klein*
                                        BRIAN E. KLEIN
                                        Baker Marquart LLP

21

2029 Century Park E – Suite 1600
Los Angeles, CA 90067
Email: bklein@bakermarquart.com
Telephone: (424) 652-7800


  */s/ Daniel W. Stiller*
DANIEL W. STILLER
DStillerLLC
Box 511130
Milwaukee, WI 53203
Email: dan@dstillerllc.com
Telephone: (414) 207-3190


  */s/ Marcia Hofmann*
MARCIA HOFMANN
Zeitgeist Law PC
25 Taylor Street
San Francisco, CA 94102
Email: marcia@zeitgeist.law
Telephone: (415) 830-6664


*Attorneys for Marcus Hutchins*