UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                                          Case No. 17-CR-124

MARCUS HUTCHINS,

        Defendant.
_____

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT
(IMPROPER EXTRATERRITORIAL APPLICATION OF LAW)
(DOC. NO. 96)**
_____

The government advances two main points in response to defendant Marcus Hutchins' motion to dismiss due to improper extraterritorial application of United States law. First, the government argues that Counts Two and Three of the superseding indictment plead a domestic application of the Wiretap Act, 18 U.S.C. § 2512(1)(c), and in any event, that law extends beyond the territorial jurisdiction of the U.S. to govern the rest of the world. Second, the government argues that no statute charged in this case requires that Mr. Hutchins have a sufficient nexus with the U.S. to be prosecuted here for his conduct abroad.

These arguments miss the mark. Counts Two and Three plead an extraterritorial application of § 2512(1)(c), and the statute does not have

extraterritorial reach. Neither the Supreme Court nor Seventh Circuit has suggested otherwise, and Congress has not indicated that it meant for the Wiretap Act to apply abroad. Finally, the sufficient nexus requirement is rooted in the Fifth Amendment due process clause, not a statute—and it applies in *all* cases, including this one.

1. **Counts Two and Three Constitute an Improper Extraterritorial Application of the Wiretap Act**

Counts Two and Three do not plead a domestic application of § 2512(1)(c) because they are not based on any direct connection between Mr. Hutchins' alleged conduct and the U.S. He has been charged for his alleged conduct in a foreign country. Regardless, the government claims, the Wiretap Act extends abroad. But the government can point to no decision that has so held, and Congress has not expressed any intent for the Wiretap Act to apply abroad. Thus, the extraterritorial application of § 2512(1)(c) is improper.

   A. **Counts Two and Three Plead an Extraterritorial, Not Domestic, Application of the Wiretap Act**

The government argues that the Wiretap Act charges in Counts Two and Three are domestic in nature because the conduct alleged in those counts purportedly occurred in the United States. (Gov't Response at 3.) This argument is based on just two allegations: (1) that Hutchins and Individual A used a YouTube video to advertise and promote Kronos; and (2) that the YouTube video and other advertisements on other internet forums were viewed in this District,

2

and an individual in this District was specifically directed to the YouTube video. (*Id.*) These bare claims do not plead a domestic application of § 2512(1)(c).

Taking the government's two arguments in turn, we first consider the YouTube video. The superseding indictment alleges that a video showing the functionality of Kronos was "posted to YouTube." (First Superseding Indictment ¶ 4(e).) It is not alleged that Mr. Hutchins or Individual A posted the video themselves. Rather, Mr. Hutchins and Individual A allegedly "used the video to demonstrate how Kronos worked and to promote the sale of Kronos." (*Id.*)

The government makes much of YouTube being a U.S.-based company. (*See, e.g.,* Gov't Response at 3 & 11.) Yet the government offers no authority suggesting that the presence of a company's office in the U.S. subjects a foreign third party's conduct—however tangentially related—to a domestic application of federal criminal law. Neither Mr. Hutchins nor Individual A is purported to have posted the video or otherwise had any direct connection to YouTube. Nor is it claimed that the video was hosted on a server in the U.S. Indeed, Google, which owns YouTube, hosts data on servers located throughout the world.[1] No essential conduct element occurred in the U.S. simply because YouTube's

---

[1] Google Data Centers, https://www.google.com/about/datacenters/inside/locations/index.html (last visited August 3, 2018). Even assuming for the sake of argument that video's posting on YouTube creates some domestic link purposes of Counts Two and Three, it does not create any nexus to this District. The government offers no explanation why the prosecution of those counts is proper in this District due to the presence of a company in another state.

3

office happens to be located in San Bruno, California.

Next, the government contends that the YouTube video and Individual A's posts on other Internet forums "were viewed in the Easter[n] District of Wisconsin, and in the case of the YouTube video, an individual in the Eastern District of Wisconsin was specifically directed to it and viewed in this district." (Gov't Response at 3.) But the superseding indictment does not plead this version of events. It does not allege that Mr. Hutchins or Individual A directed the video to an individual in this District, used the video to demonstrate anything to an individual in this District, or that the video was viewed by anyone in this District. It includes only a vague statement that Counts Two and Three occurred "in the state and Eastern District of Wisconsin and elsewhere." As in its first round of motions to dismiss, the government asks the Court to look outside the four corners of the superseding indictment to salvage these counts. But Rule 12(d) does not permit this. *United States v. Bryant*, 2013 WL 3423275, at **5-6 (E.D. Wis. July 8, 2013) (Joseph, M.J.).

More importantly, while the government characterizes the viewing of the purported advertisements as domestic "acts" subjecting Mr. Hutchins to prosecution in this country (Gov't Response at 3), these are not the "acts" of Mr. Hutchins or Individual A. Nor are they the "acts" that § 2512(1)(c) is intended to punish. The statute prohibits the intentional dissemination of advertisements of

4

a certain type of device. Thus, the conduct that the statute prohibits is the publication of certain advertisements, not the viewing of such advertisements.

There is no allegation that Mr. Hutchins or Individual A undertook any such publication from within the U.S., or that they intentionally directed any advertisement toward someone they knew to be inside the U.S. The government does not even allege that Mr. Hutchins intended Individual A to market Kronos in the U.S. The superseding indictment alleges that the co-conspirators advertised Kronos to the world at large. And the government claims just now—and outside the four corners of the superseding indictment—that someone within this District received and viewed advertisements posted on non-U.S. internet forums, as well as the YouTube video.

An offense cannot be prosecuted anywhere in the world just because it involves the Internet, and the World Wide Web does not grant the Department of Justice worldwide authority. To the extent that the government believes Mr. Hutchins may be prosecuted in this District, he could be prosecuted anywhere in the world, under the laws of any country and in any court—and there is no reason other countries could not prosecute American citizens the same way.[2]

---

[2] If other countries were to apply the government's proposed rule to U.S. citizens, nations such as Russia and China could choose to prosecute people in this country for linking to material on the Internet that those governments consider objectionable—but is perfectly lawful here—under the rationale that U.S. citizens have violated the law within those nations. That result would untenable.

5

## B. The Wiretap Act Does Not Have Extraterritorial Application Under *Bowman* or *Leija-Sanchez I & II*

The government next argues that § 2512 is a criminal statute whose language and function is intended to protect a U.S. interest, so it applies extraterritorially as a matter of course. (Gov't Response at 5.) This is incorrect and inconsistent with the precedent of the Supreme Court and Seventh Circuit.

First, the government argues that the Wiretap Act falls within a class of criminal statutes that should have extraterritorial application by their very nature. (Gov't Response at 6.) As such, according to the government, § 2512 should reach foreign citizens acting outside the United States, even if Congress has not actually expressed any intent for the law to extend abroad.

The foundation of this argument is *United States v. Bowman*, 260 U.S. 94 (1922), the holding of which is nowhere as broad as the government suggests. In *Bowman*, four people—three U.S. citizens and a British citizen—were charged with conspiring to defraud a shipping company wholly owned by the United States government. *Id*. at 95. The defendants committed the offense on the high seas, outside the jurisdiction of any state or district, "but within the admiralty and maritime jurisdiction of the United States." *Id*. at 96. The Supreme Court thus faced the question of where a crime occurs when Congress has not specifically identified its locus.

6

The Court began by observing that a wide range of crimes "against private individuals or their property . . . and frauds of all kinds" do not have extraterritorial effect unless Congress explicitly says otherwise. *Id.* at 98. It then carved out a narrow category of criminal statutes "which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the *right of the government to defend itself* against obstruction, or fraud wherever perpetrated, *especially if committed by its own citizens, officers, or agents*." *Id.* (emphasis added).³ As the Court went on to explain, limiting such crimes to the territorial jurisdiction of the U.S. "would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed *by citizens* on the high seas and in foreign countries as at home." *Id.* at 98 (emphasis added).⁴

Importantly, the *Bowman* holding was about U.S. citizens who were working for—and directly conspired against—a corporation wholly owned by the United States. *Id.* at 94–95. In addition to the three U.S. citizen defendants to whom the Court's holdings applied, the fourth defendant, a "subject of Great Britain," had not been apprehended. *Id.* at 102. The Court specifically declined

---

³ The government quotes this language on page 6 of its response, but omits the phrase "especially if committed by its own citizens, officers, or agents." The government does not provide any indication that it has left out this language.

⁴ Again, the government quotes this language on page 6 of its response, but omits the words "by citizens." This omission might be read to create an erroneous impression that the Supreme Court extended its reasoning to apply to non-citizens, as well, which it did not.

7

to address the application of U.S. law to that defendant, concluding that there "will be time enough to consider what, *if any*, jurisdiction the District Court below has to punish him when he is brought to trial." *Id.* at 102–03 (emphasis added).

So *Bowman* does not broadly authorize the imposition of federal criminal law abroad to foreign citizens and residents whose alleged actions were committed outside of the United States. It defines a narrow class of statutes that are "enacted because of the government's right to defend itself," especially against offenses committed by "its own citizens, officers, or agents," and permits extraterritorial application in that limited circumstance. *Id*. at 98.

The Wiretap Act does not fall within that category. Congress enacted this law not to enable the government defend itself, but to protect the privacy of ordinary people's communications. S. Rep. No. 90-1097, 90th Cong., 2nd Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2156. Section 2512(1)(c) in particular was enacted to "curtail the supply" of devices designed primarily for the purpose of eavesdropping on people's private exchanges. *Id*. at 2183. Thus, a violation of the Wiretap Act is a crime "against private individuals" for which Congress must explicitly authorize extraterritorial application, according to *Bowman*. 260 U.S. at 98. The fact that a government agent may have viewed an alleged advertisement for an interception device does not change Congress' original purpose for enacting the law.

8

Nor did the Seventh Circuit broadly authorize extraterritorial application of criminal law in *United States v. Leija-Sanchez*, 602 F.3d 797, 798-99 (7th Cir. 2010) (*Leija-Sanchez I*), and *United States v. Leija-Sanchez*, 820 F.3d 899, 900-01 (7th Cir. 2016) (*Leija-Sanchez II*). The government relies heavily on these cases (*see, e.g.,* Gov't Response at 3), but they are not factually analogous to this case.

In *Leija-Sanchez*, the defendant was prosecuted for a variety of crimes stemming from the activities of a criminal organization that produced fraudulent identification documents. Among other offenses, the defendant was charged under the RICO statute (§ 1959) for arranging the murder of a competitor. The murder was organized and paid for from the U.S., but was carried out in Mexico. The district court dismissed the § 1959 charge, concluding that the statute did not reach the murder abroad. The government appealed, arguing that § 1959 has extraterritorial application.

In *Leija-Sanchez I,* the Seventh Circuit considered whether the murder's occurrence abroad precluded the defendant's prosecution under § 1959 in the United States. Applying *Bowman*, the court noted that the case "does not hold that criminal statutes always apply extraterritorially," but rather "judges must consider the language and function of the prohibition." *Id.* at 799. The court looked to the text of § 1959, which states that the law applies to organizations engaged in "foreign commerce." *Id*. at 799-800. But it ultimately found that all of the conduct ascribed to the defendant—the planning and payment—took place

9

in the U.S. and had significant consequences in this country. *Id*. at 800-01. So despite the murder abroad, the case had sufficient connections to the U.S. to prosecute the defendant here. In effect, the court authorized a domestic application of § 1959, not an extraterritorial one.

Later, the Seventh Circuit revisited the case after the defendant's conviction and the Supreme Court's extraterritoriality decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261 (2010). *Leija-Sanchez II,* 820 F.3d 899. The Court stood by its analysis in *Leija-Sanchez I* for two reasons. First, the court believed that *Bowman*, rather than *Morrison*, should apply in the criminal context, *id*. at 901—but did not address *Morrison*'s clear directive that the presumption against extraterritoriality applies in "all cases." *Morrison,* 561 U.S. at 261. Second, the court reiterated that the murder was organized in and had "ample links" to the U.S. 820 F.3d at 901.

*Leija-Sanchez* did not involve a situation like this case, in which the government is prosecuting a foreign national residing in another country whose alleged acts were performed abroad. It is not clear what the Seventh Circuit would have found in such a case. *Leija-Sanchez I & II* do not shed much light on that question because they rely heavily on the defendant's acts within the U.S.

Furthermore, when deciding *Leija-Sanchez I & II,* the Seventh Circuit did not yet have the benefit of the Supreme Court's most recent extraterritoriality decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016).

10

*RJR Nabisco* directly addressed the extraterritorial application of the RICO statute (which, like the Wiretap Act, has both criminal and civil applications). *See* 136 S. Ct. at 2101-2103.

The Court held that RICO can apply extraterritorially—but *only* to the extent that the predicate offenses *themselves* apply extraterritorially. *Id.* at 2101. The Court "emphasize[d] the important limitation that foreign conduct must violate a predicate statute that manifests an unmistakable congressional intent to apply extraterritorially." *Id.* at 2102 (internal quotation marks omitted). And importantly, the Court "emphatically rejected" the notion that the phrase "foreign commerce" in a statute is sufficient to show that Congress intended that law to apply abroad. *RJR Nabisco*, 136 S. Ct. at 2110. To the extent that *Leija-Sanchez I & II* suggest otherwise, they are inconsistent with the Supreme Court's extraterritoriality precedent.

While *RJR Nabisco* was a civil case, the Court did not suggest that the presumption against extraterritoriality would apply differently depending on whether a RICO case is criminal or civil. Indeed, *Bowman* suggests that a statute that is both criminal and civil should be interpreted the same way in both contexts. 260 U.S. at 98 ("That was a civil case, but as the statute is criminal as well as civil, it appears an analogy."). That makes sense and is consistent with the rule of lenity, which directs that statutes with both criminal and civil applications should not be interpreted in a manner that treats criminal

11

defendants more harshly than civil defendants. *See Skilling v. United States*, 561 U.S. 358, 365 (2010) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," and broad constructions "should be rejected absent Congress' clear instruction otherwise.").

The government next applies "the extraterritoriality analysis from *Bowman* and *Leija-Sanchez I*" to conclude that § 2512 should apply abroad. (Gov't Response at 7.) Under this analysis, according to the government, "a court first considers the 'language and function' of the statute to determine if the 'conduct proscribed causes or is likely [to] cause significant injury to the U.S.'" (*Id.* at 7, attributing quote to *Leija-Sanchez I*.) This proposed test has two serious flaws. First, neither *Bowman* nor *Leija-Sanchez I* requires a court to determine if the "conduct proscribed causes or is likely [to] cause significant injury to the U.S." This language does not appear in either case (despite the fact that it is presented as a direct quote from *Leija-Sanchez I*). Second, *Leija-Sanchez I* attributes the "language and function" standard to *Bowman* without citation. But this language does not appear in *Bowman*. 602 F.3d at 799.

### C. Section 2512(1)(c) Does Not Have Extraterritorial Application Under the Supreme Court's Two-Part Test

The government next argues that under the Supreme Court's recent line of extraterritoriality cases, Counts Two and Three should survive because "even if the presumption against extraterritoriality applies to § 2512(1)(c), the conduct

12

relevant to the statute's focus occurred in the United States." (Gov't Response at 9.) The government characterizes this analysis as one that is limited to civil cases. (*Id.*) But the Court has made clear that it applies in "*all* cases." *Morrison,* 561 U.S. at 261.

The parties appear to agree on the two-step test. A court first asks whether "the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 136 S. Ct. at 2101. If it does not, the court determines whether the case involves a domestic application of the statute by looking to the "focus" of congressional concern. *Id.* at 2101; *Morrison*, 561 U.S. at 249.

Section 2512(1)(c) does not give a clear, affirmative indication that it is meant to apply extraterritorially. The only language in the provision that could arguably support that conclusion is the use of the phrase "foreign commerce." But the Supreme Court has repeatedly found that a statute's use of this generic phrase, with nothing more, does not meet the standard. *RJR Nabisco*, 136 S. Ct. at 2110; *Morrison*, 561 U.S. at 262-63; *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

Nor does the legislative history suggest that Congress had any intention to extend the reach of § 2512 abroad. The Senate Report drafted shortly before passage made a point to note that "there is no intent to preempt State law"—but it did not say that the statute should have extraterritorial application. S. Rep. 90-1097, at 2181.

13

Thus, we turn to whether this case involves a domestic application of § 2512 by looking to the "focus" of congressional concern. The superseding indictment does not charge a domestic application of § 2512, as discussed at length above in Section 1.A. In spite of the government's efforts to re-cast the allegations in its superseding indictment, the charges presented in Counts Two and Three are an improper attempt to apply U.S. law to the foreign acts of a foreign citizen.

**2. Mr. Hutchins Has a Constitutional Right Not to Be Improperly Tried in a U.S. Court for Alleged Conduct in a Foreign Country**

The government appears to reject the notion that there is any Fifth Amendment limitation to its prosecution of foreign citizens whose acts occur abroad. This position is not supported by the law.

The government first notes that no statute charged in this case requires the showing of a **sufficient** nexus between Mr. Hutchins and the United States. (Gov't Response at 12.) The defense agrees. The **sufficient** nexus requirement is constitutional, rooted in the Fifth Amendment right to due process attached to all statutes.

The government next contends that the sufficient nexus requirement "only applies in the context of violations of the Maritime Drug Law Enforcement Act ('MDLEA'), 46 U.S.C. § 1903(a)," and further claims that all of the cases Mr. Hutchins has cited "involve violations of the MDLEA." (Gov't Response at 13.)

14

As an initial matter, the government's characterization of the authority cited by the defense is inaccurate. Mr. Hutchins has, in fact, cited cases that do not involve the MDLEA, yet still required a sufficient nexus between the defendant and U.S. to apply a federal criminal statute extraterritorially consistent with due process. *United States v. al Kassar*, 660 F.3d 108, 118-20 (2d Cir. 2011) (arms trafficking prosecution); *United States v. Yousef*, 327 F.3d 56, 111-14 (2d Cir. 2003) (aircraft damage prosecution).

Moreover, all the cases cited by the defense, including those involving the MDLEA, explain that the sufficient nexus requirement is not a creature of any particular statute, but rather Fifth Amendment due process rights. In *United States v. Perlaza*, for instance, the Ninth Circuit explained:

> In addition to the MDLEA's statutory jurisdiction requirements, where the MDLEA is being applied extraterritorially, as in this case, due process requires the Government to demonstrate that there exists a sufficient nexus between the conduct condemned and the United States such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant.

439 F.3d 1149, 1160 (9th Cir. 2006) (internal quotation marks omitted). *See also United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990) ("[A]s a matter of constitutional law, we require that application of the statute to the acts in question not violate the due process clause of the Fifth Amendment."); *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (the substantial nexus requirement is a "judicial gloss to ensure that a defendant is not

15

improperly haled into court for trial" and "serves the same purpose as the 'minimum contacts' test in personal jurisdiction").

The government next points to two cases in arguing that "several circuits have even rejected the required showing of a 'sufficient nexus' in MDLEA cases." (Gov't Response at 13, citing *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999) and *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993).) But those two circuits did not conclude that the defendants had no due process rights to safeguard. They simply found that due process did not require the showing of a nexus under the specific circumstances of those cases.

In *Cardales,* the First Circuit concluded that when foreign nationals engage in drug trafficking on a vessel in waters under U.S. jurisdiction, "*due process is satisfied* when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel." 168 F.3d at 553 (emphasis added). This is because the foreign nation's agreement "eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair." *Id.*

And in *Martinez-Hidalgo,* the Third Circuit held that the government did not need to establish a sufficient nexus specifically for MDLEA cases because it believed Congress meant for the MDLEA to have extraterritorial application, and because drug trafficking is "condemned universally." 993 F.2d at 1056. The Third Circuit did not find, however, that a sufficient nexus is never required to

16

apply U.S. law abroad.  Indeed, the court specifically acknowledged that "there might be a due process problem if Congress provided for the extraterritorial application of United States law to conduct on the high seas without regard for a domestic nexus if that conduct were generally lawful throughout the world." *Id*.

Mr. Hutchins simply asks this Court to recognize and enforce his due process right to be tried only in a court into which he could reasonably expect to be "haled." *Klimavicius-Viloria*, 144 F.3d at 1257.

### 3. If the Court Dismisses Counts One Through Eight and Ten, Count Nine Should Also Be Dismissed

Count Nine, which charges a violation of 18 U.S.C. § 1001, relates to a purported statement Mr. Hutchins made when the FBI questioned him about his alleged actions abroad at a time when he had no substantial nexus to the U.S. And the phrase "matter within the jurisdiction," as used in § 1001, means that the department or agency has "the power to exercise authority in a particular situation." *United States v. Rogers*, 466 U.S. 475, 479 (1984).  Because the FBI had no "power to exercise authority" against Mr. Hutchins based on his conduct abroad that had no substantial nexus to the U.S., the FBI was questioning him about a matter outside its jurisdiction.  Any purportedly false statements of Mr.

17

Hutchins thus should not be able to form the basis of a criminal charge against him if Counts One through Eight and Ten are dismissed.[5]

\*\*\*

The Wiretap Act does not have extraterritorial application, and the government has not plead a domestic application of that law to Mr. Hutchins. Furthermore, due process requires that a sufficient nexus exist between Mr. Hutchins and the United States if he is to be prosecuted here—and such a nexus simply does not exist. The Court should dismiss all counts with prejudice.


DATED: August 3, 2018					Respectfully submitted,

					 /s/ Marcia Hofmann
					MARCIA HOFMANN
					Zeitgeist Law PC
					25 Taylor Street
					San Francisco, CA  94102
					Email: marcia@zeitgeist.law
					Telephone: (415) 830-6664

					 /s/ Brian E. Klein
					BRIAN E. KLEIN
					Baker Marquart LLP
					2029 Century Park E – Suite 1600
					Los Angeles, CA  90067
					Email: bklein@bakermarquart.com
					Telephone: (424) 652-7800

---

[5] Dismissing Counts One through Eight and Ten on the grounds in this defense motion would open the door for other grounds to dismiss Count Nine, including equitable grounds. The defense reserves its right to brief all those grounds in that event.

    */s/ Daniel W. Stiller*
DANIEL W. STILLER
DStillerLLC
Box 511130
Milwaukee, WI 53203
Email: dan@dstillerllc.com
Telephone: (414) 207-3190

*Attorneys for Marcus Hutchins*