# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     **Plaintiff,**

**v.**                          **Case No. 17-CR-124**

**MARCUS HUTCHINS,**

     **Defendant.**

## ORDER AND REPORT AND RECOMMENDATION
## ON DEFENDANT'S PRETRIAL MOTIONS

Motion to Suppress………………………………………………………………......3

Motion to Dismiss for Failure to State Offenses……………………………………………18

Motion to Dismiss Counts Two and Three as Multiplicitous...…………………………………26

Motion to Dismiss Count Seven………………………………………………………...28

Motion to Dismiss for Improper Extraterritorial Application of Law…………………….…30

Motion for Bill of Particulars………………………………………………………...32

Motion to Compel………………………………………………………………35

On July 11, 2017, a grand jury returned a six-count indictment charging Marcus Hutchins and another individual with conspiracy against the United States and violations of the Computer Fraud and Abuse Act ("CFAA") and the Wiretap Act related to the malware known as "Kronos." (Docket # 1.) Hutchins pled not guilty. (Docket # 8.) The case was

designated complex due to the nature of the charges, the nature and amount of the discovery, the fact that discovery would come from multiple sources, and the fact that some of the information may need independent testing/review. (Docket # 17.)

Hutchins filed several pretrial motions, including a motion to suppress (Docket # 55) for which I held an evidentiary hearing on May 16, 2018. (Docket # 82.) Other pretrial motions included a motion for a bill of particulars (Docket # 54), a motion to dismiss the indictment for failure to state an offense (Docket # 56), and a motion to compel (Docket # 73).

On June 5, 2018, a grand jury returned a ten-count superseding indictment including more charges under the CFAA and the Wiretap Act, as well as charges of making a false statement to the Federal Bureau of Investigation ("FBI") and conspiracy to commit wire fraud. (Docket # 86.) The superseding indictment expanded the scope of the indictment to include not only Kronos but also the malware known as "UPAS Kit." Hutchins pled not guilty. (Docket # 88). Trial is adjourned pending the resolution of pretrial motions.

On July 13, 2018, Hutchins filed five further pretrial motions. For clarity of the record, I allowed the parties to withdraw the original motions and responses and replace them with the new pleadings.[1] Briefing on all pretrial motions closed on August 3, 2018.

Now before me are Hutchins' motions: (1) Motion to Suppress Statements, (Docket #55); (2) Motion to Dismiss Count Seven of the First Superseding Indictment for Grand Jury Defects, (Docket # 92); (3) (updated) Motion for a Bill of Particulars, (Docket # 93); (4) (renewed) Motion to Compel, (Docket # 94); (5) Motion to Dismiss the First Superseding Indictment for Failure to State an Offense and Multiplicity, (Docket # 95); and (6) Motion to

---

[1] These motions replace the original motions (Docket # 54, 56, and 73), which are now moot.

Case 2:17-cr-00124-JPS   Filed 10/26/18   Page 2 of 37   Document 108

Dismiss the First Superseding Indictment for Improper Extraterritorial Application of Law, (Docket # 96). I will address each in turn.

### 1.   Motion to Suppress

Hutchins moves to suppress his statement to the FBI on August 2, 2017, and evidence derived from his statement. He argues that his waiver of *Miranda* and statement were not voluntarily made. I held an evidentiary hearing on the motion and the parties submitted post-hearing briefs. For the reasons that I explain below, I recommend that the motion to suppress be denied.

#### 1.1.   Evidentiary Hearing Testimony

FBI Special Agents Lee Chartier and Jamie Butcher testified at the evidentiary hearing as follows.

##### Special Agent Lee Chartier

Special Agent Lee Chartier testified that he has been employed by the FBI for approximately eleven years. (Tr. 15, Docket # 82.) He arrived in Las Vegas on August 1, 2017 along with Agent Butcher and was involved in the arrest of Marcus Hutchins on August 2, 2017 in Las Vegas. (Tr. 16.) August 2, 2017 was the first time he had any exposure to Hutchins. (Tr. 44.) He first observed Hutchins in the international terminal of the Las Vegas airport. (*Id.*) He then observed Hutchins walk into a lounge where food and drinks were served. (Tr. 17.) Chartier testified that although the original plan was to arrest Hutchins as he attempted to board the plane, he became concerned with Hutchins having any alcohol and decided to arrest him in the lounge. (Tr. 65–67.) Chartier conceded that the original plan to arrest Hutchins just prior to boarding was a strategic choice, because the FBI had been aware that Hutchins had been in Las Vegas for the prior week. (Tr. 63.)

3

Chartier testified that he approached Hutchins with two uniformed Customs and Border Patrol officers. (Tr. 17.) Chartier himself was dressed in business casual clothing. (Tr. 18.) Chartier testified that when he first approached Hutchins in the airport lounge, he did not immediately disclose that Hutchins was under arrest pursuant to a federal warrant. (Tr. 49–50.) After Hutchins identified himself, Chartier asked him to "come with us to answer a few questions." (Tr. 17.) Hutchins agreed. (*Id.*) At that time, Hutchins was not placed in handcuffs. (*Id.*)

Chartier testified that he escorted Hutchins from the lounge at approximately 1:17 p.m. (Tr. 51.) Chartier and Hutchins walked across the airport terminal and went through locked double doors and into a stairwell. (Tr. 19.) Chartier testified that when they reached the stairwell, he identified himself as a special agent with the FBI and told Hutchins he was under arrest pursuant to a federal warrant. (*Id.*) He did not mention that the warrant was out of the Eastern District of Wisconsin or that the arrest flowed from an indictment. (Tr. 56.) At that time, Hutchins was handcuffed. (Tr. 20.) Chartier stated that Hutchins had a lot of questions, but "[a]ll I said to him at that point was, '[w]e're on our way to an interview room, if you can be patient.'" (Tr. 19–20.) Chartier testified that it took about one to two minutes to get from the place Hutchins was handcuffed to the interview room. (Tr. 20.)

Chartier testified that his usual practice with interviews is identifying himself, explaining why the person is there, and then explaining the Advice of Rights form. (Tr. 23.) He stated that he reads the Advice of Rights form verbatim, asks the interviewee to read the form, and then asks the interviewee to read portions out loud. (*Id.*) He typically asks them if they can read English, and if they agree to what is written on the form, to please sign below. (*Id.*) He testified that he followed this procedure with Hutchins. (*Id.*)

4

Chartier testified that once they reached the interview room, Chartier and Butcher identified themselves. (Tr. 20.) Chartier testified that he held the form while he read it aloud to Hutchins and then gave it to Hutchins. (Tr. 24–25.) Chartier testified that there is no doubt that he orally advised Hutchins of his rights by reading the Advisement of Rights form before handing it to him. (Tr. 80.) He asked Hutchins if he could read the form and if he could understand and read English. (Tr. 25.) Hutchins then looked at the form, which Chartier understood to be reading it, and signed it. (*Id.*) Chartier testified that Hutchins indicated that he understood what was stated on the form and did not ask any questions about anything on the form. (Tr. 25–26.) Chartier stated that after Hutchins signed the form, he himself signed it and then Butcher signed it and put it into a folder. (Tr. 25.) Chartier testified that although the majority of the interview with Hutchins was audiorecorded, the reading of the Advice of Rights form was not recorded. (Tr. 47.)

Chartier testified that the agents also used an 18 U.S.C. § 1001 form which acknowledges penalties for lying to the FBI. (Tr. 26.) Chartier stated that he paraphrased the § 1001 form, along the lines of "You understand it's illegal to lie to us. Please read this form as well and sign it if you agree." (Tr. 27.)

Chartier testified that Hutchins never expressed any reservations about talking to the agents, and that the interview was professional in nature, even friendly at times. (Tr. 33–34.) Chartier testified that Hutchins never said he wanted to have an attorney present. (Tr. 34.) Chartier testified that during the interview, they provided Hutchins with a bottle of water and food from a fast food burger place. (Tr. 41–42.)

Chartier testified that Hutchins gave the officers consent to search his backpack. (Tr. 29–31.) The backpack contained two phones, two laptops, and a USB. (Tr. 30.) Hutchins

volunteered to unlock the devices, and proceeded to unlock some of these devices by key code and thumbprint. (Tr. 31.) Chartier testified that Hutchins jokingly stated that one of his passwords was so long, he would not be able to unlock his phone if he were intoxicated. (Tr. 32.) He also joked that the password for one device was very simple and the agents could probably guess it. (*Id.*)

Chartier testified that Hutchins' overall level of mental awareness seemed to be "good" and he did not see anything that would indicate otherwise. (Tr. 34.) Hutchins seemed mentally aware of what was going on and engaged in the interview. (Tr. 35.) Chartier testified that he asked Hutchins "if he was of the right frame of mind to have a conversation" and Hutchins responded that he was. (Tr. 43.) During the interview, Hutchins asked several clarifying questions. (Tr. 35.) At times, Hutchins was evasive. (Tr. 33.) Chartier testified that he showed Hutchins a list of approximately eighty online identities, a sheet that contained computer "string information" (a string of alphanumeric characters), and a print-out of a chat page from February 2015. (Tr. 35–36, 40.) Hutchins was able to identify several of the online identities, review the string information and form an opinion about it, and recall the chat page from February 2015, including identifying his interactions with the individual he had been chatting with. (Tr. 37–40.)

Chartier stated that nothing indicated that Hutchins was under the influence of drugs or alcohol and Hutchins showed no physical manifestations of impairment or intoxication. (Tr. 34.) Chartier testified that Hutchins had no slurred speech during the interview. (Tr. 42.) Nothing in Hutchins' physical appearance gave Chartier concern. (Tr. 43.) When the agents asked if he had consumed any alcohol before the interview, Hutchins said no and stated that he usually does not drink alcohol before flights because it makes him dehydrated. (Tr. 43.)

6

Chartier testified that he did not ask Hutchins if he had consumed any mind-altering substances. (Tr 69.) He also testified that he did not ask Hutchins whether he had consumed any drugs or alcohol during the week in Las Vegas. (Tr. 70.) Chartier testified that Hutchins told agents he had not attended the conference for which he had been in Las Vegas, but that he was just there for the parties. (Tr. 71.) He said he needed to drink alcohol at the conference parties to be more social. (*Id.*) Hutchins also told agents that he had slept two hours the night before.

The interview with Hutchins covered many topics including his personal background, education, and job history, Hutchins' coding activities, his activities in Las Vegas that week, and malware known as "WannaCry." (Tr. 59–61.) Chartier testified that he asked Hutchins several questions about the Kronos malware. (Tr. 79.) The agents also questioned Hutchins about the identity and location of his co-defendant. (Tr. 79–80.) Chartier stated that toward the end of the interview, he asked Hutchins whether he had any questions and Hutchins asked why he was there. (Tr. 61.)

Chartier stated that approximately one month after the interview, he learned that Butcher had mistakenly written and crossed out two incorrect times on the Advice of Rights form. (Tr. 77.) He also stated that he knew Hutchins was a citizen of the United Kingdom. (*Id.*)

*Special Agent Jamie Butcher*

Special Agent Jamie Butcher testified that she has been employed by the FBI as a special agent for approximately three years. (Tr. 88.) Butcher testified that she was the primary investigator in this case. (Tr. 109.) Butcher testified that the agents arrived at the airport a few hours before Hutchins on August 2, 2017. (Tr. 119.) Prior to August 2, she had not met

7

Hutchins. (Tr. 148–149.) She testified that the original plan was to arrest Hutchins right before he boarded the plane. (Tr. 126–127.) She testified that Chartier was in the interview room with her prior to Hutchins' arrest, but Chartier left the interview room when he became concerned about Hutchins ordering alcohol in the airport lounge. (Tr. 123.)

Butcher testified that upon Hutchins entering the interview room, both she and Chartier identified themselves. (Tr. 91.) Butcher testified that Hutchins was advised of his *Miranda* rights before questioning began. (Tr. 91.) She stated that Chartier read the Advice of Rights form and handed the form to Hutchins to read. (Tr. 92.) Butcher testified that she did not write the time on the Advice of Rights form at the time it was given to Hutchins because she was caught up in the interview process, but tried to recreate the time later. (Tr. 99–100.) She stated that she wrote "11:08" at the top of the form and crossed it out because it was incorrect, then did the same with "2:08." (*Id.*) Butcher testified that, upon reviewing relevant documents, she finally wrote what she believes to be the correct time, 1:18, on the form. (Tr. 100, 154.) Butcher testified that she wrote the 302 report summarizing the arrest and interview (Ex. 13) but she did not state in the report that she had first put incorrect times on the Advice of Rights form and that she had amended the time. (Tr. 137–138.)

Regarding the consent to search, Butcher stated that the consent form to search Hutchins' phone, laptops, and backpack was given to him a few minutes into the interview. (Tr. 93.) The agents had received verbal consent prior to Hutchins signing the form, and then waited until Hutchins signed the form before they performed the search. (Tr. 93.)

Butcher testified that the interview was recorded on a hand-held recorder that belonged to the FBI because the interview room's recording equipment was not working. (Tr. 96–97.) Butcher testified that because the interview was moving at a quick pace, she forgot to push

8

"record" during the time Hutchins was given his *Miranda* warnings and signed the Advice of Rights form. (Tr. 98.) Butcher stated that she started recording when Chartier began to ask substantive questions and she realized she had not yet started recording. (*Id.*)

Butcher testified that Hutchins did not seem to be intoxicated and appeared lucid. (Tr. 95.) She described the interview with Hutchins as casual and "pretty light." (*Id.*) Butcher testified that Hutchins and the agents joked and laughed during the interview. (*Id.*) Hutchins asked several follow-up questions and also held back on several questions. (*Id.*) Butcher testified that Hutchins was given the arrest warrant about one hour into the interview. (Tr. 148.) He was not given the indictment. (*Id.*) Butcher also testified that she knew Hutchins was a citizen of the United Kingdom and as a result she contacted the United Kingdom embassy after Hutchins' arrest. (Tr. 143–144.)

Butcher testified that she did speak to Chartier about her preparation meeting with the prosecutors. (Tr. 111–112.) She testified that in general she spoke about the interview and *Miranda* and that she wanted to make sure that their facts were the same. (Tr. 112.)

### 1.2. *Analysis*

#### *Advisement of Miranda Rights*

Although the focus of Hutchins' motion is the voluntariness of his *Miranda* waiver and statement, I begin with his challenges to the Advice of Rights form. (Ex. 9.) At the hearing, the agents testified that using the Advice of Rights form, they advised Hutchins of his *Miranda* rights prior to questioning him. However, they admitted that they failed to record that portion of the interview. Additionally, Butcher testified that she twice crossed out the time noted on the Advice of Rights form and amended the time. Based on the failure to record and the amendments to the time, Hutchins requests that I exclude the Advice of Rights form and/or

9

draw an inference adverse to the government's position that Hutchins was warned of and waived his constitutional rights before making a post-arrest statement. (Docket # 85 at 11.)

I decline to exclude consideration of the Advice of Rights form. Both Chartier and Butcher testified about it, and Hutchins had the opportunity to thoroughly cross-examine them regarding the failure to record that portion of the interview and Butcher's changes to the time noted on the form. Hutchins also had the opportunity to present his own evidence controverting the agents' testimony, but presented none. With both sides having had the opportunity to flesh out the issue with the relevant witnesses under oath, I see no basis for excluding it.

Hutchins further argues that even if I consider the Advice of Rights form, I should consider that on its face it was executed at some point in time, not any particular time. (*Id.* at 11.) To be clear, the task is to determine whether Hutchins was advised of his *Miranda* rights prior to questioning. I need not make a finding of the precise time it was done. The law simply requires that it be done prior to questioning. In making that determination, it would have been preferable for the FBI to have recorded Hutchins' interview from the very start. It would also have invited less confusion if Butcher had noted the time on the form contemporaneously to the execution of the form rather than recreating the time later.

Nonetheless, the agents' testimonies alone strongly establish that Hutchins was *Mirandized* and that this occurred before the interrogation. Both agents testified that prior to questioning, Hutchins was advised of his *Miranda* rights orally and in writing using the Advice of Rights form. Both agents testified that Hutchins was handed the form and read it. After reading the form, Hutchins stated that he understood his rights and signed the form. Both agents then signed the form as witnesses. Chartier further testified that he has no doubt that

10

this occurred prior to questioning. Hutchins has provided no evidence to contradict this testimony. On this uncontroverted evidence, I find the agents' testimony credible that they advised Hutchins of his rights prior to questioning him.

*Voluntariness of Waiver of Rights and Statement*

A statement is voluntary only if, under "the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012). Whether government conduct was coercive is determined from the perspective of a reasonable person in the position of the defendant. *See United States v. Upton*, 512 F.3d 394, 400 (7th Cir. 2008) (citing *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997)). *See also United States v. Spruill*, 296 F.3d 580, 589 (7th Cir. 2002); *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). "Factors relevant to that determination are the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerta*, 239 F.3d at 871. The government bears the burden to prove by a preponderance of the evidence that a confession was voluntary. *United States v. Villalpando*, 588 F.3d 1124, 1128–29 (7th Cir. 2009).

Hutchins argues that his *Miranda* waiver and post-arrest statement were not voluntary because (1) he was exhausted from partying and lack of sleep, (2) the agents deceived him regarding the true nature of the encounter, and (3) the agents knew he was a foreigner and took advantage of his lack of familiarity with this country's criminal justice system. I will address each in turn.

11

*Impairment*

First, the record does not support that Hutchins was impaired from exhaustion, partying, or lack of sleep. It is true that Hutchins told the agents that instead of attending conference presentations, he only attended the parties and that he had slept only two hours the night before. But even taking judicial notice of Las Vegas's reputation for debauchery, there is nothing in the record to support that Hutchins was actually in a state in which he could not exercise free will or a rational intellect. Agents testified that Hutchins showed no signs of intoxication: no sweating, complaining of nausea, or vomiting. (Docket # 82 at 34.) Hutchins stated that he does not drink alcohol when flying. Hutchins has offered no evidence that he had in fact consumed alcohol or drugs, let alone that he was impaired by them, or that he was so fatigued as to be incapable of exercising his will and intellect.

To the contrary, there is significant evidence that Hutchins was not impaired. Both agents testified that Hutchins' interactions with them did not indicate impairment. Having listened to the entirety of the audio-recording of Hutchins' interrogation, I find that the recording corroborates the agents' testimony of Hutchins' demeanor. During the interrogation, Hutchins' speech does not sound slurred or confused, he asks clarifying questions, asks follow-up questions, and at times corrects the agents. Rather than impaired, Hutchins presents as an intelligent and cautious speaker. Furthermore, Hutchins performed tasks during the interview inconsistent with impairment. Hutchins unlocked both of his cell phones, one of which had a long, complex password. Additionally, Chartier testified that he showed Hutchins a list of approximately eighty online identities, a sheet that contained computer code information, and a print-out of a chat from 2015. Hutchins was able to identify several of the online identities, interpret the code, and recall and identify the chat.

12

Overall, Hutchins' demeanor, engagement with the agents, and functioning during the interrogation did not indicate impairment from drugs or alcohol, or exhaustion from partying or lack of sleep, that might render his waiver and statement involuntary.

*Deception*

Hutchins argues that his waiver of *Miranda* and statement to the agents were the products of FBI deception. To suppress a statement based on deception, a defendant must produce clear and convincing evidence that the agents affirmatively misled him as to the true nature of their investigation. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983). A defendant must also prove that the misinformation was material in his decision to speak with the agents. *Id.* at 957. "Failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Id.* Here, Hutchins relies on *Serlin* and *United States v. Giddens*, 858 F.3d 870, 885 (4th Cir. 2017), to support his claim that his waiver and statement were the product of FBI deception.

Neither of these cases supports Hutchins' argument. In *Serlin*, IRS agents interviewed the defendant during a criminal investigation of his former business associates. 707 F.2d at 955. The agents knew that the IRS had no record of the defendant himself filing a tax return. During the interview, agents initially told the defendant that he was not the subject of any investigation, but after several minutes warned the defendant of his right not to incriminate himself. *Id.* The defendant acknowledged his rights and continued talking to the agents about his former associates. Later in the conversation, agents advised the defendant of his rights and questioned him about his own failure to file taxes. *Id.*

13

On these facts, the Seventh Circuit rejected Serlin's argument that his statement was the product of government deceit. The court noted that the typical deceit case involves a defendant being induced with assurances that the investigation is "routine" and only civil rather than criminal. *Id.* at 957. By contrast, Serlin knew of the criminal nature of the investigation. The court noted that the agents' repeated questions concerning Serlin's failure to file taxes "would have alerted even the most unsuspecting taxpayer that he was, at least, partly the focus of the search." *Id*. Finally, the court noted that the agents had not lied to Serlin, even if they had not disclosed the full scope of their investigation. It was, in fact, true that they were investigating his associates. *Id.*

In *Giddins*, the court did find that the defendant's statement was the product of deceit. The police had a warrant to arrest Giddins for his role in a series of bank robberies. 858 F.3d at 870–76. Police used a ruse to entice Giddins to come to the police station to collect his car, and then interrogated him once he was there. *Id.* at 875. When Giddins inquired if he was in trouble, the police reassured him that he was just there to get his car and that the police were taking notes because the car was used in a crime. *Id.* at 876. After *Mirandizing* Giddins, the police again reassured him that he was not under arrest or being charged with anything. *Id.* at 876–877. The police further reassured Giddins that this was the procedure to get his car back. *Id*. When Giddins stated that he felt like he was being interrogated, the police reassured him that he was not being interrogated and that he was free. *Id.* at 877. The Fourth Circuit, citing *Serlin*, found that the police engaged in affirmative deceit and the deception rose to the level "such that Giddins' will was overborne or his capacity for self-incrimination critically impaired." *Id.* at 885.

14

Bearing both *Serlin* and *Giddin*s in mind, the record here does not support Hutchins' assertion that his *Miranda* waiver and statement were products of police deception. While the agents did not inform Hutchins of the indictment and did not volunteer the full scope of the investigation despite Hutchins asking several times, the agents did not affirmatively mislead Hutchins. On the contrary, Hutchins was handcuffed and told he was under arrest. This would have indicated to Hutchins that this was not a routine matter or a civil inquiry.

Hutchins challenges whether Chartier told Hutchins that he was under arrest or that he was under arrest based on a federal warrant. (Tr. 53–55.) Hutchins points to Butcher's testimony that it was about an hour into the interview that they showed Hutchins the warrant. (Tr. 147–148.) Hutchins also questions whether Chartier told Hutchins of a warrant at all. (Tr. 53–55.) Even so, that Hutchins was handcuffed at the stairwell would have put him on notice that he was under arrest. Additionally, prior to the interrogation, Hutchins was read his *Miranda* rights, presented with a copy of them, and signed a waiver of those rights. And if Hutchins still had any doubt about the nature of the encounter, the types of questions posed to Hutchins, the Acknowledgement of Penalties for False Statements to the FBI form, the request for consent to search his backpack, phones, and laptop, and the documents the agents showed him would have made clear the criminal nature of the inquiry.

More importantly, unlike in *Giddins*, agents said nothing to Hutchins to dissuade him from believing that this was a criminal investigation. Hutchins presents no such statements. Rather, Hutchins argues only that the agents "intentionally kept Mr. Hutchins in the dark about what was happening" (Docket # 85 at 4–5), and that the agents planned to arrest Hutchins at such a time as to maximize confusion, (*id.* at 6). Even if I accepted both of these as true, they are not the kind of affirmative deception about which *Serlin* and *Giddins* were

15

concerned. Here, while the FBI dodged Hutchins' questions about the scope of their investigation, they did not lie to or mislead him as to the criminal nature of the investigation or the fact that he was the focus of it. While *Serlin* and *Giddins* stand for the proposition that law enforcement cannot affirmatively mislead a defendant about the criminal nature of an investigation, they do not obligate agents to divulge the details of their investigation in order for a defendant to voluntarily waive his *Miranda* rights and give a statement. Accordingly, without evidence that the agents actually lied to or misled Hutchins, Hutchins' claim that his waiver and statement were products of deception fails.

*Foreign Citizenship*

Finally, Hutchins argues that the fact that he is a citizen of the United Kingdom who did not understand this country's criminal justice system contributed to the involuntariness of his waiver and subsequent statement. (Docket # 85 at 19.) The record does not support this argument. Beyond establishing that the agents knew that Hutchins was a citizen of the U.K., nothing in the record supports that because of his foreign status Hutchins did not understand his *Miranda* rights and the consequences of waiving them. It is true that the jail calls show that Hutchins was confused about what the next steps in the process would be. (Ex. 2.) ("I think they are going to put me in before a judge . . ., I don't really know how it works.") Unfortunately, Hutchins' lack of familiarity with U.S. criminal procedure is not unique to U.K. citizens. Many, if not most, American citizens, with no prior experience with the criminal justice system, finding themselves in Hutchins' shoes, would also be unsure about the next steps. Hutchins' lack of familiarity with the process does not negate his ability to understand the *Miranda* rights read to him in English and that he read for himself. Critically, the record does not show that the FBI agents knew the difference between British law and

16

*Miranda* such that they used that knowledge to extract a *Miranda* waiver from Hutchins and get him to incriminate himself, or that they generally exploited Hutchins' foreign status or lack of familiarity with this country's criminal justice system to gain advantage over him. The only relevant evidence in the record is that they knew he was a U.K. citizen, and that alone is not enough to conclude that his waiver and statement were involuntary.

*Totality of Factors*

None of the above factors, considered alone or in their totality, suggests that Hutchins' waiver of his *Miranda* rights and subsequent statement were involuntary. On the contrary, I find that the government has met its burden of showing that Hutchins voluntarily waived his *Miranda* rights and voluntarily responded to the agents' interrogation.

Agents testified that they read Hutchins his *Miranda* rights from the Advice of Rights form (Ex. 9) and gave him the form, which he read and signed. The form is simple and clear, identifying each right individually instead of in paragraph form. Hutchins speaks, writes, reads, and understands English (his native language), and he was advised of his rights in English. Hutchins was twenty-three years old with a college education. The agents testified that Hutchins exhibited no signs of mental or physical impairment: he was lucid and mentally aware, asked clarifying questions and follow-up questions, made jokes, and was evasive at times.

Although initially handcuffed, Hutchins was not handcuffed during the interview. (Docket # 82 at 21.) The tone of the interrogation was professional and polite, even light-hearted at times. The agents did not shout, raise their voices, or threaten Hutchins. The interrogation was not unduly long, lasting less than two hours. (Ex. 1.) Hutchins was given food and water during the interview.

17

For all these reasons, I recommend that Hutchins' Motion to Suppress Statements be denied.

## 2.   *Motion to Dismiss for Failure to State Offenses*

Hutchins moves to dismiss the first superseding indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b). In this motion, Hutchins contends that (1) Counts One and Seven fail to allege any facts that show he intended to cause "damage" to a computer within the meaning of the Computer Fraud and Abuse Act; (2) Counts One through Six do not state an offense because software such as Kronos and UPAS Kit is not an "electronic device" within the meaning of the Wiretap Act; and (3) Counts One, Four through Eight, and Ten do not allege the necessary intent and causation required to prove a conspiracy. For the following reasons, I recommend that Hutchins' motion to dismiss for failure to state offenses be denied.

### 2.1.   *Analysis*

#### *Applicable Law*

Federal Rule of Criminal Procedure 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including "failure to state an offense" under Rule 12(b)(3)(B)(v). Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is sufficient if it: (1) states the elements of the offense charged; (2) fairly informs the defendant of the nature of the charge so that he may prepare a defense; and (3) enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *See United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2010); *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

Once the elements of the crime have been specified, an indictment need only provide enough factual information to enable a defendant to identify the conduct on which the government intends to base its case. *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003). "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Id.* (internal citation omitted). The indictment need not "exhaustively recount the facts surrounding the crime's commission." *United States v. Agostino*, 132 F.3d 1183, 1189, 1191 (7th Cir. 1997). Simply tracking the language of the charging statute will generally suffice. *White*, 610 F.3d at 958–59.

This pleading standard is different than the civil pleading standard under Federal Rule of Civil Procedure 12(b)(6). In *Vaughn*, the Seventh Circuit expressly declined to adopt the civil pleading standards when analyzing the sufficiency of a criminal indictment. 722 F.3d at 926. Importantly, the indictment need not allege sufficient facts from which a jury could find guilt, as long as the government could conceivably produce such evidence at trial. *See United States v. Castor*, 558 F.2d 379, 384 (7th Cir. 1977); *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004). "While there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *Vaughn*, 722 F.3d at 925 (quoting *White*, 610 F.3d at 958–959).

On a pretrial motion to dismiss, an indictment "is reviewed on its face, regardless of the strength or weakness of the government's case." *White*, 610 F.3d at 958. A defendant may not, via pretrial motion, challenge the sufficiency of the government's proof. *See United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) ("A motion to dismiss is not intended to be a 'summary trial of the evidence.'"). The court dismisses an indictment only if the government's

19

inability to prove its case appears convincingly on the face of the indictment. *Castor*, 558 F.2d at 384.

The Seventh Circuit has recognized one such narrow set of circumstances in which an indictment that is facially sufficient may nevertheless be dismissed: where the parties have agreed to a set of undisputed facts outside the indictment and the only question remaining is one of law. *United States v. Risk*, 843 F.2d 1059, 1060 (7th Cir. 1988).

*Application to This Case*

I note at the outset that the indictment is facially sufficient. The language of each count provides the date of the alleged violation, the elements of the violation in language closely tracking the statue, and a citation to the statute. Each count clearly states the elements of the offense, notifies Hutchins of the violations of which he is accused, and would protect him from double jeopardy. Thus, the indictment meets the requirements for facial validity articulated in *Vaughn*.

Hutchins does not argue otherwise. Rather, he argues that the indictment should nevertheless be dismissed for failure to state an offense. Hutchins relies on *Risk* and argues that *Risk* stands for the proposition that "[a] court must dismiss the indictment when the allegations in the indictment fail to state an offense." (Docket # 95 at 3.) He asserts that the indictment should be dismissed because "the allegations in the first superseding indictment do not establish Mr. Hutchins' commission of the offenses charged in Counts One through Eight and Ten." (Docket # 95 at 14.)

Hutchins misconstrues *Risk* and the standard for dismissing an indictment. *Risk* did not concern the allegations in the indictment, but undisputed facts outside the indictment. In *Risk*, there was explicit agreement between the parties that the transactions in question were

each less than $10,000. The only question remaining was a legal one: whether those transactions could be considered cumulatively under a statute that applied to transactions over $10,000. *Risk* does not, as Hutchins claims, require an indictment to contain allegations that alone establish commission of the charged offenses. As the Seventh Circuit made clear in *Vaughn*, the pleading standards in civil complaints do not apply to criminal indictments. The indictment need not allege facts sufficient to find guilt. Dismissal is appropriate only when there is no possibility the government could present such evidence.

Hutchins cites no case to support his reading of *Risk*. On the contrary, courts in this district have been careful to cabin the reach of *Risk* to that narrow subset of cases in which there are undisputed facts outside the indictment such that there is no possibility the government could produce evidence that would change the legal outcome. *See United States v. Hamzeh*, No. 16-CR-21, 2018 WL 1905806 at *3–6 (E.D. Wis. Apr. 23, 2018); *United States v. Brown*, 14-CR-82, 2015 WL 269205 at *3, *8–11 (E.D. Wis. Jan. 21, 2015); *United States v. Romo*, No. 06-CR-335, 2007 WL 3026717 at *2 n.3 (E.D. Wis. Oct. 16, 2007); *United States v. Doyle*, No. 06-CR-224, 2007 WL 542138, *6 n.5 (E.D. Wis. Feb. 16, 2007); *United States v. Kalkounos*, No. 06-CR-102, 2006 WL 2076587 (E.D. Wis. July 24, 2006). As the Seventh Circuit made clear in *Vaughn*, the pleading standards in civil complaints do not apply to criminal indictments.

In Hutchins' case, there are no undisputed facts on which the court could make a finding as a matter of law. There are only allegations in an indictment, and "an indictment is not evidence of the charges contained in it." *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995). With the correct standard in mind, I will address each of the arguments in Hutchins' motion.

Hutchins challenges Counts One and Seven of the indictment arguing that the facts alleged in the indictment do not indicate that Hutchins caused "damage" or intended to cause "damage" as required to establish a violation under 18 U.S.C. § 1030(a)(5)(A).

Count One of the indictment alleges that "[b]etween in or around July 2012 and September 2015, in the state and Eastern District of Wisconsin," Hutchins "knowingly conspired and agreed with Individual A . . . to:

> (a)     knowingly cause and aid and abet the transmission of a program, information, code, and command, and as a result of such conduct, intentionally cause damage without authorization, to 10 or more protected computers during a 1-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), (c)(4)(B)(i) and (c)(4)(A)(i)(VI) and 2;

Count Seven uses similar language to charge Hutchins with doing what Count One charges him with conspiring to do:

> On or about June 11, 2015, in the state and Eastern District of Wisconsin and elsewhere, MARCUS HUTCHINS, aka "Malwaretech," aka "irp@jabber.se," knowingly caused and aided and abetted the transmission of a program, information, code, and command and as a result of such conduct, attempted to cause damage without authorization, to 10 or more protected computers during a 1-year period. In violation of Title 18, United States Code, Sections 1030(a)(5)(A), (c)(4)(B)(i) and (ii), (c)(4)(A)(i)(VI), 1030(b), and 2. (Docket # 86 at 12.)

Both counts repeat almost verbatim the language of the cited statutes and clearly meet the standard for sufficiency on their face.

Hutchins argues that these counts nevertheless fail to state an offense because the indictment fails "to allege any facts that would show Mr. Hutchins had any intent to cause 'damage' to a protected computer within the meaning of the statute." (Docket # 98 at 1.) Hutchins seizes on the description of the Kronos software offered by the government in the "Relevant Terms" section of the indictment, which says that Kronos "recorded and

exfiltrated" data. (Docket # 86 at 1(e).) Hutchins argues that "recorded and exfiltrated" does not fit the statutory definition of "damage," defined by § 1030(e)(8) as "any impairment to the availability or integrity of data, a program, a system, or information."

Hutchins ignores that the indictment itself describes Kronos and UPAS Kit as "malware," which it defines as "malicious computer code intended to damage a computer." (*Id.* at 1(d)–(f).) That is sufficient to allege intent to cause damage. The crux of Hutchins' argument is that the government cannot prove this. But that is a question of fact reserved for the jury, not a question of law as framed by Hutchins. "A motion to dismiss is not intended to be a 'summary trial of the evidence.'" *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) (quoting *United States v. Winer*, 323 F. Supp. 604, 605 (E.D. Pa. 1971)). The question of Hutchins' intent is necessarily one of fact, proper for the jury, not this court.

*"Device" Under the Wiretap Act*

Hutchins urges dismissal of Counts One through Six because neither the Kronos nor the UPAS Kit software is an "electronic, mechanical, or other device" under the Wiretap Act. (Docket # 95 at 6–9.) Hutchins argues that the Wiretap Act's definition of this phrase, "any device or apparatus which can be used to intercept a wire, oral, or electronic communication," does not include software because software is not within the ordinary meaning of "device."

As noted above, it is not appropriate to dismiss criminal indictments without undisputed facts supporting the conclusion that a jury trial is unnecessary. While the indictment briefly defines Kronos and UPAS Kit, the details of their functions and their relationships to more traditional "devices" such as computers will be a matter for the jury. In the absence of more details, it is unwarranted at this stage to evaluate whether they alone qualify as "devices" or to assume that the government could not produce evidence that

23

Hutchins did in fact use an indisputable "device" of some kind, if not the software itself than a computer or some other device.

While it is sufficient at this juncture that the indictment tracks the statutory language, I will briefly address the two cases cited by Hutchins. In *United States v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010), the Seventh Circuit simply did not address the question of whether software qualifies as a "device." In fact, the case does not mention the word "software" at all. Hutchins would have the court infer that the Seventh Circuit's absence of discussion about software is tantamount to a holding that software is not a "device" under the Wiretap Act. While such a conclusion might be consistent with the holding, it is manifestly not part of the holding of *Szymuszkiewicz*.

The other case Hutchins offers, *Potter v. Havlicek*, No. 06-CV-211, 2008 WL 2556723 (S.D. Ohio June 23, 2008), is of no help to Hutchins, either. In *Potter*, the plaintiff had been sued by two women, including his ex-wife, who argued that he used the "Activity Monitor" software on his home computer to intercept their communications unlawfully. Havlicek sued the manufacturer of the software, alleging that it sold the software knowing that its primary use by the purchaser would be to surreptitiously intercept electronic communications in violation of 18 U.S.C. § 2512, and that he was entitled to civil recovery pursuant to 18 U.S.C. § 2520. The Southern District of Ohio dismissed the complaint on the basis that the statute did not provide for a private cause of action for violation of § 2512, and even if it did, Havlicek did not have standing to bring such a claim. *Id.* at *4–8. Only then did the court note that, even if there were a private cause of action and Havlicek had standing to sue, "the manufacture and distribution of Activity Monitor is not proscribed by section 2512" because "the definition of the word 'device' does not encompass software such as Activity Monitor."

24

*Id.* at *8–9. That determination was specific to the facts of that case, which were not analogous to the Hutchins' case in important ways. And even *Potter* did not issue a blanket statement that software could never qualify as a "device," only that it did not in this case and no court had found that it did.

Furthermore, there are reasons to doubt such a strict interpretation of the Wiretap Act would be warranted even if this court were to undertake such an interpretation. Determining that the Wiretap Act could never apply to software would require the court to overlook the notably broad language of the Wiretap Act, which was to generally prohibit unauthorized artificial interception of communication in an era of changing technologies, in favor of a hyper-technical reading of the statute. It would also require the court to adopt a very restrictive definition of "electronic, mechanical, or other device" that may not comport with legislative intent, the ordinary meaning of those words, or the (scant) existing case law. *Cf. Luis v. Zang*, 833 F.3d 619 (6th Cir. 2016); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015).

Therefore, it would be inappropriate to dismiss the indictment on the basis that Kronos and UPAS Kit are not "devices" within the meaning of the Wiretap Act. There is simply no authority for the argument that software cannot constitute a "device" within the meaning of the Wiretap Act, and even if there were, there are simply not sufficient facts before the court to determine that Hutchins did not violate the Wiretap Act using some "device" in connection with Kronos and UPAS Kit.

*Intent and Causation*

Hutchins argues that Counts One, Four through Eight, and Ten do not allege the necessary intent and causation to state the offenses. (Docket # 95 at 11–14.) Hutchins argues that the indictment "conflates [Hutchins'] alleged selling of the software with a specific intent

25

for buyers to commit an illegal act with the software. There is no allegation that Mr. Hutchins . . . intended any specific result to occur because of the sales. . . . Merely writing a program and selling it—when any illegal activity is up to the buyer to perform—is not enough to allege specific intent by Mr. Hutchins." (*Id.* at 95.)

Here again, Hutchins tries to impose a standard for civil pleading on a criminal indictment. The language about intent and causation tracks the statutory elements, and that is all that is required in an indictment. Hutchins' alleged intent in selling the software is a matter of fact to be determined by the trier of fact. The court cannot conclude that Hutchins had no criminal intent, or that the government could never prove that he did, solely based on the allegations in the indictment. This, too, is a matter for a jury.

The indictment sets forth the charges in language closely tracking the relevant statutes and is facially sufficient. It adequately states the offenses charged, none of which can be dismissed as a matter of law without reference to facts that are the province of a jury. For the foregoing reasons, I recommend that Hutchins' Motion to Dismiss for failure to state offenses be denied.

### 3. *Motion to Dismiss Counts Two and Three as Multiplicitous*

Count Two charges Hutchins with a violation of 18 U.S.C. §§ 2512(1)(c)(i), and 2. Count Three charges Hutchins with violations of 18 U.S.C. §§ 2512(1)(c)(ii), and 2. Hutchins argues that these counts are multiplicitous and as a result Count Three must be dismissed. (Docket #95 at 11.)

Multiplicity is the charging of a single offense in separate counts of an indictment. *United States v. Starks*, 472 F.3d 466, 468–69 (7th Cir. 2006) (internal citation omitted). Multiplicity in an indictment violates the Double Jeopardy Clause of the Fifth Amendment

by "exposing a defendant to the threat of receiving multiple punishments for the same offense." *Id*. The test for multiplicity is whether each count requires proof of a fact that the other does not. *Id*. (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). If a single element is needed to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity. *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002) (internal citation omitted). The multiplicity test focuses on the statutory elements of the offenses being charged, not the proof offered to establish them. *Id*. (internal citation omitted).

In this case, § 2512(1)(c) provides in relevant part:

(1) Except as otherwise specifically provided in this chapter, any person who intentionally—

(c) places in any newspaper, magazine, handbill, or other publication or disseminates by electronic means any advertisement of—

(i) any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications; or

(ii) any other electronic, mechanical, or other device, where such advertisement promotes the use of such device for the purpose of the surreptitious interception of wire, oral, or electronic communications,

knowing the content of the advertisement and knowing or having reason to know that such advertisement will be sent through the mail or transported in interstate or foreign commerce,

shall be fined under this title or imprisoned not more than five years, or both.

Sections 2512(1)(c)(i) requires (1) knowledge, or reason to know, that (2) the device advertised was *designed to be primarily useful for* surreptitious interception. Section 2512(1)(c)(ii) requires neither of these. Section 2512(1)(c)(ii), on the other hand, requires that the advertisement promote (1) any "other" device (2) *for the purpose of* surreptitious interception. The first section

27

requires neither. Because each charge requires elements that are not required for the other, these are not multiplicitous on their face.

When viewed from the perspective of legislative intent and policy, this reading of the statute makes sense. Section 2512 was intended primarily to prohibit *per se* wiretapping or eavesdropping devices. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 94–95, reprinted in 1968 U.S.Code Cong. & Ad.News 2112, 2183 ("The prohibition will thus be applicable to, among others, such objectionable devices as the martini olive transmitter, the spike mike, the infinity transmitter, and the microphone disguised as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler or cigarette pack."). Nevertheless, Congress was also concerned about curtailing wiretapping using devices that might have other legitimate uses. *See id.* at 2183. Section 2512(1)(c)(ii) encompasses advertisement of *other* devices, not specifically designed for surreptitious interception, when the advertising promotes the device's wiretapping capabilities. *See, e.g., United States v. Bast*, 495 F.2d 138 (D.C. Cir. 1974) (finding that 2512(1)(c)(ii) could encompass a brochure advertising that a miniature tape recorder "secretly tapes a conversation, interview, conference or lecture" and that its extreme sensitivity is useful for "secret intelligence investigation"). In summary, because the provisions apply to two different types of devices, have different *mens rea*, and thus require proof of unique facts, charging under both is not multiplicitous. Therefore, I recommend that the motion to dismiss for multiplicity be denied.

### 4. *Motion to Dismiss Count Seven*

Count Seven charges that Hutchins "knowingly caused and aided and abetted the transmission of a program, information, code, and command and as a result of such conduct, attempted to cause damage without authorization, to 10 or more protected computers during

a 1-year period," in violation of 18 U.S.C. §§ 1030(a)(5)(A), (c)(4)(B)(i) and (ii), (c)(4)(A)(i)(VI), 1030(b), and 2. Hutchins moves to dismiss this count for a "grand jury defect," but the motion makes what is essentially a sufficiency argument: that Count Seven is defective because it does not track the *mens rea* in the statute. (Docket # 92.)

As noted earlier, the Seventh Circuit has held that the Constitution mandates three minimum requirements for an indictment: First, it must adequately state all of the elements of the crime charged; second, it must inform the defendant of the nature of the charges so that he may prepare a defense; and finally, the indictment must allow the defendant to plead the judgment as a bar to any future prosecution for the same offense. *Vaughn*, 722 F.3d at 925; *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). An indictment is generally sufficient if it "tracks" the words of the statute itself, "so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Smith*, 230 F.3d at 305. An indictment must provide the defendant with some means of "pinning down the specific conduct at issue," but the absence of any particular fact is not necessarily dispositive, and indictments are reviewed "on a practical basis and in their entirety, rather than in a hypertechnical manner." *Id.* (internal citations omitted).

In this case, 18 U.S.C. § 1030(a)(5)(A) applies to one who "intentionally causes damage without authorization." Count Seven charges that Hutchins "attempted to cause damage without authorization." Hutchins argues that this count fails to plead an essential element of the offense, namely that the damage be "intentional." The government responds, in essence, that because Count Seven charges Hutchins with an *attempt* to violate § 1030(a)(5)(A), it need not separately allege intentionality. Count Seven also cites to § 1030(b), which specifically prohibits attempts to violate § 1030(a).

To prove an attempt to violate § 1030(a)(5)(A), the government must prove that (1) Hutchins knowingly took a substantial step toward committing a violation of § 1030(a)(5)(A) and (2) that he did so with the intent to violate § 1030(a)(5). *Seventh Circuit Pattern Jury Instruction 4.09*. Accordingly, although Hutchins is correct that §1030(a)(5) does require that the damage be intentional, he is incorrect that the charge does not allege intentionality. It alleges an attempt, and intentionality is a necessary component of an attempt. In other words, the phrase "intentionally attempted" would be redundant.

Because Count Seven, read practically and not in a hyper-technical manner, sets forth the elements of an attempt to violate § 1030(a)(5), it is sufficient. I therefore recommend that Hutchins' motion to dismiss Count Seven be denied.

### 5.  *Motion to Dismiss for Improper Extraterritorial Application of Law*

In this motion, Hutchins moves to dismiss on three grounds. First, Hutchins argues that Congress has not indicated that the Wiretap Act applies outside of the United States. Second, Hutchins argues that the prosecution violates Hutchins' due process rights as to Counts One through Eight and Ten because he had no substantial nexus with the United States during the time period covered by the indictment. Third, Hutchins argues that Count Nine, which charges a violation of 18 U.S.C. § 1001, should be dismissed because the FBI did not have jurisdiction over the alleged offenses that were the subject of the allegedly false statement. (Docket # 96.)

I begin with Hutchins' argument that the motion should be dismissed because the Wiretap Act does not apply extraterritorially. Hutchins is correct that congressional legislation is presumed to apply only within the territorial jurisdiction of the United States unless Congress has clearly expressed a contrary intent. *United States v. Dawn*,129 F.3d 878,

882 (7th Cir. 1997). But in this case, the indictment does not attempt to apply the Wiretap Act extraterritorially. On the contrary, Counts One through Eight and Ten all charge Hutchins with illegal acts "in the state and Eastern District of Wisconsin and elsewhere." Even more specifically, Count One alleges various acts in furtherance of a conspiracy resulting in the sale of UPAS Kit and Kronos to individuals in the Eastern District of Wisconsin.

Of course, Hutchins is correct that an offense cannot be prosecuted anywhere in the world just because it involves the Internet. (Docket # 105 at 5.) But the indictment does not do that. On the contrary, it alleges that relevant events occurred in the state and Eastern District of Wisconsin. Whether the government will be able to prove that is a question for another day. At this juncture, it is sufficient that the indictment alleges that the violations occurred within the state and Eastern District of Wisconsin. No more is required.

Even if some of the alleged conduct took place outside the United States, that need not result in extraterritorial application of U.S. law. In *United States v. Leija-Sanchez I*, 602 F.3d 797, 800 (7th Cir. 2010) the Seventh Circuit found that the RICO statute was not applied extraterritorially where although the killing occurred abroad, the planning and payment occurred in the United States. Hutchins distinguishes *Leija-Sanchez* and argues that "it did not involve a situation like this case, in which the government is prosecuting a foreign national residing in another country whose alleged acts were preformed abroad." (Docket #105 at 10.) Hutchins' argument disregards that, on its face, the indictment alleges conduct occurring "in the state and Eastern District of Wisconsin and elsewhere." For the indictment to run afoul of extraterritoriality, it would need to allege conduct occurring solely abroad. It does not.

31

Because on its face the indictment alleges conduct in the United States, I find it unnecessary to address whether the Wiretap Act applies extraterritorially.

Next, Hutchins argues that counts One through Eight and Ten should be dismissed because their extraterritorial application violates Hutchins' Fifth Amendment right to due process. (Docket #105 at 96.) As discussed above, the indictment alleges violations occurring in the state and Eastern District of Wisconsin and elsewhere. Accordingly, the indictment does not contemplate extraterritorial application of U.S. law, and Hutchins' due process claim fails.

Finally, Hutchins challenges Count Nine, which charges Hutchins with lying to the FBI. Hutchins argues that the FBI had "no power to exercise authority against Hutchins based on his conduct abroad that had no substantial nexus to the U.S." (Docket # 105 at 17.) This argument, too, is premised on the claim rejected above that the indictment charges Hutchins for conduct committed abroad. The FBI was investigating violations of federal law pursuant to an indictment alleging acts in the state and Eastern District of Wisconsin. Thus, the questioning of Hutchins was within its jurisdiction.

In sum, because on its face the indictment alleges that Hutchins committed overt acts in furtherance of a conspiracy and substantive offenses in this district, it does not contemplate extraterritorial application of U.S. laws and does not violate due process. For these reasons, I recommend that this motion be denied.

6.    *Motion for Bill of Particulars*

Counts Seven and Eight of the first superseding indictment charge Hutchins with violating the Computer Fraud and Abuse Act. Hutchins moves for a bill of particulars as to these counts. (Docket # 93.) Specifically, Hutchins asks that the government be required to

particularize (1) the purported "damage the government intends to offer into evidence at trial in connection with Counts One and Seven"; (2) the alleged "10 or more protected computers" to which Hutchins allegedly conspired, caused, and aided and abetted another to cause "damage" as to Counts One and Seven; and (3) the purported computers that Hutchins allegedly conspired and aided and abetted another to intentionally access without authorization in Counts One and Eight.

Federal Rule of Criminal Procedure 7(f) authorizes the court to order the filing of a bill of particulars to fill in facts in the indictment so that the defendant can prepare an adequate defense. *See United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981). A bill of particulars is "a more specific expression of the activities the defendant is accused of having engaged in which are illegal." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991). A bill of particulars is required only where the charges in the indictment are so general that they do not advise the defendant of the specific act of which he is accused. *See id.*

The test for determining whether a bill of particulars should be granted is similar to the test for determining the general sufficiency of the indictment, namely, "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *Fassnacht*, 332 F.3d at 446 (quoting *Kendall*, 665 F.2d at 134); *Canino*, 949 F.2d at 949. An indictment that includes each of the elements of the offense charged, the time and place of the accused's conduct that constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test. *Kendall*, 665 F.2d at 134. A bill of particulars is not required when a defendant can obtain the information necessary for his or her defense through "some other satisfactory form." *Fassnacht*, 332 F.3d at 447, n.2 (quoting *Canino*, 949 F.2d at 949). The Seventh Circuit

33

has held that the government's "open file" policy is an adequate "satisfactory form" of information retrieval, making a bill of particulars unnecessary. *Canino*, 949 F.2d at 949.

Hutchins has not shown that a bill of particulars is necessary to sufficiently inform him of what "damage" the government alleges. Contrary to Hutchins' argument that the indictment does not allege damage, as discussed above, Counts One and Seven explicitly allege that Hutchins acted with the intent to cause damage. Furthermore, the superseding indictment defines "malware" as "malicious computer code intended to damage a computer." (Docket # 86 at (1d)). It further states that malware "deletes, creates, and modifies files on a computer and allows unauthorized access to a protected computer." *Id*. This paragraph answers Hutchins' question of "*what* was allegedly the 'damage.'" (Docket# 93 at 6.) Hutchins may disagree with the government that Kronos and UPAS Kit cause "damage," but that is a matter for the jury. It does not warrant a bill of particulars.

Similarly, Hutchins has not shown that particularization of the ten or more computers is warranted. Hutchins is correct that the superseding indictment does not identify the computers at issue. But it does not have to. It does inform Hutchins of the time and place, the elements of the charges, and the statutes allegedly violated. This is sufficient to inform Hutchins of the charges and protect him from double jeopardy. Moreover, as to both the damage and the computers, the government's open-file policy defeats the need for a bill of particulars. Hutchins is entitled to know the nature of the charges against him, but he is not entitled to know how the government intends to prove its case at trial. Hutchins' motion for a bill of particulars is therefore denied.

34

## 7. Motion to Compel

I previously ordered the disclosure of the identity of a confidential source, "Randy," thirty days before trial. (Docket # 50.) I reasoned that "Randy" was closer to a transactional witness rather than a tipster and that disclosure thirty days prior to trial was sufficient to allow Hutchins to investigate and prepare his defense. In light of the superseding indictment, Hutchins asks the court to reconsider and order immediate disclosure of "Randy's" identity. I decline to do so.

First, although I am mindful that the defense needs "Randy's" identification to conduct its own investigation, this is not a case where the defense has not been provided any materials as to the confidential informant. As previously discussed at the conference on the original motion, the government has produced the following discovery as it relates to "Randy": (1) A proffer letter between the informant and the government; (2) online chats between a government cooperator and "Randy" regarding the sale of stolen credit card numbers; (3) "chats between ["Randy"] and Hutchins regarding Hutchins' involvement in [criminal conduct]"; and (4) a redacted FBI 302 report. (Docket # 45 at 8.) So while the government has not revealed the informant's identity, it has already provided significant relevant information. Second, the thirty-day disclosure deadline ordered here is well in line with the common practice in this district for complex cases like this one. *See, e.g., United States v. Tirado*, No. 16-CR-168, 2018 WL 3245204 (E.D. Wis. Jan. 26, 2018); *United States v. Gould*, No. 16-CR-77, 2017 WL 394504 (E.D. Wis. Jan. 27, 2017); *United States v. Wortham*, No. 14-CR-84, 2014 WL 5431110 (E.D. Wis. Oct. 24, 2014); *United States v. Bond*, No. 10-CR-117, 2010 WL 6749142 (E.D. Wis. Dec. 6, 2010); *United States v. Mathis*, No. 09-CR-254, 2010 WL 1507881 (E.D. Wis. Apr. 14, 2010).

Accordingly, Hutchins' motion to compel immediate disclosure of "Randy's" identity is denied.

**NOW, THEREFORE, IT IS ORDERED** that Hutchins' Motion for Bill of Particulars of March 30, 2018 (Docket # 54) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Hutchins' Motion to Compel (Renewed) of May 4, 2018 (Docket # 73) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Hutchins' Motion for Bill of Particulars of July 13, 2018 (Docket # 93) is **DENIED**.

**IT IS FURTHER ORDERED** that Hutchins' Motion to Compel of July 13, 2018 (Docket # 94) is **DENIED**.

**IT IS FURTHER RECOMMENDED** that Hutchins' Motion to Suppress of March 30, 2018 (Docket # 55) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Hutchins' Motion to Dismiss for Failure to State Offenses of March 30, 2018 (Docket # 56) be **DENIED AS MOOT**.

**IT IS FURTHER RECOMMENDED** that Hutchins' Motion to Dismiss Count Seven of July 13, 2018 (Docket # 92) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Hutchins' Motion to Dismiss for Failure to State an Offense and Multiplicity of July 13, 2018 (Docket # 95) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Hutchins' Motion to Dismiss for Improper Extraterritorial Application of Law of July 13, 2018 (Docket # 96) be **DENIED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be

filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 26th day of October, 2018.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge