UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

                                   Case No. 17-CR-124-JPS

      v.

MARCUS HUTCHINS,

          Defendant.

## DEFENDANT MARCUS HUTCHINS' OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER AND RECOMMENDATIONS (DKT. NOS. 108-09)

       The Court should decline to adopt the magistrate judge's recommended denial of defendant Marcus Hutchins' three motions to dismiss and motion to suppress, all of which are subject to *de novo* review.[1] (*See* Dkt. No. 109; Fed. R. Crim. P. 59(b)(3).)[2] As discussed in detail below, each of the motions should be granted for a number of compelling reasons.

---

[1] The magistrate judge also ordered denial of Mr. Hutchins' motion for a bill of particulars and renewed motion to compel. Mr. Hutchins is not challenging those orders. That said, he reserves his right to renew the motion to compel as the case proceeds based on new circumstances that may arise.

[2] The magistrate judge's "Order and Report and Recommendation on Defendant's Pretrial Motions" is found at docket entries 108 and 109. The document is identical at both docket entries, but 108 is labeled "Order" and 109 is labeled "Report and Recommendation." Mr. Hutchins objects to both the order and recommendation here.

## STANDARD OF REVIEW

A party may object to a magistrate judge's report and recommendation on a dispositive matter and/or a motion seeking suppression of evidence. Fed. R. Crim. P. 59(b)(2). The district court reviews *de novo* the recommendations of the magistrate judge to which a party makes timely objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(3). The court may "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3).

## GENERAL BACKGROUND

On August 2, 2017, Mr. Hutchins was sitting in an airport lounge in Las Vegas waiting to fly home to the United Kingdom after a long week of partying until the wee hours. He had been in town for a cybersecurity conference. At the time, he was a 23-year-old worldwide hero renowned for his pivotal role in stopping the "WannaCry" ransomware attack just three months before in May 2017. WannaCry infected hundreds of thousands of computers in over 150 countries, including in hospitals, banks, government agencies, and major companies. Mr. Hutchins, a malware analysis expert, had discovered a kill switch in WannaCry that shut down the ransomware and kept it from spreading further. White House Homeland Security Advisor Tom Bossert would later laud

2

Mr. Hutchins for his role in halting the attack, which the United States has attributed to North Korea.[3]

But that day in the airport lounge, an FBI agent from the Eastern District of Wisconsin arrested Mr. Hutchins on an arrest warrant flowing from a six-count indictment returned in this district. The indictment, returned a few weeks before Mr. Hutchins' arrest, alleged a variety of computer-related crimes tied to the "Kronos" malware dating from approximately July 2014 to July 2015, when Mr. Hutchins was 20 to 21 years old. Mr. Hutchins was charged with a co-defendant whose name was redacted.

Immediately after his arrest, that FBI agent and another one from this district interrogated Mr. Hutchins. The agents audiotaped the interrogation, but only in part: the recording starts while the interrogation is already in progress. The government claims that at the beginning of the interrogation, and prior to recording, the agents advised Mr. Hutchins of his Miranda rights and that he waived them.[4]

---

[3] Kevin Collier, *Words of Praise But No Forgiveness for Hacker Who Stopped North Korean Cyberattack*, BUZZFEED NEWS, Dec. 19, 2017, https://www.buzzfeed.com/kevincollier/words-of-praise-but-no-forgiveness-for-hacker-who-stopped?utm_term=.lykQGxXww#.bx7mkyRgg. *See also* Dep't of Justice, *North Korean Regime-Backed Programmer Charged With Conspiracy to Conduct Multiple Cyber Attacks and Intrusions* (Sept. 6, 2018), https://www.justice.gov/opa/pr/north-korean-regime-backed-programmer-charged-conspiracy-conduct-multiple-cyber-attacks-and.

[4] In doing so, the DOJ stressed the global damage caused by WannaCry before Mr. Hutchins effectively halted it: "WannaCry 2.0 infected hundreds of thousands of computers around the

3

After pleading not guilty, Mr. Hutchins filed a number of pretrial motions. Specifically, he filed a motion to compel (which was granted in part), a motion to suppress, three motions to dismiss, a renewed motion to compel (which related to a portion of the prior motion to compel that was denied), and a motion for a bill of particulars. (Dkt. Nos. 44, 54-58, and 73.)[5]

*After* the May 16, 2018 evidentiary hearing on the motion to suppress but *before* the magistrate judge ruled on the motions to dismiss, the motion to suppress, the motion for a bill of particulars, and the renewed motion to compel, the government sought and received from the grand jury on June 5, 2018 a ten-count superseding indictment.

The superseding indictment, which dropped the co-defendant for unknown reasons, now alleges Mr. Hutchins committed various computer-related crimes from July 2012 through September 2015. The superseding indictment continues to contain criminal charges related to Kronos, but it also goes further back into time to allege Mr. Hutchins committed computer-related crimes when he was an 18- to 19-year-old youth. These charges relate to another type of alleged malware called "UPAS Kit."

---

world, causing extensive damage, including significantly impacting the United Kingdom's National Health Service." *North Korean Regime-Backed Programmer Charged*, *supra* note 3.

[5] The government's various oppositions and the defense replies and related memoranda are not cited.

As a result of the superseding indictment, the defense had to re-configure and re-file the motions that are the subject of this objection on July 27, 2018, with the exception of the motion to suppress.

Due to his pretrial release conditions, Mr. Hutchins now resides in Los Angeles and is able to continue only a reduced amount of his valuable and much-lauded cybersecurity work—the need for which has only increased as cyberattacks continue around the world. Notably, soon after his arrest and despite that fact, Mr. Hutchins voluntarily agreed to assist U.S. law enforcement investigating WannaCry. On September 6, 2018, the Department of Justice unsealed criminal charges against a North Korean national who was allegedly involved in a number of destructive cyberattacks, including WannaCry.

## THE MOTION TO SUPPRESS

### A.    Introduction

The recommended denial of the motion to suppress is flawed for a number of reasons that flow from both its recitation of facts and the legal standard it applies. (*See* Dkt. No. 109 ("Rec.") at 3-11.) Mr. Hutchins' post-arrest statements should be suppressed, as well as any evidence that may have been obtained as a result of them.

The recommendation's recitation of facts is missing critical details and fails to consider important context. It over-simplifies what transpired and is mostly

5

based upon an uncritical recitation of the testimony of the government's witnesses, two FBI agents. The recommendation often overlooks or fails to consider evidence that contradicts or undercuts the agents' testimony. And the recommendation gives short shrift to exhibits, including the recorded portion of the post-arrest interrogation.

The legal standards the recommendation applies should also be found lacking. The recommendation does not rely on important caselaw that sheds light on how the agents' testimony should be evaluated and the motion decided.

These two important flaws—a faulty recitation of the facts and an incomplete and deficient application of the law—infect the entirety of the recommendation's analysis. When the facts and law are properly considered and applied, the recommendation should not be adopted and Mr. Hutchins' motion to suppress should be granted.

B. Background

Involved in the arrest and questioning of Mr. Hutchins at the Las Vegas airport were two FBI agents, Lee Chartier and Jamie Butcher. They are the same agents who testified at the evidentiary hearing on Mr. Hutchins' suppression motion.

At the outset, the Court should be aware that the agents coordinated their testimony. During the evidentiary hearing, Agent Butcher revealed what seems fair to label collusion: she and Agent Chartier got together during the pendency

6

of Mr. Hutchins' suppression motion to, in her words, "mak[e] sure that we were on—you know, that our facts were the same." (Transcript of Hearing ("Tr.") 112:4-5.) The magistrate judge's recommendation relies heavily on the agents' testimony, yet neglects to mention this admission by Agent Butcher.

The arrest was executed by Agent Chartier—who was casually dressed and wearing nothing identifying him as an FBI agent—and two uniformed customs agents as Mr. Hutchins sat in an airline lounge awaiting a flight home to the United Kingdom. (*Id.* 17:12-13; 18:10-12.) Mr. Hutchins had been in Las Vegas for over a week during DEF CON, an information security conference. Under those circumstances, Mr. Hutchins—a UK citizen—would have reasonably believed the agents wanted to speak to him about an issue related to his travels, his conduct while in Las Vegas, or even the WannaCry ransomware attack three months earlier for which he had gained global recognition.[6]

Indeed, the arrest plan was designed to confuse Mr. Hutchins. Agent Chartier testified that the original plan was to arrest Mr. Hutchins as he boarded his flight home. (*Id.* 65:8-13.) This plan—maximizing Mr. Hutchins' time experiencing normal travel—would have led Mr. Hutchins (or a reasonable

---

[6] There was unfortunate speculation floating around that Mr. Hutchins stopped the attack after he accidentally released the ransomware himself. This has since been refuted. As noted above, the United States attributed WannaCry to North Korea, and a North Korean national was subsequently charged with offenses stemming from that attack and others.

person in his shoes) to further miscomprehend the nature of and likely reason for his arrest.

The agents did not find Mr. Hutchins at the airport by accident. The FBI had conducted surveillance of him while he was in Las Vegas and was aware of his travel plans. (*Id.* 115:20-116:4.) Agent Butcher confirmed that even though an indictment had been returned weeks earlier, the agents chose not to arrest Mr. Hutchins until his scheduled departure from the U.S., at the end of his trip to Las Vegas. (*Id.*) The timing and manner of the arrest—which occurred after more than a week of partying, and at the airport with the involvement of uniformed custom officers—was meant to create confusion about what was really happening.

The morning of his arrest, the FBI started monitoring Mr. Hutchins at 6:44 a.m. when he was still at the Airbnb rental where he was staying, according to a surveillance log. (Ex. 14.) The log notes Mr. Hutchins' arrival at the airport (12:18 p.m.), time at the ticket counter (12:34 p.m.), approach to the TSA check point (12:39 p.m.), clearance through security (12:41 p.m.), entry to the lounge (12:49 p.m.), and presence in the airline lounge (12:56 p.m.). There, agents took him into custody (1:17 p.m.). (*Id.*)

Agent Chartier approached Mr. Hutchins as he sat in the airline lounge. Mr. Hutchins was not drinking alcohol, but he was exhausted from partying all

Case 2:17-cr-00124-JPS   Filed 11/09/18   Page 8 of 46   Document 111

week and staying up the night before until the wee hours, as he told the agents during questioning. (*See* Ex. 1 (Audio Recording): 17:26-18:13; 58:53-59:09.)

It should be noted that Agent Chartier conceded that during questioning, he only asked Mr. Hutchins at that time if he was drunk, a circumstance of real concern to the agent. (Tr. 65:11-25; 69:14-70:1.) But while Mr. Hutchins' non-alcoholic intoxication (like from drugs) would have been equally concerning, Agent Chartier chose not to inquire. (*Id.* 69:14-70:15.) Neither did Agent Butcher. (*Id.* 143:13-15.)

Agent Chartier also testified that he revealed to Mr. Hutchins that he was with the FBI while they were in the lounge. Agent Chartier testified that he told Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant just after Mr. Hutchins had been detained, when the agent and the customs officers took Mr. Hutchins from the lounge to a stairwell. (*Id.* 19:8-23.) But, by his own admission, Agent Chartier did not explain the charges or what was going on, despite Mr. Hutchins' numerous questions to that effect as they proceeded to the interrogation room. (*Id.* 19:25-20:4; 58:25-59:1.)

In addition, Agent Chartier claimed that after he escorted Mr. Hutchins to the interrogation room, he and Agent Butcher again advised Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant. (*Id.* 20:25-21:1.) Notably, the agents did not explain anything else. Agent Chartier acknowledged that Mr. Hutchins was not told that the arrest warrant flowed from an

9

indictment, much less that the indictment charged six felony offenses stemming from the development and sale of Kronos. (*Id.* 56:22-24.) Overall, the agents' testimony suggests that they intentionally kept Mr. Hutchins in the dark about what was happening for as long as possible (well over an hour into the interrogation, in fact). (*Id.* 56:14-24 and 58:16-59:8 (Chartier); 147:17-148:12 (Butcher).)

Further, although the agents tried to coordinate their testimony, Agent Butcher's testimonial account of these meaningful events was quite different from Agent Chartier's. She did not testify that Agent Chartier advised Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant. Only Agent Chartier makes this claim, one that is undermined by Agent Butcher and otherwise lacks any support in the record.

A lengthy portion of the interrogation was audio recorded. (Ex. 1.) But the agents did not record the part of the interview during which they—according to their testimony in defense of the statement's admissibility—purportedly advised of Mr. Hutchins of his Miranda rights, answered any questions he might have had, and had him sign a Miranda waiver form. (*Id.*)

Despite the fact that Mr. Hutchins was escorted out of the lounge at 1:17 p.m. and the audio recording of the interrogation started at approximately 1:18 p.m. (*see* Exs. 14 and 9), Agent Chartier claimed that he read Mr. Hutchins the Advice of Rights form (Ex. 9) and Mr. Hutchins read and signed it. (Tr. 24:25-

10

25:6.)  Although the form sets forth Miranda warnings and reflects Mr. Hutchins'
signature, the space designed to reflect the time those warnings were given
includes two crossed-out times (11:08 a.m. and 2:08 p.m.) and one uncrossed-out
time (1:18 p.m., which is only one minute after agents approached Mr. Hutchins
in the airline lounge).  (Ex. 9.)  Thus, the time at which Mr. Hutchins was advised
of his Miranda warnings is unclear at best.

A report Agent Butcher wrote five days after the interrogation provides no
support for the agents' claims.  It only generically states: "After being advised of
the identity of the interviewing Agents, the nature of the interview and being
advised of his rights, HUTCHINS provided the following information . . ."  (Ex.
13.)  The memorandum does not note the time that advisement was given.  (*Id.*)

The recorded portion of the questioning reflects a conversation-in-progress
with one of the agents asking to look at Mr. Hutchins' phones and any laptops in
his bags.  (Ex. 1.)  But Mr. Hutchins almost immediately asked, "Can you please
tell me what this about?"  To which, Agent Butcher responded, "We're going to
get to that." (*Id.* at 00:30-00:32)

But getting to "that" took a long time.  The arrest warrant (Ex. 12),
according to Agent Butcher, was only shown to Mr. Hutchins over an hour into
his interrogation.  (Tr. 148:2-12.)  Until then, as the audio recording reveals, Mr.
Hutchins had no idea that he had been formally charged in the Eastern District of
Wisconsin, the nature of the charges, or even why he was being interrogated.

11

Further, the only offense the warrant specifically references is a violation of 18 U.S.C. § 371, which the face of the warrant depicts in the vaguest of terms, suggestive of cheating on one's taxes: conspiracy to defraud the United States. (Ex. 12.)

The recorded portion of the statement captures the moment Mr. Hutchins learned of the arrest warrant.[7] Agent Chartier stated: "Okay. Well here's the arrest warrant. And just to be honest—if I'm being honest with you, Marcus. This has absolutely nothing to do with WannaCry." (Ex. 1 at 1:17:45-1:18:02.) Only now for the first would Mr. Hutchins (or a reasonable person in his shoes) have understood that was the case. Mr. Hutchins was never shown the indictment, nor did anyone explain the charges to him.

### C.    Legal Standard

The legal standard the recommendation lays out for evaluating the motion to suppress is accurate, as far as it goes. (*See* Rec. at 11.) But it is the law the magistrate judge does not cite or rely on that is the problem.

It is true the government bears the burden here, and the defense motion is centered around the confluence of three issues that, taken together, demonstrate Mr. Hutchins' post-arrest statements should be declared inadmissible. (*See id.* at

---

[7] As discussed above, according to Agent Chartier, he told Mr. Hutchins about the arrest warrant in the stairwell, although this testimony is suspect and should be rejected. (*See* Tr. 19:8-23.)

11.)  Specifically: (1) Mr. Hutchins did not understand the nature and posture of the investigation because the agents who arrested and interrogated him intentionally withheld that information, even after Mr. Hutchins made a number of specific inquiries seeking to understand why he was being interrogated; (2) Mr. Hutchins was running on little sleep at the tail-end of a week-long partying binge, about which the agents were on notice; and (3) the agents knew that Mr. Hutchins was a citizen of the United Kingdom—one having minimal prior contact with this country—where a defendant's post-arrest rights are very different than in the United States.[8]

The recommendation, however, fails to note that because Mr. Hutchins had been indicted prior to his interrogation, the magistrate judge was required to "indulge in every reasonable presumption against waiver" and the burden is on the government to overcome that presumption.  *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Colorado v. Connelly*, 479 U.S. 157, 169 (1986).  That did not happen here.  Rather, the recommendation's oversimplified and deficient recitation of the facts alone demonstrates she gave the benefit of any doubts to the government.

---

[8] The defense asks the Court to take judicial notice of what United Kingdom law requires, which was first discussed in the underlying motion to suppress.  (*See* Dkt. No. 55 at 8 fn. 1.) Specifically, the following caution is given upon arrest (though minor wording deviations are allowed): "You do not have to say anything. But it may harm your defence if you do not mention when questioned something which you later rely on in Court. Anything you do say may be given in evidence." Police and Criminal Evidence Act 1984 Code G ¶ 3.5, Revised Code of Practice for the Statutory Power of Arrest by Police Officers (revised July 2012), https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/117583/pace-code-g-2012.pdf.

**D.    Discussion**

The recommendation fails to adequately consider a substantial number of critical facts that support suppression.  And based on a failure to consider the case law discussed above, the recommendation fails to properly evaluate the evidence.

The recommendation recites a factual record beset by a problematic combination of the uncritical acceptance of the two agents' coordinated testimony and the failure to fully consider the partially recorded interrogation itself, plus other exhibits.  This undermines the legal analysis, which does not "indulge in every reasonable presumption against waiver."  *Brewer*, 430 U.S. at 404.

Coloring the agents' testimony is, of course, their pre-hearing collusion. As Agent Butcher revealed only on cross-examination, she and Agent Chartier got together to "mak[e] sure that we were on—you know, that our facts were the same."  (Tr. 112:4-5.)  The recommendation's description of Agent Butcher's admission attempts to neutralize its significance:

> Butcher testified that she did speak to Chartier about her preparation meeting with the prosecutors. (Tr. 111-112.)  She testified that in general she spoke about the interview and Miranda and that she wanted to make sure their facts were the same.  (Tr. 112.)

(*See* Rec. at 9.)  By stating things in that purely factual vein, the recommendation ignores the testimony's import.  "Mak[ing] sure [our] facts were the same" is a

14

problem, one suggesting the witnesses' synchronization of their testimony, a circumstance calling into question their entire characterization of events and suggesting that any benefit of any doubt the Court has regarding what happened should accrue to Mr. Hutchins' favor.

Not only was the agents' testimony problematic, as those examples show, but so is the recommendation's overview and analysis of the factual record for each of the grounds examined, namely Hutchins': (1) impairment; (2) agent-fueled confusion; and (3) status as a stranger in a strange land. Examples of those problems include:

- Example 1 (Impairment): Although the recommendation's recitation of facts concedes that Agent Chartier did not ask Mr. Hutchins if he had used drugs, it does not acknowledge that Agent Butcher did not ask, either. (*See* Rec. at 7.) Nor does the recommendation consider the agents' failure to inquire in its legal analysis of impairment. (*See id.* at 12-13.)

  The fact that the agents did not ask Mr. Hutchins about drug use is important and should have been factored into the analysis. After all, the agents abandoned their arrest plan and took Mr. Hutchins into custody sooner than planned based on the fear he might have a single sip of alcohol. (Tr. 65-67.) By their appropriate but myopic focus on alcohol, the agents left unexplored the equally concerning possibility that they were questioning a man impaired by the intake of mind-altering substances other than alcohol.

- Example 2 (Impairment): The recommendation's recitation of facts notes that Agent Chartier generally testified that, from his perspective, he thought Mr. Hutchins was in a good state of mind during questioning. (Rec. at 6.) But the recommendation fails to note that, on cross-examination, Agent Chartier acknowledged that he had no basis

15

for reaching this conclusion, since he had just met Mr. Hutchins for the first time that day. (Tr. 45:15-18.) So basically the agent's observation is not worthy of the import the recommendation gives it.

- <u>Example 3 (Deception)</u>: Although the recommendation notes towards its end that Mr. Hutchins had his handcuffs removed in the interrogation room, it does not factor this into how the agents might have deceived him into talking. (*See* Rec. at 17.) Rather, the recommendation notes that because he was handcuffed in the stairwell, this "would have put him on notice that he was under arrest." But by the same logic, uncuffing Mr. Hutchins at the start of questioning would put him on notice of the opposite (*i.e.*, if the use of cuffs communicates arrest, the removal of cuffs suggests a later freedom to leave).

- <u>Example 4 (Deception)</u>: The recommendation fails to consider an important statement Mr. Hutchins made on a post-interrogation call from jail about his confusion regarding the earlier questioning.[9] Specifically, Mr. Hutchins said: "So, I am not really sure what is going on, but I don't think it is shit I did in like 2005." (Ex. 10.) The Kronos-related charges in the original indictment alleged conduct occurring in 2014 and 2015. Mr. Hutchins' post-interrogation telephone conversation reflects his belief that he had been questioned about things different from the actual charges resulting in his arrest, and that he was still unsure what the charges stemmed from.

- <u>Example 5 (Deception)</u>: The recommendation abandons any critical role in examining the agents' testimony, accepting each agent at their word when they claimed that Mr. Hutchins received Miranda warnings and waived those rights prior to the recorded portion of the questioning.

As one example, the broader record suggests only one minute lapsed from the agents' initial contact with Mr. Hutchins in the airline lounge,

---

[9] The recommendation discusses Mr. Hutchins' post-questioning jail calls only when discussing foreign citizenship, citing it in that context as demonstrating why suppression was not merited. (*See* Rec. at 16.)

their escorting him to a stairway where they handcuffed him and shared certain information with him, and their escorting him to the interrogation room, where they removed his handcuffs. (*See* Exs. 14 and 9.) The recommendation's factual recitation shares that same timeline. (*See* Rec. 4 and 8.) But the recommendation does not so much as ponder, much less answer, how all described events transpired within a single minute. After all, Agent Chartier's own version of events involved walking Mr. Hutchins from the lounge to a stairwell; cuffing and engaging in stairwell conversation with Mr. Hutchins; and then walking Mr. Hutchins down to the interrogation room, getting settled there, and making introductions all before any administration of Miranda warnings would have occurred. (*See id.* at 4.) This supports the fact that Mr. Hutchins was not advised before questioning of his rights.

As another example, the agents advanced the theory that they administered Miranda warnings and obtained Mr. Hutchins' waiver prior to commencing interrogation, but the warnings and waiver were not recorded because Agent Butcher forgot to press "record" on the recording device. According to her testimony, she realized her mistake only after the interrogation was underway. But that innocent explanation invites a natural question, one the recommendation declines to ask and answer: if the agents meant to record the warnings and waiver but realized moments later that they had mistakenly failed to do so, they would have (and should have) taken a moment to re-advise and memorialize the warning and waiver on the recording.

- Example 6 (Deception): The recommendation overlooks that the facts it recites can be viewed as the agents designing an arrest plan intended to confuse Mr. Hutchins regarding the nature of law enforcement's interest in him.

  Agent Chartier testified that the original plan was to arrest Mr. Hutchins as he boarded his flight home. (Rec. at 3; Tr. 65:8-13.) By maximizing Mr. Hutchins' time experiencing normal travel, this would have led Mr. Hutchins to further miscomprehend the nature of and

17

likely reason for his arrest. Although the factual recitation does not note it, Agent Butcher testified that they knew of Mr. Hutchins' arrival to and weeklong presence in Las Vegas. Even though an indictment had been returned and arrest warrant issued, they chose not to arrest him then or any time before he was leaving. (Tr. 115:20-116:4.)

The agents arrested Mr. Hutchins at the last moment they deemed possible before he departed the country, which allowed Mr. Hutchins to believe that his detention was somehow related to his travels to Las Vegas, his conduct while there, or even WannaCry. The recommendation fails to acknowledge this, glossing over the agents' intentions.

- Example 7 (Deception): The recommendation downplays the significance of the agents' failure to advise Mr. Hutchins of the criminal charges he was facing despite his repeated inquiries about their nature. Although those facts are included in the factual recitation, the recommendation erroneously attaches no significance to them and their role in the broader voluntariness inquiry. (*See, e.g.*, Rec at 4.)

By his own admission, Agent Chartier did not explain the charges or what was going on in response to Mr. Hutchins' numerous inquiries in the hallway. (Tr. 19:25-20:4; 58:25-59:1.)[10] In addition, Agent Chartier claimed that after he eventually escorted Mr. Hutchins to the interrogation room, the agents again advised Mr. Hutchins that he was under arrest pursuant to a federal arrest warrant. (*Id.* 20:25-21:1.) But they did not explain anything else. Agent Chartier acknowledged that Mr. Hutchins was not told that the arrest warrant flowed from an indictment, much less that the indictment charged six felony offenses stemming from the development and sale of Kronos. (*Id.* 56:22-24.)

- Example 8 (Foreign Citizen): The recommendation acknowledges that Agent Chartier knew Mr. Hutchins had only been to the U.S. once, but fails to discuss that fact in the analysis of this factor. (*See* Rec. at 7.)

---

[10] The defense maintains that this testimony—namely, that Agent Chartier mentioned an arrest warrant to Mr. Hutchins—is inconsistent with his other statements, like when he showed him the arrest warrant near the end of the interrogation. (Tr. 148:2-12.)

Moreover, with regard to Mr. Hutchins' U.K. citizenship, the recommendation acknowledges that Mr. Hutchins did not understand the U.S. legal system. But then without citing to any precedent, the recommendation deems that circumstance legally insignificant.

Beyond those examples, the recorded portion of the post-arrest questioning demands more consideration than the recommendation gives it. Although the recommendation describes the magistrate judge having listened to the entire recording, the recommendation only relies on it to corroborate the agents' claims that Mr. Hutchins was not impaired from sleep-deprivation and partying-related exhaustion. (*See* Rec. at 12.) But the recommendation does not consider other statements that Mr. Hutchins made, which are relevant to the broader voluntariness inquiry.

The recording establishes a confused defendant and agents intentionally refraining from clearing up the defendant's confusion. (*See* Ex. 1.) Mr. Hutchins repeatedly inquired about the nature of his arrest and interrogation. The agents' (tactical) failure to respond was intended to mislead Mr. Hutchins, causing him to talk from an uninformed perspective. Here are the key interrogation excerpts, which were included in the defense's post-hearing memorandum:[11]

| 00:30-00:32[12] | Hutchins: | Can you please tell me what this is about? |
| | Butcher: | We're going to get to it. |

---

[11] Dkt. No. 85 at 14-18.

[12] These are defense-prepared draft transcriptions of what was recorded. The times provided are approximations. The defense provides these as an aid to Court when it listens to the audio recording.

[The agents proceeded to discuss Mr. Hutchins' background and employment for the next ten minutes. They did not answer his "what is this about" question for well over an hour, nor did they show him the arrest warrant or indictment. Nowhere do the agents mention on the recording that they started recording mid-interrogation, what happened before the tape started recording, or when the recording began.]

| | | |
|---|---|---|
| 1:40-1:55 | Chartier: | All right so like I said, we have a bunch of questions for you. We hope you can fill in the gaps. What's your education? |

[Agent Chartier made this sound like an open-ended investigation and did not specify the focus of his question. As the Court will hear when listening to the broader recording, the agents' questioning is broad and bounces among multiple topics, not just Kronos. This would leave a reasonable person unclear about what is really at issue: that he is under indictment, charged with crimes based on specific alleged conduct.]

| | | |
|---|---|---|
| 11:31-12:15 | Hutchins: | Kronos. I know that name. That was a guy I did work for awhile back. I sold him some injection code or something? Is that what this is about? You're looking for the Kronos developer? |
| | Chartier: | Well, I don't think we're looking. We know who the Kronos developer is. |
| | Hutchins: | You don't—because it ain't me . . . |

[Although the agents implicitly revealed their suspicion that Mr. Hutchins created Kronos, they failed to explain to him that they have arrested him on charges related to Kronos.]

| | | |
|---|---|---|
| 15:16-15:53 | Hutchins: | Yeah, well I have an account for research purposes at Malware Tech at xmpp.jp, I think it is. |
| | Butcher: | Are you worried about that one now? Now that you're kind of out in the public eye, research-wise? |
| | Hutchins: | I don't use it for research anymore, but I am a |

20

|              |           | little worried that now, because everybody knows I'm a researcher, they're all going to come back and bite me. |
|--------------|-----------|-----------------------------------------|
|              | Butcher:  | Right. |
|              | Hutchins: | Which is probably why I'm here. |
|              | Chartier: | No, that's not the reason you're here, buddy. |
|              | Butcher:  | So you said you got rid of the laptops. . . |

[Mr. Hutchins again expressed uncertainty about why he is being interrogated.  And the agents again failed to explain the true purpose of the interrogation, despite being given another opportunity to do so.]

| 27:56-29:20 | Chartier: | So you haven't had any other involvement in any other pieces of malware that are out or have been out? |
|--------------|-----------|-----------------------------------------|
|              | Hutchins: | Only the form-grabber and the bot. |
|              | Chartier: | Okay.  So you did say the form-grabber for Kronos, then? |
|              | Hutchins: | Not the form-grabber for Kronos.  It was an earlier one released in about I'm gonna say 2014? |
|              | Chartier: | And what was the name of that? |
|              | Hutchins: | Oh, fuck.  I really can't remember.  No, I'm drawing a blank.  I mean, like, I actually sell the code.  I sell it to people and then they do what the fuck they want with it. |
|              | Chartier: | I understand, I understand, I understand.  But you see why we're here? |
|              | Hutchins: | Yep. I can definitely see. |
|              | Chartier: | I mean, you know, Marcus, I'll be honest with you.  You're in a fair bit of trouble. |
|              | Hutchins: | Mmm-hmm. |
|              | Chartier: | So I think it's important that you try to give us the best picture, and if you tell me you haven't talked to these guys for months, you know, you can't really help yourself out of this hole.  Does that make sense? |
|              | Hutchins: | Yeah. |
|              | Chartier: | Now, I'm not trying to tell you to do something you're not doing, but I know you're more active than you're letting on, too.  Okay? |

| | Hutchins: | I'm really not. I have ceased all criminal activity involving— |
| | Chartier: | Yeah, but you still have access and information about these guys. |
| | Hutchins: | What do you mean? Like, give me a name and I'll tell you what I know about that. |
| | Chartier: | All right, why don't you start out with this list of nics. |

[Although the agents came close to telling him why he is being interrogated, they still left it up to Mr. Hutchins to guess. And from there, the agents switched the focus to what he might be currently doing, not anything historical like his charged involvement in 2014 and 2015 with Kronos.]

| 35:52-36:03 | Butcher: | He paid your VPS— |
| | Hutchins: | If I'm going to go jail because he paid my $7 VPS, I'm going to pissed. |
| | Butcher: | Why did he pay for your VPS? |

[Mr. Hutchins again made it known he was not really sure why he was being interrogated.]

| 57:58-58:23 | Chartier: | Well, you brought up WannaCry, so. |
| | Butcher: | Yeah, well, we were gonna ask you about that anyway. |
| | Hutchins: | That's gonna suck. [laughter] |
| | Butcher: | Wow. It was quite the… Pretty overwhelming for you, I guess, with all the attention it got. |
| | Hutchins: | Yeah, I'm still not over it, oh man, that was something. And now I guess I get to go through it again, will I get indicted for whatever bullshit this is. |

[Mr. Hutchins expressed his belief that the agents were interrogating him to gather information about WannaCry, which garnered international headlines. He also again made it clear that he did not know the nature of the case giving rise to his arrest.]

| 1:03:45-1:03:58 | Hutchins: | So can I just ask, is this just some shit to get me to |

22

give you the [WannaCry sinkhole] domain, because I know you wanted that, right?

Butcher:    No.

Hutchins:    Yeah.

Chartier:    No.

Hutchins:    No, okay.

Chartier:    No, this is not some shit to get us the domain.

[Mr. Hutchins again, over an hour into the interrogation, revealed confusion about what is really going on and the agents again failed to clear it up.]

1:11:06-1:11:14    Hutchins:    So do you think I'm behind it or something?

Chartier:    WannaCry?

Butcher:    No.

Hutchins:    Okay.

[Mr. Hutchins once again expressed his sense of the interrogation really being about WannaCry, and the agents again did not explain the true purpose.]

1:17:45-1:18:02    Chartier:    Okay. Well here's the arrest warrant. And just to be honest—if I'm being honest with you, Marcus. This has absolutely nothing to do with WannaCry.

[Over 75 minutes into the interrogation, the agents finally showed Mr. Hutchins the arrest warrant. Only then did Agent Chartier dispel Mr. Hutchins' stated understanding that his status was somehow tied to WannaCry.]

1:19:10-1:19:18    Chartier:    What questions do you have for us?

Hutchins:    I don't really have any. Like, my only one was why the hell am I here and you've answered that pretty well.

Chartier:    Okay. Well, we'll step out for a second. Give us a minute to talk . . .

[Having finally seen the arrest warrant, Mr. Hutchins expressed for the first time a very limited understanding of why he might have been arrested, although even the arrest

23

warrant lacks any mention of Kronos, instead advising only that he is charged with conspiring to defraud the United States.]

The recommendation also fails to consider how Agent Butcher's failure to start the audiotape at the very beginning of Mr. Hutchins' post-arrest interrogation leaves a gap in the record that severely prejudices him. A complete recording—something that is unavailable to this Court—would provide irrefutable evidence of what did and did not happen during the custodial interrogation. The lack of a complete recording is truly unfortunate, and the responsibility for this important evidentiary deficit rests solely at the feet of the FBI. The magistrate judge brushes by this important point.

Finally, the recommendation finds no basis for excluding the Advise of Rights form and declines to do so. (Rec. at 9-10.) But the recommendation fails to really consider that the form, as it existed whenever Mr. Hutchins signed it, apparently no longer exists. In its place is an altered version, and the government should not be permitted to introduce and rely on altered evidence in defending against Mr. Hutchins' suppression motion. *See Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) (Section 1983 case explaining that the deliberate manufacture of false evidence violates the Due Process Clause).

24

The Court should therefore exclude the altered form from the record informing its treatment of Mr. Hutchins' motion.[13] And the Court should also draw from the circumstance an inference adverse to the government's position that Mr. Hutchins was warned of and waived his constitutional rights before making a post-arrest statement. *See United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) (noting that a "spoliation" instruction, allowing adverse inferences, is "commonly appropriate" in both civil and criminal cases where it is reasonable to conclude that evidence favorable to one side was destroyed by the other).

### E.    Conclusion

The Court should grant the motion to suppress. When all the evidence is considered fully and the proper legal standard is applied to the facts, which the recommendation fails to do, this is the only conclusion one can draw.

## THE MOTION TO DISMISS
## (FAILURE TO STATE OFFENSES AND MULTIPLICITY)

Mr. Hutchins seeks dismissal of Counts One through Eight and Ten of the superseding indictment for failure to state offenses on a number of grounds. (Dkt. Nos. 92 and 95.) The Court should decline to adopt the recommendations that those motions be denied and should, instead, dismiss these counts.

---

[13] The focus here is exclusion of the altered form from the Court's consideration of Mr. Hutchins' suppression motion. The defense additionally believes that the altered form should be declared inadmissible at trial.

Case 2:17-cr-00124-JPS   Filed 11/09/18   Page 25 of 46   Document 111

## A.    Applicable Law

The recommendation first discusses the standard for a motion to dismiss an indictment and its application to this case.  (Rec. at 18-21.)  But this discussion misconstrues the thrust of the defense's challenge to the indictment for its failure to state offenses.  The defense does not challenge the sufficiency of the evidence.  Rather, the defense argues that the government's allegations are insufficient to charge an offense as a matter of law.

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. Rule Crim. P. 7(c)(1).  An indictment satisfies Rule 7(c)(1) if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions."  *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

However, Federal Rule of Criminal Procedure 12(b)(1) provides that a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Thus, Rule 12 "authorizes dismissal of an indictment *if its allegations do not suffice to charge an offense*, though "such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges."  *United States v. DeLaurentis*, 230 F.3d 649, 661 (3d Cir. 2000), *citing United States v. Sampson,* 371 U.S. 75, 78-79 (1962) (emphasis

26

added).  The key is that, here, the defense is challenging the sufficiency of the allegations as a matter of law, not as a factual matter.

In *United States v. Risk,* the Seventh Circuit upheld the pretrial dismissal of an indictment because the facts were uncontested, and thus not in dispute.  843 F.2d 1059, 1060 (7th Cir. 1988).  Thus, the district court there was able to determine dismissal was appropriate "not because the government could not prove its case, but because there was no case to prove."  *Id.*

While it is true that discovery is not before the Court here, as it was *Risk*, this is not the only posture in which a purely legal question can be before the Court on a pretrial motion to dismiss.  The superseding indictment here largely tracks the language of the charged statutes (with the notable exception of Count Seven, discussed below).  But it does more than that: it makes additional factual allegations that, if true, would not constitute a violation of the law.  Despite having the opportunity to correct these factual assertions in its superseding indictment, the government elected not to do so.  This is the basis for this motion.

### B.    "Damage" Under the Computer Fraud and Abuse Act

Mr. Hutchins's motions also seek dismissal of Counts One and Seven because the superseding indictment does not allege any facts that would show Hutchins caused or intended to cause "damage" as required to establish a violation of 18 U.S.C. § 1030(a)(5)(A).  (Dkt. No. 95 at 4-6.)  That statute prohibits "knowingly caus[ing] the transmission of a program, information, code, or

27

command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." "Damage" is defined as "any impairment to the availability or integrity of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Mr. Hutchins argues that the allegations in the indictment do not meet this standard.

The recommendation that Mr. Hutchins' motion be denied rests on the notion that Counts One and Seven repeat the statutory language of § 1030(a)(5)(A) and that the government offers a self-composed definition of "malware" to mean "malicious computer code intended to damage a computer." (Rec. at 22-23.) As such, the recommendation treats Counts One and Seven as adequately pleaded, with Mr. Hutchins' intent to cause damage left as a question of fact for the jury. (*Id.* at 23.)

Mr. Hutchins objects because the recommendation overlooks one glaring problem: the government alleges that Kronos and UPAS Kit have a particular functionality, which is to record and exfiltrate information. And that functionality does not meet the statutory definition of "damage."

Specifically, the government alleges that Kronos "recorded and exfiltrated user credentials and personal identifying information from protected computers," (First Superseding Indictment ("FSI") ¶ 1(e)), and that UPAS Kit "allowed for the unauthorized exfiltration of information from protected computers" (*id*. ¶ 1(f)). These descriptions do not indicate that the programs

28

cause "impairment to the availability or integrity" of the data. The programs allegedly "record" and "exfiltrate" data—that is, the programs allegedly make a copy of data and then transmit the copy. These actions, without more, would not constitute "damage," as the operative statute defines it, because they do not affect the "availability" or "integrity" of the underlying data.

"Damage" requires more than what the superseding indictment alleges. For example, in *Int'l Airport Ctrs. LLC v. Citrin*, the defendant caused "damage" when he installed software on his employer's computer that permanently deleted stored files. 440 F.3d 418, 419 (7th Cir. 2006).[14] And in *United States v. Mitra*, the defendant caused "damage" when he disrupted the functionality of the city of Madison's emergency response system, which resulted in "knocking out police, fire, and emergency response communications." 405 F.3d 492, 494-95 (7th Cir. 2005).

But simply copying and taking data in a manner that does not cause disruption or impairment does not meet the statutory definition. As this Court itself has found, "merely accessing and disseminating information" on a computer does not meet the CFAA's "very specific" definition of "damage."

---

[14] *Citrin* is admittedly a civil rather than criminal case. But § 1030 is principally a criminal statute that also has a private right of action, and its basic definitions apply consistently in both criminal and civil contexts.

29

*Landmark Credit Union v. Doberstein,* 746 F. Supp. 2d 990, 993-94 (E.D. Wis. 2010) (Stadtmueller, J.).

And the Seventh Circuit shares this Court's perspective. In *Fidlar Technologies v. LPS Real Estate Data Solutions, Inc.,* a data analytics company was accused of violating § 1030(a)(5)(A) for using a computer program to download real estate records in bulk from county databases in violation of a technology provider's license agreement. 810 F.3d 1075, 1078 (7th Cir. 2016). There, the Seventh Circuit found that the company did not cause "damage" under the statutory definition because it did not "alter or disrupt" the technology provider's service—it simply downloaded information while avoiding the provider's attempts to track user activity. *Id.* at 1084; *see also, e.g., Motorola, Inc. v. Lemko Corp.,* 609 F. Supp. 2d 760, 769 (N.D. Ill. Apr. 19, 2009) ("The plain language of the statutory definition [of 'damage'] refers to situations in which data is lost or impaired because it was erased or because (for example) a defendant smashed a hard drive with a hammer."); *Worldspan, L.P. v. Orbitz, LLC,* 2006 WL 1069128, *5 (N.D. Ill. 2006) (rejecting argument that "the mere taking of information" constitutes "damage" within the meaning of the CFAA) (internal quotation marks omitted).

Because the superseding indictment does not adequately allege facts that would show that Kronos or UPAS Kit caused "damage" within the meaning of

30

the CFAA, it fails to state an offense in Counts One and Seven. The Court should

ignore the recommendation and dismiss these counts.

### C.    "Device" Under the Wiretap Act

Mr. Hutchins urges dismissal of Counts One through Six because Kronos

and UPAS Kit are not, alone, "electronic, mechanical, or other devices" as

defined by the Wiretap Act. (Dkt. No. 95 at 6–9.) The recommended denial of

this motion relies on the rationale that the indictment tracks the Wiretap Act's

statutory language. (Rec. at 23-25.) Mr. Hutchins objects because, again, the

allegations in the indictment do not satisfy the statutory definition.

The Wiretap Act defines the term "electronic, mechanical, or other device"

to mean "any device or apparatus which can be used to intercept a wire, oral, or

electronic communication," with some exceptions not relevant in this case. 18

U.S.C. § 2510(5). The statute does not define the word "device."

Counts Two through Five claim that Mr. Hutchins advertised, sent, and

sold the Kronos software in violation of § 2512. But these counts cannot survive

where the charges are based—as they are here—on advertising, sending, and

selling software *by itself*. Section 2512 makes it illegal only to advertise, send, or

sell an "electronic, mechanical, or other device" that is primarily useful for

surreptitious interception or promoted as such. Software is not a device because

it is not an "apparatus," a "piece of equipment" or a "mechanism." It is a

computer program, a set of instructions that tells a computer what to do. In

isolation, software cannot intercept anything. It must be installed and working on a computer for there to be an interception "device."

According to the recommendation, *United States v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010) (as amended Nov. 29, 2010), does not support the conclusion that software alone cannot be a device. (Rec. at 24.) The recommendation is wrong. In *Szymuszkiewicz*, the defendant configured his workplace supervisor's email program so that it made copies of her email and forwarded them to the defendant. *Szymuszkiewicz*, 622 F.3d at 703. Even though the email program had been set up to copy the supervisor's emails, the Seventh Circuit did not focus on the email program, but rather the computers that were actually performing the interceptions. *Id.* at 707. Specifically, the Seventh Circuit noted that the defendant "acquired the emails by using at least three devices: [the supervisor's] computer (where the rule was set up), the Kansas City server (where the rule caused each message to be duplicated and sent his way), and his own computer (where the messages were received, read, and sometimes stored." *Id*. Even if the Court concludes that *Szymuszkiewicz* does not address the issue Mr. Hutchins raises directly enough to be precedential here, *Szymuszkiewicz* certainly does not suggest that software standing alone is a "device."

Turning to *Potter v. Havlicek*, the recommendation acknowledges that the court in *Potter* found that "the definition of the word 'device' does not encompass software such as Activity Monitor." (Rec. at 24, quoting No. 06-CV-

32

211, 2008 WL 2556723, at **8-9 (S.D. Ohio June 23, 2008).) But, according to the recommendation, "[t]hat determination was specific to the facts of that case, which were not analogous to the Hutchins' case in important ways." (Rec. at 25.) The recommendation does not explain, however, how the facts are different in "important ways." The defense notes that *Potter* was civil and this case is criminal, but that is an irrelevant difference. The definition of "electronic, mechanical, or other device" is used throughout the Wiretap Act and does not vary depending on whether a case is civil or criminal.

The recommendation goes on to state that "[E]ven *Potter* did not issue a blanket statement that software could never qualify as a 'device,' only that it did not in this case and no court had found that it did." (Rec. at 25.) But *Potter* is not so narrow. It said that "computer software alone, Activity Monitor in this case, does not fit" a dictionary definition of the word "device." No. 06-CV-211, 2008 WL 2556723, at *8. And *Potter* further explained that "Activity Monitor alone cannot be used to intercept communications. It must be installed in a device, such as a computer, to be able to do so." *Id.* Thus, according to *Potter*, software by itself—which in that case happened to be Activity Monitor—cannot qualify as a "device" because it cannot be used to intercept communications until it is installed on a computer. That is just as true in this case as it was in *Potter*.

Finally, the recommendation declines to adopt a "hyper-technical reading of the statute," suggesting that Mr. Hutchins' interpretation "may not comport

33

with legislative intent, the ordinary meaning of ['electronic, mechanical, or other device'], or the (scant) existing case law." (Rec. at 25.) But the recommendation does not address any of these concerns—and in fact, they all weigh favor Mr. Hutchins' position.

First, the ordinary understood meaning of "device" does not include stand-alone computer programs: when we use our iPhone to play Angry Birds or listen to Coldplay, the phone, and not the game or iTunes, is the "device." Consistent with our everyday understanding of the term, Merriam-Webster Dictionary defines the word "device" to mean, *inter alia*, "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function."[15] The dictionary offers as an example of usage for this definition "a hidden recording device"—precisely the type of tool at the heart of the Wiretap Act's prohibitions. But a software program standing alone is neither a "piece of equipment" nor a "mechanism." In isolation, it does not meet the ordinarily understood meaning of "device."

Moreover, the legislative history of the Wiretap Act shows no sign that Congress intended the definition of "electronic, mechanical, or other device" to include software standing alone. Even though Congress has amended the Wiretap Act six times since its initial passage, it has never seen fit to expand the

_____

[15] https://www.merriam-webster.com/dictionary/device (last visited Nov. 9, 2018).

34

definition of "electronic, mechanical, or other device" to include software. In fact, rather than expanding the scope of §§ 2511 and 2512 in light of new technologies, Congress has chosen to limit the reach of those statutes, increasing the level of *mens rea* from "willful" to "intentional" in both. Electronic Communications Privacy Act, Pub. L. 99-508, Title I, § 101(f), 100 Stat. 1853 (1986).

To the extent the Court finds the statutory definition ambiguous, this is only further reason to grant Mr. Hutchins' motion. Criminal statutes should be narrowly construed in favor of the accused unless Congress clearly directs otherwise. *Skilling v. United States*, 561 U.S. 358, 365 (2010); *Rewis v. United States,* 401 U.S. 808, 812 (1971).

Thus, the Court should dismiss Counts One through Six.

### D.      Intent and Causation

Mr. Hutchins moves to dismiss Counts One, Four through Eight, and Ten because they fail to allege the necessary intent and causation to state the offenses. (Dkt. No. 95 at 11–14.) The recommendation that these challenges be rejected rests on the ground that the language in these counts tracks the wording of the charged statutes, and intent and causation are questions of fact for the jury. (Rec. at 25-26.)

Mr. Hutchins objects because the language in these counts does not allege the necessary intent and causation. The superseding indictment alleges merely

35

the sale of Kronos and UPAS Kit to a buyer. These counts are missing the specific intent necessary to allege criminal conduct.

The Seventh Circuit has made clear in the context of drug-distribution cases that a buyer-seller relationship—without more—does not establish a conspiracy. *United States v. Johnson*, 592 F.3d 749, 759 (7th Cir. 2010). There must be an agreement "to commit a crime *other than* the crime that consists of the sale itself." *Id.* (emphasis in original) (citations omitted). To form a conspiracy, the seller must not only know that the buyer will re-sell the drugs—the buyer must *intend* for it to happen. *7th Cir. Criminal Pattern Jury Instruction* 5.10.

Translating that well-established legal theory to what is alleged in this case, there can be no criminal liability where Mr. Hutchins and Individual A are merely alleged to have sold Kronos or UPAS Kit to a buyer—even if they knew the buyer could then later use it to cause damage to a computer, intercept a communication, or access a computer without authorization. The indictment must *also* allege that Mr. Hutchins and his co-conspirator *specifically intended* for the buyer to commit those acts. Mr. Hutchins and his co-conspirator's goal— their conspiratorial objective—must have been for those substantive crimes to occur. But this is not alleged in the indictment.

Nor do the allegations involving Individual B establish intent or causation on Mr. Hutchins' part. The superseding indictment claims that Mr. Hutchins distributed Kronos to Individual B, and that he knew Individual B "was involved

36

in the various cyber-based criminal enterprises including the unauthorized access of point-of-sale systems and the unauthorized access of ATMs." (FIS ¶ 4(j).) But the government does not allege that Mr. Hutchins specifically *intended* for Individual B to use Kronos to gain unauthorized access to computers, nor that any such thing actually occurred.

Thus, the Court should dismiss Counts One, Four through Eight, and Ten.

### E.    Motion to Dismiss Counts Two and Three as Multiplicitous

Mr. Hutchins argues that Counts Two and Three are multiplicitous and expose Mr. Hutchins to double jeopardy, so Count Three must be dismissed. (Dkt. No. 95 at 11.)

The recommendation that this motion be denied rests on the perception that each count requires proof of an element the other does not. (Rec. at 26.) As such, the recommendation states:

> Section 2512(1)(c)(i) requires (1) knowledge, or reason to know, that (2) the device advertised was *designed to be primarily useful for* surreptitious interception. Section 2512(1)(c)(ii) requires neither of these. Section 2512(1)(c)(ii), on the other hand, requires that the advertisement promote (1) any 'other' device (2) *for the purpose of* surreptitious interception.

(Rec. at 27.)

Mr. Hutchins objects because Counts Two and Three do not *each* require proof of an additional fact that the other does not: instead, they require proof of the same facts, as noted in the underlying motion. (Dkt. No. 95 at 11.)

37

Specifically, § 2512(1)(c)(i) prohibits the advertisement of an interception device when one *knows or has reason to know that the design of the device renders it primarily useful for the purpose of surreptitious interception*. And § 2512(1)(c)(ii) prohibits the advertisement of an interception device in a manner that *promotes its use for the purpose of surreptitious interception*. The same fact proves the offense charged in both counts: when one advertises a device designed for surreptitious interception, he promotes its use for surreptitious interception. That is the government's approach to Counts Two and Three.

## THE MOTION TO DISMISS
### (COUNT SEVEN)

The theory of redundancy the recommendation embraces in rejecting Mr. Hutchins' argument that Count Seven is flawed for its failure to allege *intentional* damage to computers reveals the count's true problem: it charges a crime different from any Congress has defined. The court should therefore not adopt the recommendation.

Violating § 1030(a)(5)(A) requires an act (*i.e.*, transmitting a program), plus an intended outcome (*i.e.*, intentionally causing damage to protected computers). An act that does not cause the intended outcome is not a substantive violation of the statute.

But § 1030(b) expands the reach of § 1030(a)(5)(A) by stating that it is also unlawful to conspire to violate or, relevant here, attempt a violation of § 1030(a).

38

Count Seven invokes this subsection in charging that Mr. Hutchins caused the §

1030(a)(5)(A) act (*i.e.*, transmitting a program) and attempted the required

outcome.  But where § 1030(a)(5)(A), itself, requires the *intentional* causation of

damage to protected computers, Count Seven alleges only (attempted) causation.

Mr. Hutchins' motion complains about the count's omission of the intentionality

requirement, a complaint the recommendation rejects by explaining that

attempts are inherently intentional so that pleading attempted intentional

damage is redundant.  Logically sound as the reasoning is, it overlooks that the

count—as it is pleaded and given the recommendation's interpretation of it—

deviates from § 1030(b) and conventional notions of inchoate offenses.

An attempt, as the recommendation recognizes, requires that a person

intending to commit a given crime takes a substantial step towards its

commission.  *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000).  Though the

crime, comprised of its elements, is not completed, the whole crime—as in all of

its elements—must be intended.  *United States v. Morris*, 827 F.3d 696, 699 (7th

Cir. 2016) (Hamilton, J., concurring) (explaining that "an attempt to commit a

crime should be treated as an attempt to carry out acts that satisfy *each element of*

*the completed crime*") (emphasis in original). That is the essence of an attempted

crime.  *See id.*  To the extent that an actor's commission of an incomplete crime

involves the satisfaction of one or more—but not all—of the offense's elements,

those represent substantial steps taken as part of the overall attempt.  *See Barnes,*

230 F.3d at 315 (describing a substantial step as something less than the last act necessary to completing the crime).

And so § 1030(b), with its declaration that an attempted violation of § 1030(a)(5)(A) is, itself, a crime, stands for the idea that it is illegal to attempt the full crime which, again, is defined by all of its elements. An attempted violation of § 1030(b)(5)(A) is an attempt at the prohibited act (*i.e.*, the transmission of a program), plus its intentional outcome (*i.e.*, intentionally caused damage to protected computers). But this is not what Count Seven alleges.

Count Seven detaches the act of transmission from the intended damaging outcome, treating the former as a completed act and the latter as an attempt. And it is only upon this unauthorized hybridization that the recommendation's theory of redundancy obtains its footing.

A proper charge under § 1030(b) would describe the whole violation of § 1030(a)(5)(A), with all of its elements, as attempted. To the extent Mr. Hutchins, as alleged, completed the act of transmitting a program, that is not a free-standing circumstance detached from the attempted offense. Instead, it represents a substantial step taken in furtherance of the broader attempt. And once the attempt is assigned its proper place and role within the count, it is not redundant to describe the attempted substantive offense by all of its elements: Mr. Hutchins attempted to transmit a program and, as a result, intentionally cause damage to a protected computer. *See* 18 U.S.C. § 1030(a)(5)(A).

40

## THE MOTION TO DISMISS
## (IMPROPER EXTRATERRITORIAL APPLICATION OF LAW)

This Court should not adopt the recommended denial of Mr. Hutchins'

motion to dismiss the superseding indictment due to its improper application of

United States law. (*See* Rec. at 30-32; Dkt. No. 96 (Mot.)) The recommendation

concludes that the superseding indictment contains only domestic applications

of law, but fails to recognize that the factual allegations do not support that

conclusion.

Hutchins' motion is based on three arguments. First, Congress did not

clearly indicate that the Wiretap Act is intended to have extraterritorial reach,

and Counts Two and Three are not a domestic application of the Wiretap Act as

charged. (Dkt. No. 96 at 6-12.)

Second, Counts One through Eight and Ten violate Mr. Hutchins' due

process rights because he did not have a sufficient nexus with the United States

during the relevant time period covered by those offenses. (*Id*. at 12-17.) As

such, the application of United States law to him would be arbitrary and

fundamentally unfair.

Finally, Count Nine should be dismissed if the Court dismisses the other

counts on extraterritoriality grounds. (*Id*. at 17-18.) Count Nine charges a false

statement in violation § 1001(a), a statute implicated only by false statements

about a "matter within the jurisdiction of the executive, legislative, or judicial

41

branch of the Government of the United States." (FSI at 14.) Mr. Hutchins asserts a lack of domestic jurisdiction over all the other alleged offenses, so any false statement made by Mr. Hutchins about those offenses is not subject to prosecution under § 1001. (Dkt. No. 96 at 17-18.)

The recommendation goes astray for a variety of reasons. First, it finds that the superseding indictment alleges only domestic violations of the Wiretap Act. Specifically, it says that Counts One through Eight and Ten charge Hutchins with illegal acts "in the state and Eastern District of Wisconsin and elsewhere," and Count One alleges various acts in furtherance of a conspiracy resulting in the sale of UPAS Kit and Kronos to individuals in the Eastern District of Wisconsin. (Rec. at 30-31.)

But, to be clear, Mr. Hutchins does not challenge *all* the Wiretap Act counts on the basis of improper extraterritorial application of United States law. He only challenges Counts Two and Three, which allege that Mr. Hutchins violated §§ 2512(1)(c)(i) and (ii) by disseminating and aiding and abetting the advertisement of Kronos. As to its treatment of these counts, Mr. Hutchins objects to the recommendation on this basis: while the superseding indictment states broadly that these acts occurred "in the state and Eastern District of Wisconsin and elsewhere," it does not allege facts that support that claim.

To the contrary, the superseding indictment alleges that Individual A (not Mr. Hutchins) marketed and offered to sell Kronos on internet forums (*i.e.*,

42

exploit.in, Darkode, and AlphaBay).  (FSI ¶¶ 4(f), (g), and (k).)  None of those

internet forums are alleged to be based in the United States, hosted on United

States servers, or otherwise have any connection to this country.  And neither

Mr. Hutchins nor Individual A are alleged to have been located in the United

States at that time.

The superseding indictment also claims that a video showing the

functionality of Kronos was posted on the video-sharing platform YouTube.  (*Id*.

¶ 4(e).)  It does not allege that either Mr. Hutchins or Individual A posted that

video, only that they pointed to the video to demonstrate how Kronos worked

and to promote its sale.  (*Id*.)  Again, the superseding indictment draws no link to

the United States; it alleges only that a video was posted on YouTube for all the

world to see.  (*Id*.)  It does not claim that Mr. Hutchins or Individual A

disseminated the video to anyone located in the United States, or even that it was

hosted on servers in the United States.  Mr. Hutchins' alleged actions were

performed abroad in the United Kingdom, and on the face of the indictment, no

specific act or result is alleged to have occurred within the United States. Thus,

the allegations relevant to Counts Two and Three do not reflect a domestic

application of a United States law.

The recommendation next concludes that Counts One through Eight and

Ten do not violate Mr. Hutchins' due process rights because, again, those counts

allege violations occurring in the state and Eastern District of Wisconsin and

elsewhere. (Rec. at 32.) Mr. Hutchins objects because the mere allegation that a crime was committed "in the state and Eastern District of Wisconsin and elsewhere" does not create a "sufficient nexus" between the United States and a foreign national to ensure that application of United States law "would not be arbitrary or fundamentally unfair," as the Fifth Amendment requires. *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990). Whether Mr. Hutchins has a sufficient nexus with this District to be haled into court here is a threshold matter "totally distinct from the crime itself" and "must be considered" before the Court determines whether Mr. Hutchins has criminal liability. *United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006).

The superseding indictment fails to articulate a clear nexus between Mr. Hutchins and the United States on Count One through Eight and Ten. The recommendation does not address this critical fact. And those counts rely heavily on Individual A and Individual B's own completely distinct contacts with the United States to charge Mr. Hutchins in this country. But other people's contacts cannot be imputed to Mr. Hutchins to create a sufficient nexus for purposes of prosecution.

The requirement is akin to the "minimum contacts" test for personal jurisdiction in the civil context and "ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257

44

(9th Cir. 1998) (internal quotation marks omitted). Under the "minimum contacts" test, "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Each person over whom a court exercises personal jurisdiction must independently have sufficient contacts with that forum. *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (personal jurisdiction depends on "contacts that the defendant himself creates with the forum State") (internal quotation marks omitted). The Court must find an independent sufficient nexus for each individual.

Finally, the recommendation concludes that Mr. Hutchins' challenge to Count Nine is "is premised on the claim rejected above that the indictment charges Hutchins for conduct committed abroad." (Rec. at 32.) As Mr. Hutchins' argument on Count Nine relies on dismissal of the other counts for improper extraterritorial application of United States law (Dkt. No. 96 at 17-18), he objects to this finding for all those reasons.

Mr. Hutchins asks the Court to reject the recommendation on the Motion to Dismiss for Improper Extraterritorial Application of Law of July 13, 2018 (Docket # 96). The motion should be granted.

## CONCLUSION

For all the above reasons, the Court should decline to adopt the magistrate judge's recommended denials and grant the motion to suppress and motions to dismiss.

DATED: November 9, 2018          Respectfully submitted,

  _/s/ Brian E. Klein_
BRIAN E. KLEIN
Baker Marquart LLP
2029 Century Park E – Suite 1600
Los Angeles, CA 90067
Email: bklein@bakermarquart.com
Telephone: (424) 652-7800

  _/s/ Marcia Hofmann_
MARCIA HOFMANN
Zeitgeist Law PC
25 Taylor Street
San Francisco, CA 94102
Email: marcia@zeitgeist.law
Telephone: (415) 830-6664

  _/s/ Daniel W. Stiller_
DANIEL W. STILLER
DStillerLLC
Box 511130
Milwaukee, WI 53203
Email: dan@dstillerllc.com
Telephone: (414) 207-3190

_Attorneys for Marcus Hutchins_

46