# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>MARCUS HUTCHINS,<br><br>                       Defendant. | Case No. 17-CR-124-2-JPS<br><br><br><br>**ORDER** |

## 1.    INTRODUCTION

Defendant Marcus Hutchins is a hacker who received considerable attention for disabling a North Korean malware called WannaCry. He has a reputation as a "white hat" hacker, which implies a hacker who works for the benefit of the public. Hutchins has nevertheless been indicted for various crimes related to his activity with two forms of malware, "Kronos" and "UPAS Kit."

On March 30, 2018, Hutchins filed a motion to suppress the statement that he made to Federal Bureau of Investigation ("FBI") agents immediately following his arrest, as well as any evidence the government may have obtained as a result. (Docket #55). On July 13, 2018, Hutchins also filed three motions to dismiss various counts in the superseding indictment. (Docket #92, #95, and #96).[1] Magistrate Judge Nancy Joseph issued a report and recommendation in which she recommended denying all motions.

---

[1]Hutchins's motion to dismiss for failure to state offenses and multiplicity (Docket #95) relates to the superseding indictment and is intended to replace his original motion to dismiss (Docket #56), which will be denied as moot.

(Docket #109). Hutchins timely objected, and each party has fully briefed the issues. The Court will address each of the motions below. In accord with Magistrate Joseph's analyses, all motions will be denied. The Court will overrule Hutchins's objections and adopt Magistrate Joseph's recommendation in large measure.

## 2.    LEGAL STANDARD

When reviewing a magistrate's recommendation, this Court is obliged to analyze *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id.*; *see also* Fed. R. Crim. P. 59(b).

## 3.    RELEVANT FACTS

Hutchins, a citizen of the United Kingdom, is a coder and hacker of considerable repute. He is most well-known for finding the kill-switch to a North Korean malware called WannaCry in May 2017. According to the superseding indictment, several years ago, Hutchins developed two types of malware, UPAS Kit and Kronos (a "banking trojan").

The superseding indictment alleges that Hutchins developed UPAS Kit and, in 2012, sold it to Individual A, who then sold it to an individual in the Eastern District of Wisconsin. At some point before July 2014, Hutchins allegedly developed Kronos and provided it to Individual A, intending for Individual A to advertise, promote, and sell it. Hutchins used a YouTube video to demonstrate how Kronos worked, and referred prospective customers to Individual A. In December 2014, Hutchins hacked and analyzed a malware that competed with Kronos, and published a blog post

describing the competing malware's vulnerability. In February 2015, Hutchins allegedly updated the Kronos malware, and distributed it to Individual B, who was located in California and was known to be involved in cyber-based criminal activities.

On July 11, 2017, a grand jury indicted Hutchins on various counts related to his activity with the malware. He was charged with conspiracy, fraud, and unlawfully intercepting communications. (Docket #1). On June 5, 2018, the government filed a superseding indictment with additional charges. (Docket #86). In Count One, the superseding indictment charges Hutchins with conspiring to violate the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Electronic Communications Privacy Act ("Wiretap Act"), 18 U.S.C. § 2510 *et seq.*, in violation of 18 U.S.C. § 371. Counts Two and Three charge Hutchins with disseminating, aiding, and abetting an attempt to advertise the malware, in violation of the Wiretap Act. Counts Four and Five charge Hutchins with aiding and abetting the distribution of the malware, in violation of the Wiretap Act. Count Six charges Hutchins with using, or getting others to use, the malware to intercept communications in violation of the Wiretap Act. Count Seven charges Hutchins with causing, aiding, and abetting the transmission of malware in violation of the CFAA. Count Eight charges Hutchins with aiding and abetting the intentional access and damage to protected computers for the purpose of private financial gain, in violation of the CFAA. Count Nine charges Hutchins with lying to the FBI about whether he knew that his computer code was part of Kronos, in violation of 18 U.S.C. § 1001(a)(2). Finally, Count Ten charges Hutchins with conspiring to commit fraud in connection with his malware activities, in violation of 18 U.S.C. §§ 1343, 1349.

In the summer of 2017, Hutchins spent a week in Las Vegas to attend "Defcon," which is a conference for hackers. On August 2, 2017, Hutchins was about to embark on his journey back to the U.K. Hutchins was waiting in a lounge at the Las Vegas airport when a federal agent and two Customs and Border Patrol ("CBP") officials approached him. Unbeknownst to him, FBI Special Agents Lee Chartier ("Chartier") and Jamie Butcher ("Butcher") had been monitoring Hutchins's whereabouts all morning, and had followed him to the airport, through security, and to his lounge. Although the FBI had originally planned to arrest Hutchins as he boarded the flight, they opted to arrest him earlier in order to ensure that he did not consume any alcoholic beverages that might affect his ability to answer questions in an interrogation. Indeed, Hutchins had spent much of the week partying, which included ingesting various intoxicating substances. He had had very little sleep the night before. There are no allegations, however, that Hutchins was intoxicated whilst at the airport—only exhausted and, it can be assumed, terribly hungover.

Thus, at approximately 1:17 p.m., Hutchins was approached in the airport lounge by two CBP officers and a plainclothes FBI agent, Chartier. These officials escorted Hutchins to a stairwell, whereupon he was handcuffed. Chartier informed Hutchins that he was under arrest pursuant to a federal warrant. The officials then led Hutchins to an interview room, where Butcher was waiting. The agents observed Hutchins to be alert, engaged, and not visibly intoxicated or disoriented. Hutchins verbally confirmed that he was able to answer questions and was not drunk. Hutchins received his *Miranda* rights orally. He was also given an advisement of rights form. He listened to his rights and signed the advisement form in the presence of both agents. There is a dispute as to

what time he signed it, but the Court does not find this to be material for reasons that will be explained below.

Hutchins then proceeded to respond to the questions asked by the agents, and gave consent for them to search his phones, laptops, backpacks, and USB drives. He did not request a lawyer or invoke his right to remain silent, although he did ask "what this is all about." The agents told him they would explain eventually, but continued questioning him. In total, Hutchins was questioned for approximately 105 minutes. He was offered food, an opportunity to use the restroom, and—eventually—allowed to contact his mother. He was not shown a copy of the arrest warrant until over an hour into the interrogation.[2]

Hutchins showed every indication of being voluntarily cooperative with the agents, but was also clearly confused about the nature of the interrogation. The interrogation began with broad questions about his career and his online activities, but about ten minutes in, the questions focused on Hutchins's involvement with malware. Hutchins acknowledged that when he was younger, he had written some code that ultimately ended up in malware, but denied that he developed malware. About eleven minutes into the interrogation, after looking at a string of code, Hutchins asked if they were looking for the developer of Kronos. Hutchins stated that

---

[2]The Court notes that the agents' testimony is somewhat contradictory on this point. Chartier stated that they showed Hutchins the warrant before the interrogation was recorded. By contrast, Butcher stated that they first showed Hutchins the warrant over an hour into the interrogation. The recording of the interrogation suggests that Butcher is correct. Specifically, over an hour into the recording, Chartier says: "Okay. Well, here's the arrest warrant. And just to be honest—just to be honest, hey, now I'm going to tell you the truth…If I'm being honest with you, Marcus, this has absolutely nothing to do with WannaCry." The balance of the evidence strongly suggests that Hutchins was not shown the arrest warrant until over an hour into the interrogation.

he did not develop Kronos, and he had "gotten out" of writing code for malware before he was eighteen. Thirteen minutes in, he said that he had feared that law enforcement authorities would come after him, instead of the actual developer, because pieces of his code appeared in Kronos. Thus, Hutchins was aware that the criminal investigation was, at least in part, about Kronos, and that he was implicated in the investigation, although he expressed confusion about why he was being detained throughout the interrogation. Almost eighty minutes into the recorded interrogation, the agents finally provided him with the warrant, and told him that it had "nothing to do with WannaCry." The interrogation continued for about twenty minutes after that. Throughout the remainder of the interrogation, Hutchins tried to be helpful but noted that he had been "out" of so-called "black hat" hacking for so long that he did not have any helpful connections.

Hutchins was taken to a jail, where he proceeded to make two phone calls, which were recorded. Prior to making the phone calls, Hutchins was informed that the phone calls were subject to monitoring and recording. In the calls, Hutchins also made incriminating statements.

4.    **ANALYSIS**

4.1    **Motion to Suppress**

Hutchins seeks to suppress his post-arrest statements and any evidence that may have been obtained as a result of his statements. He argues that he did not waive his *Miranda* rights, (Docket #55 at 6–9), and submits that the government has not met its burden in rebutting the presumption against waiver, (Docket #111 at 13). Hutchins calls into question whether (1) he received notice of his rights at all; and (2) whether he was able to voluntarily waive his rights due to his intoxication, his

limited understanding of the American criminal procedural system, and the deceptive nature of the interrogation.

It is axiomatic that law enforcement officers must inform suspects of their *Miranda* rights before a custodial interrogation. *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018). "If the suspect invokes his rights, the officers must cease their questioning." *Id*. However, before officers must cease their questioning, the burden is on the suspect to assert his *Miranda* rights in a "clear and unambiguous" fashion. *Id*. (quoting *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005)). Hutchins did not make any statements regarding his intent to invoke his *Miranda* rights; therefore, his rights were not invoked in a clear and unambiguous fashion. The interrogation properly proceeded.

However, "[e]ven if a suspect does not invoke his *Miranda* rights, his self-incriminating statements cannot be used against him in court unless the Government shows by a preponderance of the evidence that he voluntarily waived these rights." *Thurman*, 889 F.3d at 364 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 382–84 (2010); *United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2011)). Indeed, the Court must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). In order to rebut the presumption, the government must show that Hutchins's decision to give up his rights was "the product of a free and deliberate choice. . .made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382–83 (internal quotations and citations omitted).

Voluntariness, or free and deliberate choice, is assessed in view of the totality of the circumstances. *Brown*, 664 F.3d at 1118. The Court will consider, among other things, a defendant's age, level of education, and

prior experience with law enforcement, as well as the conditions of the interrogation itself and the attitude of the interrogating officials. *Thurman*, 889 F.3d at 364–65; *Brown*, 664 F.3d at 1118; *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). "The law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385; *Thurman*, 889 F.3d at 364–65 (finding waiver despite refusal to sign a waiver form because the defendant understood his rights, the interrogation was "low key and informal," and defendant engaged in the interrogation); *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (finding waiver despite refusal to sign waiver form where a suspect "immediately began talking to the agents…[and] never requested an attorney and never asked that the questioning be stopped.").

### 4.1.1 Adequate Receipt of *Miranda* Rights

Hutchins argues that there is insufficient evidence that he received notice of his *Miranda* rights. This argument is a non-starter, in part because Hutchins acknowledges that he was read his rights. (Docket #55 at 5–6) ("[T]here seems to be little doubt that the agents—in some unspecified fashion, at an uncertain time—advised Mr. Hutchins of his rights under *Miranda*."). Hutchins makes much about the fact that there is no proof that he received his rights at the beginning of the interrogation, but he does not suggest when else they may have been given. Additionally, both agents have testified, under oath and in non-contradictory terms, that the rights were given at the beginning of the interrogation. Moreover, in the recorded portion of the interrogation, Butcher provided Hutchins with a consent form to search his computers and said, "because we're the government, there's a form for that, too," implying that Hutchins had previously

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 8 of 32   Document 117

received other consent forms. The Court sees no reasonable basis to conclude that Hutchins did not receive notice of his rights before the interrogation.

Additionally, it does not actually matter when Hutchins signed the advisement of rights form, so long as he was apprised of his *Miranda* rights prior to questioning. "[T]he rigidity of *Miranda* does not extend to the precise formulation of the warnings given a criminal defendant. . .[and] no talismanic incantation is required to satisfy its strictures." *Duckworth v. Eagen*, 492 U.S. 195, 202–03 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981)) (internal quotation marks omitted). Courts merely look to whether the law enforcement officers "fully conveyed" the rights. *Prysock*, 453 U.S. at 361; *In re Terrorist Bombing of U.S. Embassies in E. Africa*, 552 F.3d 177, 209 (2d Cir. 2008) (oral warnings sufficient to satisfy *Miranda* regardless of any alleged deficiencies in the advisement of rights form). In light of Hutchins's admission that he received his *Miranda* rights, and in light of the agents' corroborating testimony that this occurred before the interrogation, as well as the lack of any indication of when else he may have received them, the Court finds that Hutchins was sufficiently apprised of his rights before the interrogation.

### 4.1.2    Voluntariness of Waiver

The waiver of Hutchins's *Miranda* rights must have been "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Hutchins must also have waived his rights with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Hutchins argues he did not voluntarily waive his *Miranda* rights because he was intoxicated, unsure

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 9 of 32   Document 117

about American criminal procedure, and deceived by the questioning agents as to the nature of his arrest. These factors will be assessed in turn.

#### 4.1.2.1    Intoxication

In assessing the validity of a *Miranda* waiver, courts may consider intoxication, lack of sleep, or other physical discomfort as they affect a defendant's susceptibility to coercion. *See United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) (finding voluntary waiver despite the fact that defendant was high on crack, sleep deprived, and in pain). However, "intoxication. . .by itself—without some showing of coercion by the government—will not negate voluntariness." *United States v. Chrimson*, 965 F.2d 1465, 1469 (7th Cir. 1992); *Anderson v. Thieret*, 903 F.2d 526, 530–31 (7th Cir. 1990) (noting that impairment is unlikely where approximately 19 hours had elapsed between the defendant's last drink and his confession). Additionally, "mental state alone cannot make [a defendant's] confession involuntary. . .[I]t is relevant only to the extent it made him more susceptible to mentally coercive police tactics." *Id.* at 530 n.1 (citing *Colorado v. Connelly*, 479 U.S. 157, 163–67 (1986)).

It is unlikely that Hutchins's alleged impairment significantly factored into his ability to give a voluntary waiver or made him more susceptible to deceptive interrogation tactics. The agents monitored Hutchins from the beginning of the day to ensure that he was sober when he was arrested. They ensured that he was in custody before he had the opportunity to drink at the airport. They walked him to two separate locations (first, the stairwell; second, the interview room) and engaged him in conversation, which gave them opportunity to evaluate whether Hutchins appeared to be somehow impaired by an intoxicant. Hutchins appeared to be alert, engaged, coordinated, and coherent. There is no

evidence in the record to the contrary. There is also no evidence, nor does Hutchins claim, that he was under the influence of drugs that day—only that he was exhausted. But a terrible hangover alone does not, as a matter of law, render someone unable to exercise or waive their *Miranda* rights. This factor does not weigh in Hutchins's favor.

### 4.1.2.2    Intelligent Waiver

Hutchins next argues that he did not appreciate the nature of his *Miranda* rights, or the consequences of waiving them, because he was confused by the purpose of the interrogation, and believed, based on U.K. criminal procedure, that it would be helpful for him to speak in his defense. (Docket #111 at 13).[3]

The Court takes judicial notice of the warning given to suspects upon arrest in the U.K., which advises: "You do not have to say anything. But it may harm your defence if you do not mention when questioned something which you later rely on in Court. Anything you do say may be given in evidence." Police and Criminal Evidence Act 1984 Code G ¶ 3.5, Revised Code of Practice for the Statutory Power of Arrest by Police Officers (revised                          July                          2012), https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/117583/pace-code-g-2012.pdf. For comparison, an arrest warning in the United States reads to the effect of, "you have the right to remain silent,

---

[3] Hutchins also stresses that agents arrested him at the last possible moment, rather than on July 11, 2017, when the indictment came in, in order to confuse him. The logic underlying this argument is not entirely clear, and there are other obvious, less nefarious reasons why there might be a delay in the arrest (*e.g.,* the desire to prolong the investigation throughout the conference; the arrest logistics). It is not eminently clear what is confusing about being arrested *on the plane* versus at any point earlier.

anything you say can and will be used against you in a court of law." *See e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

On its face, the U.K. warning appears to serve the same function as the U.S. warning, but there are important differences that theoretically would have affected whether Hutchins appreciated the consequence of giving up his right to remain silent. In the U.K., a defendant is told, "You do not have to say anything." There is neither right, nor waiver—the consequence stems, in fact, from *not* saying anything ("it may harm your defence if you do not mention when questioned…"). By contrast, in the U.S., a defendant is told "you have a right to remain silent," and the consequences of failing to remain silent are clear: "anything you say can and *will be used against you*." The warnings—and their consequences—are substantively different, although their cadences are similar. It is conceivable that anyone—even a well-educated person—would find comfort in the broad similarities between the two, and believe that, wording aside, the substance is the same.

The Seventh Circuit has held that *Miranda* waivers are valid so long as the defendant has a general understanding of the nature of the right, and the consequences of waiver. *See Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). In *Gaetz*, which evaluated a person of limited mental capacity's ability to waive his rights, the Court of Appeals referred to a "relatively low bar in proving an intelligent waiver," whereby a defendant need only comprehend the most basic concepts underlying *Miranda*. *Id.* Other circuits to consider this issue in the context of foreign citizens have invalidated a waiver only where the defendant's grasp on the interrogating language was so attenuated that he could not intelligently waive his rights. *See United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000) (finding that a defendant's

lack of contact with the U.S. criminal justice system and the Japanese consulate "did not render his waiver involuntary" in light of evidence that he understood English, was read his rights twice, and claimed to understand them); *c.f. United States v. Garibay*, 143 F.3d 534, 538–39 (9th Cir. 1998) (finding no valid waiver where the defendant was not fluent in English and had a low verbal IQ); *United States v. Zaitar*, 858 F. Supp. 2d 103, 115–16 (D.D.C. 2012) (finding no valid waiver of counsel during an interview in Romania conducted in Portuguese by American officials, where the defendant, a native Lebanese speaker, responded affirmatively to all questions except the question regarding waiver of counsel, to which he replied, nonsensically, "I understand Portuguese.").

Hutchins is a well-educated English-speaker from a common law country. Although there is no language barrier, he claims that he did not understand the consequences of waiving his *Miranda* rights in light of the subtle, but substantive, differences between U.S. and U.K. arrest procedure. The Court is inclined to agree that these differences, though small, are elemental enough that they may have affected Hutchins's understanding of the basic concepts underlying *Miranda* (i.e., whether it would be helpful for him to speak). However, in light of Hutchins's mental acuity, the Court cannot find that his waiver was unintelligent. This factor does not weigh heavily in his favor.

### 4.1.2.3    Deception

In order to establish that his statement was the product of deception, Hutchins bears the burden of showing by "clear and convincing evidence that that the agents affirmatively mislead him as to the true nature of their investigation." *United States. v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983). "Defendant must also prove that the misinformation was material in his

decision to speak with the agents." *Id.* "Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Id.* The fact that an agent makes misrepresentations to a defendant, while relevant, is "insufficient. . .to make [an] otherwise voluntary confession inadmissible." *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *but see United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017) (finding that a defendant's will was "overborne or his capacity for self-determination critically impaired" where he voluntarily went to the police station under the pretense of retrieving an impounded car, was repeatedly told that he was not under arrest or investigation, but was interrogated anyway).

In *Serlin*, a defendant was questioned by the IRS regarding a criminal investigation, but did not realize that he was the target of the investigation. 707 F.2d at 957. The agents initially told him they were investigating his business partners, but several minutes into the interview, warned the defendant not to make incriminating statements. *Id.* The defendant continued to speak. *Id.* The Seventh Circuit determined that the defendant's statements "were not the product of affirmative deceit," in large part because the statements that the agents made were true—the agents were, in fact, investigating the defendant's business partners as well. *Id.* Moreover, the agents warned the defendant not to incriminate himself, and then specifically asked about his own failure to file taxes. *Id.* On those facts, the Seventh Circuit determined that "even the most unsuspecting taxpayer [would be alerted that he] was, at least partly, the focus of the search." *Id.*

In this case, Hutchins received his *Miranda* rights and understood that he was under arrest for alleged criminal activity, and the investigation related, at least in some way, to Kronos. However, Hutchins's recent triumph with WannaCry had vaulted him into the public eye as a "white hat" hacker. Thus, Hutchins could have been reasonably confused about the FBI's interest in him. In assessing whether he voluntarily waived his rights, some consideration must be given to the fact that white hat hacking is a complex and relatively novel field that can toe an already blurry line vis-à-vis online criminal activity. The agents did not tell Hutchins why he was under arrest, and did nothing to explain the nature of the charges against him until the end of his interrogation. Hutchins, who had no cause for concern regarding his role in WannaCry, and who had distanced himself from nefarious internet activity, cooperated. The interrogation ended twenty minutes after he was presented with the warrant, though he continued to consent to searches and answer questions after he understood the charges against him.

This case differs from *Serlin* in one salient way: Hutchins had already been indicted on a host of specific charges. Thus, the aim of the agents' questioning was not to cobble together enough information to establish probable cause for arrest, as it was in *Serlin*. Rather, the purpose of the interrogation was to continue collecting enough evidence to establish guilt beyond a reasonable doubt. The stakes were dramatically higher, and Hutchins's privilege against self-incrimination all the more precious. The government argues that this fact cuts against Hutchins—that is, he understood that the "nature" of the investigation was criminal, and should have known not to make incriminating statements. However, this ignores the context of Hutchins's work as a hacker. Hutchins had recently dealt

with matters of international concern, and reasonably believed that it was in his best interest to answer their questions. At one point in the interrogation, he made a comment that showed that he did not realize he had even been indicted. There is no reason why the government could not have told him exactly why he was arrested, as he requested, and as was required of them by Federal Rule of Criminal Procedure 4(c), unless they were concerned that he would not be cooperative with them. There is certainly an element of deception to this set of events that the Court does not endorse.

On the other hand, the scope of the agents' questions should have put Hutchins on notice of the nature of the investigation. The agents did not try to "hide the ball," so to speak, about their interest in Kronos, and asked him about it early and often in the interrogation. And although the agents acted very familiarly with Hutchins, which may have put him at false ease, Chartier did remind him that he was in trouble. The Court is concerned by the abject failure of the agents to abide by the Federal Rules of Criminal Procedure 4(c), but their obvious interest in Kronos—including providing Hutchins with a string of code related to Kronos—leads the Court to conclude that there is not clear and convincing evidence that they acted with intent to deceive. Moreover, the fact that Hutchins continued to answer questions and consented to the search after he knew the substance of the indictment indicates that the deception was not material to his statements—that is, it seems that he would have attempted to be helpful even if he had seen the warrant.[4]

_____

[4]Hutchins does not argue the effect of the violation of Federal Rule of Criminal Procedure 4(c)(3)(A), which governs execution of a warrant:

#### 4.1.2.4      Totality of the Circumstances

Under the totality of the circumstances—considering Hutchins's exhausted state, his unfamiliarity with the American criminal procedure system, his high level of intelligence, and the lack of material deception, there is an insufficient basis for the Court to find that Hutchins's statements were involuntary. It is wholly improper that he was not provided with a warrant immediately upon arrest. But in light of the record of the post-arrest interrogation, the government has met its burden in proving that the waiver was voluntary. *Thurman*, 889 F.3d at 364.

### 4.2      Motion to Dismiss

Hutchins advances several motions to dismiss, all of which must be denied for the reasons given below. A motion to dismiss is proper where an indictment fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). The indictment must contain a "plain, concise, and definite written statement of

---

Upon arrest, an officer possessing the original or a duplicate original warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged and, at the defendant's request, must show the original or a duplicate original warrant to the defendant as soon as possible.

Few courts have had moment to consider whether a violation of this rule would warrant exclusion of evidence, though it certainly might, for deterrent purposes, if the violation compromised a substantive constitutional right and the officers acted bad faith. *Bryson v. United States*, 419 F.2d 695, 701–02 (D.C. Cir. 1969); *Murray v. United States*, 855 P.2d 350, 353–56 (Wyo. 1993); *United States v. Hamilton*, 2017 WL 9476881, at *5 (N.D. Ga. Jan. 3, 2017). However, Hutchins did not raise this issue, so the Court will not consider it. Additionally, even if his statements were excluded, it is likely that the physical evidence still would be admissible. *See United States v. Patane*, 542 U.S. 630, 637–38 (2004) (failure to give *Miranda* warnings requires suppression of voluntary statements, but does not require suppression of physical evidence acquired as a result of those voluntary statements).

Case 2:17-cr-00124-JPS    Filed 02/11/19    Page 17 of 32    Document 117

the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment meets this rule's criteria if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). A charge that traces the language of the statute will typically suffice if it contains enough facts to provide the defendant with an understanding of the conduct at issue. *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). "[T]he presence or absence of any particular fact is not dispositive." *Id.* (quoting *White*, 610 F. 3d at 958–59). "A motion to dismiss is not intended to be a 'summary trial of the evidence.'" *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) (quoting *United States v. Winer*, 323 F. Supp. 604, 605 (E.D. Pa. 1971)). The Court will not assess "the strength or weakness of the government's case" at this stage—rather, it will consider whether the government is theoretically able to prove its case. *White*, 610 F.3d at 958; *United States v. Castor*, 558 F.2d 379, 384–85 (7th Cir. 1997).

As Magistrate Joseph noted, the superseding indictment is facially sufficient because each charge in it lists the date of the alleged wrongful conduct, the elements of the crime charged, and the nature of the offense charged—including the software at issue—such that Hutchins would be protected from double jeopardy. *See* (Docket #109 at 20). The Court also agrees with Magistrate Joseph's analysis of *United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988), wherein the Seventh Circuit dismissed an indictment where the government provided a set of undisputed facts that did not constitute a violation of any statute. In *Risk*, the issue was not that the government failed to allege enough facts—it was that the facts the

government itself alleged could not, as a matter of law, result in a violation of a statute. *Id.* at 1061. By contrast, here, the government has alleged that Hutchins engaged in behavior that violated various statutes, and the government has not provided a set of undisputed facts to the contrary.

Accordingly, the Court agrees with Magistrate Joseph's determination that the superseding indictment is sufficient. In the interest of thoroughness, Hutchins's specific arguments will be addressed below.

### 4.2.1 Counts One and Seven Allege "Damage" Under 18 U.S.C. § 1030

Counts One and Seven are brought under the CFAA and allege that Hutchins conspired and attempted to cause damage to protected computers. Specifically, Count One alleges that between "July 2012 and September 2015, in the state and Eastern District of Wisconsin," Hutchins "knowingly conspired and agreed with Individual A . . . to:

> (a) knowingly cause and aid and abet the transmission of a program, information, code, and command, and as a result of such conduct, intentionally **cause damage without authorization**, to 10 or more protected computers during a 1-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), (c)(4)(B)(i) and (c)(4)(A)(i)(VI) and 2." (Docket #86 at 3) (emphasis added).

Relatedly, Count Seven alleges that:

> "On or about June 11, 2015, in the state and Eastern District of Wisconsin and elsewhere, MARCUS HUTCHINS, aka 'Malwaretech,' aka 'irp@jabber.se,' knowingly caused and aided and abetted the transmission of a program, information, code and command and as a result of such conduct, **attempted to cause damage without authorization**, to 10 or more protected computers during a 1-year period. In violation of Title 18, United States Code, Sections 1030(a)(5)(A), (c)(4)(B)(i) and (ii), (c)(4)(A)(i)(VI), 1030(b), and 2." (Docket #86 at 12) (emphasis added).

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 19 of 32   Document 117

Each count is facially sufficient because it traces the language of the statute, cites to the statute, and provides a date (and a location) for the alleged conduct. *Vaughn*, 722 F.3d at 925. Count One contains additional allegations, including that Hutchins developed UPAS Kit and provided it to Individual A, who sold it to an individual in the Eastern District of Wisconsin. (Docket #86 at 4). The count goes on to allege that Hutchins developed Kronos intending for Individual A to advertise, promote, and sell it; used a YouTube video to demonstrate how Kronos worked; updated the Kronos malware; and evaluated competing malwares. *Id.* at 4–5. Finally, it alleges that Hutchins referred prospective customers to Individual A. *Id.* at 6.

Hutchins argues that the facts as alleged are insufficient to state an offense. He submits that Counts One and Seven "fail[] to allege any facts that would show that Mr. Hutchins had any intent to cause 'damage' to a protected computer" because the superseding indictment does not allege that the malware at issue "damage[s]" computers. (Docket #95 at 1 and #111 at 28). The CFAA defines damage as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The superseding indictment states that UPAS Kit is a "malware" that allows for "unauthorized exfiltration," and Kronos is a "malware" that "recorded and exfiltrated" various data. (Docket #86 at 2). Hutchins suggests that "exfiltrate" means "making a copy of the data and taking it away," (Docket #95 at 5), which is not "damage" under the CFAA.

The Seventh Circuit has held that "damage encompasses clearly destructive behavior such as using a virus or worm or deleting data. . .[b]ut it may also include less obviously invasive conduct, such as flooding an email account." *Fidlar Tech. v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 20 of 32   Document 117

1075, 1084–85 (7th Cir. 2016) (quotations omitted) (finding that a claim involving a web-harvester was "trespassory in nature" but "mere access" did not amount to damage under the CFAA). The word "exfiltrate" has several definitions, one of which is: "to steal (sensitive data) from a computer (as with a flash drive)." *Exfiltrate, Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/exfiltrate (accessed Jan. 19, 2019). When a person "steals (sensitive data)," as a matter of logic, they "impair[]. . .the integrity. . .of [the] data [or]. . .system." 18 U.S.C. § 1030(e)(8). This is more than merely accessing data. *C.f. Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 993–94 (E.D. Wis. 2010) (finding no damage where former employee accessed and disclosed client list by emailing it to herself). The superseding indictment also describes the software at issue as "malware" or "malicious computer code intended to damage a computer." (Docket #86 at 2). These terms are sufficient to allege intent to cause damage. The burden will be on the government to prove this at trial.

### 4.2.2 Counts One Through Six Refer to a "Device" Under 18 U.S.C. § 2510(5)

Counts One through Six are brought under the Wiretap Act, which criminalizes activity involving "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5). Hutchins argues that software such as Kronos and UPAS Kit should not be considered "devices" for the purposes of the Wiretap Act because software is not an "electronic, mechanical, or other device" under Section 2510(5). Hutchins relies on *United States v. Szymuszkiewicz*, in which the Court of Appeals assumed that "devices" referred to computers and servers that carried out a program, rather than the program itself. 622 F.3d 701, 707 (7th

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 21 of 32   Document 117

Cir. 2010) (discussing a Microsoft Outlook "rule" for email forwarding). In *Szymuszkiewicz*, the Court of Appeals considered whether "the 'device' used to intercept a communication must differ from the device the intended audience uses to receive the message," and determined that it did not. *Id.* The opinion did not consider whether a program or a piece of software could be considered a "device." Hutchins also relies on *Potter v. Havlicek* for the proposition that a software "alone cannot be used to intercept communications. It must be installed in a device, such as a computer, to be able to do so." 2008 U.S. Dist. LEXIS 122211, at *23–24 (S.D. Ohio June 23, 2008). The *Havlicek* court did not cite any cases directly in support of its conclusion, and this Court finds its definitional logic faulty: computers, alone, also cannot be used to intercept communications. They require some software or program installed in order to have this capability.

The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the Wiretap Act. *See Luis v. Zang*, 833 F.3d 619, 630 (6th Cir. 2016) (accepting that a software could be a "device" for the purpose of the Wiretap Act); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1087 (N.D. Cal. 2015) (concluding that a software was an "electronic, mechanical or other device"); *Klumb v. Goan*, 884 F. Supp. 2d 644, 661–62 (E.D. Ten. 2012) (analyzing spyware software as a device under Wiretap Act); *Rene v. G.F. Fishers, Inc.*, 817 F. Supp. 2d 1090, 1094 (S.D. Ind. 2011) (holding that keystrokes are not electronic communications for the purpose of the Wiretap Act, but accepting the notion that software could be a device); *Shefts v. Petrakis*, 2012 WL 4049484, at *8–9 (C.D. Ill. 2012) (analyzing software as a device under the Wiretap Act); *see also United States v. Barrington*, 648 F.3d 1178, 1203 (11th Cir. 2011)

(accepting that a keylogger software could be considered a scanning receiver, or a device, under 18 U.S.C. § 1029(e)(8)).

The Court is in accord with the majority of courts to consider this issue. The Court also agrees with the government's position that Section 2510(5)'s reference to "mechanism," which is commonly defined as a "process, technique, or system for achieving a result" seems to encompass software. *Mechanism*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/mechanism (accessed Jan. 22, 2019); *see also United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005) (acknowledging that general technology statute should be read broadly in order to accommodate new developments).

### 4.2.3 Counts One, Four Through Eight, and Ten Allege Intent and Causation

Hutchins argues that the superseding indictment does not allege the necessary intent and causation elements in Counts One, Four through Eight, and Ten. The aforementioned counts each contain an intent element in connection with allegedly distributing malware for illegal purposes. Hutchins argues that the superseding indictment fails to specifically allege that he "intended any specific result to occur" as a result of his activities, and therefore, the superseding indictment does not state offenses. (Docket #95 at 12).

These are arguments that go to the merits of the case, i.e., whether Hutchins had the requisite intent to commit the crimes charged. As discussed above, the superseding indictment is facially valid, and Hutchins does not contend that these specific counts lack all elements of the crimes charged, fail to inform him of the nature of the offenses, or are so insufficiently pled that he would be prevented from asserting any judgment

as a bar to future prosecutions of the same offense. *Vaughn*, 722 F.3d at 925.

The superseding indictment does not need to establish intent—it merely

needs to allege it, which it does by listing the elements of the crimes

charged. As the magistrate noted, Hutchins "tries to impose a standard for

civil pleading on a criminal indictment." (Docket #109 at 26). Therefore, this

motion to dismiss will be denied.

### 4.2.4   Counts Two and Three are not Multiplicitous

Hutchins contends that Counts Two and Three are multiplicitous

and submits that Count Three should be dismissed. (Docket #95 at 9–11).

Count Two charges Hutchins with a violation of 18 U.S.C. § 2512(1)(c)(i),

Count Three charges Hutchins with a violation of 18 U.S.C § 2512(1)(c)(ii).

"If one element is required to prove the offense in one count which is not

required to prove the offense in the second count, there is no multiplicity."

*United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002) (citing *United States*

*v. Briscoe*, 896 F.2d 1476, 1522 (7th Cir. 1990) (quoting *United States v.*

*Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986)) (internal citations and

quotations omitted)). Put another way, the Court must determine whether

each count requires proof of a fact that the other does not.

The relevant portions of the statute make it unlawful for a person to

intentionally:

"(c) place[] in any newspaper, magazine, handbill, or other
publication or disseminate[] by electronic means any advertisement
of—

(i) any electronic, mechanical, or other device knowing or
having reason to know that the design of such device renders
it primarily useful for the purpose of the surreptitious
interception of wire, oral, or electronic communications; or

(ii) any other electronic, mechanical, or other device, where such advertisement promotes the use of such device for the purpose of the surreptitious interception of wire, oral, or electronic communications." 18 U.S.C. § 2512(1)(c)(i),(ii).

In other words, Count Two, Section 2512(1)(c)(i), requires that Hutchins (1) made an advertisement with (2) knowledge or reason to know that the device's primary design was for surreptitiously infiltrating communication. There is no element requiring that Hutchins promoted the device as one that could be used for the surreptitious interception of communication, only that he knew its primary design was that.

By contrast, Count Three, Section 2512(1)(c)(ii), requires that Hutchins (1) made an advertisement with (2) the claim or promotion that a device could be used for the surreptitious interception of communication. Count Three does not require that Hutchins knew or had reason to know that its primary design was surreptitious interception of communication, as Count Two requires, only that he promoted it for that purpose.

Each count contains an element required to prove the offense that is not required in the other count, and the counts require proof of different facts. There is no multiplicity.

### 4.2.5 Count Seven does not Contain a Grand Jury Defect

As discussed above, Count Seven alleges violations of the CFAA, which criminalizes actions intended to damage protected computers. 18 U.S.C. § 1030(a)(5)(A) applies to one who "intentionally causes damage without authorization." Count Seven charges Hutchins with "attempt[ing] to cause damage without authorization." (Docket #86 at 12). To prove an attempt to violate Section 1030(a)(5)(A), the government must prove that (1) Hutchins *knowingly* took a substantial step toward committing a

violation of Section 1030(a)(5)(A) and (2) that he did so *with the intent* to violate § 1030(a)(5)(A). *Seventh Circuit Pattern Jury Instruction 4.09* (2012) (emphasis added). It is fairly well settled that allegations of "attempt" necessarily encompasses the intent element. *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007) (holding that "the word 'attempt' as used in common parlance connote[s] action rather than mere intent, but more importantly, as used in the law for centuries, it encompasses *both* the overt act and intent elements.") (emphasis added). The indictment must "set forth all the elements necessary to constitute the offense intended to be punished" and allow defendant to "pin[] down the specific conduct at issue." *Smith*, 230 F.3d at 305 (internal citations omitted). However, the absence of any particular fact is not necessarily dispositive, and indictments are reviewed "on a practical basis and in their entirety, rather than in a hypertechnical manner." *Id.* (quotations and citations omitted); *see also* (Docket #109 at 29).

Hutchins argues that he cannot be charged with attempt to aid and abet an attempt to violate the CFAA because Count Seven is pled "without reference to the intentional causing of damage," as stated in the statute. (Docket #92 at 5). The superseding indictment alleges that Hutchins attempted to cause damage, which encompasses the intent element. Whether the government can actually prove this at trial is a question for another time.

### 4.2.6 Extraterritorial Challenges

Hutchins argues that Counts Two and Three, which arise under the Wiretap Act, are an improper exercise of extraterritoriality because they do not charge domestic conduct. (Docket #96 at 6). He further argues that Congress did not intend for the Wiretap Act, 18 U.S.C. § 1343, or 18 U.S.C.

§ 1001 to have extraterritorial application, "so the government must allege domestic violations of those statutes to state viable claims." *Id.* at 8.

The Court generally agrees with the magistrate's finding that the superseding indictment alleges domestic violations of all statutes, and therefore there is no extraterritoriality issue at hand. For example, the superseding indictment alleges that the criminal conduct in question occurred in the Eastern District of Wisconsin. (Docket #86). Specifically, it alleges that Hutchins developed UPAS Kit and provided it to Individual A, who subsequently sold it to someone in the Eastern District of Wisconsin. *Id.* at 4. The superseding indictment further alleges that Hutchins developed Kronos and provided it to Individuals A and B, the former of whom advertised, marketed, and sold Kronos in the Eastern District of Wisconsin. *Id.* at 4–6. It also alleges that Hutchens used a YouTube video to promote the sale of Kronos, and referred interested purchasers of Kronos to Individual A. *Id.* at 4, 6. As Magistrate Joseph and this Court have repeatedly stated, "whether the government will be able to prove that is a question for another day." (Docket #109 at 31). However, as stated, the charges sufficiently allege activity in the United States, specifically in the Eastern District of Wisconsin. There is no extraterritorial activity at issue.

However, because there is confusion about the proper standard to apply in the extraterritorial analysis, the Court takes this opportunity to clarify the issue in case it should arise in the future. There is a presumption against applying statutes extraterritorially because "Congress generally legislates with domestic concerns in mind." *Small v. United States*, 544 U.S. 385, 388 (2005) (quotations and citations omitted). This broad presumption applies in all cases, "preserving a stable background against which Congress can legislate with predictable effects." *Morrison v. Nat'l Australian*

*Bank Ltd.*, 561 U.S. 247, 261 (2010). "[G]eneral reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality." *Id.* at 263. Although Congress does not need to explicitly state a rule of extraterritoriality and "context can be consulted," there must be an "affirmative indication" of Congress's extraterritorial intent. *Id.* at 265.

Thus, the first step in any inquiry—civil or criminal—is "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016) (discussing RICO statute's extraterritorial hold). If there is no clear, affirmative indication of extraterritorial application, courts are instructed to consider

> whether the case involves a domestic application of the statute. . .by looking to the statute's focus. If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.
> *Id.* (quotation marks omitted).

In other words, if there is no clear Congressional intent for extraterritoriality, the Court must determine (1) the statute's focus and (2) whether the conduct relevant to the focus occurred in the United States. *Id.*

The government and the magistrate rely on *United States v. Bowman*, 260 U.S. 94, 98–99 (1922) and *United States v. Leija-Sanchez*, 602 F.3d 797, 799 (7th Cir. 2010) ("*Leija-Sanchez I*") to stand for the broad proposition that the presumption against extraterritoriality does not apply to criminal cases. In

light of *Morrison* and *RJR Nabisco*, this is not the correct standard. However, neither case has been overruled—and, indeed, there is no conflict with their holdings.

In *Bowman,* the Supreme Court held that a criminal fraud statute applied to certain extraterritorial conduct at sea and in foreign ports after finding that Congress must have intended it to apply to at-sea vessels and foreign ports. 260 U.S. at 102. Although the statute did not explicitly say that it applied extraterritorially, the Supreme Court determined that Congress's intent for extraterritorial application could be inferred from the function of the statute and from other sections in the statute's chapter, which was titled, "Offenses against the Operation of Government." *Id.* at 98–99; *see also*; *RJR Nabisco*, 136 S. Ct. at 2102 ("an express statement of extraterritoriality is not essential."). Thus, the *Bowman* opinion shows the Supreme Court's determination that there was a "clear, affirmative indication" that the statute applied extraterritorially. *See Morrison*, 561 U.S. at 265; *RJR Nabisco*, 136 S. Ct. at 2101.

In 2016, the Seventh Circuit upheld its decision in *Leija-Sanchez I*, which found that a criminal RICO statute applied extraterritorially to individuals who murdered a Mexican man in Mexico. *United States v. Leija-Sanchez II*, 820 F.3d 899, 900 (7th Cir. 2016) (*Leija-Sanchez II*). Ten days after the Seventh Circuit denied rehearing in *Leija-Sanchez II*, the Supreme Court issued *RJR Nabisco,* which noted that "[t]he unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *RJR Nabisco*, 136 S. Ct. at 2103. In the *Leija-Sanchez* cases, the murder was arranged and paid for in the United States in order to protect a criminal organization based in the United States, whose focus was defrauding the United States government. *See Leija-*

*Sanchez II,* 820 F.3d at 901. The Court will not take it upon itself to re-write the Seventh Circuit's analysis in light of *RJR Nabisco,* but merely observes that it is possible to reconcile *Leija-Sanchez I & II* with the rule in *RJR Nabisco.*

Therefore, the proper rule to apply is that of *RJR Nabisco*: if Congress has not evinced an affirmative intent to apply the statute extraterritorially, the Court must assess the focus of the statute, and determine whether the conduct relevant to the focus occurred in the United States. Under *RJR Nabisco*, some conduct could occur outside of the United States as long as the conduct relevant to the focus of the statute occurred inside the United States. However, as stated above, the conduct that the superseding indictment alleges took place in the United States. Therefore, the Court need not evaluate Sections 2512, 1343, or 1001 for extraterritorial application.

### 4.2.7   Counts One Through Eight and Ten do not Violate Due Process

Hutchins argues that there is an insufficient nexus between his conduct and the United States, which violates his Due Process rights. Generally, a defendant must have adequate contacts with the United States in order to support United States jurisdiction. *See In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009); Restatement (Third) of Foreign Relations Law §§ 402, 403 (1987); *see also United States v. Yousef*, 750 F.3d 254, 262 (2d Cir. 2014) ("The due process requirement that a territorial nexus underlie the extraterritorial application of a criminal statute. . . protects criminal defendants from prosecutions that are arbitrary or fundamentally unfair.") (citations and quotations omitted).

As the magistrate noted, the government's superseding indictment states the approximate date and location for each charge, and briefly

Case 2:17-cr-00124-JPS   Filed 02/11/19   Page 30 of 32   Document 117

describes the allegedly unlawful conduct that occurred in the United States. To the extent that the government prosecutes Hutchins's activities within the United States—specifically, the Eastern District of Wisconsin—the Court finds that there is adequate nexus as alleged in the superseding indictment. For example, if, as it is alleged, Hutchins promoted his malware to individuals in the Eastern District of Wisconsin, then he could reasonably foresee being haled before this Court for trial on that issue. *See United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006) ("The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial.") (citations and quotations omitted). Whether Hutchins actually did any of the alleged conduct is a question for the jury.

### 4.2.8 The Superseding Indictment Properly Alleges Count Nine

Count Nine charges Hutchins with lying to the FBI in violation of 18 U.S.C. § 1001(a)(2). (Docket #86 at 14). The crux of Hutchins's argument here is that Count Nine should be dismissed if Counts One through Eight and Ten are dismissed, because the FBI "had no power to exercise authority against Mr. Hutchins." (Docket #105 at 17) (citations and quotations omitted). Because none of the charges above are dismissed, the Court finds that the FBI was properly within its jurisdiction to investigate these claims. Therefore, the charge that Hutchins lied to the FBI must also go forward.

### 5. Conclusion

The Court lacks a sufficient basis to grant the motion to suppress or the motions to dismiss. Indeed, many of Hutchins's contentions are not properly resolved at the motion to dismiss stage. Therefore, the Court adopts the magistrate's recommendation to deny all motions.

Accordingly,

**IT IS ORDERED** that Marcus Hutchins's motion to suppress (Docket #55) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Marcus Hutchins's motion to dismiss (Docket #56) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Marcus Hutchins's motions to dismiss (Docket #92, #95, and #96) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that Marcus Hutchins's objections to Magistrate Judge Nancy Joseph's Report and Recommendation (Docket #111) be and the same are hereby **OVERRULED** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that Magistrate Judge Nancy Joseph's Report and Recommendation (Docket #109) be and the same is hereby **ADOPTED** in accordance with the terms of this Order.

Dated at Milwaukee, Wisconsin, this 11th day of February, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge