UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td>Case No. CR 17-124</td></tr>
<tr><td></td><td>)</td><td>Milwaukee, Wisconsin</td></tr>
<tr><td>vs.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>July 26, 2019</td></tr>
<tr><td>MARCUS HUTCHINS,</td><td>)</td><td>11:30 a.m.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
</table>

----------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE J.P. STADTMUELLER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        **Benjamin W Proctor**
                           **Benjamin P Taibleson**
                           United States Department of
                           Justice (ED-WI)
                           Office of the US Attorney
                           517 E Wisconsin Ave - Rm 530
                           Milwaukee, WI 53202
                           414-297-4525
                           Fax: 414-297-1738
                           benjamin.proctor@usdoj.gov
                           benjamin.taibleson@usdoj.gov


U.S. Probation Office:     JAMES P. FETHERSTON (414) 297-1736

U.S. Official Reporter:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:         WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

APPEARANCES CONT'D:

For the Defendant:                    **Brian E Klein**
                                      Baker Marquart LLP
                                      777 S Figueroa St - Ste 2850
                                      Los Angeles, CA 90012
                                      424-652-7800
                                      Fax: 424-652-7878
                                      Email: bklein@bakermarquart.com

                                      **Marcia C Hofmann**
                                      Zeitgeist Law PC
                                      25 Taylor St
                                      San Francisco, CA 94102
                                      415-830-6664
                                      Email: marcia@zeitgeist.law

                                      **Emily Stierwalt**
                                      Baker Marquart LLP
                                      777 S Figueroa St - Ste 2850
                                      Los Angeles, CA 90017
                                      424-652-7800
                                      Fax: 424-652-7850
                                      estierwalt@bakermarquart.com

P R O C E E D I N G S

**(Call to Order of the Court at 11:28 a.m.)**

THE CLERK:  The Court calls the *United States of America vs. Marcus Hutchins*, Case No. 17-CR-124, for a sentencing hearing.  May I have the appearances beginning with the Government?

MR. PROCTOR:  Good morning, Your Honor.  Benjamin Proctor and Benjamin Taibleson appearing for the United States.

PROBATION OFFICER:  Good morning, Your Honor.  Jim Fetherston from Probation.

MR. KLEIN:  Good morning, Your Honor.  Brian Klein on behalf of Marcus Hutchins.

MS. HOFMANN:  Marsha Hofmann on behalf of Marcus Hutchins.

MS. STIERWALT:  Emily Stierwalt on behalf of Marcus Hutchins.

MR. KLEIN:  And Mr. Hutchins is here, out of custody.

THE COURT:  Thank you.  Good morning, counsel, and good morning to Mr. Hutchins, and good morning to our probation officer.

Marcus Hutchins, back on May 2nd of this year, you entered pleas of guilty and were later adjudged guilty of two of the offenses charged in the ten-count indictment pending against you, that being the superseding indictment.

The offense charged in Count 1 constitutes a violation

1    of Title 18 of the United States Code, Section 371; the offense

2    charged in Count 2 constitutes a violation of Title 18 U.S.C.

3    § 2512(1)(c)(i), and 2.

4           We have now reached that stage of these proceedings

11:30    5    where it becomes the duty of the Court to address several

6    questions to both you and counsel.  First of all, Mr. Hutchins,

7    have you had sufficient opportunity to review the revised

8    presentence report prepared in your case under date of July 23rd

9    of this year, as well as the addendum to that report which bears

11:31    10    the same date, July 23rd?

11           THE DEFENDANT:  I have, Your Honor.

12           THE COURT:  Thank you.

13           Similarly, counsel for the defendant, Mr. Klein and

14    your colleagues, have you had an opportunity to review those

11:31    15    documents?

16           MR. KLEIN:  We have, Your Honor.

17           THE COURT:  And are there any facts disclosed in the

18    numbered paragraphs that either you or your client take issue

19    with or otherwise seek clarification on?

11:31    20           MR. KLEIN:  There is one minor one, Your Honor.  And I

21    would turn your attention to paragraph 147 of the revised PSR.

22    It's on page 28.

23           THE COURT:  All right.

24           MR. KLEIN:  I believe under the new calculation by the

11:31    25    Probation Office in the report, Mr. Hutchins is now in Zone B

4

1    and he actually would be eligible for probation.  So I believe

2    this should be changed to say he is eligible for probation now.

3              THE COURT:  Thank you.

4              Mr. Fetherston?

11:32  5         PROBATION OFFICER:  That's correct, Judge.

6              THE COURT:  All right.  Anything else?

7              MR. KLEIN:  No, Your Honor.

8              THE COURT:  Thank you.

9              Mr. Proctor, Mr. Taibleson, any objection either as to

11:32  10   the facts or information in the revised presentence report?

11             MR. PROCTOR:  Not with regard to the facts, Your

12   Honor.

13             THE COURT:  Thank you.

14             That being the case and the Court having no

11:32  15   independent basis to challenge or otherwise disagree with any of

16   the facts or finding them to be lacking, the Court does herewith

17   adopt all of the facts as detailed in the numbered paragraphs of

18   the July 23rd revised presentence report, which now takes us to

19   the matter of the advisory sentencing guidelines applicable in

11:33  20   Mr. Hutchins' case.

21             As we are aware, the Probation Department has

22   submitted the following metric:  It includes a total offense

23   level of 11, criminal history category I which, in combination

24   with the offense level, carries a guideline term of imprisonment

11:33  25   of 8 to 14 months, followed by a term of at least 1 but not more

1    than 3 years of supervised release, a fine of not less than

2    $4,000, nor no more than $40,000, and, finally, a $100 special

3    assessment on each count or a total special assessment of $200.

4            Mr. Klein, do you and your client and your colleagues

11:34    5    accept that guideline metric as recommended by the Probation

6    Department?

7            MR. KLEIN:  Yes, Your Honor.

8            THE COURT:  Thank you.  Mr. Proctor and Mr. Taibleson,

9    I appreciate you submitted objections to the guideline

11:34   10    submission which are addressed in the July 23rd addendum.  Based

11    on the Probation Department's analysis, do you wish to be heard

12    further on the objections or do you accept the Probation

13    Department's calculations?

14            MR. PROCTOR:  Your Honor, since we have submitted a

11:34   15    lot of paper on this, I do want to just briefly address this

16    issue.

17            Our issue is with the calculation that results in no

18    assessment based on loss under 2B1.1.  And ultimately if the

19    Court wants to take this under 3553(a), I understand, but I do

11:35   20    want to just emphasize what the government's position is on

21    that.

22            There's really no argument here that the malware was

23    not deployed and that people were not harmed.  The argument is

24    that the government isn't able to identify specific individuals

11:35   25    who suffered due to the deployment of the malware.

1    And that's largely due here to the nature of the

2    offense and the defendant's actions.  There's a decentralized

3    aspect to this where the malware was sold to individuals, it

4    could be customized to them, and there was no real centralized

11:35  5    command and control infrastructure to go on.  It was distributed

6    around the world.

7    Further, the sales were conducted via encrypted

8    communications, personal messages.  Malware was designed to run

9    undetected.  They were sold -- these items were sold using

11:36  10   aliases, hiding the anonymity of the internet.  And there are

11   marketplaces where information that can be harvested using this

12   malware is then resold, which further adds layers in trying to

13   tie the specific items to the defendant's conduct.

14   So I submit that loss exists, but it's very difficult

11:36  15   to pin down in this case; therefore, we opted for a "gains

16   theory" as permitted under 2B1.1.  And to that end, we tried to

17   seek out sales records from the data that was available to us.

18   Two points on that.  One, we scraped the data from

19   Liberty Reserve databases, which is where and how the FBI had

11:36  20   purchased UPAS from the defendant and his accomplice, and that's

21   where the money went.  So we know that that account was used in

22   connection with the offense.

23   And we also used comments in the advertisements for

24   Kronos where commenters would say, *hey, I purchased this, this*

11:37  25   *aspect isn't working,* and Mr. Hutchins' accomplice would

1    response, you know, and somebody saying, *okay,* you know, *it will*
2    *be fixed.* Things like that that indicate purchases.

3          Now, in the -- in the PSR and in the addendum, the --
4    and in the objection, the defendant objected to the Liberty
5    Reserve numbers. There wasn't a specific objection to the
6    comments numbers, the numbers that we developed from the
7    comments section which showed 13 separate sales of Kronos. And
8    we knew the price of that based on what was advertised and what
9    the government had purchased it for, which is in the 2,000 to
10   $3,000 range.

11         So I stand by our numbers that we've submitted, which
12   I believe allows the Court to make a reasonable estimate of
13   gains in this case based on the conduct of the defendant and his
14   accomplice in selling the malware and we -- that's between 47
15   and $60,000. But even if we get rid of the Liberty Reserve
16   money that the defendant has objected to, we still are left with
17   about $26,000, if we base it on 13 sales at $2,000 per sale,
18   which still would give a -- an adjustment of four levels.

19         So, again, the government isn't ultimately
20   recommending a specific sentence here. If the Court wants to
21   take this all under 3553(a), I understand, but that's the
22   government's position.

23         Thank you, Your Honor.

24         THE COURT: All right, thank you.

25         Do counsel for Mr. Hutchins have anything more you'd

1    like to add beyond your submissions to the Probation Department?

2          MS. HOFMANN:  Your Honor, I would just like to briefly

3    respond to the government's points just now.

4          It's the government's burden to prove pecuniary loss

11:39   5    by a preponderance of the evidence.  And the probation office

6    has reviewed the evidence presented here by the government

7    before, and we agree with the probation office that this

8    evidence is just too speculative to establish any sort of

9    reasonable estimate of loss here.

11:39  10          We agree that there was some form of loss, but it's

11    impossible to quantify.  And the Liberty Reserve data simply is

12    a selection of transactions that are not clearly tied to any

13    particular activity that the government is guessing had to do

14    with sales of UPAS.

11:39  15          We simply agree with the probation office.  We think

16    that there is some loss here.  Certainly Mr. Hutchins and his

17    co-conspirator had some kind of gain, but we don't know what it

18    is, and we think that it simply doesn't justify an adjustment

19    for sentencing purposes.

11:40  20          THE COURT:  All right.  Anything further, Mr. Proctor?

21          MR. PROCTOR:  No, Judge.

22          THE COURT:  Well, fortunately, at least in this branch

23    of the court, this is only the second of these computer-related

24    cases that I've had before me.  And fortunately, or

11:40  25    unfortunately, the last one was almost a generation ago — Chad

1   Davis, 99-CR-183.  And Mr. Proctor's colleagues, Mr. Eric Klumb,

2   and I forget who the other assistant was, made similar arguments

3   because of an intrusion on a Department of Defense server.  And

4   there was some hard loss.  As I recall it was 7 or $8,000, much

11:41   5   less than what the government was seeking at sentencing.

6         And in Mr. Davis's case the guidelines, as I recall,

7   keeping in mind they were mandatory back then, called for a

8   sentence of 6 to 10 months.  And Mr. Davis, like Mr. Hutchins,

9   was, in the vernacular, what might be best described as a

11:41   10   youthful offender, but the conduct was a felony.

11         And the Court made the observation, now almost 20

12   years ago, that the real issue, and it's still prevalent in

13   today's world, and that is the matter of cybersecurity is an

14   incredibly challenging issue, even in today's world.  And the

11:42   15   protocols that are in place, as we know from both this set of

16   facts and the WannaCry debacle, that the protocols are really

17   woefully, woefully inadequate.  And we live in a world today

18   where security is everything, whether it's in finance, whether

19   it's in healthcare, whether it's in transportation, whether it's

11:42   20   in law enforcement, manufacturing, I mean, the list goes on and

21   on.

22         And obviously there's a body of talent out there in

23   the face and name of Marcus Hutchins who can be drawn upon to

24   bring this matter of cybersecurity within our reach so that we

11:43   25   don't see these cases, even though, generationally, different

10

1    years, different faces.

2            And so when it comes to the whole matter of loss or

3    gain, I think the thing that's most striking is the comparison

4    between UPAS and Kronos and WannaCry.  Because if one looks at

11:43    5    the loss and the number of infections — not hits, infections —

6    over 8 billion throughout the world with WannaCry and over

7    120 million alone with the UK.  And thankfully, because of

8    Mr. Hutchins' foresight and ability to put in place in a matter

9    of hours a kill switch, it makes -- the facts of the case that

11:44    10   is before the Court today virtually pale in comparison.  And we

11   need to keep in focus not only the sentencing guidelines, but

12   the societal interest as a whole in determining what ought to be

13   an appropriate, fair, just and reasonable sentence.

14           I dare say, had this case been prosecuted and the

11:45    15   WannaCry issue come up six months after Mr. Hutchins was

16   formally processed here in this district, this morning, soon to

17   be this afternoon, we'd be looking at a motion pursuant to U.S.

18   Sentencing Guideline 5K1.1 for a downward departure.

19           And the facts of this case are such, quite candidly,

11:45    20   that this investigation began two or three years before

21   Mr. Hutchins was actually arrested.  And obviously law

22   enforcement was totally unaware, because WannaCry hadn't even

23   been released much less kill-switched before Mr. Hutchins was

24   brought before the bar of justice.

11:46    25           So the Court has these overarching considerations, not

11

1    only the matter of the loss versus infections, versus hits,

2    versus the hard reality that there's a lot more to not only the

3    facts that underlie this case, but the facts that are associated

4    with the individual who is before the Court today for

5    sentencing.

6         And so I have no doubt, absolutely none, having spent

7    over 16 years of my career as an assistant U.S. attorney and the

8    U.S. attorney in this district, that the government coming

9    before the Court today with no recommendation on sentencing is

10   very thoughtful, but it telegraphs to the Court that they put

11   themselves in a corner by putting pedal to the metal for over

12   two years in litigating this case that perhaps in the bigger

13   picture with another set of facts and circumstances

14   undifferentiated from those that are before the Court, that this

15   case could have been resolved at least a year, 15 months ago,

16   but, unfortunately, it wasn't.

17        I appreciate the government is entitled to pursue the

18   case as it deems appropriate, but we're now beyond that point.

19   But the Court is still left with having to make the value

20   judgment on what the totality of the facts and circumstances

21   presented in terms of what is most appropriate that is fair,

22   just and reasonable in terms of sentencing.

23        And with all due respect to the matter of loss and the

24   matter of gain, I believe, at the end of the process, the

25   Probation Department got it right in their original submission,

12

1      and that is the revised presentence report, and they also got it

2      right in recommending that the government's objections on the

3      matter of loss and gain be overruled.  And that is the Court's

4      position.

11:48    5        Everyone has weighed in.  I haven't seen so much paper

6      in a particular sentencing -- and I'm not critical of anyone on

7      that matter, but we reach a point where a decision has to be

8      made and the Court has made its.  If the government believes

9      that the matter richly deserves more attention, they can

11:49   10      certainly appeal the Court's ruling with regard to these

11      guidelines.

12          All of this in the loss amount really is driven just

13      by how difficult these cases are, even in 2019.  They were just

14      as difficult in Mr. Chad Davis's case, as I said earlier, now

11:49   15      almost a generation ago.

16          So on the guidelines that are before the Court, the

17      Court is constrained to adopt the guidelines that the Probation

18      Department initially submitted and reaffirmed; that is:  A total

19      offense level of 11; criminal history category I; guideline term

11:50   20      of imprisonment of 8 to 14 months, followed by a term of at

21      least 1 but not more than 3 years of supervised release; fine of

22      not less than $4,000 nor no more than $4 million; and, finally,

23      a $200 special assessment.

24          Having made those determinations, counsel,

11:50   25      particularly Mr. Klein and your colleagues, do any of you have

13

1   any reason to advance, now late morning, as to why the Court

2   ought not proceed today with the imposition of sentence in this

3   case?

4   MR. KLEIN:  Your Honor, no.  I understand we'll have a

11:51   5   chance to make a few additional arguments to Your Honor.

6   THE COURT:  Certainly.  And the Court has reviewed the

7   lengthy sentencing memoranda that the government prepared, that

8   you prepared, that you've further submitted material on.  And I

9   would note, parenthetically, that many of these submissions were

11:51   10   made under seal.  And to the extent that counsel wish to draw

11   upon them beyond what is before the Court in writing, you're

12   either going to have to waive the sealing as to comments you

13   make or ask that the Court seal the courtroom during those

14   presentations that are drawn from sealed material.

11:51   15   So if you want to confer about that with Mr. Proctor

16   and Mr. Taibleson, feel free, and we can prepare accordingly.

17   (Counsel confer.)

18   MR. KLEIN:  Your Honor, thank you for giving us that

19   moment.

11:52   20   We spoke with Mr. Taibleson and Mr. Proctor, and we

21   will waive the sealing as to our comments.  There are things we

22   would still like to be kept under seal, and we will be discrete

23   and judicious in what we say.

24   THE COURT:  Certainly.  Well, you should appreciate

11:52   25   I've spent a lot of time reading the materials this week and

14

1    before.  And I appreciate the fact that this is the first time

2    that I have met your client.  He's had many encounters with the

3    magistrates and the Court has reviewed the magistrates'

4    recommendations on pretrial motions and ruled on those, but I

11:53    5    have not personally been introduced to your client until today.

6            MR. KLEIN:  We understand.  It is somewhat of a

7    strange process in that way, that you don't meet until you

8    sentence him.  He's here.

9            THE COURT:  Certainly.  To the extent, Mr. Klein and

11:53    10    Ms. Stierwalt and Ms. Hofmann, if you'd like to address the

11    Court individually and if Mr. Hutchins wishes to make some

12    comments, now is your opportunity.

13            MR. KLEIN:  Yes, Your Honor.  Thank you.  I'm going to

14    make a few short comments.  We did submit a substantial amount

11:54    15    of briefing and we appreciate your attention to it and thorough

16    reading of it.

17            And so what I'd like to start with is just

18    acknowledging some of the family and friends who are here today.

19            Marcus's mother and father are here from England.

11:54    20            Some of the friends whose letters are included in the

21    brief.  Tarah Wheeler is also here with her husband.  Another

22    friend, Tran.  They've flown here to support him.  We think they

23    represent a global community of people who support Mr. Hutchins,

24    and he will return from this to people who love and support him.

11:54    25            I want to address a couple points that the government

15

1    raised and I'll be as brief as I can be, Your Honor.  One thing

2    the government alludes to is that what Mr. Hutchins was doing

3    was his job.  His job was cybersecurity.

4         He did work for Kryptos Logic, but on that day with

11:55    5    WannaCry he was doing more than his job.  He was actually on

6    vacation.  And his job, as the head of Threatened Intelligence

7    at Kryptos Logic, was in helping identifying malware, but not

8    ransomware.  WannaCry is ransomware.

9         So the companies that employed and hired Kryptos Logic

11:55    10    were not hiring him to do what he did that day.  He was running

11    around town on vacation, heard about this, and came back and

12    saved the world.

13         And I think that's an important point.  Of course, if

14    he was even doing his job, he should still be lauded.  If a

11:55    15    firefighter saves not just one building but the world from

16    burning down, they're going to be lauded.  And that's what

17    happened that day.

18         A couple other points.  As a foreigner, Mr. Hutchins

19    is not eligible to some of the benefits if he was sentenced to

11:55    20    prison that a U.S. citizen would get, including the right to be

21    released to a halfway house or be on home detention.  One of the

22    reasons we're asking for probation, which I know Your Honor is

23    aware of.

24         The government raises a bunch of points about

11:56    25    deterrence.  And I would think there is no disagreement with

16

1    anybody here in this courtroom that Mr. Hutchins does not need

2    specific deterrence.  He is not going to commit these crimes

3    again.  He already is way past that in his life.

4         As for the argument of general deterrence, I would

11:56   5    just note that is one of the many 3553(a) factors.  And it's not

6    the only one, of course and you consider it with all the other

7    ones including his -- who he is.

8         I would note that he has spent two years caught up in

9    this legal system.  He accepts responsibility for his actions.

11:56   10   He's not trying to make excuses.  This process played out the

11   way it did.  But he has already suffered, frankly, somewhat

12   greatly.  He's been pulled away from his job, the thing he cares

13   about.  He's had to live in a foreign country.  He's been

14   separated from his family and friends.  He will return to the UK

11:57   15   as a felon.  Now, he won't lose the benefits that a felon here

16   would lose who is a citizen, but it will, for the rest of his

17   life, follow him around.  And so I think Your Honor should keep

18   that in mind when you consider general deterrence.

19        A couple other brief points.  The government's

11:57   20   sentencing position spends seven pages talking about this crime.

21   We don't dispute any of that.  They spent one page talking about

22   Mr. Hutchins.  That should be reversed, Your Honor.

23        As you indicated at the start of your comments,

24   security is everything.  That is a motto that Mr. Hutchins lives

11:57   25   by too.  And I think that Your Honor is not giving that short

17

1   shrift based on your introductory remarks already.

2           And, just briefly, by looking at the last -- how the

3   government chooses to end its sentencing position, which is

4   talking about, again, focusing on deterrence.  And it states on

11:58   5   page 12 of its brief, "... but this does not permit him or

6   anyone else to pretend his criminal conduct was insignificant."

7           Mr. Hutchins does not pretend it's insignificant.  His

8   life shows that.  What he's done shows that.  And that would not

9   be the message he'd want anyone else to have either.

11:58   10          The government then goes on to say, "Like a man who

11  spent years robbing banks, and then one day came to realize that

12  was wrong, and even worked to design better security systems, he

13  deserves credit for his epiphany."

14          We agree.  "But he still bears responsibility for what

11:58   15  he did."  We don't disagree, but I would want to talk for a

16  moment about that analogy.

17          Mr. Hutchins is not a bank robber.  There was no

18  violence.  He was not -- he was youthful, as Your Honor

19  indicated.  That analogy is far from perfect.  He was most akin

11:59   20  to someone in his youth who created lock picks to help people

21  rob banks.  And we're not downplaying that.  That's a serious

22  crime too.

23          But, when you think about that, someone who creates

24  lock picks to help people rob banks and we can't identify what

11:59   25  banks they robbed or if they got any money or -- we know there

18

1    were more than 10, we don't dispute that, but when they say *and*

2    *then worked to design a better security system,* that's not what

3    Mr. Hutchins did.  He didn't work just to design a better

4    security system, he worked to stop bank robberies.  And he

11:59    5    stopped a lot of bank robberies, Your Honor.  I think you know

6    that from our briefing.  And I think when you focus on that for

7    a moment, he stopped the world's biggest bank robbery.  A rogue

8    nation set out in May 2017 to shut down the world, and he

9    stopped it.  He deserves credit for that, and I think Your Honor

12:00    10    is giving him credit for that.

11    It's been a real privilege to represent him.  And with

12    that, I'm done.

13    THE COURT:  All right, thank you.  Do your colleagues

14    wish to add any comments, Mr. Klein?

12:00    15    MR. KLEIN:  No, Your Honor.  I think Mr. Hutchins has

16    a statement if this is the time.

17    THE COURT:  Certainly.

18    MS. HOFMANN:  Your Honor, I have a copy of it if you

19    would like to follow along.  May I approach?

12:00    20    THE COURT:  Certainly.

21    (Brief pause.)

22    THE DEFENDANT:  Your Honor, when I was a teenager, I

23    made a series of bad decisions which led me to being involved in

24    writing and selling malware over a period of some years.

12:01    25    I deeply regret my conduct, the crimes in which I was

19

1    involved, and the harm which resulted from the code I had

2    written.  I eventually discontinued my involvement in creating

3    malware, but I wish I could go back and undo all the damage I

4    had caused.

12:01    5    I now work in cybersecurity, focusing mostly on

6    tracking and stopping the same kinds of malware that I was once

7    involved in.  As a hobby, I also liked to create educational

8    content, teaching people about malware in the context of

9    detecting and preventing it.  I do this in the hope that I can

12:01    10    steer people away from the path in which I once took, even

11    before people knew of my mistakes.

12    Throughout the process of this case, I have not only

13    had to face my past, but reflect on the harm caused by the

14    malware I once developed, some which I was not even aware of.

12:02    15    The future reinforces that I have no intention to go back to

16    that life.  My plan is to continue my work in security, but if

17    possible I would like to dedicate more time to teaching the next

18    generation of security experts.

19    Finally, I'd like to apologize to the victims of the

12:02    20    malware I developed, the colleagues and acquaintances who felt

21    betrayed upon learning of my past, my friends, and most

22    importantly my family who have endured much financial and

23    emotional stress as the result of me being arrested in a foreign

24    country.

12:02    25    Thank you for taking the time to listen to this.

1          THE COURT:  Thank you, Mr. Hutchins.

2          Anyone else like to speak this afternoon on behalf of

3    Mr. Hutchins?

4          MR. KLEIN:  No, Your Honor.

12:03  5          THE COURT:  Thank you.

6          Mr. Proctor, Mr. Taibleson, do you have some thoughts

7    you'd like to add?

8          MR. PROCTOR:  Thank you, Your Honor.

9          We do have a unique case here, Your Honor.  We have a

12:03 10    serious offense, and we also have some very unique positive

11    attributes associated with the defendant.  WannaCry was a big

12    deal.  No doubt about it.   And I'll talk a little bit more

13    about that in a bit.  But I want to talk about why the

14    government considers this offense particularly serious.

12:03 15          The development of malware can be a lucrative and

16    prestigious business for those who want to get into it and then

17    they feel safe hiding around the world through the anonymity of

18    the internet.  And these are crimes that affect everyone, either

19    through personal victimization, or through increased costs

12:04 20    associated with remedying the victimization of others, or

21    through dedication of more resources continually toward

22    cybersecurity.

23          Now, the banking trojans that Mr. Hutchins created had

24    one purpose, and that was to make it easy for others to steal

12:04 25    personal information, specifically banking credentials, which

1      can be used to steal identities and drain life savings.

2              Malware is designed to secretly record all the

3      keystrokes on the victim's computer, steal log-in credentials,

4      for any type of business, email, social media accounts, and

12:04   5      basically allow a takeover of the victim's computer.

6              Now, the parties agree that this malware, particularly

7      Kronos, was used to infect computers around the world and this

8      is further shown through some of the reports and studies

9      included in our memo.

12:04   10             Reports of Kronos infections go back to 2014, the year

11     that Mr. Hutchins and an accomplice were first observed selling

12     that product, advertising it.  They continued through 2015 and

13     2016.  And Mr. Hutchins bears some responsibility for the

14     fallout associated with this malware, and I appreciate his

12:05   15     comments today where he does take such responsibility.

16             I know in the defendant's submissions to the Court,

17     they take issue with some of the facts and figures showing the

18     impact that Kronos has had in terms of how many alerts have been

19     raised.  The government's numbers on that are sound.  We're not

12:05   20     pulling them from the wind.  They come from leading

21     cybersecurity firms who implement protocols to limit false

22     positives which are just a reality of this type of research.

23     And that data is relied on with confidence by researchers,

24     businesses and governments in assessing cybersecurity threats.

12:06   25             Moreover, just because an alert may reflect an

22

1      interception of Kronos, that doesn't mean there can be no

2      infection as argued by the defendant.  Successful interceptions

3      require the most up-to-date cybersecurity protections, and

4      that's hardly uniform across all computer users.  Indeed that

12:06  5      malware is only effective if it actually infects computers.

6      Attackers, therefore, get their product tested and altered

7      through crypting in order to beat back these type of

8      protections.

9              Now, our data shows that there have been over 200

12:07  10     variants of Kronos spanning from 2014 to 2019.  And one way that

11     those variants are created is through crypting, as I mentioned,

12     and that was a service offered by the defendant and his

13     accomplice.  And each of those variants can impact countless

14     computers.

12:07  15             In the end, what the data shows is that attackers have

16     been using and continue to use the products developed by

17     Mr. Hutchins to steal information from victim computers.  Now,

18     was it the most prolific thing out there?  No.  But it's

19     maintained a constant presence since 2014, activity rising and

12:07  20     falling at times, affecting all sectors of the economy, in the

21     U.S. and in other countries.

22             Now, switching gears a bit to the defendant himself.

23     We agree with the defense that there are many, many positive

24     attributes for the Court to consider.  We agree that

12:08  25     Mr. Hutchins was young when he committed this offense.  Though,

23

1    this isn't an excuse, he did know right from wrong, and he

2    continued his criminal conduct for several years.  But, it's not

3    uncommon for young people to make a poor decision and then come

4    to realize it later and make different decisions.

12:08    5        That's here.  Mr. Hutchins has generally -- genuinely

6    left his criminal path behind him.  And I've read the many

7    letters submitted by the defense, from Mr. Hutchins' friends,

8    his family, his coworkers and acquaintances.  They're very

9    moving letters and they do show the positive impact he's had on

12:08    10   many lives.

11        And again, his role in stopping WannaCry, it was a

12   major event.  He rightly deserves the credit and notoriety he's

13   received for helping to stop what was on track to be an

14   unbelievable cyber disaster.

12:08    15       And he's accepted responsibility, he's entered a

16   guilty plea, and he's expressed remorse for his criminal

17   conduct.  All of that is to his credit.

18        Your Honor, in the end we have a serious offense, one

19   in which the defendant tried to make money for himself, making

12:09    20   it easy for other people to victimize and steal information from

21   others.  He knew what he was doing.  He did it without concern

22   for the lives that would be ruined.  And once that genie came

23   out of the bottle, it can't be put back in.  It's still out

24   there.  Variations of it are still being used today.  And, on

12:09    25   the other hand, we have a very unique individual with very

24

1    significant positive contributions to our society.  And per the

2    terms of the plea agreement, we aren't recommending a specific

3    sentence.  We defer to the judgment of Your Honor in balancing

4    all these factors.

12:09    5        Thank you.

6        THE COURT:  Thank you, Mr. Proctor.

7        Anything further that the defense would like to either

8    comment on or submit?

9        MR. KLEIN:  Your Honor, we addressed our response in

12:10    10    all our briefing.  I don't think we have anything else to say.

11    I think we've thoroughly addressed all those issues and our

12    feelings on the government's loss numbers and claim number of

13    victims beyond 10.

14        Unless you have specific questions of us about that, I

12:10    15    think we've addressed those.

16        THE COURT:  All right, thank you.

17        Well, Mr. Hutchins, the judge that you are before

18    today recently passed his 32nd anniversary as an Article III

19    district judge.  You're pretty close to being number 2200 of the

12:10    20    defendants that I have sentenced over the last 32 years.  Each

21    and every case is different, and your case is just as unique as

22    most unique cases that come before the Court.  And, frankly, all

23    of that makes the job that His Honor has so interesting, because

24    we see all sides of the human existence, both young, old, career

12:11    25    criminals, those like yourself who may have strayed from what we

25

1  would expect not only in your homeland in England, but here in

2  these United States.

3  And I appreciate the fact that one might view the

4  ignoble conduct that underlies this case as against the backdrop

12:12  5  of what some have described as the work of a hero, a true hero.

6  And that is, at the end of the day, what gives this case in

7  particular its incredible uniqueness.

8  It is very difficult, even in the context of

9  sentencing guidelines, to begin to put together a mosaic that

12:12  10  would ultimately lead to what has been described in the

11  submissions as a fair, just, and reasonable sentence that is one

12  that is sufficient, but not greater than necessary to achieve

13  the goals of sentencing.

14  And there are many, many facets, not only of you and

12:12  15  your personality, but many facets of the core conduct of this

16  case versus what occurred with the matter of WannaCry.

17  And then there is the other ingredient that not a lot

18  of attention has been spent on because it's one of those

19  unquantifiables, other than the core fact, and that is, you have

12:13  20  been away from your family and your homeland for over two years.

21  And there's something to be said for basically being, for lack

22  of a better description, caught up in the legal morass that

23  attends a very, very complicated set of facts and circumstances

24  that have international, indeed global implications.

12:14  25  And while this case may have taken a different

26

1    trajectory with different hands at the tiller as it were early

2    on, we then can't regenerate the course of what occurred once

3    this case was submitted and filed.  Just like the return of the

4    superseding indictment.  These are matters over which the Court

12:14    5    has no direct control except that there are consequences that

6    flow from them, both for the government as well as the defense.

7    And I am not sure, from even a review of the plea agreement or

8    of the history of this case, precisely what it was that lead to

9    your decision to resolve the case in the manner in which it's

12:15    10    been resolved.

11         To be sure, again, against the backdrop of more than

12    16 years as a prosecutor, it is fair, reasonable and

13    appropriate, and we're now at the final chapter of what ought to

14    be the ultimate disposition.

12:15    15         And as everyone associated with this case is so well

16    aware, and as so well aware is the judge, this case has a series

17    of complex interfaces that require a bit of distillation,

18    particularly against the backdrop of the 3553(a)(2) factors that

19    the Court must draw upon in imposing an appropriate sentence.

12:15    20    Because, unlike Mr. Chad Davis, the guidelines in this case,

21    whatever they be, whether they be the government's suggestion of

22    more than 20-month sentence or those that the Court has adopted

23    from the Probation Department, they're advisory.  They are not

24    mandatory.  Just like there is no mandatory minimum sentence

12:16    25    associated with this case.

27

1          Perhaps in the context of WannaCry, if you were the

2   defendant in the WannaCry case with over 8 billion infections

3   and humongous losses, there perhaps should be a minimum

4   mandatory sentence.  But the reality is, those that are

12:16   5   perpetrating these massive intrusions as they have been

6   described, are not typically anywhere near these United States

7   given the reality that the internet is accessible worldwide.

8          And then you add all of the layers of the deep down

9   under in which these communications and malware and ransomware

12:17   10   are launched, it's very, very difficult for law enforcement to

11   access them until such time as the effects are widespread and

12   known.

13          And more here in these United States, there have been

14   millions of individuals whose credit ratings have been affected

12:17   15   as a result of hacking of systems, whether it be at Target or

16   other retailers or credit card providers, et cetera, et cetera.

17   And it's going to take individuals like yourself who have the

18   skillset, even at the tender age of 24 or 25, to come up with

19   solutions, because that is the only way we are going to

12:18   20   eliminate this entire subject of, as the Court described it

21   earlier, the woefully inadequate security protocols that are in

22   place for our entire panoply of information technology systems.

23   Whether it's individual computers or servers or networks or

24   websites, they're all caught up in the same milieu of inadequate

12:18   25   security.

28

1           And it is very much like our individual security.

2      Keeping in mind whether it's Judge Stadtmueller leaving the

3      courthouse, we are not cloaked with or embosomed in security

4      that we are not subject to whether it's being assaulted or shot

12:19  5      at or what have you.

6           These instrumentalities, although we are talking about

7      cybersecurity, are prevalent in so much of everyday life that we

8      endure as a society.  And it only occurs the right way when

9      well-intentioned people respect the rights of others.  Whether

12:19  10     it's their personal security, whether it's their financial

11     security, whether it is their computer security, their home

12     security, their children's security, the list just goes on and

13     on and on.

14          And so you can begin to appreciate in the parlance of

12:20  15     sentencing just how serious this sort of conduct if fully

16     implemented can be because it's so devastating and it's

17     uncontrollable particularly when you don't know where it is

18     coming from.  That is the real conundrum when it comes to

19     security.  We know there's a potential, but until you know where

12:20  20     it is coming from it is very, very difficult to intercept and

21     take remedial action.

22          There's also the component of deterrence.  And this

23     has been discussed extensively throughout, as well as respect

24     for the law.  I quite agree with your approach and that of your

12:21  25     counsel that this is not a matter that ought to be of primary

29

1   concern of this court, because you turned the corner, if you

2   will, before being arrested in connection with the matter before

3   the Court.  I appreciate the investigation started years before.

4   But in terms of your actual appearance before the bar of

12:21   5   justice, it occurred after you turned the corner.

6   Now, on the one hand that makes you a hero.  On the

7   other hand, it doesn't totally wipe out the ignobility of the

8   conduct that serves as the predicate for the Court's sentence

9   today.  But it's certainly to your credit that, without any

12:22   10   encouragement, working for an FBI agent or security in England

11   that you stepped up to the plate without any expectation either

12   of notoriety or consideration for potential charges stemming

13   from UPAS or Kronos.  So all that is to your credit.

14   Just as it is important for the Court to keep in mind

12:22   15   the relative age and the relative culpability, if you will, of a

16   young person who may not have matured to the point of being

17   able, at the end of the day, to exercise what parents would say,

18   good judgment.  Good judgment is everything.  And without good

19   judgment you could be 140 IQ and have all the requisite talent

12:23   20   to do great things.  But commensurate with all of the ability to

21   do those great things, as has been exhibited in this case, is

22   the ability to, along the way, to acquire that most important of

23   traits, and that is the exercise of good judgment.

24   There is no question, in looking at you and your

12:23   25   background, that in a very, very poignant way you have chosen to

30

1    be more of an introvert as opposed to extrovert.  And you have

2    been very circumspect in selecting friends who for the most part

3    are on the same page as Marcus Hutchins, that is, wanting to do

4    the right thing at all times and be guided by a set of

12:24    5    principles and morals that keep you on the straight and narrow

6    such that you would never find yourself in front of a court,

7    particularly in the context of being a defendant in a criminal

8    prosecution.

9          So all of that, too, weighs very considerably in the

12:24    10   Court's determination today as to what the ultimate sentence

11   ought to be.

12         Yes, there is the matter of deterrence.  It's

13   important generally.  Because, as we all know, and why it is

14   that it is so incredibly important that as a society we continue

12:25    15   to aggressively deal with cybersecurity issues because it has

16   become such an integral part of our society.  And if we don't

17   take the appropriate steps to protect the security of these

18   wonderful technologies that we rely upon each and every day, it

19   has all the potential, as your parents know from your mom's

12:25    20   work, to raise incredible havoc in the workplace, whether it's

21   hospital care, whether it's transportation systems, whether it's

22   the matter of manufacturing or financial or just communication

23   generally.  Just think about what we would be doing today if we

24   didn't have computers or cell phones or tablets.  It has totally

12:26    25   eclipsed the way of life, whether it's here in these United

31

1    States or the world.

2          So, all of those components are very much part and

3    parcel of the Court's analysis this afternoon as to reaching

4    this question of ultimately what ought to be a fair, just and

12:26  5    reasonable sentence.

6          There is no question that for you personally, had you

7    become aware of the work that might be available to you, whether

8    here in the United States or England with a firm such as Kryptos

9    Logic, you may never have ventured into what brings all of us to

12:27  10    this courtroom today.

11          Keeping in mind, there is no limit, as we know from

12    many, many who have labored long and hard in technology, that

13    putting the effort into that which brings positive results

14    carries with it not only the adulation of being recognized, but

12:27  15    the rewards that far transcend the matter of adulation or

16    financial success.

17          And you have all of those potentials in a very, very

18    unique way.  Whether you will be able to exercise any of that in

19    the future back in these United States, I guess is a bit of an

12:28  20    open question given the fact that the sentence that the Court

21    imposes today may, at the end of the day, preclude your coming

22    back to the United States in the absence of either a waiver

23    because of your unique skillset, or potentially a pardon for the

24    conduct that underlies the case.

12:28  25          And while the Court has no pardon power, that is a

1    matter that is reserved to the Executive Branch of government.

2    And what the protocols are for that, given the totality of the

3    facts and circumstances in this case, is truly left for another

4    day, another person, another administrative body within the U.S.

5    Department of Justice and the Executive Branch to make the value

6    judgment call on.  But it's certainly something that ought not

7    go unnoticed, particularly against the backdrop of what occurred

8    and your efforts with regard to WannaCry and what might lie

9    ahead in terms of your future abilities, whether back in England

10   or worldwide, to deal with the nettlesome issues that the Court

11   has addressed more than once today.

12        In terms of protecting the public from other criminal

13   conduct, again, I hearken back to what is already self-evident

14   in the old adage of *that which is obvious need not necessarily*

15   *be restated,* but it's certainly worth emphasizing that Marcus

16   Hutchins turned the corner with regard to any further conduct

17   that would be remotely connected to what led to the charges in

18   this case ever occurring again.  There are just too many

19   positives on the other side of the ledger, whether they be

20   academic, whether they be financial, whether they be rewards of

21   a wholly different type, but they're all there.

22        So we reach a point in balancing all of these

23   considerations and, at the end of the process, the Court is left

24   to make the final call as to what ought to be an appropriate

25   sentence.

12:29
12:29
12:30
12:30
12:31

1          And the final call in the case of Marcus Hutchins

2     today is a sentence of time served, with a one-year period of

3     supervised release.

4          I don't know whether the supervised release in this

12:31  5     case is ultimately going to be viewed as academic because we

6     don't know, as of Friday, July 26, 2019, what lies ahead in

7     terms of Mr. Hutchins' ability to continue to reside or work in

8     the United States.  But in order to ensure that there be some

9     follow-on with regard to supervision, my staff have prepared a

12:32  10    series of 14 conditions of supervised release and I'm going to

11    circulate those to counsel.  And if you would be so kind,

12    Mr. Klein and Ms. Hofmann, to review those with your client, and

13    suggest any changes from either you or the government.

14         THE DEFENDANT:  Thank you, Your Honor.

12:32  15         (Brief pause.)

16         MR. KLEIN:  Your Honor, we've reviewed the

17    conditions -- proposed conditions.  We just have two small

18    comments?

19         THE COURT:  Certainly.

12:34  20         MR. KLEIN:  Nos. 12 and 13.  Mr. Hutchins plans to

21    return home.  I assume that's contemplated in that type of

22    instruction.  He just needs to tell his probation officer he's

23    going to fly home.

24         THE COURT:  Certainly.  There is nothing further after

12:35  25    today that requires that he stay here.  There may be an issue

1    getting his passport back so he can depart and be allowed back

2    into England.

3              MR. KLEIN:  And then no. 13, Your Honor, he doesn't

4    have plans for that, but I just think it should be clear that

12:35  5    it's limited to the United States.  He'll be back in England.  I

6    don't know what's going to happen and he has no plans, but I

7    think it should be clear that it's U.S. law enforcement.

8              THE COURT:  Certainly.  That's certainly agreeable

9    with the Court.

12:35  10             Mr. Proctor?

11             MR. PROCTOR:  No objections, Your Honor.

12             THE COURT:  Mr. Fetherston, can you advise everyone

13   what the process will be to allow Mr. Hutchins to leave and how

14   soon?

12:35  15             PROBATION OFFICER:  At this point, Your Honor, I would

16   recommend that the supervised release be allowed to commence in

17   the Central District of California.  That'll allow the defendant

18   to return there.  At that point he can seek to have his passport

19   returned to him from the Pretrial Services office.  He may

12:36  20   already be in possession of it today in order to have traveled

21   here.  At that point, it's up to him when he makes arrangements

22   for travel.  His supervision time will continue to run until it

23   expires in one year from today's date.

24             THE COURT:  Mr. Klein, do you have any thought on what

12:36  25   the timeline may be to depart?

1          MR. KLEIN:  I know he wants to return back to Los

2     Angeles and get his stuff in order and return home.  I don't

3     know how quickly he'll be able to do that, but he does plan to

4     return home relatively quickly.

12:36  5          THE COURT:  All right.  Well, the judgment and

6     commitment order will reflect that the Court will designate the

7     Central District of California as to the place that he is to

8     report.

9          Obviously given today is a Friday, the earliest would

12:37  10    be on Monday.  Mr. Fetherston can notify his counterparts in

11    Los Angeles of the sentence that the Court has imposed today.

12    I'm not sure whether it will be processed fully today.  I'm

13    certain that the court will get it out on Monday morning.  And

14    once they receive it and if he notifies them that he is going to

12:37  15    make arrangements to return to England, he'll have to be

16    processed there because he will be subject to their jurisdiction

17    as long as he remains in the U.S.  There's nothing about the

18    Court's judgment or sentence that require that he remain in the

19    United States.

12:38  20          And what I'm seeking to avoid is that he be allowed to

21    return on his own and not be taken into custody by Immigration

22    and Customs.

23          MR. KLEIN:  His plan is to return on his own,

24    Your Honor, yes.

12:38  25          THE COURT:  No, I understand that's what he would

36

1    like, but we don't need any more publicity about this and having

2    another statistic.  That's my point.

3            MR. KLEIN:  We appreciate that, Your Honor.

4            THE COURT:  So for all of the reasons that the Court

12:38  5    has discussed with the input of counsel, this now becomes the

6    formal sentence of the Court:

7            Marcus Hutchins, on May 2nd of this year you entered a

8    plea of guilty and were adjudged guilty both as to

9    Counts 1 and 2 of the underlying superseding indictment, Count 1

12:39  10    charging a violation of Title 18 § 371, and Count 2 charging a

11    violation of Title 18 § 2512(c)(i), and 2.

12            The Court having asked the defendant why judgment

13    should not now be pronounced and pursuant to the Sentencing

14    Reform Act of 1984, it is the judgment of the Court that you,

12:39  15    Marcus Hutchins, be committed to the custody of the Bureau of

16    Prisons to be imprisoned for a period of time served as to each

17    of Counts 1 and 2, to operate to run concurrent with one another

18    for a total sentence of time served.

19            The Court further determines that the defendant does

12:40  20    not have the financial ability to pay any fine and accordingly

21    waives any fine in his case.

22            Upon release from imprisonment he shall be placed on

23    supervised release for a term of one year, subject to each of

24    the 14 conditions, two of which were modified, until such time

12:40  25    as he departs from the United States.

1    He will be released to the Central District of

2  California where he is to report on Monday, July 29th to that

3  office to receive further instructions, as well as disclose his

4  travel plans to return to his native country.

12:40   5    In accordance with the terms of the Mandatory Victims

6  Restitution Act of 1996, as provided for in 18 U.S.C. § 3013,

7  the Court is obliged to impose a special assessment in the

8  amount of $100 as to each count of conviction for a total

9  special assessment of $200, which is due and payable immediately

12:41  10  at the Office of the Clerk of the Court, which is located in

11  Room 362 of this building.

12    In addition, pursuant to the terms of the plea

13  agreement the offenses charged in Counts 3 through 10 inclusive

14  of the superseding indictment will stand dismissed.

12:41  15    Having entered pleas of guilty to the conduct charged

16  in Counts 1 and 2 of the superseding indictment, and the Court

17  having imposed today what it believed to be an appropriate,

18  fair, just and reasonable sentence that is one that is

19  sufficient but not greater than necessary to achieve the goals

12:42  20  of sentencing, I now advise Mr. Hutchins that if he believes the

21  guilty pleas he earlier entered were either involuntary or

22  contrary to law, or that the Court imposed a sentence today that

23  is contrary to law, I now advise him of his right of appeal.

24    Should you elect to appeal, Mr. Hutchins, Mr. Klein

12:42  25  and Ms. Hofmann are obliged to file a notice of appeal on your

38

1    behalf within 14 days of the docketing of the judgment and

2    commitment order, otherwise you will have effectively waived any

3    right of appeal.

4         If you are unable to pay the cost of an appeal you do

12:42  5    have the right to seek relief to appeal in forma pauperis.

6         And as you are aware, Counsel, pursuant to the

7    teachings of the U.S. Supreme Court in *Rowe vs. Flores-Ortega*

8    decided in February of 2000, you have an obligation to confer

9    with your client as to the merit of any appeal and be guided by

12:43  10   any request that he may make of you in that regard.

11        In the event he elects to forego any appeal, I would

12   invite you as his counsel to formally notify the Court, whether

13   by pleading or letter, indicating that you have discussed with

14   your client his right of appeal and that he has elected to

12:43  15   forego such an appeal.

16        In addition to the communication, whether it be a

17   notice or a letter, I would also ask that you have your client

18   sign that communication acknowledging having been advised of his

19   right of appeal and that he has elected to forego such an

12:43  20   appeal.

21        Are there any other matters that the Court need

22   address, Mr. Klein or Mr. Proctor?

23             MR. PROCTOR:  Not from the United States.

24             MR. KLEIN:  None from the defense, Your Honor.

12:43  25             THE COURT:  Very well.  The Court stands in recess.

39

1          THE BAILIFF:  All rise.

2          (Proceedings concluded at 12:44 p.m.)

3                          *     *     *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter for the United States District Court for the Eastern
District of Wisconsin, do hereby certify that the foregoing
pages are a true and accurate transcription of my original
machine shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

Signed and Certified August 1, 2019.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 324,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM